# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PLANNED PARENTHOOD OF GREATER NEW YORK, 26 Bleecker Street New York, NY 10012 | ) ) ) ) ) | **Civil Action No. 25-cv-2453** |
| PLANNED PARENTHOOD CALIFORNIA CENTRAL COAST, 518 Garden Street Santa Barbara, CA 93101 | ) ) ) ) ) | |
| PLANNED PARENTHOOD OF THE HEARTLAND, INC. 818 5th Avenue Des Moines, IA 50309 | ) ) ) ) ) | |
| *Plaintiffs*, v. | ) ) ) | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue SW Washington, DC 20201 | ) ) ) ) ) | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services, 200 Independence Avenue SW Washington, DC 20201 | ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) ) ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     This case challenges the U.S. Department of Health and Human Services' (HHS) unlawful imposition of sweeping new requirements on grantees under Tier 1 of the Teen Pregnancy Prevention (TPP) Program, a successful evidence-based public health initiative intended to reduce unintended teen pregnancy and associated risk factors. Plaintiffs—three nonprofits that receive funding from the Tier 1 program to provide sexual education programs across the country—bring this action to challenge Defendants' unlawful attempts to rewrite the TPP Program's requirements in ways that would fundamentally undermine the program.

2.     The same day HHS approved Plaintiffs' continued funding through June 2026, HHS published the *OASH Teen Pregnancy Prevention Program Policy Notice* (Program Mandate), which upended the statutory framework governing the TPP Program by conditioning continued access to funding on compliance with harmful mandates that are contrary to law, and that directly contravene the TPP Program's purpose—to provide effective, medically accurate programming to reduce teen pregnancy and associated health risks.

3.     HHS's actions represent a pattern of agency overreach that threatens to gut a successful, bipartisan, evidence-based public health program. Through these agency actions, HHS has imposed novel and undefined requirements, including that grantees "align" their programs with all current Presidential Executive Orders—regardless of relevance, legality, or scientific validity—and introduce a host of additional content-based restrictions that are vague, unrelated to the purpose of and fundamentally incompatible with the statutory mandate Congress established for the TPP Program.

4.     HHS's unlawful new Program Mandate threatens grantees that fail to comply with its requirements with suspension, termination, and other consequences including the claw-back of

already allocated funds. But these new programmatic requirements are not only unlawful, they are also unworkable. They force grantees to guess how the agency will enforce a requirement mandating "alignment," to censor medically accurate and inclusive content, and to abandon programming that has already been rigorously evaluated and approved by HHS itself.

5.      Plaintiffs seek declaratory and injunctive relief on both administrative law and constitutional grounds—to preserve the integrity of the TPP Program, to protect the communities they serve, and to ensure that federal funding decisions are made based on law and science.

6.      HHS's actions are unlawful and dangerous. They jeopardize years of progress in reducing teen pregnancy and sexually transmitted infections, particularly among underserved communities. They force grantees to choose between compromising their missions or losing critical funding. And they send a chilling message: that evidence, expertise, and equity can be discarded in favor of ideology.

7.      This Court should not allow it. Plaintiffs respectfully ask the Court to enjoin the enforcement of the Program Mandate, declare it unlawful, and, in doing so, preserve the ability of Plaintiffs to continue delivering the high-quality, evidence-based programming that Congress intended the TPP Program to support.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 704-06.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant resides in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

10.      **Plaintiff Planned Parenthood of Greater New York (PPGNY)** is a not-for-profit corporation organized under the laws of New York. PPGNY provides high-quality, affordable, evidence-based sexual health care and education throughout New York. PPGNY was awarded a five-year TPP grant in June 2023. PPGNY's request for year three funding was approved on July 2, 2025.

11.      **Plaintiff Planned Parenthood California Central Coast (PPCCC)** is a not-for-profit corporation organized under the laws of California. PPCCC provides high-quality, affordable, evidence-based sexual health care and education in three counties along the Central Coast of California. PPCCC's mission is to improve its communities' sexual health outcomes through healthcare, education, and advocacy. PPCCC was awarded a five-year TPP grant in June 2023. PPCCC's request for year three funding was approved on July 2, 2025.

12.      **Plaintiff Planned Parenthood of the Heartland (PPH)** is a not-for-profit organization organized under the laws of Minnesota. PPH provides high-quality, affordable, evidence-based sexual health care and education throughout Iowa, Minnesota, Nebraska, North Dakota, and South Dakota. PPH's mission is to provide, promote, and protect reproductive and sexual health through high quality care, education, and advocacy. PPH was awarded a five-year TPP grant in June 2023. PPH's request for for year three funding was approved on July 2, 2025.

13.     **Defendant HHS** is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551(1). HHS is the federal agency responsible for awarding and administering funds under the TPP Program. Since 2019, the Office of Population Affairs, within the Department of Health and Human Services, has administered the TPP Program.

14.     **Defendant Robert F. Kennedy, Jr.** is Secretary of HHS and is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A. Teenage Pregnancy in the United States

15.     While unintended teenage pregnancy rates in the United States have steadily decreased since the 1960s, teenage pregnancy continues to be a "significant public health concern" in this country "because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society."[1]

16.     At the time Congress passed the TPP Program, "teen childbearing in the U.S. cost[] taxpayers (federal, state, and local) at least $9.4 billion annually."[2] These costs included direct costs of supporting perinatal and infant healthcare as well as costs related to public assistance, foster care, and other services needed by teen parents and their children.

---

[1] Alexandria K. Mickler & Jessica Tollestrup, Cong. Rsrch. Serv., R45184, *Teen Births in the United States: Overview and Recent Trends*, at 1 (2025), https://www.congress.gov/crs-product/R45184.
[2] OAH, HHS, *Results from the OAH Teen Pregnancy Prevention Program*, https://opa.hhs.gov/sites/default/files/2020-07/tpp-results-factsheet.pdf.

17.     Public health organizations, including the Centers for Disease Control and Prevention, agree that reducing unintended teenage pregnancy and preventing sexually transmitted infections (STIs) is in the best interest of not only teenagers, but society as a whole.[3]

18.     Since the 1980s, Congress has authorized—and HHS has administered—programs with a focus on adolescent pregnancy prevention.[4]

**B. The TPP Program**

19.     In 2009, Congress created the TPP Program to fund a wide array of evidence-based, scientifically rigorous approaches to combating unintended teen pregnancy and additional evaluation and development of evidence-based programs.[5] Congress designed the TPP Program "to create evidence-based social policy initiatives to improve policymaking and program outcomes" using "new initiatives to build rigorous data, rather than treating evaluation as an afterthought[.]"[6]

20.     Consistent with those objectives, Congress initially appropriated $110 million in funds to the TPP Program in fiscal year (FY) 2010, directing that such funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants."[7]

---

[3] Jessica Tollestrup, Cong. Rsch. Serv., R45183, Adolescent Pregnancy: Federal Prevention Programs 1 (2024), https:// www.congress.gov/crs-product/R45183.
[4] *Id.*
[5] *Id.*
[6] Evelyn M. Kappeler & Amy Feldman Farb, *Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program*, 54 J. ADOLESC. HEALTH S1, S2 (2014).
[7] Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

21.    HHS has consistently incorporated and described the reduction of STIs as part of the goal and objective of the program.[8]

22.    Congress requires HHS to fund two tiers of TPP Programs, "Tier 1" and "Tier 2."

23.    Tier 1 grantees "replicat[e]" "medically accurate and age appropriate programs" that have "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024).

24.    HHS designates which programs are eligible for replication by Tier 1 grantees. Programs eligible for "replication" are identified by HHS through the agency's Teen Pregnancy Prevention Evidence Review (TPPER) process, a rigorous process akin to expert peer review.[9] HHS then puts the eligible Tier 1 programs on a list, and applicants must in turn select from this menu of HHS-designated options when making their project proposals (i.e., their proposals for implementation of HHS's approved programs).

25.    Tier 2 grantees are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing]" new "medically accurate and age appropriate programs" "for preventing teenage pregnancy."  138 Stat. at 671.  In other words, "Tier 2 lets grantees test new programs, and programs that prove effective then become eligible for Tier 1." *Planned Parenthood of Greater Wash. & N. Idaho v. HHS (PPGWNI)*, 946 F.3d 1100, 1106 (9th Cir. 2020).

---

[8]    *See* OASH, OPA, *About the Teen Pregnancy Prevention Program*, HHS, https://opa.hhs.gov/grant-programs/teen-pregnancy-prevention-program/about-tpp-program  (last visited July 29, 2025); *see also* OASH, OPA, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review*, HHS, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review (last visited July 29, 2025).
[9]    OASH, OPA, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review*, *supra* n.8.

26.     TPP Program grant recipients, including Plaintiffs in this case, receive project funding through two types of application processes: a competitive award cycle and an annual non-competitive continuing award process.

27.     Consistent with HHS's regulations, 45 C.F.R. § 52.6, the TPP Program's competitive award cycle necessarily begins with a notice of funding opportunity (NOFO), by which the agency declares its intention to award funds and outlines the program goals, objectives, and conditions for applying. *See, e.g.*, HHS, OASH, OPA, Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services, Notice of Funding Opportunity, AH-TP1-23-001 (2023 NOFO), at 5-6 (attached hereto as Ex. A).

28.     HHS grants these awards for a "project period," during which HHS "intends to support the project without requiring the project to recompete for funds." 45 C.F.R. § 52.6(c).

29.     Each year, grantees submit a non-competing continuation award application consisting of "a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." 2023 NOFO, Ex. A at 56.

30.     Continuous funding is "contingent upon the availability of funds, satisfactory progress of the project, adequate stewardship of Federal funds, and the best interests of the Government." 2023 NOFO, Ex. A at 17.

**C. Plaintiffs' TPP Programs**

31.     **PPGNY's TPP Program:** PPGNY operates a Tier 1 TPP program with annual funding of approximately $1,091,185. Through its project, Supporting Teens' Access and Rights (STAR), PPGNY works to advance health equity and to improve the sexual health outcomes of youth in New York City. The project replicates age-appropriate, medically accurate, and evidence-based education programs across a network of PPGNY's partners in 15 community districts

throughout New York City and includes a parent-to-parent peer education component for parents, guardians, and other adults in young people's lives. Programming is offered in three settings: middle and high schools, after school and out-of-school time programs offered by community-based organizations, and residential facilities serving youth experiencing homelessness.

32.     PPGNY implements various evidence-based programs selected from the HHS-approved list resulting from its TPPER process, which were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the target populations identified by PPGNY. PPGNY's most recent non-competing continuation award application (NCC Application) for year three of this five-year project was approved on July 2, 2025.

33.     **PPCCC's TPP Program:** PPCCC operates a Tier 1 TPP program with annual funding of approximately $798,636. Through its project, "Central Coast Comprehensive Sex Education" (CSEC), PPCCC has implemented a systems-based teen pregnancy prevention initiative with overarching goals of improving sexual health outcomes, promoting positive youth development and empowerment, and advancing health equity and inclusivity for adolescents, their families, and communities through replication of medically accurate and age-appropriate evidence-based teen pregnancy prevention programs. CSEC is focused on underserved areas of the Central Coast region in three California counties. It aims to provide the marginalized communities on the Central Coast with inclusive, culturally relevant, and medically accurate sex education.

34.     CSEC implements various evidence-based programs selected from the HHS-approved list generated by its TPPER process, which were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the target populations identified by

PPCCC. PPCCC's most recent NCC Application for year three of this five-year project was approved on July 2, 2025.

35. **PPH's TPP Program:** PPH operates a Tier 1 TPP program with annual funding of approximately $773,619. PPH's TPP project, titled "*Community-Responsive, Youth-Driven Comprehensive Sexual and Reproductive Health Interventions to Achieve Optimal Health for Adolescents in Western Iowa and Eastern Nebraska*," was designed to implement evidence-based programs in each community served; to mobilize parents, adults, and communities through health fairs and training; and to provide continuous quality improvement by measuring outcomes.

36. PPH implements various evidence-based programs selected from the HHS-approved list resulting from its TPPER process, which were determined to be culturally appropriate and proven effective to impact sexual risk behaviors within the target populations identified by PPH. PPH's most recent NCC Application for year three of this five-year project was approved on July 2, 2025.

**D. Defendants' Imposition of Unlawful Requirements on the TPP Program**

37. Over the past several months, HHS has engaged in a pattern of escalating efforts to undermine the statutory goals of the TPP Program—first through the imposition on Plaintiffs' NCC applications of an Executive Order "alignment" requirement, and now through a sweeping Policy Mandate that not only cements the Executive Order "alignment" requirement as a condition of continued funding, but also introduces a host of additional unlawful and harmful restrictions that invite arbitrary enforcement and are fundamentally incompatible with the statutory requirements of the TPP Program.

*HHS Issues the Tier 1 NCC Notice and Litigation Ensues*

38.     On March 31, 2025, roughly two weeks before the April 15, 2025, Tier 1 NCC

application deadline for year three of the current five-year grant cycle, OPA unexpectedly emailed

TPP Tier 1 funding recipients an updated NCC Notice, imposing, for the first time, a requirement

that Tier 1 recipients "align" their programs with *all* Executive Orders.[10]

39.     PPCCC and PPH made some modifications to their programs in response to the

unlawful new requirements in the NCC Notice. PPGNY did not make any changes. Plaintiffs all

timely submitted their NCC applications under protest, and made explicit that they were submitting

their applications without certifying "alignment" with Executive Orders.

40.     On May 1, 2025, PPGNY, PPCCC, and PPH filed suit alongside other TPP Tier 1

grantees challenging the imposition of the alignment requirement to the Tier 1 NCC application

process. *See* Plaintiffs' Complaint for Declaratory and Injunctive Relief, *Planned Parenthood of*

*Greater N.Y. v. HHS* (*PPGNY*), No. 25-1334 (TJK) (D.D.C. May 1, 2025).

41.      On June 26, 2025, the District Court denied emergency relief solely on the ground

that plaintiffs had not demonstrated irreparable harm. *PPGNY*, 2025 WL 1768100, at *6, 9 (D.D.C.

June 26, 2025), Dkt. No. 27. The order did not address the likelihood of success on the merits.

42.     On July 2, 2025, HHS granted Plaintiffs' NCC applications. As a result, Plaintiffs

no longer faced the potential that their applications would be denied and voluntarily dismissed

their case on July 11, 2025.

---

[10] OPA, *Guidance for Preparing a Non-Competing Continuation (NCC) Award Application, Teen Pregnancy Prevention (TPP) Program Recipients (AH-TP1-23-001)*, HHS (2025) (hereinafter the "NCC Notice") (attached hereto as Ex. B).

43.     Notwithstanding their NCC applications being granted, the Plaintiffs are now subject to the Program Mandate that HHS subsequently issued for the entire TPP program, which is discussed further below.

### HHS Issues the Program Mandate

44.     HHS's efforts to impose unlawful and harmful directives culminated with the publication of the Program Mandate, which imposes numerous harmful and unlawful requirements on all TPP program participants that are subject to arbitrary enforcement.

45.     On July 2, 2025, HHS published an update to its website titled "*HHS Issues Policy to Stop the Radical Indoctrination of Children and Ensure Parental Oversight for Teen Pregnancy Prevention Program Grants*."[11] The update includes a link to a word document titled *OASH Teen Pregnancy Prevention Program Policy Notice* (Program Mandate), attached hereto as Exhibit C. Although the Program Mandate is dated July 1, 2025, it was not posted publicly until July 2, 2025, around 9:00 AM EST.

46.     Notably, the Program Mandate was published on the same day that HHS granted the Plaintiffs' NCC applications. In other words, while HHS granted the Plaintiffs' applications notwithstanding their refusal to certify compliance with the Executive Order "alignment" requirements in connection with their application materials, it then turned around and made their projects subject to a host of unlawful requirements through a new mechanism and under a new method of enforcement.

---

[11] OASH, HHS, *HHS Issues Policy to Stop the Radical Indoctrination of Children and Ensure Parental Oversight for Teen Pregnancy Prevention Program Grants* (*HHS Issues Policy*) (Jul. 29, 2025), https://health.gov/news/hhs-issues-policy-stop-radical-indoctrination-children-and-ensure-parental-oversight-teen.

47.    The Program Mandate states that "TPP Program grant recipients are expected to ensure all program materials comply" with its directives. Program Mandate, Ex. C at 5. The Program Mandate threatens that TPP Program grantees "determined [to be] noncompliant with the [Program Mandate] may face grant suspension under 45 C.F.R. § 75.371 and grant termination under 45 C.F.R. § 75.372(a) before October 1, 2025, and, starting October 1, 2025, termination under 2 CFR §§ 200.340(a)(1)-(4)." *Id.* OASH also warns that it "may re-evaluate the effectiveness of programs consistent with the statutory text and [the Program Mandate]" and "may impose additional conditions on grantees that fail to comply with any Federal statutes, regulations or terms and conditions that apply to their awards." *Id.* at 6 (citing 45 C.F.R. § 75.371). 45 C.F.R. § 75.371 sets forth a range of "remedies" for noncompliance ranging from "temporary withhold[ing]" of funds, the initiation of "suspension . . . proceedings" or "enforcement actions" by the agency, or "other remedies that may be legally available."

48.    While HHS characterizes its Program Mandate as a "policy notice" that merely "clarif[ies] OASH policy," the Program Mandate in fact imposes new and substantive harmful conditions on continued funding.

**Executive Order "Alignment" Requirement**

49.    The Program Mandate codifies the NCC Notice's requirement that TPP participants "align" their programs with "*all* current Presidential Executive Orders." Program Mandate, Ex. C at 1 (emphasis added). The Program Mandate leaves the term "align" entirely undefined thereby failing to impose constraints on how agency officials may evaluate alignment with the more than 170 Executive Orders issued since January 20, 2025—and granting them unchecked discretion to enforce the requirement in an arbitrary or discriminatorily selective manner.

50.    Of the 170 Executive Orders issued since January 20, 2025, most (if not all) are entirely irrelevant to teenage pregnancy prevention, ranging from everything from national security and immigration, to reorganization of federal agencies, to cultural-renaming initiatives.[12] Many of those Executive Orders contain vague, undefined, or underdefined terms. Many have been enjoined.[13]

51.    Notably, the Program Mandate does not require applicants to "*comply*" with the Executive Orders—presumably because the Executive Orders themselves are not self-executing as to private entities (i.e., they direct *agencies* to take various actions) and, therefore, do not themselves create any new obligations for funding recipients.[14] Instead, Defendants take a sweeping and indecipherable approach by demanding "alignment."

52.    While the Program Mandate requires TPP grantees to be aware of *all* Executive Orders, it highlights five specific Executive Orders that "may be of most relevance to the work of the TPP program." Program Mandate, Ex. C at 1. Those Executive Orders are: *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (EO

---

[12] *See, e.g.*, Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (entitled "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats"); Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) (entitled "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative"); Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025) (entitled "Restoring Names that Honor American Greatness").

[13] *See, e.g.*, *Chicago Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1118659, at *1 (N.D. Ill. Apr. 15, 2025) (enjoining enforcement of EOs 14151 and 14173 insofar as they mandated termination of equity-related grant or compliance certification by grantee); *see also Litigation Tracker: Legal Challenges to Trump Administration Actions*, Just Security (July 22, 2025), https://perma.cc/8JKK-NJUG (collecting cases in which injunctions have been issued). The Program Mandate's failure to distinguish those Executive Orders that remain in effect from others compounds both the arbitrariness and vagueness of the "alignment" requirements.

[14] H. COMM. ON GOV'T OPERATIONS, 85th Cong., EXECUTIVE ORDERS AND PROCLAMATIONS: A STUDY OF A USE OF PRESIDENTIAL POWERS 1 (Comm. Print 1957) ("Executive orders are generally directed to, and govern actions by, Government officials and agencies. They usually affect private individuals only indirectly.").

14168), *Ending Radical Indoctrination in K-12 Schooling* (EO 14190), *Protecting Children From Chemical and Surgical Mutilation* (EO 14187), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (EO 14151), and *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14173).

53.    A brief review of the five enumerated Executive Orders that grantees are now required to "align" with reveals that the "alignment" requirement is fundamentally at odds with the statutory mandates and underlying public health goals of the Teen Pregnancy Prevention Program, and also that the "alignment requirement" violates the Constitution and the APA.

54.    **Executive Order 14151.** On January 20, 2025, President Trump issued Executive Order 14151, titled *Ending Radical and Wasteful Government DEI Programs and Preferencing*. 90 Fed. Reg. 8,339 (Jan. 29, 2025). Order 14151 directs the Director of the Office of Management and Budget "to coordinate the termination of all discriminatory programs, including illegal DEI." It further directs all agency heads to "terminate, to the maximum extent allowed by law, DEI offices, programs, and positions, as well as 'equity-related' grants or contracts." The Order does not define "illegal DEI" or what it means for a grant to be "equity-related."

55.    **Executive Order 14168.** On January 20, 2025, President Trump issued Executive Order 14168, titled *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*. 90 Fed. Reg. 8,615 (Jan. 30, 2025). Order 14168 states that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." It then defines "female" and "male" based on whether an individual belongs, "at conception, to the sex that produces the large reproductive cell" or "the small reproductive cell." It further defines "gender ideology" as "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender

identity, permitting the false claim that males can identify as and thus become women and vice versa," which "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." In its operative provisions, Order 14168 directs agencies to adopt the definitions set forth in the Order and to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." It further directs agencies to "assess grant conditions and grant preferences and ensure grant funds do not promote gender ideology."

56.     Order 14168 also instructs the Secretary of HHS to "provide guidance expanding on the sex-based definitions set forth in th[e] order." On February 19, 2025, HHS adopted guidance pursuant to the Order, largely repeating its language and adopting the Order's definitions. The guidance provides that "[a] person's sex is unchangeable and determined by objective biology" and that "[r]ecognizing the immutable and biological nature of sex is essential to ensure the protection of women's health, safety, private spaces, sports, and opportunities." Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Feb. 19, 2025), http://bit.ly/44eLQmz. According to the guidance, "[s]ex is a person's immutable biological classification as either male or female." "Female is a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)." "Male is a person of the sex characterized by a reproductive system with the biological function of producing sperm." "Woman is an adult human female." "Girl is a minor human female." "Man is an adult human male." "Boy is a minor human male." "Mother is a female parent." "Father is a male parent." *Id.*

57.     **Executive Order 14173.** On January 21, 2025, President Trump issued Executive Order 14173, titled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity.* 90

Fed. Reg. 8,633 (Jan. 31, 2025). Order 14173 directs that "[t]he head of each agency shall include in every contract or grant award … [a] term requiring that the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions" and "[a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." The government has publicly taken the position that merely "tout[ing] [one's] commitment to diversity, equity, and inclusion" may, in its view, warrant investigation for unlawful discrimination.[15]

58.    **Executive Order 14187.** On January 28, 2025, President Trump issued Executive Order 14187, titled *Protecting Children from Chemical and Surgical Mutilation* which directs agency heads to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children." 90 Fed. Reg. 8,771 (Feb. 3, 2025).

59.    **Executive Order 14190.** On January 29, 2025, President Trump issued Executive Order 14190, titled *Ending Radical Indoctrination in K-12 Schooling*. 90 Fed. Reg. 8,853 (Feb. 3, 2025). Order 14190 directs agencies to develop recommendations to "eliminat[e] Federal funding or support for illegal and discriminatory treatment and indoctrination in K-12 schools, including based on gender ideology and discriminatory equity ideology." It further directs that such recommendations shall contain and analyze "[a]ll Federal funding sources and streams, including grants or contracts, that directly or indirectly support or subsidize the instruction, advancement, or promotion of gender ideology or discriminatory equity ideology" and shall outline a "process to

---

[15] *See* Equal Emp. Opportunity Comm'n, *Letter to Reed Smith* (Mar. 17, 2025), https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf.

prevent or rescind Federal funds, to the maximum extent consistent with applicable law, from being used … to directly or indirectly support or subsidize the social transition of a minor student."

60.    None of the Executive Orders highlighted in the Program Mandate as "most relevan[t]" to the TPP program mention teen pregnancy or sexual education. Nor do they identify what characteristics an evidence-based program to prevent teen pregnancy must have to "align" with the order.

**New Content Mandates**

61.    In addition to the Executive Order "alignment" requirement, the Program Mandate sets forth sweeping content-based restrictions. At best, the requirements set forth in the Program Mandate are impossibly vague; at worst, they conflict with statutory requirements and run afoul of well-established scientific consensus.

62.    As detailed below, the Program Mandate imposes five content mandates: (1) an anti-DEI mandate; (2) a prohibition of certain LGBTQ+ content; (3) an anti-"normalizing" sex mandate; (4) the redefining of what qualifies as "medically accurate" information; and (5) the imposition of an opt-out requirement.

63.    The Program Mandate's prohibition may cover an untold number of undefined "ideologies." Aside from three ideologies mentioned in the Program Mandate: (1) "content at issue in *Mahmoud*," (2) "gender ideology," and (3) "discriminatory equity ideology," Program Mandate, Ex. C at 4, it is entirely unclear what criteria the agency will use in assessing which "ideologies" are not acceptable or how ideologies are to be excluded from TPP programs and materials. That is, while the Program Mandate *identifies* certain "ideologies," it wholly fails to *define* them. At least as commonly used, the term "ideology" means "a systematic body of concepts especially about human life or culture." *Ideology*, Merriam-Webster, https://www.merriam-

webster.com/dictionary/ideology (last visited July 29, 2025). The Program Mandate does not direct that teenagers must be educated absent *any* ideology (assuming that is even possible), only that the programs must not include ideology that Administration views as "harmful." The use of "ideology" as a benchmark for funding is thus particularly prime for arbitrary enforcement and—critically—viewpoint discrimination.

**Anti-DEI Mandate**

64.    The Program Mandate imposes what can be described as an anti-DEI mandate—a vague set of requirements prohibiting programming from including "discriminatory equity ideology," and "diversity, equity, or inclusion-related discrimination." Program Mandate, Ex. C at 4-5. The Program Mandate also broadly forbids programs from promoting ideologies that the administration deems "harmful," though it fails to define what those ideologies are. *Id.* at 4.

65.    The Program Mandate expressly prohibits TPP programs from "teaching minors" about "discriminatory equity ideology," as "defined in Executive Order 14190." Program Mandate, Ex. C at 2; *see also HHS Issues Policy*, *supra* n.2 ("Program materials . . . may not promote anti-American ideologies such as discriminatory equity ideology.").

66.    Executive Order 14190 defines "discriminatory equity ideology" as follows:

> an ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations, including that:
>
> (i) Members of one race, color, sex, or national origin are morally or inherently superior to members of another race, color, sex, or national origin;
>
> (ii) An individual, by virtue of the individual's race, color, sex, or national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;
>
> (iii) An individual's moral character or status as privileged, oppressing, or oppressed is primarily determined by the individual's race, color, sex, or national origin;
>
> (iv) Members of one race, color, sex, or national origin cannot and should not attempt to treat others without respect to their race, color, sex, or national origin;

(v) An individual, by virtue of the individual's race, color, sex, or national origin, bears responsibility for, should feel guilt, anguish, or other forms of psychological distress because of, should be discriminated against, blamed, or stereotyped for, or should receive adverse treatment because of actions committed in the past by other members of the same race, color, sex, or national origin, in which the individual played no part;

(vi) An individual, by virtue of the individual's race, color, sex, or national origin, should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;

(vii) Virtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist or were created by members of a particular race, color, sex, or national origin to oppress members of another race, color, sex, or national origin; or

(viii) the United States is fundamentally racist, sexist, or otherwise discriminatory.[16]

67.     The Program Mandate also states that "OASH is concerned" about the definitions of several terms OASH has adopted in prior NOFOs.[17] The Program Mandate does not identify what exactly in those definitions is "concern[ing]." Instead, the Program Mandate states that the terms "health equity," "equitable environment," "inclusivity," and "adolescent-friendly services" "should not be construed to . . . permit unlawful diversity, equity, or inclusion-related discrimination." The Program Mandate does not explain the basis for its concerns, nor how or why these terms would be construed unlawfully, nor does it offer alternative definitions for "health equity," "equitable environment," "inclusivity," or "adolescent-friendly services."

68.     The Program Mandate does not define "diversity, equity, or inclusion" or "diversity, equity, or inclusion-related discrimination." Nor do any of the referenced Executive Orders. *See generally* Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 29, 2025); *see also Am. Pub. Health Assoc. v. Nat'l Inst. of Health*, 2025 WL 1822487, at *5 (D. Mass. July 2, 2025) ("The

---

[16] Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025).
[17] Those terms are "adolescent-friendly services," "age appropriateness," "equitable environment," "health equity," "inclusivity," and "medical accuracy." Program Mandate, Ex. C at 4-5.

Executive Branch decided early on, through Executive Orders, to focus on eradicating anything that it labels as Diversity, Equity and Inclusion ('DEI'), an undefined enemy. No one has ever defined it to this Court—and this Court has asked multiple times.").

69.    The Program Mandate imposes prohibitions on "discriminatory equity ideology" and "diversity, equity, or inclusion-related discrimination" without articulating any limiting principles, thereby granting agency officials broad discretion to determine—based on subjective or discriminatory judgments—when a program has violated these vague standards, enabling arbitrary and discriminatory enforcement..

70.    Public reporting reflects that the government has deemed grant-funded programming to amount to prohibited DEI for "including words like 'trauma,' barriers,' 'equity,' and 'excluded.'"[18]

71.    "The phrase 'diversity, equity, and inclusion' commonly denotes 'a set of values and related policies and practices focused on establishing a group culture of equitable and inclusive treatment and on attracting and retaining a diverse group of participants, including people who have historically been excluded or discriminated against.'" *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 25-cv-091-LM, 2025 WL 1188160, at *19 (D.N.H. Apr. 24, 2025) (quoting *Diversity, equity, and inclusion*, Merriam-Webster, https://www.merriam-webster.com/dictionary/diversity,% 20equity% 20and% 20inclusion). "As is clear from this dictionary definition, to label a program as a 'diversity, equity, and inclusion' program necessarily involves 'appeals to abstract principles . . . such that the practical meaning of the [Program Mandate] must, by definition, depend in significant part on the political, social, and moral

_____

[18] Carolyn Johnson, Scott Dance, & Joel Achenbach, *Here Are the Words Putting Science in the Crosshairs of Trump's Orders*, WASH. POST (Feb. 4, 2025), https://www.washingtonpost.com/science/2025/02/04/national-science-foundation-trump-executive-orders-words/.

assumptions of the party enforcing it.'" *Id.* (quoting *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp.

3d 783, 807 (M.D. Tenn. 2024)).

72.     Vague regulatory language like "DEI" and "discriminatory equity ideology" can

lead to arbitrary or even discriminatory enforcement thereby bestowing upon the agency unfettered

discretion to decide how to weaponize the term. *See Sessions v. Dimaya,* 584 U.S. 148, 182 (2018)

(Gorsuch, J., concurring) ("Vague laws also threaten to transfer legislative power to police and

prosecutors, leaving to them the job of shaping a vague statute's contours through their

enforcement decisions."); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) ("A vague

law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution

on an ad hoc and subjective basis.").

73.     It is "no surprise" that federal courts across the country have struck down similar

DEI prohibitions as unconstitutionally vague and arbitrary and capricious. *Nat'l Educ. Ass'n*, 2025

WL 1188160, at \*19; *see also, e.g.*, *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp.

3d 521, 529, 543-45 (N.D. Cal. 2020) (holding unconstitutional an Executive Order that prohibited

the promotion of "divisive concepts" within federal trainings, including the idea that "the United

States is fundamentally racist or sexist"); *Nat'l Ass'n of Diversity Officers in Higher Educ. v.

Trump*, 2025 WL 573764, at \*23, \*26 (D. Md. Feb. 21, 2025) (holding an Executive Order

directing the Attorney General "to encourage the private sector to end illegal discrimination and

preferences, including DEI" was unconstitutionally vague); *Am. Pub. Health Assoc.*, 2025 WL

1822487, at \*17 (D. Mass. July 2, 2025) ("Without a definition of DEI, [the agency] embarked on

a fool's errand resulting in arbitrary and capricious action.").

**Prohibition of LGBTQ+ Content**

74.     The Program Mandate also prohibits the inclusion of various  LGBTQ+-inclusive content in TPP programming through a combination of harmful and sweeping restrictions, including explicitly banning so-called "gender ideology" and referencing the "content at issue in *Mahmoud*," which were materials depicting same-sex marriage and LGBTQ+ identities. Collectively, these requirements could effectively be enforced to mandate the exclusion of any affirming or inclusive content related to gender identity or sexual orientation.

75.     The Program Mandate does not define "gender ideology." Instead, the Program Mandate refers to "gender ideology" "as such terms are defined in Executive Order 14190." Program Mandate, Ex. C at 2. Executive Order 14190 does not define "gender ideology," but does adopt the definitions of Executive Order 14168, which states the following:

> "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.  Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex.  Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

> "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

76.     The Program Mandate's prohibition on "gender ideology" can be arbitrarily enforced to disallow lesson plans or language that are inclusive of and respect the existence of transgender, gender non-conforming, and non-binary program participants. Such a prohibition can be enforced to preclude discussions about gender roles and expectations, which are essential to helping young people learn about the way that people may behave in relationships and corresponding skills that are important in TPP programs such as how to communicate, negotiate, and refuse unprotected sexual activity.

77.     Moreover, a review of studies on teen pregnancy prevention programs shows that programs that address issues of gender are more likely to result in reductions of sexually transmitted diseases and teen pregnancy. Examining how gender roles and expectations may influence how adolescents engage in relationships is an important component of pregnancy prevention. Gender norms and expectations can influence sexual risk-taking behavior. For example, gender norms can influence the perception of which person is responsible for preventing teen pregnancy when in fact both people are responsible. HHS did not provide any justification for its change of position on why, contrary to previous research on effective teen pregnancy prevention programs, "gender ideology" is outside the scope of the TPP Program.

78.     Additionally, the Program Mandate's requirement that TPP programs maintain the "biological reality of sex" as including only "males and females" contravenes the statutory requirement that TPP programs be "medically accurate."  HHS's assertion that "information" is not "medically accurate" if it "denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females," Program Mandate, Ex. C at 5, runs directly contrary to widely available scientific evidence, *see, e.g.*, Tiffany Jones, *Intersex Studies: A Systematic Review of International Health Literature*, 8 SAGE OPEN 2 (April 2018) ("Research has generally estimated that 1.7% to 4% of people go on to actually have intersex variations."); Claire Ainsworth, *Sex Redefined*, 518 NATURE 288, 288-90 (February 19, 2015) ("[D]octors have long known that some people straddle the boundary—their sex chromosomes say one thing, but their gonads (ovaries or testes) or sexual anatomy say another."). The agency's decision to redefine sex—and in doing so erase the existence of individuals with intersex characteristics—therefore cannot be sustained because it "rests upon a factual premise that is unsupported by substantial evidence." *Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018).

79.    The Program Mandate also identifies the "content at issue in *Mahmoud*" as "ideological content" to be excluded from TPP Programming and argues that the *Mahmoud* decision "confirms that the best reading of the TPP statute does not contemplate such ideological content." Program Mandate, Ex. C at 3. The Program Mandate identifies the "content at issue" in *Mahmoud* as "LGBTQ+-inclusive" books and content that "portrayed messages and images about same-sex marriage and gender ideology." *Id.* at 2. The Program Mandate thus bans any material that the agency may determine falls within these categories from program material.

80.    The Program Mandate places no limits on how the agency can enforce the requirement that TPP grantees exclude certain LGBTQ+ content from their programs. Nor does it address that several Tier 1 projects are *required* to reach underserved communities with the highest unmet needs, including LGBTQ+ youth, as a part of their contractual agreements with HHS.  For example, in the 2023 Tier 1 NOFO, HHS, citing public health data, identified the need for teen pregnancy prevention projects that addressed the existing health disparities between LGBTQ+ youth and their heterosexual and cisgender peers, with LGBTQ+ youth experiencing higher rates of unintended teen pregnancy and STIs than their counterparts. 2023 NOFO, Ex. A at 5, 7.

81.    Requiring Tier 1 recipients to change their curriculum around these ideological requirements is also incompatible with the statutory mandate that TPP Program funding recipients replicate the evidence-based programs already approved by the agency.

**Anti-Normalizing Sex Mandate**

82.    The Program Mandate also prohibits "content that encourages, normalizes, or promotes sexual activity for minors." Asserting, in a conclusory fashion, that such content is "outside the scope of the TPP," the Program Mandate does not define the terms "encourages," "normalizes," or "promotes." And this problem is compounded by the fact that any discussion of

teen pregnancy prevention necessarily requires discussion, and acknowledgment, of sexual activity as an essential element of the curriculum to ensure that the program is effective. The Program Mandate provides no standards that the agency will use in determining what materials or instructions constitute "encouraging," "normalizing," or "promoting" sexual activity for minors, thereby granting agency officials broad discretion to enforce the provision based on subjective interpretations—enabling arbitrary and discriminatory enforcement in violation of the Fifth Amendment.

83.    A prohibition on "normaliz[ing]" sex within TPP programs could, in effect, be enforced as a requirement that programs adopt abstinence-only curriculum, even if not explicitly labeled as such. Generally, effective sexual education programs teach about contraception, consent, healthy relationships, and strategies for reducing "other risk factors" associated with teen pregnancy that acknowledge the reality that some adolescents are or will become sexually active. If such instruction is deemed to "normalize" sex and is therefore restricted, educators may be limited to promoting abstinence as the only acceptable behavior to prevent teen pregnancy. But even abstinence-only programs could be construed as "normalizing" sex as activities in those programs—such as role plays to help young people learn to refuse sex—could be viewed as normalizing the idea that sex could occur among teenagers.

84.    Abstinence-only-until-marriage programs have been shown to be ineffective in changing adolescent sexual behavior. Thus, by framing medically accurate, developmentally appropriate, and evidence-based information and programs about safe sex as impermissible "normalization," the anti-normalizing sex mandate would effectively suppress critical health education and undermines the statutory goals of the TPP program aimed at reducing unintended

teenage pregnancy, behavioral risk factors underlying teenage pregnancy, and other associated risk factors.

85.    The Program Mandate also excludes from the scope of the program content "that is not related to, or counter to the aim of reducing teen pregnancy," listing "anal and oral sex." These topics are vital to the TPP Program's goal of reducing rates of STIs and are an important component of effective sexual education. Mandating exclusion of such content disregards rising rates of STIs among young people and the importance of addressing topics related to behaviors that pose a risk of STI transmission among program participants. *See also, e.g.*, Cora C. Breuner, MD, MPH *et al.*, *Sexuality Education for Children and Adolescents*, 138 Am. Acad. Pediatricts 2, e2 (2016) ("All children and adolescents need to receive accurate education about sexuality to understand ultimately how to practice healthy sexual behavior.").

**Redefining "Medically Accurate"**

86.    The Program Mandate also abandons the agency's prior, evidence-based standard for determining whether content is "medically accurate" in favor of a vague and ideologically driven formulation.

87.    Under prior NOFOs, OSHA defined medical accuracy as follows:

> Medical accuracy - Verified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete.[19]

88.    This definition is not only consistent with a well-established and longstanding meaning of medical accuracy within public health and evidence-based policy, but is also identical

---

[19] Program Mandate, Ex. C at 5.

to the definition of "medically accurate and complete" in 42 U.S.C. § 713(e)(2), as a part of the Personal Responsibility Education Program.

89.    The Program Mandate indicates that "OASH is concerned" about the prior definition, but does not identify the cause of these concerns, and what weight, if any, this prior definition still holds. Instead, the Program Mandate instructs as follows:

> "Medically accurate" materials or instructions with pharmaceutical or health-related recommendations are expected to include information on a full range of health risks, so that minors and their parents or guardians can make fully informed decisions. Content that is not "medically accurate" may include inaccurate information about methods of contraception, including associated health risks, or information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy.

Program Mandate, Ex. C. at 4-5.

90.    The Program Mandate insists that "OASH will determine whether program content is 'medically accurate' consistent with the statutory language," Program Mandate, Ex. C at 5, but then provides no explanation of what is wrong with the prior definition or any justification for why the agency is changing its position on how to define "medically accurate."

91.    Moreover, the Program Mandate does not merely "clarify" what it considers to be medically accurate, but also imposes a novel obligation that TPP programs instruct participants on the "full range of health risks" associated with contraceptives.

92.    TPP programs are not clinical settings, and it is neither practical nor appropriate within the context of a TPP program to require facilitators—who may not be medical professionals—to provide individualized medical guidance about contraception. Moreover, the mandate to present a "full range of health risks" is harmful and unworkable, and raises serious questions about whether, for instance, every mention of contraception must be accompanied by an

exhaustive, disclaimer-style disclosure beyond that which is required in TV ads for prescription drugs.[20]

93.     OASH cannot impose new affirmative obligations on TPP programs under the guise of "clarifying" a statutory term. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) ("The Administrative Procedure Act requires courts to exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]").

**Opt-Out Requirement**

94.     The Program Mandate, invoking the U.S. Supreme Court decision in *Mahmoud v. Taylor*, 606 U.S. ___ (2025), imposes yet another new requirement on TPP programs: to "provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." Program Mandate, Ex. C at 3.

95.     The Program Mandate's opt-out requirement delegates sweeping enforcement discretion to agency officials by failing to specify how the agency will assess the propriety of an opt-out advance notice provided or what content is subject to it. By requiring grantees to allow parents to opt out of content that "may burden" their religious exercise—without defining the scope of that burden or the types of content implicated—the Mandate enables enforcement based on subjective and potentially discriminatory assessments. This standardless framework permits officials to selectively enforce the opt-out requirement depending on viewpoint, creating a serious

---

[20] *Compare* Program Mandate, Ex. C at 5 (requiring that "methods about contraception" must be accompanied by "information on a *full range* of health risks") (emphasis added), *with* FDA, *Prescription Drug Advertising - Questions and Answers*, (Jun. 19, 2015) (requiring only disclosure of "the drug's *most important* risks") (emphasis added), https://www.fda.gov/drugs/prescription-drug-advertising/prescription-drug-advertising-questions-and-answers#non_requirements.

risk of arbitrary and discriminatory application. As such, the opt-out provision is unconstitutionally vague under the Fifth Amendment.

**Threat of Non-Compliance**

96.    TPP funds are made available via Payment Management Services (PMS), a service provider that processes grant payments for the federal government. Through the process of accessing funds already awarded to them via an electronic reimbursement process–i.e., "drawing down" the awarded funds–TPP funding recipients certify that they will comply with program policies, including the Program Mandate.

97.    However, if an agency determines that a recipient of TPP funds has been noncompliant, it may pursue a series of remedies including suspension and termination of funding. In certain circumstances, HHS regulations allow for recoupment of funds that the agency deems wrongfully issued through the "clawback" of funds previously issued to reimburse grantees for expenses and costs associated with the program.

## HARMS SUFFERED BY PLAINTIFFS

98.    Plaintiffs are nonprofit organizations dedicated to providing comprehensive, medically accurate, developmentally appropriate, and inclusive sexual education programming. In response to the TPP Tier 1 FY 2023 NOFO, Plaintiffs devised and operationalized five-year projects implementing evidence-based curricula that were designed—and approved—to provide services to communities with the highest unmet needs. The continued existence of these projects is threatened by the Program Mandate.

99.    Presently, Plaintiffs' TPP Projects have been approved for Year 3 funding for the budget year of July 1, 2025 through June 30, 2026. Each of these TPP Projects' contents and

materials have been approved by the agency directly or through the TPPER process before the award of TPP funding.

100.    In order to access funds awarded to them, the Plaintiffs must certify compliance with the Program Mandate. However, if Plaintiffs draws down funds subject to the Program Mandate, HHS may arbitrarily and abruptly decide that Plaintiffs' TPP Projects violate aspects of the Program Mandate and subject Plaintiffs to "noncompliance" proceedings, including requiring Plaintiffs to repay funds provided to reimburse costs and expenses incurred to carry out TPP Programs using materials and content that the agency had previously approved. That is, Plaintiffs—nonprofits that operate on tight budgets—face the prospect of being required to pay back funds already spent on agency-approved programming.

101.    Drawing down the TPP funds that have been awarded to Plaintiffs is critical for their ability to continue their TPP programs. But because the Program Mandate forces funding recipients to agree to various new requirements, the need to draw down funds and the resulting threat of noncompliance creates an impossible situation, either: (1) agree to comply with the Program Mandate's harmful requirements under the threat of arbitrary enforcement; or (2) relinquish TPP funds and end their respective programs.  Plaintiffs fear the chilling effect that the Program Mandate will have on their ability to carry out their TPP programs in accordance with their missions, values, and the underlying purpose of the TPP Program

102.    For example, Plaintiffs fear that approved, evidence-based programs that acknowledge that young people may consider being sexually active and discuss the importance of using contraception to prevent unintended teen pregnancy or STIs may lead to accusations that they are  in violation of the prohibition against "normalizing" sexual activity for minors. Or simply acknowledging disproportionate rates of unintended teen pregnancy and/or STI rates within certain

populations and communities in an effort to explain the purpose of the program could be deemed by agency officials as violating the Program Mandate's anti-"normalizing" sex mandate.

103.    As another example, Plaintiffs implement HHS-approved, evidence-based curricula that include activities during which program participants practice declining to engage in unsafe sexual behavior in different scenarios. Given the undefined nature of Program Mandate's many terms, some Plaintiffs fear that HHS would allege such activities violate the Program Mandate's prohibition against "role play."

104.    Because Plaintiffs are required to replicate the curricula approved by the agency, they are unable to simply discard chapters or substance from these materials without violating the TPP statutory requirement.

105.    Plaintiffs, at the direction of HHS, committed significant resources, time, and capacity-building efforts to design and implement projects that are focused on communities and populations with the greatest needs and facing significant health disparities within their respective communities. In response to the 2023 NOFO, Plaintiffs carefully developed their projects based on public health data identifying rates of unintended pregnancy and STIs among adolescents that recognized the unique needs of many communities.

106.    Choosing to relinquish TPP funds places the future of Plaintiffs' TPP Projects and their programming in peril.

107.    **PPGNY**: PPGNY provides evidence-based programming that is, by design and in response to the 2023 NOFO, intended to provide high-quality, fact-based sexual education to communities that PPGNY has identified as facing significant disparities in rates of unintended teen pregnancy and STIs. Consequently, PPGNY's TPP programming—entitled Project STAR—addresses the unique needs of youth who identify as LGBTQ+, immigrant and/or English language

learners, and youth with intellectual and developmental disabilities. PPGNY's programming is taught in a variety of settings, including schools, community based organizations, and residential settings. Through implementation of various HHS-approved, evidence-based programs, PPGNY's programming involves a curriculum that covers a wide array of topics ranging from HIV prevention to educating parents on how to normalize conversations with their children about sexuality. Likewise, PPGNY's educators are trained on how to answer student questions in an accurate, developmentally appropriate, and non-judgmental manner and ensure that lessons are inclusive to the experiences and identities of all participants.

108.    Under the Program Mandate, PPGNY would have to substantially modify its programs to mitigate accusations of noncompliance in a manner that is inconsistent with the organization's values and mission and would dilute the quality of sexual education programming that it offers and go against TPP requirements that EBPs be implemented with fidelity.

109.    The Program Mandate would have a chilling effect on PPGNY's program staff, who would be forced to censor discussions related to and cease all programming that they fear could be considered by the agency to "promote gender ideology" or LGBTQ+ inclusion, or remove key content related to inclusivity, equity, trauma-informed practices, or youth identities, which would defeat the purpose of Project STAR. All of these changes would damage PPGNY's reputation in the community as a source of medically accurate and evidence-based information and services. It would also damage the goodwill that PPGNY has built with its community partners. For these reasons and absent relief, PPGNY will not draw down funds while the Program Mandate is enforceable against it.

110.    Relinquishing TPP funds places future of Project STAR in peril. Without access to TPP funds, PPGNY will be limited in the sexual education programming that it can continue to

offer. The loss of TPP funds will result in the loss of irreplaceable funds and require termination of programming, layoffs of highly trained PPGNY staff, and the end of partnerships that PPGNY has established with communities that are often overlooked and underserved.

111.    Because of its limited financial resources as a nonprofit and obligations to third parties in relation to its ability to provide expected programming, PPGNY must decide this week as to the future of its program.

112.    **PPCCC:** PPCCC's TPP Program, CSEC, is a teen pregnancy prevention initiative that aims to improve sexual health outcomes; promote positive youth development and empowerment; and advance health equity and inclusivity for adolescents, their families and communities through replication of medically accurate and age-appropriate evidence-based teen pregnancy prevention programs. CSEC engages in public education activities that work with bilingual community health educators to deliver sexual education and information to adults, teens, and families.

113.    Because of the Program Mandate, PPCCC is forced to choose between (1) continuing the program as approved under the threat of investigation and claw back of funding; (2) being forced to make further changes that render the program less effective and run contrary to PPCCC's mission and even then still risk being deemed non-compliant with a vague directive in the Program Mandate; or (3) foregoing the third year of funding, which already has been awarded, shutting down the project and laying off program staff.

114.    PPCCC has to make a decision imminently because PPCCC cannot operate the program, pay staff, and incur program related costs without a guarantee that those costs will be reimbursed. Moreover, PPCCC's education department's future has been placed in jeopardy as it is unable to make pressing decisions, including related to renewing contracts and properly

informing staff as to the potential termination of their roles. Every passing day adds further expense and risk.

115.    PPCCC fears it may be subject to arbitrary accusations of noncompliance if it chooses to stay in the program. For example, while non of the educational materials that PPCCC uses depict sexual activity or anatomy in an erotic or explicit manner, PPCCC fears that its HHS approved evidence-based programming could be accused of "promoting" or "normalizing" sexual activity. The Program Mandate's changes to the definitions of "age appropriate" and "medical accuracy" and the scope of the program have a chilling effect on the content that PPCCC's educators can provide and restrict their ability to be transparent about the risks of sexual behavior and the safety measures needed to help prevent teen pregnancies and STIs, as they have done for the last few years under their grant. In addition, PPCCC is concerned that the agency could determine that the Program Mandate required PPCCC's educators to make inappropriate and inaccurate disclosures about contraception and potentially restricts educators from answering questions in a straight-forward and honest way.

116.    PPCCC's continued participation in the program would put it at risk of arbitrary and discriminatory investigation and enforcement. Additionally, if an investigation resulted in the claw-back of funds that were already spent in reliance on the expectation of reimbursement under the TPP grant, this could jeopardize PPCCC's financial viability.

117.    The Program Mandate also threatens irreparable harm to PPCCC's reputation among contracting partners and the communities it serves.  For some of those communities, removing content and material that acknowledges their community's unique needs will be perceived as betraying a commitment to provide effective and inclusive sex education.

118.    Finally, PPCCC is concerned that under the Program Mandate, it may be required to make further changes to its approved, evidence-based programming that would likely defeat the very purpose of PPCCC's program: to ensure that sexual education and information is delivered to adults, teens, and families experiencing the highest unmet needs in the area in a manner that is effective, medically accurate, and appropriate to their individualized circumstances. Further programming changes would also entail additional unrecoverable costs, including staff time necessary to review and modify program materials.

119.    If, on the other hand, PPCCC leaves the TPP Program, it will no longer be able to continue to run CSEC. This absence will harm the communities that have come to rely on CSEC programming. Further, PPCCC will be forced to lay off CSEC staff and find alternative funding for staff who were partially supported by TPP funding. This will reduce PPCCC's capacity and ability to serve its mission. Having to terminate the program early will also irreparably damage PPCCC's relationships with community partners and its reputation in the community.

120.    Because PPCCC must submit its revised workplan to HHS on August 15, 2025, and in doing so certify compliance with the Program Mandate, relief is urgently needed before that date.  PPCCC cannot operate its programs and incur programming expenses under the HHS's threat of compliance proceedings and potential claw-backs, and thus will be forced to withdraw from the TPP Program absent judicial relief.

121.    **PPH**: PPH's TPP Project offers sexual education programming designed, in response to the 2023 NOFO, to meet the needs of communities in Iowa and Nebraska counties, including the Ponca and Winnebago Tribes of Nebraska, Black, Indigenous, and People of Color (BIPOC), and LGBTQIA2S+ communities.

122.    Because of the Program Mandate, PPH is forced to decide between (1) continuing the program as approved and risking an arbitrary investigation or enforcement of the Program Mandate; (2) incorporating further changes that render the program less effective and even then still risk being deemed non-compliant with a vague directive in the Program Mandate; (3) or leaving the program and shutting down the project.

123.    PPH is committed to providing comprehensive and inclusive sexual education that meets young people where they are, and relies on programming proven to be effective by research. While PPH's use of specific EBPs has been approved, PPH fears arbitrary enforcement of many of the terms of the Program Mandate, notwithstanding the approval. PPH fears that in implementing the EBPs and materials approved by the HHS, they will be accused of violating the Program Mandate. PPH also fears that HHS may accuse it of violating aspects of the Program Mandate such as the "anti-normalization" mandate in circumstances where educators are willing to answer young people's questions about sex and pregnancy prevention in a developmentally appropriate and medically accurate manner, especially in live presentation and question/answer environments that are a central feature of the program.

124.    Additionally, the Program Mandate's anti-DEI mandate and prohibition on some LGBTQ+ content goes against PPH's TPP project goals, designed in response to the 2023 NOFO, which are to increase the community's capacity to engage with BIPOC and LGBTQIA2S+ youth around their sexual health in an effort to decrease teen pregnancy and STI rates across Nebraska and Iowa. These project goals are undermined by the requirements of the Program Mandate, including the restrictions on inclusion of lawful diversity, equity, and inclusion (DEI) language, references to gender identity, disability, and related components.

37

125.    Alternatively, if PPH were to relinquish its TPP funding, the results would be devastating. PPH's infrastructure depends on PPH's ability to obtain TPP funds. PPH would be forced to lay off staff and would have to cease its TPP programming, meaning that it would not be able to support subgrantees and other partners. This would have a negative impact on communities where PPH is a trusted partner and at times, the primary provider of sexual health information and resources, and cause PPH to suffer reputational harm.

126.    Given the options currently before PPH, and the irreparable impacts that would result without its TPP funds, PPH anticipates drawing down funds in order to stave off those alternate harms. PPH must make this decision imminently because it has limited financial resources readily accessible to operate such programs. But once PPH draws down its funding, it must accept the Project Mandate's terms and conditions and will thereby be subject to the risk of other harms stemming from arbitrary accusations of noncompliance.

127.    As set forth above, HHS's actions undermine public health initiatives crucial to teen pregnancy prevention, threatening decades of progress in evidence-based public policy and place at risk the ability of underserved communities to access important public health programming.

128.    Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
### THE PROGRAM MANDATE IS UNCONSTITUTIONAL UNDER THE
### FIFTH AMENDMENT'S DUE PROCESS CLAUSE

129.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

130.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The APA

also allows the reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

131.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. U.S. CONST. amend V. A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to provide fair notice and prevent arbitrary enforcement. A law is unconstitutionally vague if it invites arbitrary enforcement. *Grayned v. City of Rockford*, 408 U.S. 104 (1972). In *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012), the Court emphasized that regulations must provide clear guidance to prevent arbitrary and discriminatory enforcement.

132.    Termination or suspension of Plaintiffs' ongoing funding implicates Plaintiffs' protected liberty and property interests.

133.    The Program Mandate threatens to terminate and suspend TPP Program grantees' funding if grantees fail to (1) "align" their programs with Executive Orders and (2) comply with a series of content mandates. These requirements are unconstitutionally vague because they are not stated with sufficient clarity to "define what conduct is sanctionable and what is not," inviting arbitrary enforcement. *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018).

134.    The Program Mandate requires grantees to "revise their projects to align with Executive Orders that are currently in force as necessary in order to receive continuation funding." Program Mandate, Ex. C at 1. While TPP grantees are expected to "review and be aware of *all* current Presidential Executive Orders," the Program Mandate identifies five "of most relevance to the work of the TPP program." *Id.* at 1-2 (emphasis added).

135.    Of the over 170 Executive Orders issued since January 20, 2025, most (if not all) are entirely irrelevant to teenage pregnancy prevention, ranging from everything from national security and immigration, to reorganization of federal agencies, to cultural-renaming initiatives.[21] Many of those Executive Orders contain vague, undefined, or underdefined terms. Many have been enjoined.[22]

136.    The Program Mandate fails to define: how the agency will enforce the request for "alignment" with these Executive Orders; how it expects funding recipients to reconcile potentially conflicting directives within these Executive Orders; or the standards or criteria OPA will use to evaluate "alignment."

137.    The five Executive Orders identified as "most relevant" contain broad and undefined or underdefined terms, leading to significant vagueness concerns.

138.    The Program Mandate imposes five content-based mandates: (1) an anti-DEI mandate; (2) a prohibition of LGBTQ+ content; (3) an anti-"normalizing" sex mandate; (4) the redefining of what qualifies as "medically accurate" information; and (5) the imposition of an opt-out requirement. Each of these mandates is unconstitutionally vague. For example,

  a.  **Anti-DEI mandate:** The Program Mandate imposes a vague set of requirements prohibiting programming from including "discriminatory equity ideology," and "diversity, equity, or inclusion-related discrimination." Program Mandate, Ex. C at 4-5. But the Program Mandate fails to clearly set forth how the agency will define "discriminatory equity ideology" and "DEI" in assessing noncompliance.

---

[21] *See, e.g.*, Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (entitled "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats"); Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) (entitled "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative").
[22] *See supra* note 13.

b. **Prohibition of LGBTQ+ content:** The Program Mandate prohibits the inclusion of certain LGBTQ+-inclusive content by explicitly banning so-called "gender ideology" and by referencing the "content at issue in *Mahmoud*," which the Program Mandate identifies as "LGBTQ+-inclusive" content. The scope of this prohibition is vague. The Program Mandate does not clearly define how the agency will determine which LGBTQ+ content cannot be included in programming or how TPP Programs are supposed to exclude "gender ideology," a vague and underdefined term.

c. **Anti-normalizing sex mandate:** The Program Mandate prohibits TPP programming from including "content that encourages, normalizes, or promotes sexual activity for minors." The Program Mandate does not define the terms "encourages," "normalizes" or "promotes." The Program Mandate fails to provide any guidance on what materials or instructions it considers to be encouraging, normalizing, or promoting sexual activity for minors, leaving grantees at risk of arbitrary and discriminatory enforcement.

d. **Redefining "medically accurate":** While the Program Mandate articulates that "OASH is concerned" about several definitions used in prior NOFOs, the Program Mandate does not identify what exactly in those definitions is "concern[ing]" or how TPP grantees are supposed to modify their programs, if at all, to comply with the concerns within those definitions. The Program Mandate's new definition of "medically accurate" in particular requires that TPP programming instruct participants on the "full range of health risks" associated with contraceptives. This mandate is vague and unworkable, inviting arbitrary enforcement.

e. **Imposition of opt-out requirement:** The Program Mandate requires that TPP Programs "provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." Program Mandate, Ex. C at 3. But the Program Mandate fails to provide any meaningful guidance or standards setting forth how the agency will enforce this requirement or assess whether a TPP Program has properly complied with this requirement

139.    These open-ended, content-based requirements confer broad discretion on agency officials to determine compliance on an ad hoc basis, enabling arbitrary and discriminatory enforcement untethered to any objective standard.

140.    Moreover, the vague requirements in the Program Mandate are ripe for arbitrary, or even discriminatory enforcement. *See Dimaya,* 584 U.S. at 182 (Gorsuch, J., concurring) ("Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions."); *Grayned,* 408 U.S. at 108-09 ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.").

141.    As a result, the Program Mandate's requirements are unconstitutionally vague, violating the Fifth Amendment's Due Process Clause and the requirements of the APA, and rendering the notices invalid under 5 U.S.C. § 706(2)(A).

142.    The Program Mandate must be declared unlawful.

143.    The Program Mandate must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

144.    If the Program Mandate is not enjoined, vacated, and declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

145.    This Court should therefore enjoin the enforcement of the Program Mandate pending conclusion of these proceedings by ordering Defendants to refrain from relying on the Program Mandate, or its requirements, in making determinations about Plaintiffs' compliance with TPP Program requirements.

## COUNT II

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – THE PROGRAM MANDATE IS UNCONSTITUTIONAL UNDER THE FIRST AMENDMENT

146.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

147.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The APA also allows the reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

148.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. The government cannot "punish or suppress disfavored expression," *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024), or retaliate against such expression, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). As such, "the government may not deprive an individual of a 'valuable government benefit[]' in retaliation for his or her exercise of First Amendment rights." *Barton v. Clancy*, 632 F.3d 9, 23 (1st Cir. 2011). Moreover, the government may not exert undue pressure against First Amendment rights through a regime of "thinly veiled threats" and "informal censorship." *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 1235084, at *19 (D. Mass. Apr. 29, 2025) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963)).

149.    The Program Mandate's vague prohibition on ideologies it deems "harmful" and requirement that TPP grantees instead instruct content that adheres to the Administration's political ideologies violates Plaintiffs' free speech rights and chills protected speech. *See, e.g.*, *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 1235084, at *19 (D. Mass. Apr. 29, 2025) (noting a regulation "that is unwritten or vague but enforced with harsh penalties would seem more likely to chill broad swaths of speech than one that clearly defines what is forbidden").

150.    As a result, the Program Mandate's requirements unconstitutionally chill and suppress protected speech, violating the First Amendment's Free Speech Clause and the requirements of the APA, and rendering the notices invalid under 5 U.S.C. § 706(2)(A).

151.    The Program Mandate must be declared unlawful.

152.    The Program Mandate must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

153.    If the Program Mandate is not enjoined, vacated, and declared unlawful, Plaintiffs will suffer substantial injury.

### COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT – THE PROGRAM MANDATE IS CONTRARY TO LAW

154.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

155.    Under the APA, courts shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also allows reviewing courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

156.    The APA, 5 U.S.C. § 706, authorizes federal courts to set aside agency action that is contrary to law.

157.    The statutory authority for the TPP Program, as provided in the relevant appropriations statutes, allocates funds for "medically accurate and age appropriate programs that reduce teen pregnancy," with specific allocation Tier 1 funding "for replicating programs that have been proven effective through rigorous evaluation." 138 Stat. at 671.

158.    The Program Mandate's requirements for grantees to "align" their programs with Executive Orders and adhere to certain content mandates imposes additional obligations not contemplated by, and inconsistent with, the statutory framework established by Congress for the TPP Program.

159.    Contrary to the statutory requirement that TPP programs be "medically accurate," the Program Mandate requires Plaintiffs to "align" with medically inaccurate Executive Orders and adhere to medically inaccurate assertions about sex.

160.    For Tier 1 projects, Congress has mandated that Tier 1 funding be used for "*replicating* programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 138 Stat. at 671. The Program Mandate violates the statutory requirement that Tier 1 programs "replicat[e] programs that have been proven effective," because it expressly "require[s] some grantees to revise their TPP Program curricula and content"—apparently on an ad hoc basis—to adhere the Program Mandate's newly imposed requirements.

161.    By imposing funding requirements contrary to law on Plaintiffs' ongoing funding, the Program Mandate constitutes agency action that is not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A).

162.    The Program Mandate must be declared unlawful.

163.    The Program Mandate must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

164.    If the Program Mandate is not enjoined, vacated, and declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

165.    This Court should therefore enjoin the enforcement of the Program Mandate pending conclusion of these proceedings by ordering Defendants to refrain from relying on the Program Mandate in making determinations about Plaintiffs' compliance with TPP Program requirements.

### COUNT IV
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT –
### THE PROGRAM MANDATE IS ARBITRARY AND CAPRICIOUS

166.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

167.    Under the APA a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The APA also allows the reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

168.    The APA, 5 U.S.C. § 706, authorizes federal courts to set aside agency action that is arbitrary and capricious.

169.    The Program Mandate's requirements are arbitrary and capricious because the agency fails to provide any reasoned explanation for (a) imposing these new mandates or (b) how the agency will enforce these mandates in assessing noncompliance. There is no evidence that the agency considered, for example:

    a.    Whether the Executive Orders bear any rational nexus to teen-pregnancy outcomes;

b.  The scientific evidence that inclusive programming increases the effectiveness of TPP programs;

c.  How alignment with each Executive Order could be operationalized and content mandates imposed in evidence-based curricula;

d.  The significant risk of undermining Plaintiffs' contractual agreements;

e.  The nature and degree of Plaintiffs' reasonable reliance interests—including prior resources and investments in developing and implementing specific, agency pre-approved programming under earlier guidance;

f.  The burdens imposed by requiring TPP Programs to modify content and materials of pre-approved programs;

g.  Whether already-approved, evidence-based programs can be modified to adhere to the new content requirements and, if so, whether those changes will nullify the effectiveness of the programs and violate the statutory mandates;

h.  The impact that the new requirements could have on Plaintiffs' partnerships and the young people who benefit from Plaintiffs' TPP programing, which Plaintiffs intentionally implemented in high-risk and high-need communities at HHS's request;

i.  Potential conflicts between the objectives of the Executive Orders and content mandates and the criteria endorsed by HHS's own TPPER;

j.  Potential conflicts with state laws that require sexual education to be, *inter alia*, medically accurate, comprehensive, and/or inclusive;

k.  Whether any exceptions or hardship waivers would be provided for grantees unable to comply;

l.   Seeking or considering feedback from existing TPP grantees, state health departments, community-based partners, and other impacted stakeholders on the feasibility and impact of the new requirements;

m.   Less intrusive means of advancing any legitimate policy goals before imposing a binding, high-stakes requirement.

170.   The Program Mandate is arbitrary and capricious because the agency provided no empirical justification or reasoned analysis for the requirements in the Program Mandate.

171.   The Program Mandate's purported delineation of activities outside of the scope of the TPP Program is also arbitrary and capricious because it failed to provide good reason for adopting these definitions, failed to consider an important aspect of the problem in the imposition of its new additional requirements and restrictions, imposed  additional requirements and restrictions on TPP grantees that are contrary to statutory mandate, the purpose of the program, adopts internally inconsistent reasoning, unjustifiably changed existing policy, and are unsupported by substantial scientific evidence.

172.   Moreover, the Program Mandate is so vague in what it purports to require that it fails to provide "fair notice" and "reasoned decision-making" required by the APA.

173.   By imposing requirements that are arbitrary and capricious, the Program Mandate constitutes agency action that is not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A).

174.   The Program Mandate must be declared unlawful.

175.   The Program Mandate must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

176.   If the Program Mandate is not enjoined, vacated, and declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

177.    This Court should therefore enjoin the enforcement of the Program Mandate pending conclusion of these proceedings by ordering Defendants to refrain from relying on the Program Mandate, in making determinations about Plaintiffs' compliance with TPP Program requirements.

## COUNT V
## THE PROGRAM MANDATE IS *ULTRA VIRES*

178.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

179.    HHS, through its officials, may exercise only the authority conferred by statute.

180.    The TPP Program, as provided in the relevant appropriations statutes, allocates funds for "medically accurate and age appropriate programs that reduce teen pregnancy," with specific allocation "for replicating programs that have been proven effective through rigorous evaluation" and "for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." 138 Stat. at 671.

181.    The Program Mandate's requirements for grantees to align their programs with specific Executive Orders and to adhere to certain content mandates imposes additional obligations not contemplated by the statutory framework established by Congress for the TPP Program.

182.    Moreover, Defendants' actions are patently outside of their statutory authority because the Program Mandate, which requires Plaintiffs to "align" with medically inaccurate Executive Orders and adhere to medically inaccurate assertions about sex, is incompatible with Congress' mandate that TPP Programs be "medically accurate."

183.    By conditioning access to awarded appropriated funds on compliance with standardless requirements irreconcilable with Congress' criteria, Defendants have violated the separation of powers and encroached upon Congress's Spending authority and thereby acted *ultra vires*.

184.    The Program Mandate must be declared unlawful.

185.    If the Program Mandate is not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs respectfully request an order:

a)  declaring unlawful the new requirements imposed in the Program Mandate;

b)  enjoining the enforcement of the Program Mandate pending conclusion of these proceedings by permitting Plaintiffs to operate their programs and draw down funds for Year 3 under their approved NCC Applications, so long as they remain in compliance with the Materials Review Guidance dated January 2025;

c)  ordering Defendants to refrain from relying on the Program Mandate in making determinations about Plaintiffs' current and ongoing funding;

d)  vacating and setting aside the Program Mandate under 5 U.S.C. § 706;

e)  preliminarily and permanently enjoining Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants from implementing, maintaining, or giving effect to the new requirements in the Program Mandate;

f)  requiring HHS to submit status reports every 30-days after the date of the entry of the Court's order to ensure prompt and complete compliance with the Court's directive, up and until HHS completely complies with the Court's directive in its entirety;

g)  awarding Plaintiffs reasonable costs and attorney's fees in accordance with law including but not limited to 28 U.S.C. § 2412; and

h)  issuing any and all other such relief as the Court deems just and proper.

Dated: July 29, 2025                    Respectfully submitted,

By:    */s/ Andrew T. Tutt*
       Drew A. Harker (DC Bar # 412527)
       Andrew T. Tutt (DC Bar # 1026916)
       Bonnie E. Devany (*pro hac vice* pending)[*]
       Daniel Yablon (DC Bar # 90022490)
       ARNOLD & PORTER KAYE SCHOLER LLP
       601 Massachusetts Avenue, NW
       Washington, DC 20001
       (202) 942-5000
       drew.harker@arnoldporter.com
       andrew.tutt@arnoldporter.com
       bonnie.devany@arnoldporter.com
       daniel.yablon@arnoldporter.com

       Emily Nestler (DC Bar # 973886)
       PLANNED PARENTHOOD FEDERATION OF
       AMERICA
       1100 Vermont Avenue NW
       Washington, DC 20005
       (202) 973-4800
       emily.nestler@ppfa.org

       Valentina De Fex (*pro hac vice* pending)
       Melissa Shube (DC Bar # 241034)
       PLANNED PARENTHOOD FEDERATION OF
       AMERICA
       123 William Street, 9th Floor
       New York, NY 10038
       Phone: (212) 261-4696
       valentina.defex@ppfa.org
       melissa.shube@ppfa.org

---

[*] *Admitted only in Texas; practicing in D.C. pursuant to D.C. Ct. of Appeals R. 49(c)(8), under supervision of D.C. Bar Members.*