**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **)** | |
| **)** | |
| PLANNED PARENTHOOD OF **)** | |
| GREATER NEW YORK, *et al.*, **)** | |
| **)** | |
| Plaintiffs, **)** | |
| v. **)** | Civil Action No. 25-cv-2453 |
| **)** | |
| U.S. DEPARTMENT OF HEALTH AND **)** | Oral Argument Requested |
| HUMAN SERVICES, *et al.*, **)** | Expedited Hearing Requested |
| **)** | |
| Defendants. **)** | |
| **)** | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION**
**FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

    A.   The TPP Program .................................................................................................. 2

    B.   HHS's Imposition of New Requirements on the TPP Program............................ 4

C.   TRO Plaintiffs Imminently Face An Impossible Situation: Accepting Funds With
Significant Risks, Acceding to Unlawful Conditions, or Declining Funds Altogether ............... 6

LEGAL STANDARD............................................................................................................ 7

    A.   Plaintiffs Are Likely to Succeed on the Merits of Their Program Mandate Challenge ...... 8

        1.   The Program Mandate Is Unlawful Under the Constitution and the APA .................... 8

        2.   The Program Mandate Violates the APA Because it is Contrary to Law and Arbitrary
and Capricious ................................................................................................... 16

        3.   The Program Mandate is *Ultra Vires* ......................................................................... 29

    B.   TRO Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.......................... 30

    C.   The Balance of Equities and Public Interest Weigh Heavily in TRO Plaintiffs' Favor ... 37

CONCLUSION...................................................................................................................... 39

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>:**                                                                                      **<u>Page(s)</u>:**

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ................................................................7

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
   770 F. Supp. 3d 121 (D.D.C. 2025) ....................................................23, 24

*Am. Pub. Health Ass'n v. Nat'l Inst. of Health*,
   2025 WL 1822487 (D. Mass. July 2, 2025) ........................................11, 12

*Am. Trucking Associations., Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ..............................................................31

*Ark Initiative v. Tidwell*,
   816 F.3d 119 (D.C. Cir. 2016) ..............................................................24

*\*Ass'n of Am. Univs. v. Dep't of Energy*,
   No. 25-cv-10912-ADB, 2025 WL 1414135 (D. Mass. May 15, 2025) ......................28, 33, 36

*Bd. of Regents of State Cols. v. Roth*,
   408 U.S. 564 (1972) ..............................................................................9

*Beacon Associations., Inc. v. Apprio, Inc.*,
   308 F. Supp. 3d 277 (D.D.C. 2018) ......................................................33

*Beckles v. United States*,
   580 U.S. 256 (2017) ..............................................................................8

*California v. Trump*,
   2025 WL 1667949 (D. Mass. June 13, 2025) ..................................29, 30

*Chamber of Commerce v. Fed. Election Comm'n*,
   69 F.3d 600, 603 (D.C. Cir. 1995) .........................................................35

*Chi. Women in Trades v. Trump*,
   2025 WL 1118659 (N.D. Ill. Apr. 15, 2025) .........................................11

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ............................................................................21

*Comcast Corp. v. FCC*,
   579 F.3d 1 (D.C. Cir. 2009) ................................................................24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ........................................................................23, 24

*Eagle Tr. Fund v. U.S. Postal Serv.*,
   365 F. Supp. 3d 57 (D.D.C. 2019), *aff'd*, 811 F. App'x 669 (D.C. Cir. 2020)........................29

*Elrod v. Burns*,
   427 U.S. 347, 373 (1976) ...............................................................................................35

*Estate of Coll-Monge v. Inner Peace Movement*,
   524 F.3d 1341 (D.C. Cir. 2008)......................................................................................33

\*FCC v. Fox Television Stations, Inc. (Fox I),
   556 U.S. 502 (2009).......................................................................................20, 24, 26, 27

*FCC v. Fox Television Stations, Inc.* (*Fox II*),
   567 U.S. 239 (2012).........................................................................................................9

*Fed. Express Corp. v. United States Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022).........................................................................................29

*Genuine Parts Co. v. Env't Prot. Agency*,
   890 F.3d 304 (D.C. Cir. 2018)........................................................................................26

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019)..............................................................................................7

*Hall v. Johnson*,
   599 F. Supp. 2d 1 (D.D.C. 2009)......................................................................................7

*Hill v. Colorado*,
   530 U.S. 703 (2000).........................................................................................................9

*Johnson v. United States*,
   576 U.S. 591 (2015).........................................................................................................9

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020)..........................................................................................9

*Kingdom v. Trump*,
   No. 25-cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025)...............................................20

\*League of Women Voters v. Newby,
   838 F.3d 1 (D.C. Cir. 2016).......................................................................................32, 37

*Leedom v. Kyne*,
   358 U.S. 184 (1958).......................................................................................................29

*Mahmoud v. Taylor*,
   606 U.S. ___ (2025).................................................................................................13, 14

*Massachusetts v. Nat'l Insts. of Health*,
  770 F. Supp. 3d 277 (D. Mass. 2025) ...............................................................23, 24

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..............................................................................16, 20, 22, 24

*Multnomah Cnty. v. Azar*,
  340 F. Supp. 3d 1046 (D. Or. 2018) .......................................................................18

*NAACP v. U.S. Dep't of Educ.*,
  2025 WL 1196212 (D.D.C. Apr. 24, 2025) ............................................................13

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  2025 WL 573764 (D. Md. Feb. 21, 2025) ..............................................................12

*\*Nat'l Council of Nonprofits v. OMB*,
  2025 WL 368852 (D.D.C. Feb. 3, 2025) ....................................................20, 33, 37

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
  2025 WL 1188160 (D.N.H. Apr. 24, 2025)...........................................9, 11, 12, 15

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998)................................................................................................15

*Nat'l Senior Citizens L. Ctr., Inc. v. Legal Servs. Corp.*,
  581 F. Supp. 1362 (D.D.C. 1984), aff'd, 751 F.2d 1391 (D.C. Cir. 1985).......35, 36

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) .....................................................................................20

*Nken v. Holder*,
  556 U.S. 418 (2009).................................................................................................7

*Ohio v. EPA*,
  603 U.S. 279 (2024).................................................................................................22

*\*Open Communities All. v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ..............................................................4, 26, 32

*Orr v. Trump*,
  2025 WL 1145271 (D. Mass. Apr. 18, 2025) ..........................................................19

*Perkins Coie LLP v. DOJ*,
  2025 WL 1276857 (D.D.C. May 2, 2025)................................................................13

*Planned Parenthood of Greater N.Y. v. HHS* (*PPGNY*),
  No. 25-1334 (TJK) (D.D.C. May 1, 2025), Dkt. No. 1 .........................................5, 8

*Planned Parenthood of N.Y.C., Inc. v. HHS (PPNYC)*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) ............................................................... *passim*

*Reuters Ltd. v. UPI, Inc.*,
    903 F.2d 904 (2d Cir. 1990) ................................................................................33

*S. F. A.I.D.S. Found. v. Trump*,
    2025 WL 1621636 (N.D. Cal. June 9, 2025) ......................................................15

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020) ................................................................12

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ..........................................................................37

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ..............................................................................7

*Solondz v. Fed. Aviation Admin.*,
    141 F.4th 268 (D.C. Cir. 2025) ...........................................................................20

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ...............................................................................33

*Tenn. Educ. Ass'n v. Reynolds*,
    732 F. Supp. 3d 783 (M.D. Tenn. 2024) .............................................................15

*Timpinaro v. SEC*,
    2 F.3d 453 (D.C. Cir. 1993) ..................................................................................9

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017) ............................................................................9

*United States v. Williams*,
    553 U.S. 285 (2008) ............................................................................................10

*Xiaomi Corp. v. Dep't of Def.*,
    2021 WL 950144 (D.D.C. Mar. 12, 2021) ..........................................................35

## Statutes, Rules & Regulations

5 U.S.C. § 706(2) ........................................................................................................20

5 U.S.C. § 706(2)(B) .....................................................................................................8

42 U.S.C. § 713(e)(2) ..................................................................................................28

Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009) .......................................................2

Pub. L. No. 118-47, 138 Stat. 460, 671 (2024).................................................................... *passim*

45 C.F.R. § 52.6 ..........................................................................................................................3

45 C.F.R. § 52.6(c)......................................................................................................................3

45 C.F.R. § 75.371 ....................................................................................................................15

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025)....................................................11

Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025)....................................................11

**<u>Other Authorities</u>**

Claire Ainsworth, *Sex Redefined*, 518 NATURE 288, 288-90 (February 19, 2015) .....................26

John S. Santelli, M.D., M.P.H. *et al.*, *Abstinence-Only-Until-Marriage Policies
    and Programs*, 61 J. ADOLESCENT HEALTH 400.......................................................................25

Tiffany Jones, *Intersex Studies: A Systematic Review of International Health
    Literature*, 8 SAGE OPEN 2 (April 2018)................................................................................25

*The Biological Reality of Sex and Intersex: A Response to the Executive Order*
    (Feb. 11, 2025), https://pedsendo.org/wp-content/uploads/2025/02/Society-
    Statement-on-Biological-Sex-Development-and-DSD-2025.pdf...........................................19

FDA, *Prescription Drug Advertising - Questions and Answers*, (Jun. 19, 2015),
    https://www.fda.gov/drugs/prescription-drug-advertising/prescription-drug-
    advertising-questions-and-answers#non_requirements. ..........................................................14

HHS, *ASPE Research Brief: Making Sense of Replication Studies* (May 2015),
    https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//55351/rb_TPP_
    Replication.pdf.......................................................................................................................25

HHS, *Making Adaptations Tip Sheet*,
    https://acf.gov/sites/default/files/documents/prep-making-adaptations-ts_0.pdf ...................17

*Litigation Tracker: Legal Challenges to Trump Administration Actions*,
    Just Security (July 22, 2025), https://perma.cc/8JKK-NJUG ..................................................11

OASH, HHS, *HHS Issues Policy to Stop the Radical Indoctrination of Children
    and Ensure Parental Oversight for Teen Pregnancy Prevention Grants* (Jul. 2,
    2025), https://health.gov/news/hhs-issues-policy-stop-radical-indoctrination-
    children-and-ensure-parental-oversight-teen ............................................................................5

OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence
    Review*, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-
    program-evaluations/tpp-evidence-review#ftn1 (last visited July 29, 2025) .......................2, 3

*Replicate*, Merriam-Webster, https://www.merriam-
     webster.com/dictionary/replicate (last visited July 27, 2025) .................................................18

## INTRODUCTION

This case challenges the U.S. Department of Health and Human Services' (HHS) unlawful imposition of sweeping new requirements on the Teen Pregnancy Prevention (TPP) Program, an evidence-based, congressionally mandated public health initiative that has successfully reduced unintended teen pregnancy and related health disparities for over fifteen years. TRO Plaintiffs, Planned Parenthood of Greater New York (PPGNY) and Planned Parenthood of California Central Coast (PPCCC), are non-profit organizations successfully operating TPP projects across the country. Absent this Court's swift intervention, Plaintiffs' sexual education projects will be shut down, irreparably harming TRO Plaintiffs and the communities they serve.

Through HHS's *OASH Teen Pregnancy Prevention Program Policy Notice* (Program Mandate), HHS has unlawfully conditioned continued funding on compliance with amorphous requirements that are contrary to law, unsupported by evidence, and directly contravene the very purpose of the TPP program—to provide effective, medically accurate programming to reduce teen pregnancy and associated health risks. TRO Plaintiffs face an imminent deadline—for PPGNY by July 31 at the latest, and for PPCCC, shortly thereafter—to either shut down their public health programs or agree to comply with an unlawful HHS policy seemingly designed to permit targeted enforcement. Barring the grant of emergency relief, and given this Hobson's choice, PPGNY and PPCCC will have to shut down their TPP projects.

To protect TRO Plaintiffs from the immediate, irreparable injuries that they will suffer from declining to draw down funds—and ending their TPP projects—or accepting the funds with unlawful conditions, TRO Plaintiffs request that this Court grant a temporary restraining order immediately barring Defendants from imposing or enforcing the Program Mandate against them.

**STATEMENT OF FACTS**

**A. The TPP Program**

Teenage pregnancy has long been a significant public health concern in the United States because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society. Jessica Tollestrup, Cong. Rsch. Serv., R45183, *Adolescent Pregnancy: Federal Prevention Programs* 1 (2024). Despite a substantial decline over the past two decades, the rate of unintended adolescent pregnancy in the United States remains higher than that of comparable high-income countries, with persistent racial, ethnic, and geographic disparities. *Id.*

In 2009, Congress created the TPP Program to fund a wide array of evidence-based, scientifically rigorous approaches to reducing teen pregnancy and associated health risks. Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). In doing so, Congress appropriated $110 million "to fund medically accurate and age appropriate programs that reduce teen pregnancy." *Id.* Since then, Congress has continuously funded the TPP Program at approximately the same levels in the same manner and with the same statutory requirements. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024).

Congress requires HHS to fund two tiers of TPP Programs, "Tier 1" and "Tier 2." Tier 1 grantees "replicat[e]" "medically accurate and age appropriate programs" that have "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 138 Stat. at 671. HHS designates programs eligible for "replication" through the agency's Teen Pregnancy Prevention Evidence Review (TPPER) process, a rigorous process akin to peer review. OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review*, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review#ftn1 (last visited July 29,

2025). Tier 2 grantees are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing]" new "medically accurate and age appropriate programs" "for preventing teenage pregnancy." 138 Stat. at 671.

TPP Program grant recipients, including Plaintiffs, receive project funding through two distinct processes: a competitive award cycle and an annual non-competitive continuing award process. Consistent with HHS's regulations, 45 C.F.R. § 52.6, the TPP Program's competitive award cycle begins with a notice of funding opportunity (NOFO), by which the agency declares its intention to award funds and outlines the program goals, objectives, and conditions for applying. *See, e.g.*, HHS, OASH, OPA, Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services, Notice of Funding Opportunity, AH-TP1-23-001, (2023 NOFO) at 5-6 (attached hereto as Ex. A).

HHS grants these awards for a "project period," during which HHS "intends to support the project without requiring the project to recompete for funds." 45 C.F.R. § 52.6(c). Each year, grantees submit a non-competing continuation award application (NCC application) consisting of a progress report for the current budget year, and a work plan, budget, and budget justification for the upcoming year. 2023 NOFO, Ex. A at 56.

TRO Plaintiffs PPGNY and PPCCC[1] are Tier 1 TPP grantees whose projects were designed in response to HHS's 2023 NOFO, which solicited applications for replicating programs that were "culturally and linguistically appropriate, trauma-informed, and inclusive of all youth." 2023 NOFO, Ex. A at 13. Each grantee's project was approved for a five-year performance period from 2023 to 2028, subject to an annual non-complete continuous funding application process. Compl. ¶ 99.  Plaintiffs' third-year of funding was approved on July 2, 2025. Compl. ¶¶ 10-12.

---

[1] Plaintiff Planned Parenthood of the Heartland (PPH) does not seek a temporary restraining order.

When a TPP continuation award is granted, the funds are made available in an online account, and Plaintiffs then "draw down" funds as needed to reimburse them for their approved project expenses. Compl. ¶ 96. Through the process of accessing funds already awarded to them—i.e., "drawing down" the awarded funds—TPP funding recipients certify that they will comply with program policies, including the Program Mandate. *Id.* Plaintiffs have not drawn down any funds since HHS issued the Program Mandate on July 2, 2025.

**B. HHS's Imposition of New Requirements on the TPP Program**

Over the past several months, HHS has engaged in a pattern of escalating efforts to undermine the statutory goals of the TPP Program—first through the imposition of an Executive Order "alignment" requirement on Plaintiffs' NCC applications, and now through a sweeping Policy Mandate that not only requires Plaintiffs to "align" with Executive Orders as a condition of continued funding but also imposes a host of additional content-based restrictions that are vague, lack scientific reasoning, and are fundamentally incompatible with the purposes and statutory requirements of the TPP Program.

A little more than two weeks before the Tier 1 NCC application deadlines, OASH issued its *Guidance for Preparing a Non-Competing Continuation (NCC) Award Application, Teen Pregnancy Prevention (TPP) Program Recipients (AH-TP1-23-001)* (NCC Notice) to Tier 1 TPP funding recipients.[2] The NCC Notice imposed, for the first time, a requirement that grantees "align" their programs with *all* Executive Orders. NCC Notice, Ex. B at 4-5. Plaintiffs all submitted their NCC applications without certifying compliance with the Executive Order

---

[2] *See* OPA, *Guidance for Preparing a Non-Competing Continuation (NCC) Award Application, Teen Pregnancy Prevention (TPP) Program Recipients (AH-TP1-23-001)* (2025) (NCC Notice) (attached hereto as Ex. B).

"alignment" requirement. HHS granted Plaintiffs' NCC applications, but only after they filed a lawsuit challenging the Tier 1 NCC Notice.

On May 1, 2025, Plaintiffs filed suit alongside other TPP grantees challenging the imposition of the "alignment" requirement to the NCC application process. *See* Plaintiffs' Complaint for Declaratory and Injunctive Relief, *Planned Parenthood of Greater N.Y. v. HHS* (*PPGNY*), No. 25-1334 (TJK) (D.D.C. May 1, 2025), Dkt. No. 1. On June 26, 2025, the District Court denied preliminary relief solely on the ground that plaintiffs had not demonstrated irreparable harm. *PPGNY*, 2025 WL 1768100, at *6 (D.D.C. June 26, 2025). The order did not address the likelihood of success on the merits. *See id.* Plaintiffs in that case promptly filed a notice of appeal. *Notice of Appeal*, *PPGNY*, No. 25-1334 (D.D.C. June 27, 2025), Dkt. No. 29.

But on July 2, 2025, HHS granted Plaintiffs' NCC applications—albeit subject to the terms of the Program Mandate, attached hereto as Exhibit C, which it published that same day.[3] As a result, the plaintiffs no longer faced harm from the potential denial of their applications and voluntarily dismissed their case on July 11, 2025. Notice of Voluntary Dismissal, *PPGNY*, No. 25-1334 (D.D.C. July 11, 2025), Dkt. No. 34. Although HHS granted Plaintiffs' NCC applications notwithstanding their refusal to certify compliance with the Executive Order "alignment" requirements, the Program Mandate's effect is to reimpose that same unlawful requirement (and more) via a new agency action, under the threat of more expansive enforcement mechanisms.

While HHS characterizes its Program Mandate as a "policy notice" that merely "clarif[ies] OASH policy," Program Mandate, Ex. C at 1, the Program Mandate in fact imposes new and

---

[3] *See* OASH, HHS, *HHS Issues Policy to Stop the Radical Indoctrination of Children and Ensure Parental Oversight for Teen Pregnancy Prevention Grants* (Jul. 2, 2025), https://health.gov/news/hhs-issues-policy-stop-radical-indoctrination-children-and-ensure-parental-oversight-teen.

substantive conditions on continued funding—both via its Executive Order "alignment" requirement and by imposing additional sweeping new content mandates. Specifically, the Program Mandate imposes five content mandates: (1) an **anti-DEI mandate** that prohibits TPP programming from including "discriminatory equity ideology," and "diversity, equity, or inclusion-related discrimination"; (2) a **prohibition of certain LGBTQ+-inclusive content** that explicitly bans so-called "gender ideology," including "LGBTQ+-inclusive" content; (3) an **anti-"normalizing" sex mandate** that prohibits TPP programming from including any "sexually explicit content" or "content that encourages, normalizes, or promotes sexual activity for minors"; (4) the **redefining of "medically accurate"** in a manner that is both medically inaccurate and exceptionally burdensome on program participants; and (5) **an opt-out requirement** that TPP programs must "provide parents advance notice . . . and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." *Id.* at 3-5.

### C. TRO Plaintiffs Imminently Face An Impossible Situation: Accepting Funds With Significant Risks, Acceding to Unlawful Conditions, or Declining Funds Altogether

HHS's actions directly threaten the future of Plaintiffs' TPP projects. Despite HHS approving Plaintiffs' projects for a third year, the Program Mandate's unlawful requirements put Plaintiffs to the impossible choice as to whether to draw down the awarded funds (and certify compliance with the Program Mandate) or abandon the vulnerable populations they serve. Plaintiffs can either (a) maintain their effective and approved programming without significantly altering their projects at the risk of arbitrary and discriminatory enforcement, (b) introduce program changes that will undermine their purpose at the expense of their mission and values while still running these risks, or (c) relinquish access to TPP funds. Decl. of Wendy Stark (PPGNY

Decl.) ¶ 4 (attached hereto as Ex. E); Decl. of Jenna Tosh (PPCCC Decl.) ¶ 5 (attached hereto as Ex. F).

Plaintiffs designed their budgets, programming, staffing, and partnerships with community organizations based on the understanding that HHS would provide continued funding. By conditioning that funding on Plaintiffs' acceding to unlawful and standardless requirements, the Program Mandate disrupts Plaintiffs' operations and threatens their relationships and goodwill with many local and geographic partners in areas where programming is offered. These disruptions threaten Plaintiffs' ability to provide public health programming to communities that have been identified as having the highest unmet need for such programming and perpetuate the negative health outcomes this program was designed to address.

## LEGAL STANDARD

The standard governing temporary restraining orders is the same as for a preliminary injunction. *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009). Under that standard, Plaintiffs are entitled to emergency relief upon showing (1) a likelihood of success on the merits; (2) a likelihood that they would suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

The first factor—likelihood of success on the merits—is the "most important." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). And the last two factors "merge when the Government is the party opposing the preliminary injunction." *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

TRO Plaintiffs meet all of the factors warranting emergency relief.[4] The Court should enjoin the Program Mandate and issue all necessary and appropriate relief to preserve the status quo.

### A. Plaintiffs Are Likely to Succeed on the Merits of Their Program Mandate Challenge.

Under threat of grant termination and suspension, the Program Mandate codifies the Executive Order "alignment requirement" and imposes a range of content mandates that are unconstitutionally vague, invite arbitrary and discriminatory enforcement, and violate both the Constitution and the Administrative Procedure Act. Plaintiffs are likely to succeed on the merits of their claims because the Program Mandate is: (1) unconstitutionally vague; (2) violates the APA because it is contrary to law and arbitrary and capricious; and (3) is *ultra vires*.

### 1. The Program Mandate Is Unlawful Under the Constitution and the APA

The Program Mandate violates the Fifth Amendment's Due Process Clause and the requirements of the APA by enabling arbitrary enforcement. Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V. A core requirement of due process is that laws and regulations must contain adequate safeguards to prevent arbitrary and discriminatory enforcement. *See Beckles v. United*

---

[4] As a threshold matter, Plaintiffs indisputably have Article III standing. Courts across the country have expressly held that TPP Program recipients have standing to challenge changes to the program's terms. *See PPGWNY*, 946 F.3d at 1108-09; *Planned Parenthood of NYC, Inc. v. HHS (PPNYC)*, 337 F. Supp. 3d 308, 319-24 (S.D.N.Y. 2018); *see also PPGNY*, 2025 WL 1768100, at **3-4 (not addressing standing, but reaching the merits of irreparable harm and allowing plaintiffs to move forward with an expedited briefing schedule).

*States*, 580 U.S. 256, 262 (2017). A regulation that is "so standardless that it invites arbitrary enforcement" offends due process. *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

As a threshold issue, TRO Plaintiffs have a property interest protected by due process here: an interest in receiving continued TPP Program funding. *See, e.g.*, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972) ("[A] person receiving [governmental] benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process."). The void for vagueness doctrine has long been held to protect the interests that derive from similar benefits, even if the vague government requirement appears in an administrative action rather than a statute or rule. *See, e.g.*, *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (upholding vagueness challenge to revocation of a White House press pass); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) (upholding vagueness challenge to an agency letter threatening to revoke federal funding); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993) (remanding unconstitutionally vague SEC rule); *see also FCC v. Fox Television Stations, Inc.* (*Fox II*), 567 U.S. 239, 253-54 (2012) (similar).

The void for vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox II*, 567 U.S. at 253. Thus, courts will find an agency action unconstitutionally vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

The Program Mandate's codification of the Executive Order "alignment" requirement and its sweeping content mandates authorize arbitrary and discriminatory enforcement, rendering it unconstitutionally vague under the second prong.

**Vagueness As To What It Means To "Align" with Executive Orders**. The Program Mandate's "alignment" requirement invites arbitrary and discriminatory enforcement by granting officials unchecked discretion to determine whether a grantee's project sufficiently "aligns" with Executive Orders.  The Program Mandate requires TPP Program recipients to "revise their projects to align with Executive Orders." Program Mandate, Ex. C at 1. Yet it offers no objective standards or limiting principles for determining what "alignment" entails. Notably, the Program Mandate does not require applicants to "*comply*" with the Executive Orders, which themselves impose no direct obligations on private parties and instead provide direction only for specified *governmental* actors.[5] Unlike a word like "comply" that has a settled legal meaning, the word "alignment"—like the words "'annoying' or 'indecent'"—has a meaning that turns on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). The vagueness of the "alignment" requirement is exacerbated by the fact that of the more than 170 Executive Orders issued since January 20, 2025, most (if not all) are entirely irrelevant to teenage pregnancy prevention, addressing topics from national

---

[5] *See* H. Comm. on Gov't Operations, 85th Cong., Executive Orders and Proclamations: A Study of a Use of Presidential Powers 1 (Comm. Print 1957) ("Executive orders are generally directed to, and govern actions by, Government officials and agencies. They usually affect private individuals only indirectly.").

security to immigration to cultural-renaming initiatives.[6] Several have already been enjoined.[7] The Program Mandate vests unbounded discretion in agency officials by offering no standards for reconciling potentially conflicting directives within and among Executive Orders, or for determining how "alignment" should be enforced when it appears to conflict with grantees' obligations under existing funding agreements or the TPP statute.

The Program Mandate highlights five specific Executive Orders that "may be of most relevance to the work of the TPP program." Program Mandate, Ex. C at 1. The Orders themselves contain broad and undefined (or underdefined) terms like "gender ideology" (EO 14168), "discriminatory equity ideology" (EO 14190), and "illegal DEI" (EO 14173). As courts have recognized, these Orders are "rudderless"—they "do not even attempt to define DEI, but instead set it up as some sort of boogeyman." *Am. Pub. Health Assoc. v. Nat'l Inst. of Health*, 2025 WL 1822487, at *17 (D. Mass. July 2, 2025). "Without a definition of DEI, [the agency] embarked on a fool's errand resulting in arbitrary and capricious action." *Id.*; *cf. Nat'l Educ. Ass'n*, 2025 WL 1188160, at *19 (D.N.H. Apr. 24, 2025) (finding agency letter threatening to revoke federal education funding based on ambiguous term "DEI" was likely unconstitutionally vague, meriting preliminary relief).

---

[6] *See, e.g.*, Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (entitled "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats"); Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025) (entitled "Restoring Names that Honor American Greatness").

[7] *See, e.g.*, *Chicago Women in Trades v. Trump*, 2025 WL 1118659, at *1 (N.D. Ill. Apr. 15, 2025) (enjoining enforcement of EOs 14151 and 14173 insofar as they mandated termination of equity-related grant or compliance certification by grantee); *see also Litigation Tracker: Legal Challenges to Trump Administration Actions*, Just Security (July 22, 2025), https://perma.cc/8JKK-NJUG (collecting cases in which injunctions have been issued). The Program Mandate's failure to distinguish those Executive Orders that remain in effect from others compounds both the arbitrariness and vagueness of the "alignment" requirements.

**Vagueness As To What Content Mandates Prohibit.** The Program Mandate also imposes a series of content mandates that lack clear standards and thereby invite arbitrary and discriminatory enforcement. These include the anti-DEI mandate, a prohibition on so-called "harmful ideologies," the anti-normalizing sex mandate, redefinition of what qualifies as "medically accurate" information, and the imposition of an opt-out requirement. Each of these mandates uses open-ended language that grants officials broad, subjective discretion to decide when a grantee's content violates the Program's requirements. The absence of objective, enforceable criteria creates a serious risk that enforcement decisions will be inconsistent, politicized, or selectively applied, in violation of the Fifth Amendment's prohibition on arbitrary governance.

The Program Mandate targets what the administration might view as "DEI" initiatives, prohibiting TPP programs from including "discriminatory equity ideology" and "diversity, equity, or inclusion-related discrimination." Program Mandate, Ex. C at 4-5. These broad and undefined terms confer sweeping discretion on agency officials to determine when a grantee's content or approach runs afoul of the Mandate. By declining to tie these prohibitions to established anti-discrimination standards or provide any limiting principles, the Mandate authorizes enforcement based on subjective and potentially ideological judgments. This unchecked discretion creates a substantial risk of arbitrary and discriminatory enforcement, in direct violation of the Fifth Amendment's due process guarantees. Federal courts across the country have struck down similar DEI prohibitions as unconstitutionally vague and arbitrary and capricious. *See Am. Pub. Health Assoc.*, 2025 WL 1822487, at *17 (D. Mass. July 2, 2025); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 2025 WL 1188160, at *19 (D.N.H. Apr. 24, 2025); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 529, 543-45 (N.D. Cal. 2020); *Nat'l Ass'n of Diversity Officers in*

*Higher Educ. v. Trump*, 2025 WL 573764, at *23, *26 (D. Md. Feb. 21, 2025); *NAACP v. U.S. Dep't of Educ.*, 2025 WL 1196212, at *6 (D.D.C. Apr. 24, 2025) (finding likelihood of success); *Perkins Coie LLP v. DOJ*, 2025 WL 1276857, at *45 (D.D.C. May 2, 2025) (finding likelihood of success).

The Program Mandate also broadly prohibits TPP programming from including certain "ideological content" that the Administration deems "harmful," but provides no objective standards for identifying what qualifies as such content. To the extent the Mandate references specific categories—such as "content at issue in *Mahmoud*," "gender ideology," and "discriminatory ideology"—it offers no definitions or limiting principles to guide enforcement. These vague and entirely subjective terms grant agency officials sweeping discretion to determine what ideologies are deemed "harmful." The absence of clear, enforceable criteria invites inconsistent and arbitrary enforcement, in violation of the Fifth Amendment's core due process protections.

The Program Mandate additionally imposes a prohibition on "sexually explicit content" and "content that encourages, normalizes, or promotes sexual activity for minors." The Program Mandate does not define the terms "encourages," "normalizes" or "promotes," nor does it provide guidance as to how the agency will enforce those terms. And this problem is compounded by the obvious fact that any discussion of teen pregnancy prevention necessarily requires discussion, and acknowledgment, of sexual activity and anatomy to ensure that the program is effective. *See, e.g.*, Decl. of Leslie M. Kantor, PhD, MPH (Kantor Decl.) ¶ 44 (attached hereto as Ex. D). Sex education unavoidably entails education about sex. In practice, the Mandate enables penalizing medically accurate and evidence-based education in favor of abstinence-only messaging, even where not expressly required. At best, the Mandate operates as a license for arbitrary enforcement

in violation of due process. At worst, it runs directly counter to Congress's statutory mandate for the TPP program. *See infra* part A(2)(a).

Additionally, while the Program Mandate states that "OASH is concerned" about several definitions used in prior NOFOs, it fails to articulate what aspects of those definitions are objectionable or how grantees are expected to respond. This ambiguity grants officials broad discretion to retroactively penalize program content already approved by the agency without any objective standard. In one instance, the Mandate redefines "medically accurate" to require instruction on the "full range of health risks" associated with contraceptives, but offers no guidance as to what level of detail is required or how that threshold will be judged. This vague and open-ended requirement enables agency officials to enforce compliance based on subjective views about contraception or public health messaging. For instance, agency officials could claim it requires every mention of contraception to be accompanied by an exhaustive, disclaimer-style disclosure akin to the fine print in a pharmaceutical advertisement.[8] Such unbounded discretion invites inconsistent, selective, and discriminatory enforcement, in violation of the Fifth Amendment's guarantee against arbitrary government action.

Finally, the Program Mandate, invoking the U.S. Supreme Court decision in *Mahmoud v. Taylor*, 606 U.S. ___ (2025), imposes an opt-out requirement on TPP programs: to "provide parents advance notice (including relevant specifics [presumably about the program's contents]) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." Program Mandate, Ex. C at 3. The Mandate offers no standards

---

[8] *Compare* Program Mandate at 5 (requiring that "methods about contraception" must be accompanied by "information on a *full range* of health risks") (emphasis added), *with* FDA, *Prescription Drug Advertising - Questions and Answers*, (Jun. 19, 2015) (requiring only disclosure of "the drug's *most important* risks") (emphasis added), https://www.fda.gov/drugs/prescription-drug-advertising/prescription-drug-advertising-questions-and-answers#non_requirements.

for proscribing what content "may burden" religious exercise, nor does it specify how the opt-out mechanism is expected to function or what content must trigger it. This absence of clear criteria delegates sweeping discretion to agency officials to determine whether a grantee's program is compliant, allowing enforcement to turn on officials' subjective or ideological assessments of religious burden. Such standardless discretion creates a serious risk of arbitrary and discriminatory enforcement, in violation of due process.

The result of all this is to empower HHS to arbitrarily terminate program funding or initiate "enforcement actions," *see* 45 C.F.R. § 75.371, for discriminatory reasons in the name of failure to comply with the Program Mandate, *see* Program Mandate, Ex. C at 6.

As numerous courts have recognized, imposition of this sort of standardless ideological requirement is a textbook case for the void-for-vagueness doctrine. *See, e.g.*, *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *19 (holding an agency action was unconstitutionally vague because "to label a program as a 'diversity, equity, and inclusion' program necessarily involves 'appeals to abstract principles . . . such that the practical meaning of the [agency action] must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it'" (quoting *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024))); *San Francisco A.I.D.S. Found. v. Trump*, 2025 WL 1621636, at *21 (N.D. Cal. June 9, 2025) ("The vagueness of the term 'equity-related' grants or contracts invites arbitrary and discriminatory enforcement and does not provide sufficient notice to grantees as to what types of speech or activity they must avoid to prevent termination of their grants or contracts—compelling grantees and grant applicants to steer far too clear of [the] 'forbidden area' of anything related to the broad and undefined term of 'equity.'" (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998))). The Program Mandate grants agency officials unbounded discretion to determine

whether a TPP program has "aligned" with Executive Orders or satisfied the content mandates, effectively operating as a license for arbitrary and discriminatory enforcement based on viewpoint.

### 2. The Program Mandate Violates the APA Because it is Contrary to Law and Arbitrary and Capricious

It has long been recognized that agency action should be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). As a threshold matter, the Program Mandate is final agency action that is therefore reviewable under the APA. *See PPNYC*, 337 F. Supp. 3d at 326 (concluding that terms of TPP Program funding are final agency action that applicants may challenge). By its terms, TPP Program grant recipients that are "noncompliant with the [the Program Mandate] may face grant suspension . . . and grant termination." Program Mandate, Ex. C at 5. The Program Mandate also "delineate[s] when materials and activities are . . . outside the scope of the TPP Program," and thus sets forth requirements that TRO Plaintiffs must meet to remain in the program. *Id.* at 1. The Program Mandate must be set aside because it is both (a) contrary to law and (b) arbitrary and capricious.

### a. The Program Mandate Contravenes Congress's Directives for the TPP Program

The Program Mandate violates the APA because it is contrary to law. To the extent the Program Mandate's requirements are discernable, they defy at least three of Congress's longstanding directives: (1) that Tier 1 funding "shall be used for *replicating* programs' (2) that "have been proven *effective* through rigorous evaluation," and (3) that all TPP programming must be "medically accurate." 138 Stat. at 671 (emphasis added).

***The Program Mandate contravenes the statutory replication requirement.*** Congress has mandated that Tier 1 funding be used for "*replicating* programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying

teenage pregnancy, or other associated risk factors." 138 Stat. at 671 (emphasis added); *see also PPGWNI*, 946 F.3d at 1113. What it means to "replicate[] a program" is well established in the public health field: it requires the program administrator to "provid[e] the program the way it was conducted when it was researched and found to be effective." Kantor Decl. ¶ 24b. Though minor adaptations of approved programs are permitted, such adaptations must be carefully thought out. Kantor Decl. ¶¶ 48-49. Indeed, "[i]n the past, any adaptations that were made to evidence based teen pregnancy programs were closely overseen by the Office of Population Affairs," which issued very specific guidelines about the types of adaptations that could be made. Kantor Decl. ¶ 48; *see, e.g.*, HHS, *Making Adaptations Tip Sheet*, https://acf.gov/sites/default/files/documents/prep-making-adaptations-ts_0.pdf ("All adaptation changes, regardless of their motives, need to be reviewed and approved in the context of maintaining fidelity to the core components.").

The Program Mandate violates the statutory requirement that Tier 1 programs "replicat[e] programs that have been proven effective," because it expressly "require[s] some grantees to revise their TPP Program curricula and content"—apparently on an ad hoc basis—to meet the Program Mandate's newly imposed requirements, including to "align" with all Presidential Executive Orders and to excise proscribed "ideological content." Program Mandate, Ex. C at 6; *see also id.* at 6-7 (stating that "the prior administration erred in approving [program] materials" and that even those participants whose programs have been approved must "ensure all program materials comply with this [Program Mandate]"). To "revise" a program is the opposite of "replicating" it and plainly contravenes the statutory replication requirement. *See PPGWNI*, 946 F.3d at 1113 ("[T]he 2018 Tier 1 [NOA] would incorrectly permit grants for programs not proven effective, contrary to the TPPP"); *PPNYC*, 337 F. Supp. 3d at 331-37 ("Defendants have violated their statutory obligation to select model 'programs' 'proven effective through rigorous evaluation.'").

As set forth in the Program Mandate, the unspecified changes required for Executive Order and ideological alignment may be substantial, and include, among other changes, adaptations to existing curriculum, and updating policies, staffing, and training. Making substantial "changes," "modifications," and "adaptations" to approved programs and curricula without a rigorous analysis of how such changes affect the program's core components, *id.*, is the opposite of "replicating" them, 138 Stat. at 671; *see Replicate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/replicate (last visited July 27, 2025) (defining "replicate" as to "duplicate" or "repeat").

*The Program Mandate contravenes the statutory "effectiveness" requirement.* The Program Mandate's prohibition on "normaliz[ing]" sex is fundamentally incompatible with effective teen pregnancy prevention and could, in effect, be enforced as an abstinence-only requirement. Comprehensive sexual education includes topics like contraception, consent, and healthy relationships—acknowledging that some teens are or will become sexually active. Kantor Decl. ¶¶ 44-45. If such content is forbidden for "normalizing" sex, educators will be left with abstinence as the only permissible message. Abstinence-only-until-marriage programs have been shown to be ineffective in changing adolescent sexual behavior. Kantor Decl. ¶ 43. Thus, by framing medically accurate, developmentally appropriate, and evidence-based information and programs about safe sex as impermissible "normalization," the anti-normalizing sex mandate effectively suppresses critical health education and undermines the statutory requirement that Tier 1 TPP programs replicate "effective" programming approved through the TPPER process. *See* 138 Stat. at 671; *cf. Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 106-68 (D. Or. 2018) (vacating 2018 Tier 1 Funding Announcement as "not in accordance with law" because "HHS … ignore[d] the qualifier that the programs 'must be proven effective by rigorous evaluation.'"). For these

18

reasons, TRO Plaintiffs "cannot and [do] not provide programming that promotes abstinence as the only appropriate behavior for youth as it is not an approach rooted in evidence and reflective of the real world decisions that our participants are contemplating." PPGNY Decl. ¶ 55; PPCCC ¶ 61 (similar).

>    **The Program Mandate contravenes the statutory requirement that TPP programs be "medically accurate."** The Program Mandate's requirement that TPP programs adhere to the "biological reality of sex" as including only "males and females" contravenes the statutory requirement that TPP programs be "medically accurate." HHS's assertion that "information" is not "medically accurate" if it "denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females," Program Mandate, Ex. C at 5, erases the existence of intersex and transgender individuals and is directly contrary to widely available scientific evidence. *See, e.g.*, Kantor Decl. ¶ 57 ("[A] large scientific literature on the biological basis of sex concludes that there is significant variation within the category of biological sex."); Pediatric Endocrine Soc'y, *The Biological Reality of Sex and Intersex: A Response to the Executive Order* (Feb. 11, 2025), https://pedsendo.org/wp-content/uploads/2025/02/Society-Statement-on-Biological-Sex-Development-and-DSD-2025.pdf ("The proposed definitions of biological sex within the Executive Order should not and cannot apply to people born with biological conditions known as Differences of Sex Development . . . a collection of rare medical conditions that occur before birth in which biological sex development does not follow the typical path."); *Orr v. Trump*, 2025 WL 1145271, at *13 (D. Mass. Apr. 18, 2025) ("Viewed as a whole, the language of the Executive Order is candid in its rejection of the identity of an entire group—transgender Americans—who have always existed and have long been recognized in, among other fields, law and the medical profession."). By defining "medical accuracy" in a manner that denies the

existence of intersex and transgender individuals, the Program Mandate's binary definition of sex fails to reflect medical reality and violates the statutory requirement for TPP programs to be medically accurate.

### b. The Program Mandate Violates the APA Because it is Arbitrary and Capricious

The Program Mandate is also unlawful because it is arbitrary and capricious. Under the APA, courts must "hold unlawful and set aside" arbitrary or capricious agency action. 5 U.S.C. § 706(2). Under that standard, agency action is unlawful where the agency has (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," *Solondz v. Fed. Aviation Admin.*, 141 F.4th 268, 276 (D.C. Cir. 2025) (quoting *State Farm*, 463 U.S. at 43), or (4) provided a sound reason for any change in the agency's position, *FCC v. Fox Television Stations, Inc.* (*Fox I*), 556 U.S. 502 (2009).

"[A]s numerous courts have held, the fact that an agency's actions were undertaken to fulfill a presidential directive does not exempt them from arbitrary-and-capricious review." *Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *10 (D.D.C. June 3, 2025) (finding agency action implementing gender ideology Executive Order was arbitrary and capricious). After all, "furthering the President's wishes cannot be a blank check for the Agencies to do as they please." *Nat'l Council of Nonprofits*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025). "The APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision." *Id.* Here, there is none.

***Reliance on factors not intended by Congress.*** At the outset, the Program Mandate relies on factors not intended by Congress, including "the President's clear policy directive to protect children from harmful ideologies." Program Mandate, Ex. C at 3; *cf. Nebraska v. Su*, 121 F.4th 1,

16 (9th Cir. 2024) (holding that an agency action violates the APA when the action relied on political directives not authorized by statue). Congress made a deliberate choice to pursue *evidence-based* social policy initiatives through the tiered evidence approach. *See* Tollestrup, *supra*, at 4. "The creation of the TPP Program as an evidence-based model coincided with a larger movement across the federal government to engage in evidence-based policymaking, which sought to ensure that public funds were appropriated for approaches backed by evidence and that investments were made in evaluations to help build out the evidence base related to solving particular problems." Kantor Decl. ¶ 25. Congress meant what it said when it deployed the TPP Program statutory framework: Tier 1 funds must be spent on "replicating" programs that have been empirically "proven effective" to reduce teen pregnancy.  138 Stat. at 671. It did not authorize HHS to instead allocate funds based on its ideological preferences.

By eschewing evidence-based decisionmaking in favor of unreasoned ideological requirements, the agency exceeded the "small range of choices" Congress allowed it. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). The agency erred here in basing the Program Mandate and continued TPP funding on political concerns instead of program effectiveness, requiring "alignment" with dozens of Executive Orders and five heavily policy-laden orders in particular. *See* Program Mandate, Ex. C at 1-2; *see also* Compl. ¶¶ 54-59 (detailing the five Executive Orders). The Program Mandate situates itself within the Administration's efforts by imposing content mandates restricting ideologies it deems as harmful. Program Mandate, Ex. C at 4. HHS additionally considered impermissible factors when it short-circuited the tiered evidence approach by declaring that TPP Program grantees must not "den[y] the biological reality of sex or otherwise fail[] to distinguish appropriately between males and females." *Id.* at 5. These considerations are plainly incompatible with the statutory text, which instructs the agency to select

programs by their proven effectiveness as opposed to their "alignment" with unrelated ideological priorities.

   ***Failure to consider an important aspect of the problem.*** In issuing the Program Mandate, the agency also "ignore[d]" the most "important aspect of the problem" before it: effective prevention of teen pregnancy. *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43). The Program Mandate prohibits content that is "sexually explicit" or "encourages, normalizes, or promotes" sexual activities. *See* Program Mandate, Ex. C at 3-4. "Normaliz[ing]" sexual activities could encompass providing any information about them at all. But effective sex education is impossible without talking about sex. Kantor Decl. ¶¶ 43-45. The agency similarly undertook no effort to spell out how its changes to the concepts of "health equity" and "inclusivity" might further the TPP Program's evidence-based goals. *See* Program Mandate, Ex. C at 5-6. To state the obvious: teens of different backgrounds and gender identities can become pregnant. Excluding inclusive content does nothing to prevent pregnancy; and it ignores the reality that teens from diverse backgrounds still need effective education. *See also, e.g.*, Kantor Decl. ¶ 54 ("Cultural and linguistic appropriateness is essential to ensure that programs meet the needs of youth who, in a country as large and varied as the United States, come from different settings (*e.g.*, rural, suburban and urban), cultural backgrounds, and may or may not speak English as a first language."). The agency also declined to consider that the most effective way to reach different populations is to cater programming to their cultural backgrounds and unique needs. *See* PPCCC Decl. ¶ 84 ("Due to challenges, such as language and transportation barriers, members of these communities are often unable to benefit from other sex education programs . . . PPCCC designed a project to meet these gaps in services."); PPGNY Decl. ¶ 49 (PPGNY's project was "intended to

ensure that its programming addressed gaps in existing curricula that failed to account for unique needs of many communities including LGBTQ+ youth")

Nor does the Program Mandate grapple with how it impacts Congress's directives governing the TPP Program. The notice does not explain, for example, how requiring program participants to revise their programs will further or even comply with Congress's mandate that Tier 1 programs must "replicat[e] programs that have been proven effective through rigorous evaluation." 138 Stat at 671. To the contrary, "'replicating' requires the prior existence of something that is to be duplicated, repeated, copied, or reproduced." *PPNYC*, 337 F. Supp. 3d at 333. By mandating and prohibiting content at odds with the core curricula that make the models HHS already approved successful, the notice nullifies the replication requirement that both Congress and HHS established.

***Failure to properly consider reliance interests.*** In addition, because the agency "was 'not writing on a blank slate,' it was required to assess whether there were reliance interests, determine whether those interests were significant, and weigh them against any competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020); *see, e.g.*, *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Supp. 3d 121, 139 (D.D.C. 2025) (finding agency action arbitrary and capricious where it ignored the reliance interests of grantees). Reliance interests here are substantial. Plaintiffs are now two years into their five-year programs. They have developed program materials, hired and trained staff, contracted with subgrantees, and made commitments to community partners. *See, e.g.*, PPGNY Decl. ¶¶ 45-46, 69, 73; PPCCC Decl. ¶¶ 77, 86. The agency further failed to consider how the new requirements, in conjunction with their vague mandates, would affect schools and local communities that rely on effective public health programming. *Cf. Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 309 (D.

Mass. 2025) (finding action arbitrary and capricious where it "fails to consider the impact . . . on public health.").

The agency paid only lip service to these concerns, acknowledging that some materials "previously approved by OASH" would now need to be revised but claiming—without explanation—that it had "taken that into account." Program Mandate, Ex. C at 5. Its only justification was a bare assertion that the prior administration's approach was unlawful. *See id.* at 6. Yet an agency's novel belief that its prior action was unlawful provides no license to run roughshod over regulated parties' reliance interests or dispense with the APA's requirement of reasoned decisionmaking. *Dep't of Homeland Sec. v. Regents of the Univ. of Cali.*, 591 U.S. 1, 24, 30 (2020) (holding that the agency's decision to rescind DACA failed to consider "legitimate reliance" even though the government thought the program unlawful). "[C]onclusory statements" like these fall far short of what the law demands. *Nat'l Institutes of Health*, 770 F. Supp. 3d at 310 (D. Mass. 2025) (quoting *Fox I*, 556 U.S. at 515-16); *see also AIDS Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 139 (similar).

***Explanation runs counter to evidence.*** Courts "have not hesitated to vacate" agency action "when the agency has not responded to empirical data or to an argument inconsistent with its conclusion." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). An agency action is arbitrary and capricious when it has "offered an explanation for its decision that runs counter to the evidence." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Given the consensus of scientific literature and the evidence developed through the program materials HHS has already approved, at least two aspects of the Program Mandate violate this cardinal rule.

First, HHS ignored evidence that present programming has been proven effective at reducing teen pregnancy and plainly furthers Congress's statutory mandate. In the last few decades, "teen pregnancy prevention researchers have achieved notable success in identifying programs that can be effective in reducing teen pregnancy, [STIs], and associated sexual risk behaviors." HHS, *ASPE Research Brief: Making Sense of Replication Studies*, at 1 (May 2015), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//55351/rb_TPP_Replication.pdf. And "[m]uch of the supporting research evidence" for HHS's approved Tier 1 programs, like those replicated by PPGNY and PPCCC, "comes from rigorous randomized controlled trials, considered the 'gold standard' in evaluation research." *Id.* at 1. On the other hand, the Program Mandate's anti-normalizing sex requirement could be enforced as requiring abstinence-only programming, which has been scientifically shown to be ineffective at preventing teenage pregnancy and other associated risk behaviors. *See, e.g.*, John S. Santelli, M.D., M.P.H. *et al.*, *Abstinence-Only-Until-Marriage Policies and Programs*, 61 J. ADOLESCENT HEALTH 400, 400 ("[Abstinence only] programs are not effective in delaying initiation of sexual intercourse or changing other behaviors."). Indeed, for this very reason, Congress diverted funding from abstinence-only sexual education programs to the TPP Program's tiered, evidence-based model. Kantor Decl. ¶ 21. As recognized by Congress and HHS—and supported by overwhelming scientific evidence— effective sexual education requires acknowledging the reality that some adolescents are or will become sexually active. *Id.* ¶¶ 20-21.

Second, as previously explained, the Program Mandate's assertion that "information" is not "medically accurate" if it "denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females," Program Mandate, Ex. C at 5, runs directly contrary to widely available scientific evidence. *See, e.g.*, Tiffany Jones, *Intersex Studies: A Systematic*

*Review of International Health Literature*, 8 SAGE OPEN 2 (April 2018) ("Research has generally estimated that 1.7% to 4% of people go on to actually have intersex variations."); Claire Ainsworth, *Sex Redefined*, 518 NATURE 288, 288-90 (February 19, 2015) ("[D]octors have long known that some people straddle the boundary—their sex chromosomes say one thing, but their gonads (ovaries or testes) or sexual anatomy say another."). The agency's decision to redefine sex—and in doing so erase the existence of individuals with intersex characteristics and transgender individuals—therefore cannot be sustained because it "rests upon a factual premise that is unsupported." *Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018).

      ***No good cause for changing policy.*** Although the Program Mandate purports merely to "clarify" program requirements, its stark departure from evidence-based decisionmaking and imposition of new ideological requirements mark a significant change in agency policy. *See* Program Mandate, Ex. C at 1, 4-6 (explaining that the agency was correcting supposed "deficiencies" in existing definitions of statutory language and claiming it "erred" in prior project approvals). Where, as here, an agency changes its policy, it must show "good reasons" for doing so. *Fox I*, 556 U.S. at 514-15. HHS "must provide a more detailed justification than would suffice for a policy 'created on a blank slate' where 'its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.'" *Ass'n of Am. Univs*, 2025 WL 1725857, at *16 (quoting *Fox I*, 556 U.S. at 515). When an agency changes its position, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* (quoting *Fox I*, 556 U.S. at 516). The Program Mandate offers no such reasoned explanation.

The Program Mandate does not even recognize that the Executive Order "alignment" mandate far exceeds the requirement in HHS's prior NOFOs that grant recipients "comply" with Executive Orders. And where the Program Mandate does recognize a change in position, it gives no good reason for doing so. *See, e.g.*, Program Mandate, Ex. C at 4 (indicating "concern[s]" about prior definitions, but not specifying what is concerning or why the definitions are not within the statutory scope of the TPP Program); *id.* at 6 (concluding that the prior administration "erred" in approving some TPP Program materials, but giving no substantive reason for why or how it has determined what is "unrelated to reducing teen pregnancy"). The Program Mandate asserts that certain materials or ideologies are beyond the scope of the TPP Program but does not provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox I*, 556 U.S. at 516. For instance, the Program Mandate does not explain how excluding content that is inclusive of all gender identities from the program will further the prevention of unintended teen pregnancy. Nor does it explain any change in facts or circumstances as to why inclusive programming no longer falls within the scope of the TPP Program, where such programming was *required* by the agency in earlier years. *See* 2023 NOFO, Ex. A at 11.

The Program Mandate also fails to give any reason for abandoning the agency's prior definitions of "adolescent-friendly services," "age appropriateness," "equitable environment," "health equity," "inclusivity," and "medical accuracy." Indeed, the Program Mandate does not even identify *how* the agency's prior interpretations erred, stating only that the agency "is concerned" that these definitions may "include deficiencies based on the statutory language." Program Mandate, Ex. C at 4. Nebulous "concern[]" is no substitute for reasoned decisionmaking.

The agency's redefining of "medical accuracy" is particularly egregious. Previously, the agency defined medical accuracy as: "Verified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." *Id.* Not only is this definition consistent with a well-established and longstanding meaning of medical accuracy within public health and evidence-based policy, Kantor Decl. ¶ 33, but is also identical to the definition of "medically accurate and complete" that Congress provided for under the Personal Responsibility Education Program in 42 U.S.C. § 713(e)(2). HHS does not identify what is "deficient" in this definition nor any factual findings that contradict it. Instead, the agency redefines medical accuracy in a manner that, as previously discussed, is itself medically inaccurate. *Cf. Ass'n of Am. Universities*, 2025 WL 1725857 (finding an agency's action was "arbitrary and capricious because it ignores important aspects of the problem, namely [the agency's] statutory directive to 'support basic scientific research and programs to strengthen scientific research potential and scientific education programs.'").

Moreover, "a review of studies on teen pregnancy prevention programs . . . shows that teen pregnancy prevention programs that address issues of gender are more likely to result in reductions of sexually transmitted diseases and teen pregnancy." Kantor Decl. ¶ 63. "Examining how gender roles and expectations may influence how adolescents engage in relationships is a very important component of pregnancy prevention." *Id.* The Program Mandate's prohibition on teaching "gender ideology," Program Mandate, Ex. C at 5, would "disallow discussions about gender roles which are essential to helping young people learn to communicate, negotiate and refuse unprotected sexual activity." Kantor Decl. ¶ 63. HHS did not provide any justification for its change of position

on why, contrary to research, such discussions fall outside the scope of Congress's directives for the TPP Program.

Finally, the Program Mandate fails to explain why teen pregnancy prevention curricula, which are administered to youth on an individualized basis by community, would be less effective if they contain purported "DEI"-related materials. Nor could it: Plaintiffs' sex education programs are taught on an individual basis, specifically crafted for the communities that receive them—communities HHS has, in the past, recognized face particularly high rates of teen pregnancy and STIs.

### 3. The Program Mandate is *Ultra Vires*

"Judicial review for *ultra vires* agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up). "Stated simply, a claim that an agency acted *ultra vires* is a claim that the agency acted 'in excess of its delegated powers[.]'" *Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019), *aff'd*, 811 F. App'x 669 (D.C. Cir. 2020) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). "Accordingly, an agency acts *ultra vires* if it attaches conditions to formula grants that are unauthorized by statute." *California v. Trump*, 2025 WL 1667949, at *14 (D. Mass. June 13, 2025).

Here, Defendants have imposed funding conditions that are not authorized by Congress and are directly at odds with the TPP Program's governing statute. The statute allocates funds for "medically accurate and age appropriate programs that reduce teen pregnancy," with specific requirements for Tier 1. 138 Stat. at 671. The Program Mandate's Executive Order "alignment" requirement and five content mandates impose additional obligations not contemplated by Congress. These requirements conflict with the statutory mandate that Tier 1 programs "replicate"

rigorously evaluated models and that all programs be "medically accurate"—terms with well-established meanings in public health. *See* Kantor Decl. ¶ 22. The Program Mandate's requirements about defining sex directly contradict the statute's mandate that programs be "medically accurate." *Id.* And requiring programs to make modifications to "align" with Executive Orders and exclude certain "ideologies" defy the requirement that TPP Tier 1 recipients "replicat[e]" programs already approved by HHS. *PPNYC*, 337 F. Supp. 3d at 333. By conditioning appropriated funds on the fulfillment of criteria irreconcilable with those Congress prescribed, Defendants have acted beyond their authority, violated the separation of powers and encroached upon Congress's spending power, and thereby acted *ultra vires*. *Cf. California v. Trump*, 2025 WL 1667949, at *15.

## B.  TRO Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

Absent immediate relief from this Court, TRO Plaintiffs will have to leave the TPP Program and shutter their TPP projects—a decision they have no choice but to make.  The Program Mandate conditions TPP grantees' ability to continue providing critical public health services on agreeing to unlawful terms. The Program Mandate's coercive structure, which threatens investigation, claw back of funds, and funding termination, endangers not only TRO Plaintiffs' TPP projects' operational continuity, but also TRO Plaintiffs' missions and reputations—a harm that cannot be remedied through retrospective monetary relief.

TPP grantees are being forced to make an urgent, high-stakes decision: forego the sole funding for their critical sexual education programs, *or* agree to the Program Mandate's unlawful terms (and, if applicable, make project changes) and draw down funds at the risk of arbitrary enforcement under an HHS rule that appears designed to permit the agency to retaliate against grantees at will. This is a Hobson's choice, and relief cannot wait. If PPGNY does not obtain relief by July 31, 2025, at which point it can no longer pay its staff without guarantee of TPP funding,

PPGNY will have to leave the program. PPGNY Decl. ¶ 44. Every day without relief PPCCC is incurring risks and expenses with no other funds to cover the costs of its program and is unable to make "pressing decisions, including renewing contracts and properly informing staff as to the potential termination of their roles," which "is particularly true now with the uncertainty and challenges to other federal and state funding [PPCCC] face[s] in the current environment." PPCCC Decl. ¶ 56-57.

Shuttering PPGNY and PPCCC's TPP projects would be a "devastating outcome"— causing irreparable and serious harms to their projects, missions, reputations, and the communities they serve. PPGNY Decl. ¶¶ 47-48; PPCCC Decl. ¶ 59. Immediate relief is necessary.

**PPGNY Faces Irreparable Harm to Its Mission, Integrity, and Community Trust**

PPGNY will face irreparable harm because the Program Mandate requires it to abandon core aspects of its mission-driven, evidence-based programming or face termination, claw back, and reputational damage. Absent relief from this Court prior to July 31, 2025, PPGNY will have to shut down its TPP project. PPGNY Decl. ¶ 44. PPGNY cannot access the funds awarded to it without agreeing to comply with the Program Mandate. *Id.* ¶ 33. After reviewing the Program Mandate and meeting with an HHS Project Officer, PPGNY assessed it either had to modify its project by the end of July or withdraw from the TPP Program and end its critical sexual education services. *Id.* ¶¶ 31-32, 44. Either way, PPGNY faces irreparable harm. *See Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (plaintiffs suffer irreparable harm where "very real penalty attaches to [Plaintiffs] regardless of how they proceed").

To even "review all of the programming and to propose additional changes," "would take approximately seven staff members seven to ten work days," which would in itself take resources away from PPGNY's other critical work.  PPGNY Decl. ¶¶ 61-62. Regardless, compliance with

the Mandate would "force PPGNY to mitigate risk by changing its programming and practices in a manner contrary to our mission/values and would harm PPGNY's relationships with community stakeholders and reputation." *Id.* ¶ 5.

The harm is concrete. PPGNY's Project STAR, which serves LGBTQ+, immigrant, and disabled youth in New York City, was built to comply with HHS's 2023 equity-focused grant solicitation. PPGNY Decl. ¶¶ 15-16, 18. But the Program Mandate now prohibits or stigmatizes previously approved content on condom use, sexual orientation, gender identity, and STI risk mitigation—topics that are not only evidence-based and scientifically valid but also required by New York City schools for HIV education. *Id.* ¶¶ 51-52. Stripping these elements from PPGNY's curriculum would violate fidelity requirements and render its programs noncompliant under state law. *Id.* ¶¶ 51-53.

This contortion of programming material goes to the heart of PPGNY's expressive and educational mission. *See, e.g.*, PPGNY Decl. ¶¶ 43, 58 ("[I]t would go against PPGNY's values to provide information that is not based in reliable science."). As courts have held, the compelled abandonment of a nonprofit's mission and values inflicts irreparable harm. *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017) (finding irreparable harm because agency action would "perceptibly impair[]" plaintiff's programs and "directly conflict with the organization's mission").

The financial consequences are also severe. TPP funds support 25% of PPGNY's Education & Training staff and 75% of its Research & Evaluation team. PPGNY Decl. ¶¶ 68. Without access to those funds, PPGNY must immediately begin layoffs, suspend partnerships, and divert resources from essential healthcare operations. *Id.* ¶¶ 44-47, 69. "Importantly, if [PPGNY]

had to lay off staff, [they] would be losing talented people who have undergone significant training" to meet the unique needs of Project STAR, including "training on working with youth with disabilities" and "training for bilingual staff including Spanish language circles on answering difficult questions in Spanish." *Id.* ¶ 69. Such a loss would be irreparable. *Cf. Ass'n of Am. Universities v. Dep't of Energy*, No. 25-cv-10912-ADB, 2025 WL 1414135, at *19 (D. Mass. May 15, 2025) (finding "loss of human capital" and "cumulative knowledge" to represent irreparable harm). PPGNY cannot afford to continue Project STAR without assurance of reimbursement— and it cannot draw down funds without certifying compliance with ambiguous and shifting mandates that risk future enforcement and claw backs. *Id.* ¶¶ 44, 64-66.

These harms—structural, reputational, financial—are not remediable by money. Courts recognize that loss of mission fidelity, community trust, and staff capacity, especially in the nonprofit sector, warrant injunctive relief. *See Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (reputational harm irreparable when unrecoverable from other parties); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *12-13 (D.D.C. Feb. 3, 2025) (threats to organizational survival, staff layoffs, and loss of trust support injunction).  Preventing organizations from delivering to the communities they serve "almost inevitably creates irreparable damage to . . . good will."  *Reuters Ltd. v. UPI, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990); *see also Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1350 (D.C. Cir. 2008) ("disruption of . . . business" constitutes irreparable harm). Here, PPGNY faces irremediable harm to its reputation with state- and local-level institutional partners

and the communities it serves if it is forced to abandon its TPP programming midway through its five-year project. PPGNY Decl. ¶¶ 45, 57.

**PPGNY and PPCCC Face Irreparable Harm from Chilling Effects, Self-Censorship, and the Costs of Caution.**

In addition to compelled program changes at PPGNY, both PPGNY and PPCCC face a separate category of irreparable harm: the chilling effect of the Program Mandate's ambiguous restrictions, the pressure to self-censor (and the resulting reputation harm), and the financial costs and burdens of operating under threat of claw back.

PPCCC, unlike PPGNY, has not been directed to change specific lesson plans. But it has been told it must resubmit an implementation plan by August 15, 2025, certifying that all program materials comply with the Program Mandate and Executive Orders. PPCC Decl. ¶ 44. That certification must cover materials previously approved by HHS and must be made without guidance on what constitutes prohibited "promotion" or "normalization" of sexual activity, "discriminatory equity ideology," or "gender ideology." *Id.* ¶¶ 44-48.  The fear that medically accurate, culturally inclusive answers could retroactively be deemed noncompliant has chilled and will continue to chill educator speech and has delayed implementation decisions. PPGNY Decl. ¶¶ 55-59; PPCCC Decl. ¶¶ 60-63. Educators now hesitate to answer students' questions, particularly about gender identity, sexual orientation, or contraception, for fear of triggering future enforcement. PPGNY Decl. ¶ 57; PPCCC Decl. ¶ 63.

That chilling effect undermines student trust and harms the quality of instruction, even before any formal program changes are made. *See* PPCCC ¶ 16 ("Forcing PPCCC's educators to avoid certain subjects could shame students for asking questions, undermine the educational process, deny medical accuracy, and cause harm to the very people PPCCC has set out to serve."); PPGNY Decl. ¶ 57 (this censorship "undercut[s] PPGNY's mission of providing sexual education,

and diminish PPGNY's reputation in the community as a source of accurate, inclusive, and non-judgmental information."). This kind of preemptive self-censorship—compelled not by statutory command, but by ambiguous enforcement risk—is itself a First Amendment harm and supports injunctive relief. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also Chamber of Commerce v. Fed. Election Comm'n*, 69 F.3d 600, 603 (D.C. Cir. 1995) ("[A] party has standing to challenge, pre-enforcement, even the constitutionality of a statute if First Amendment rights are [merely] arguably chilled, so as long as there is a credible threat of prosecution."). Courts have long recognized that compelled changes to program delivery models— forcing withdrawal from planned services, refusal of new responsibilities, or alteration of established operations—constitute irreparable harm. *See Nat'l Senior Citizens L. Ctr., Inc. v. Legal Servs. Corp.*, 581 F. Supp. 1362, 1372–73 (D.D.C. 1984) (finding irreparable harm where plaintiffs were forced to "decline new direct litigation commitments," make "irreversible" operational changes, and abandon services under a new funding restriction), aff'd, 751 F.2d 1391 (D.C. Cir. 1985).

Like PPGNY's risk of reputational harms, described above, PPCCC also faces harm to its reputation in the communities it serves and partners with. *See Xiaomi Corp. v. Dep't of Defense*, 2021 WL 950144, at **9-10 (D.D.C. Mar. 12, 2021) (threats of future action causing reputational damage are irreparable harms). Such harms are particularly stark where, as here, PPCCC has developed partnerships in "rural and agricultural communities." PPCCC Decl. ¶ 83. Because of their historic exclusion from programming, or lack of programming tailored to their unique needs, the communities PPCCC serves have some distrust and skepticism about efforts to offer services that disregard unique needs such as language barriers. *Id.* ¶ 84. "It required PPCCC significant

investment, which cannot be quantified beyond the humanity and dedication of our program staff, to earn and establish trust within these communities." *Id.* To end PPCCC's program, or provide medically inaccurate information would cause PPCCC to "lose the momentum of the past two years in building this program, developing [their] relationships with communities, and making inroads into rural and coastal communities where no other or very limited sex education services are offered." *Id.* ¶ 85; *see also id.* ¶ 73 ("Seemingly diverting from our mission would send a devastating message to the community that our commitment to serve their individual needs is a facade and would cause further irreparable harm.").

The financial harm for PPCCC is likewise severe. PPCCC, like PPGNY, has no unrestricted funds to cover unreimbursed programming costs. It is continuing to pay staff and implement programming while unable to draw down funds without certifying uncertain compliance. PPCCC Decl. ¶¶ 56-57, 74-75. The organization anticipates needing to lay off staff and suspend services if relief is not granted. *Id.* ¶ 77 ("PPCCC would have to lay off four full-time program staff fully funded by the TPP Program . . . ."). If PPCCC were forced to do so, "there is no guarantee that the staff would be willing or able to return at a later date." *Id.* And PPCCC would lose its significant investment of resources expended to train its program staff to implement its TPP project. *Id.* This loss of "cumulative knowledge" is irreparable harm. *Ass'n of Am. Unis.*, 2025 WL 1414135, at *19. These harms are not speculative—they are ongoing, structural, and imminent.

The Mandate threatens PPCCC's and PPGNY's ability to serve marginalized youth. The risk of losing inclusive programming disproportionately harms LGBTQ+ youth, Latinx youth, and youth with disabilities, who already face higher STI and pregnancy risk and have fewer trusted sources of health information. PPCCC Decl. ¶¶ 25-26; PPGNY Decl. ¶ 18. These young people

are the intended beneficiaries of the TPP Program. But under the Program Mandate, providers are pressured to remain silent or omit affirming content, leaving these populations more vulnerable and less informed. Courts have recognized that irreparable harm includes not only injury to the organization itself, but also to the underserved communities it is uniquely positioned to reach. *See Nat'l Senior Citizens L. Ctr., Inc. v. Legal Servs. Corp.*, 581 F. Supp. 1362, 1372-73 (D.D.C. 1984) (finding irreparable harm where legal services providers would be forced to withdraw from current and future representation, depriving indigent clients of necessary advocacy), *aff'd*, 751 F.2d 1391 (D.C. Cir. 1985); *see also Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *12-13 (D.D.C. Feb. 3, 2025) (irreparable harm where "patients or customers that rely on [plaintiffs'] services may be denied care when it is most needed").

Only a temporary restraining order can prevent these harms—some already occurring, others imminent—from becoming irreversible.

**C. The Balance of Equities and Public Interest Weigh Heavily in TRO Plaintiffs' Favor**

There is a profound public interest in preventing teen pregnancy and associated risks, particularly among the most at-risk populations, as recognized in the 2023 NOFO. *See* 2023 NOFO, Ex. A at 6 ("To advance health equity and direct resources to those communities and populations with the greatest need and facing significant disparities, we expect recipients to focus their project on a community(ies) and population(s) that are disproportionally affected by unintended teen pregnancy and STIs."). There is also a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks omitted); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (holding that when an agency failed to adhere to a statute's standards, the "public interest balance plainly would weigh in favor of an injunction").

37

Granting preliminary relief is in the public interest because it will preserve a vital resource—critical teen pregnancy prevention programs—for communities most in need. Thousands of people, and particularly youth from historically underserved communities, rely on TPP programs to deliver medically accurate and effective sexual education. *See, e.g.*, PPCCC Decl. ¶ 13 ("[O]ur sexual health education programs reached more than 1,800 youth per year."); PPGNY Decl. ¶ 73 ("Without TPP funding, 200 parents and caregivers and 50 youth-serving professionals, annually, would not have access to medically accurate information to engage with the young people with whom they work."). Evidence shows that pregnancy prevention programs reduce sexual activity, reduce STIs, increase use of contraceptives, including condom use, and reduce teen pregnancy. *See, e.g.*, Kantor Decl. ¶ 20. Ending these programs will also have long-term effects, since lowering the rate of unintended teen pregnancies ultimately improves health outcomes, such as decreased risk of maternal mortality and adverse child health outcomes. Plaintiffs have made tremendous strides to address these issues over the past two years through their replication projects and have invested significant resources to build and expand their programs with great success, all of which progress will be lost if they are stopped in their tracks. PPCCC Decl. ¶¶ 77, 85; PPGNY Decl. ¶¶ 73-74.

On the other side of the ledger, the burden of a TRO on HHS would be minimal. The TPP Program has been administered using the same criteria for over a decade, and HHS would suffer no harm from merely continuing to administer funding consistent with those criteria and Congressional mandate.

**CONCLUSION**

For the foregoing reasons, the Court should grant TRO Plaintiffs' motion and restrain the

Program Mandate and any actions to implement its requirements.

Dated: July 29, 2025                              Respectfully submitted,

                                        By:    */s/ Andrew T. Tutt*
                                               Drew A. Harker (DC Bar # 412527)
                                               Andrew T. Tutt (DC Bar # 1026916)
                                               Bonnie E. Devany (*pro hac vice* pending)[*]
                                               Daniel Yablon (DC Bar # 90022490)
                                               ARNOLD & PORTER KAYE SCHOLER LLP
                                               601 Massachusetts Avenue, NW
                                               Washington, DC 20001
                                               (202) 942-5000
                                               drew.harker@arnoldporter.com
                                               andrew.tutt@arnoldporter.com
                                               bonnie.devany@arnoldporter.com
                                               daniel.yablon@arnoldporter.com

                                               Emily Nestler (DC Bar # 973886)
                                               PLANNED PARENTHOOD FEDERATION OF
                                               AMERICA
                                               1100 Vermont Avenue NW
                                               Washington, DC 20005
                                               (202) 973-4800
                                               emily.nestler@ppfa.org

                                               Valentina De Fex (*pro hac vice* pending)
                                               Melissa Shube (DC Bar # 241034)
                                               PLANNED PARENTHOOD FEDERATION OF
                                               AMERICA
                                               123 William Street, 9th Floor
                                               New York, NY 10038
                                               Phone: (212) 261-4696
                                               valentina.defex@ppfa.org
                                               melissa.shube@ppfa.org

---

[*] *Admitted only in Texas; practicing in D.C. pursuant to D.C. Ct. of Appeals R. 49(c)(8), under supervision of D.C. Bar Members.*