# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PLANNED PARENTHOOD OF GREATER
NEW YORK, *et al.*,

        *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

        *Defendants*.

Case No. 1:25-cv-02453-BAH

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 4

I.          The TPP Program Appropriation .......................................................... 4

II.         HHS Guidance for 2025 Continuation Award Applications ................................. 5

III.        Plaintiffs' Funding Applications and the First Litigation ....................................... 6

IV.         This Litigation ........................................................................................ 9

STANDARD OF REVIEW ............................................................................................. 10

ARGUMENT ................................................................................................................... 10

I.          Plaintiffs Cannot Demonstrate Irreparable Harm ................................................ 10

II.         Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims. ....................... 14

   A.       Plaintiffs Are Unlikely to Prevail on Their APA Claims .................................... 14

      1.    Plaintiffs' Claims Are Not Justiciable Under the APA ................................... 14

      2.    Plaintiffs Are Unlikely to Prevail on Their Fifth Amendment Claim ............... 19

      3.    Plaintiffs' "Contrary to Law" Claim Fails .................................................. 24

      4.    Plaintiffs' Arbitrary and Capricious Claim Fails ............................................. 26

   B.       Plaintiffs Are Unlikely to Prevail on their Ultra Vires Claim ............................. 28

III.        The Balance of Equities and Public Interest Weigh Against Relief ................... 29

IV.         Any Injunctive Relief Should Be Narrowly Tailored and Permit Lawful Agency
            Action ......................................................................................................... 30

V.          A Bond Should Accompany Any Injunctive Relief ............................................ 30

CONCLUSION ................................................................................................................ 31

## INTRODUCTION

For the second time since May, Plaintiffs—a group of Planned Parenthood entities who seek continuing funding to operate research projects as part of the Teen Pregnancy Prevention Program ("TPP Program")—have come to this Court seeking emergency relief to prevent the U.S. Department of Health and Human Services ("HHS") from taking any further steps to implement changes to the program mandated by new Executive Branch policy and Supreme Court case law. On this occasion, Plaintiffs seek a temporary restraining order ("TRO") against an interpretive notice letter that they have been aware of for nearly a month. Plaintiffs' initial effort to forestall HHS's changes to the TPP Program by seeking emergency injunctive relief were rebuffed by this Court. *Planned Parenthood of Greater New York v. U.S. Dep't of Health & Human Servs.*, No 1:25-cv-01334, 2025 WL 1768100 (D.D.C. June 26, 2025) ("*PPGNY I*") (Kelly, J.).[1] Subsequently, Plaintiffs were issued notices of award for their continuation funding. Plaintiffs' instant motion asserts Defendants are trying to impose the same harms at issue in that case through a notice letter that accompanied their notices of award, albeit nearly a month after they received the notice of award, and three weeks after Plaintiffs voluntarily dismissed *PPGNY I*. Like their last attempt to seek emergency relief, this renewed motion likewise fails to meet the demanding standards necessary for enjoining HHS from implementing its guidance prior to a hearing on the merits. That is so for at least five reasons.

*First*, there is no irreparable harm. Only one of the named plaintiffs, Planned Parenthood of Greater New York ("PPGNY"), asserts that it needs relief on or before July 31 such that a

---

[1] Plaintiffs should have designated this case as related to *PPGNY I* when they filed their complaint, as it "involv[es] the same parties" and "relat[es] to the same subject matter" as *PPGNY I*. D.D.C. L.R. 40(a)(4), (b)(2). Defendants have filed a notice of related case in this matter and in *PPGNY I*. Notice of Related Case, ECF No. 7.

temporary restraining order (as opposed to a motion for a preliminary injunction) is required. That need supposedly emanates from a policy notice letter that HHS published on or about July 2, the same day Plaintiffs learned their continuing grant applications had been granted, and was incorporated into the notice of awards Plaintiffs received on July 8. But PPGNY (along with its co-plaintiffs) dismissed its then-pending lawsuit over the threatened termination of its TPP Program grants on July 11—after Judge Kelly entered an expedited summary judgment schedule for resolving Plaintiffs' claims on the merits. And PPGNY has put forward no evidence that it has taken any steps, through the judicial process or otherwise, between July 8 and yesterday afternoon to try to address the allegedly irreconcilable conflict between its programs and HHS's new policy notice. This lengthy, and self-imposed, delay belies the need for the Court to exercise its equitable powers in this extraordinary fashion.

*Second*, Plaintiffs do not have a cause of action to challenge HHS's activities to date under the Administrative Procedure Act ("APA"), which they recognize as a predicate to their merits claims. Until Plaintiffs actually submit their programs for review to the Office of the Assistant Secretary of Health ("OASH"), HHS has no way to discern what programs are compliant. It has not consummated its decision-making process with respect to any particular program materials, nor has it taken any actions from which legal rights and obligations flow. Plaintiffs previously filed their continuing grant applications under protest due to changing award guidance that they believed was unlawful, and fail to explain why they could not take similar steps here when drawing down funds. And even if Plaintiffs were right on this score, the Court lacks jurisdiction because the manner in which the agency exercises its discretion to decide which program materials comply with the terms and conditions of the grants is committed to agency discretion by law under 5 U.S.C. § 701(a)(2) and *Lincoln v. Vigil*, 508 U.S. 182 (1993).

*Third*, Plaintiffs cannot establish a likelihood of success on their constitutional and statutory theories. Their Due Process Clause claim fails at the outset, because the void-for-vagueness doctrine does not apply when the government acts as benefactor, and because Plaintiffs lack a constitutionally protected property interest in continued funding. Plaintiffs' constitutional claim also fails on the merits, as Plaintiffs are only being asked to submit materials so Defendants can assess how Plaintiffs intend to comply with OASH's new policy guidance, and what corrective steps, if any, will be necessary on the part of Plaintiffs. Furthermore, HHS has not acted contrary to the TPP Program appropriation in insisting that all funded programs comport with the statute's terms and pertinent executive orders, and has reasonably explained its bases for actions at all steps of the process to date.

*Fourth*, Plaintiffs' ultra vires claim also cannot justify a TRO. Instructions to applicants for continued funding are not the stuff of ultra vires review, and Plaintiffs can point to no clear and unambiguous (or indeed any) statutory violation that would give rise to a plausible ultra vires claim.

*Fifth*, and finally, as to the balance of the equities, the injunctive relief that Plaintiffs seek would upend HHS's administration of the TPP Program. Any harm that Plaintiffs suffer as a result of a TRO being denied will be the result of their own decision to wait until the eleventh hour to file a new lawsuit and seek emergency relief, when their claims could have been addressed in their earlier suit on the expedited summary judgment briefing schedule Judge Kelly set.

For these reasons, the Court should deny the motion.

# BACKGROUND

## I.    The TPP Program Appropriation

Since 2010, Congress has appropriated money to HHS annually for "grants to public and private entities to fund medically accurate and age-appropriate programs that reduce teen pregnancy." *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4876 (2022). There are two funding categories, referred to as Tier 1 and Tier 2. After program support expenses, three-quarters of the appropriation goes to Tier 1 projects for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavior[] risk factors underlying teenage pregnancy, or other associated risk factors." *Id.* Remaining funds go to Tier 2 projects for "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.* Only Tier 1 projects are at issue in this case.

HHS solicited applications for TPP Program grant funds in April 2023 through a Notice of Funding Opportunity ("NOFO"). *See* TRO Mot. Ex. 1, ECF No. 3-2. Applicants could request funding from $350,000 to $2 million per year for a period of up to five years. *Id.* at 4. Applications for TPP Program funds go through a formalized agency review process laid out in the NOFO before final decisions are made and funds are obligated. After initial selection for funding, for each year of the approved period of performance, grant recipients are required to submit a noncompeting application for funds. *Id.* at 16. That application requires grantees to submit a "progress report for the current budget year, [a] work plan, [and] budget and budget justification for the upcoming year." *Id.* at 16-17, 56. HHS awards continuation funding based on "availability of funds, satisfactory progress of the project, grants management compliance, including timely reporting, and continued best interests of the government." *Id.* at 56.

As part of the registration process to receive funding, the NOFO required applicants to certify that they will comply "with all applicable requirements of all other federal laws, executive orders, regulations, and public policies governing financial assistance awards[.]" *Id.* at 61–62. The Notice of Award provided to Tier 1 funding recipients, under its "Standard Terms," further states that "[t]he recipient must comply with all terms, conditions, and requirements outlined in this Notice of Award, including[] . . . [a]ll requirements imposed by program statutes and regulations, Executive Orders, and HHS grant administration regulations, as applicable. . . ." *See, e.g.*, Sample Notice of Award for PPCCC at 5–6 (Ex. A).

## II.    HHS Guidance for 2025 Continuation Award Applications

In January 2025, HHS issued guidance for funding recipients to apply for continuation awards in the third year of funding, to cover July 1, 2025 through June 30, 2026. Jan. Guidance for Non-Compete Awards (Ex. B). The January 2025 guidance set an application deadline of April 15, 2025. *Id.* at 2, 15. Among other requirements, the January 2025 guidance instructed applicants to provide a project narrative for work to be performed in the upcoming year, including a brief summary of any proposed changes to the project work plan from the previous budget year, and a work plan to address expectations set forth in the NOFO. *Id.* at 5.

HHS provided updated guidance to applicants on March 31, 2025 ("March 2025 guidance"). Ex. 2, ECF No. 1-2. The March 2025 guidance largely mirrored the guidance HHS provided in January 2025. The March 2025 guidance, however, added additional instructions that recipients of funding are "expected to review and be aware of current Presidential Executive Orders," and the March 2025 guidance stated that recipients should "revise their projects, as necessary, to demonstrate that the [non-competing continuation] award application is aligned with current Executive Orders." *Id.* at 4. The March 2025 guidance states that "[r]ecipients should

review and be aware of all current Presidential Executive Orders; however, the following may be of most relevance to the work of the TPP program":

- <u>Executive Order 14168</u>, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*;

- <u>Executive Order 14190</u>, *Ending Radical Indoctrination in K-12 Schooling*;

- <u>Executive Order 14187</u>, *Protecting Children From Chemical and Surgical Mutilation*;

- <u>Executive Order 14151</u>, *Ending Radical and Wasteful Government DEI Programs and Preferencing*;

- <u>Executive Order 14173</u>, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*.

*Id.* at 4-5. The March 2025 guidance further instructed applicants to include in the project narrative accompanying their applications a "[d]escription of changes made to align with Executive Orders, if applicable," including "the steps taken to review the project and identify the modifications proposed." *Id.* at 5. It provided examples of changes that recipients may make to align their projects, such as "selecting a different evidence-based program for implementation, making adaptations to existing curriculum, and updating policies, staffing, and training, etc." *Id.* It also instructed applicants to provide a brief summary of any proposed substantial changes to the project work plan from the previous budget; to provide a work plan that "address[es] the expectations outlined in the original NOFO, to the extent aligned with Presidential Executive Orders;" and to "submit program materials to [the Office of Population Affairs] for review" by uploading them as an appendix through the online portal for grant applications. *Id.* at 5, 15.

## III.   Plaintiffs' Funding Applications and the First Litigation

Plaintiffs are three not-for-profit organizations that received Tier 1 finding awards for a period of up to five years pursuant to the NOFO. *See* Compl. ¶ 50, ECF No. 1. They are Planned Parenthood of Greater New York (PPGNY); Planned Parenthood of the Heartland, Inc. (PPH); and

Planned Parenthood California Central Coast (PPCCC). All three Plaintiffs, including the two seeking emergency relief here, filed continuing applications by the applicable deadline. TRO Mot. 5. The applications made no secret of Plaintiffs' dissatisfaction with Defendants' notice regarding program requirements in the March 2025 guidance. For instance, PPGNY only made "minor edits to the Program Narrative, Work Plan, Logic Model, Needs Assessment, and Budget Narrative language to note site types, site names, and site locations and on April 15, 2025, PPGNY uploaded its non-competing continuation award application for year three of the current grant cycle and included language indicating that it was making such modifications under protest as to the new EO 'alignment' requirement, and without certifying compliance with the new EO 'alignment' requirement." Stark Decl. ¶ 28, ECF No. 3-6; *see also* Tosh Decl. ¶ 39, ECF No. 3-7 (describing PPCCC's application, which was filed "under protest").

After applying, Plaintiffs took their concerns to this Court, filing a complaint on May 1, 2025, along with a motion for a preliminary injunction. The case was assigned to Judge Kelly. He denied the preliminary injunction motion on the basis of a lack of irreparable harm on June 26, 2025. As relevant here, he held that "Plaintiffs identify no imminent deadline after which, assuming HHS grants their applications, the Court will be unable to grant them relief by ordering that their TPP projects be restored to their pre-[March 2025 guidance] forms." *PPGNY I*, 2025 WL 1768100, at *6.

Plaintiffs received notice that their applications were granted on July 2, 2025. Stark Decl. ¶ 29; Tosh Decl. ¶ 40. Attached to the emails providing this notice was a "policy notice" intended to "clarify OASH policy for Teen Pregnancy Prevention Program (TPP Program) grant recipients." Off. of the Ass't Sec'y of Health, U.S. Dep't of Health & Human Servs., *OASH Teen Pregnancy Prevention Program Policy Notice* 1 (July 1, 2025) ECF No. 3-4 )("OASH Notice"). Plaintiffs

received their Notice of Award on July 8. Stark Decl. ¶ 30; Tosh Decl. ¶ 41. Plaintiffs also met

with HHS officials on July 8 who provided them with a document stating "Project Officer (PO)

will continue to work with the grantee to support them in meeting the expectations of this grant

under the priorities of the current administration while remaining within scope of the project. If a

change in scope is needed, the grantee will work with the PO and Grants Management." Stark

Decl. ¶ 31; *see also* Tosh Decl. ¶ 42 (similar message delivered in "workplan assessment" PPCCC

received on July 8). On the same day, Judge Kelly set an expedited briefing schedule that would

have resulted in full summary judgment briefing of Plaintiffs' claims by August 21, 2025. Despite

the issuance of the OASH Notice in conjunction with the acceptance of the awards and the existing

briefing schedule, *PPGNY I*, No. 1:25-cv-1334 (D.D.C.), Minute Order of July 8, 2025, Plaintiffs

voluntarily dismissed their lawsuit before Judge Kelly on July 11, 2025, *id.*, ECF No. 34.

Plaintiffs cast the OASH Notice as a "mandate" that is "impos[ing] new and substantive

conditions on continued funding," even though the grants, by their terms, have long required

compliance with relevant executive orders by grantees, and the March guidance alerted Plaintiffs

to these policy developments several months ago. TRO Opp. 5–6. PPGNY claims that it must

decide by July 31 as to whether it can proceed with the program due to its "limited financial

resources by which it can continue to operate" its program and pay staff "without guarantee of

reimbursement from TPP funding." Stark Decl. ¶ 44. Although the origin of this purported

requirement is not clearly spelled out by Plaintiffs, PPGNY appears to assert that it needs to draw

down further funding by July 31 to remain solvent, but that drawing down the funds will require

acceptance of the terms of the Notice of Award, including the new OASH Notice. *Id.* ¶ 39. PPGNY

also says that it has until the "end of July" (that is, Thursday) to submit "a revised workplan with

modified objectives" and the curriculum to it program to HHS although it does not state where this

purported requirement came from. *Id.* ¶ 32. By contrast, PPCCC was told by its project officer to "resubmit its implementation plan by August 15, 2025," and that it would need to "certify[] that it was compliant with all Executive Orders issued by the Trump Administration" and the OASH Notice. Tosh Decl. ¶ 44.

## IV.    This Litigation

Plaintiffs filed their complaint in this action on July 29, 2025. ECF No. 1. The complaint contains the same four claims Plaintiffs advanced in *PPGNY I*, plus one additional claim. In Count I, Plaintiffs allege, through the APA, that the OASH Notice violates Plaintiffs' purported rights under the Due Process Clause. *Id.* ¶¶ 129–45. In Count II, Plaintiffs allege a violation of the First Amendment, a theory they did not advance in *PPGNY I* and do not advance in their TRO motion. *Id.* ¶¶ 145–53. In Counts III and IV, Plaintiffs allege that, in issuing the March 2025 guidance, HHS acted arbitrarily and capriciously, and in violation of the law, and therefore violated the APA. *Id.* ¶¶ 154–77. And in Count V, Plaintiffs claim that HHS's issuance of the OASH Notice alongside the notices of award was *ultra vires*. *Id.* ¶¶ 178–85.

Plaintiffs moved for a TRO on the same day. They have asked the Court to (1) "enjoin enforcement of the [OASH Notice] pending the conclusion of these proceedings"; (2) "permit TRO Plaintiffs to continue to operate their programs and draw down funds for Year 3 under their previously approved Non-Competing Continuation (NCC) applications, so long as they remain in compliance with the agency's Materials Review Guidance dated January 2025"; and (3) to order Defendants "not to pause, freeze, impede, block, cancel, or terminate any awards pursuant to the Teen Pregnancy Prevention Program to which TRO Plaintiffs are awardees"; and (4) that any injunction "preserve Plaintiffs' status and rights with respect to funds claimed or received while the Court's order is in effect, and any claims for funding or reimbursement submitted by Plaintiffs

during the duration of the order shall be deemed lawful and valid under their respective grant agreements, even if the order is subsequently vacated, modified, or reversed." ECF No. 3, at 1–2.

## STANDARD OF REVIEW

A temporary restraining order, like a preliminary injunction, is extraordinary relief granted only to preserve the status quo. *See Nat'l Council of Nonprofits v. Off. Of Mgmt. & Budget*, No. 1:25-cv-239, 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025). It is "an extraordinary and drastic remedy" and "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). As such, it may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). To obtain such extraordinary relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20); *see also Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) ("The decision of whether to award a TRO is analyzed using the same factors applicable to preliminary injunctive relief[.]" (cleaned up)). When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Cannot Demonstrate Irreparable Harm

In this Circuit, there is a "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Any alleged irreparable harm "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wis. Gas Co. v. FERC*,

758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). It also must be of such "*imminence* that there is a clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co.*, 758 F.2d at 674 (per curiam))). A motion for TRO can be denied solely on the basis that the plaintiffs have failed to demonstrate irreparable injury. *See id.* ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." (citing *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989))). That standard has not been met here.

Plaintiffs have requested that the Court enter temporary relief by July 31 to prevent an imminent injury to them. But only two of the three plaintiffs, PPGNY and PPCCC, have actually come forward in this motion to seek temporary relief. And as between those entities, only PPGNY asserts a need for the Court to act by tomorrow. PPCCC is under a deadline to submit an implementation plan by August 15, 2025, but that deadline alone would not require issuance of a TRO before a preliminary injunction motion could be briefed and deliberated. And close scrutiny of PPGNY's assertions of irreparable harm belies the notion that it has met the high standard necessary for entry of an emergency injunction to resolve its dilemma.

The sole evidence of PPGNY's harm is the declaration of Ms. Stark, who states that "PPGNY is forced to choose between (1) continuing the previously approved program at risk of investigation and termination of funding for violating the terms of the Notice of Award, (2) out of abundance of caution, substantially modify its program and incorporate changes that run contrary to PPGNY's mission, make the program less effective, and even then still risk being accused of being non-compliant due to the risk of arbitrary and discriminatory enforcement of the Program Mandate, or (3) ending its TPP funded education programming entirely." Stark Decl. ¶ 43. But this alleged dilemma is not of sufficient gravity to justify the Court's intervention. PPGNY asserts a

"risk" of future investigation and future termination of funding if it draws down funds as intended upon issuance of a continuation award, but that "risk" cannot be conflated with the sort of imminent harm requiring a TRO. PPGNY has not submitted its program materials to HHS, and HHS has not given PPGNY a deadline for doing so (as it has for PPCCC). HHS has not therefore had a chance to assess PPGNY's materials and determine whether corrective action should be taken, and if so, what form that action would assume.

The lack of imminence of this "risk" is borne out by Plaintiffs' second assignation of harm, which posits that PPGNY could choose "out of an abundance of caution" to "modify its program" in such a way that it satisfies the OASH Notice; but just as "risks" of enforcement do not rise to the level of imminent injury, neither do changes made out of an "abundance of caution" rather than necessity. PPGNY asserts it has "until the end of July" to make these changes, *id.* ¶ 32, but this appears to be a self-imposed deadline based on PPGNY's internal constraints, not a deadline HHS imposed. *Compare id. with* Tosh Decl. ¶ 44 ("PPCCC was told by its PO to resubmit its implementation plan by August 15, 2025."). A decision by PPGNY to cancelling its TPP program altogether would not transform either of these non-imminent concerns into irreparable injury.

Two further considerations militate against a finding of irreparable harm. The first is that Plaintiffs' course of dealing before, and during, *PPGNY I* does not square with the assertion that a temporary restraining order is needed. As explained, even though Plaintiffs were vehemently in disagreement with the new direction taken by the March TPP notice, Plaintiffs (including PPGNY) nonetheless filed applications under protest, and were awarded grants, but is impossible to maintain now that they have completed the application process and issued a notice of award reflecting the terms of the NOFO in which they participated. Plaintiffs argue now that "[a]lthough HHS granted Plaintiffs' NCC applications notwithstanding their refusal to certify compliance with

the Executive Order 'alignment' requirements, the Program Mandate's effect is to *reimpose that same unlawful requirement* (and more) via a new agency action, under the threat of more expansive enforcement mechanisms." TRO Mot. 5 (emphasis added). Assuming, *arguendo*, that this is in fact what HHS did, then it makes no sense why Plaintiffs (1) chose to dismiss their already pending lawsuit before Judge Kelly on July 11 after their noncompete applications were accepted, rather than (2) renew their preliminary injunction motion on the basis that HHS had, while appearing to accept their continuing application, attached such conditions to it that the application was not accepted at all (or alternatively, briefed that issue in the context of the expedited summary judgment schedule Judge Kelly had already set).

The second relevant consideration is Plaintiffs' timing. Although timing, on its own, is not a basis for denying a motion for a preliminary injunction under this Circuit's law, it can "bolster[]" the conclusion that such a motion should be denied. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (concluding district court's denial of a temporary restraining order was "bolstered" by the plaintiff's delay in seeking one). That is "because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). Here, Plaintiffs have been aware of the OASH Notice since at least July 2 and their Notices of Award (which, in tying acceptance of conditions to drawdown of funds, are not unusual and track the requirements of previous NOAs) since July 8. But Ms. Stark's declaration fails to explain what PPGNY was doing between July 8 (when it met with the TPP Program project office) and the filing of this motion, and why it decided to seek emergency relief just two days before its apparently self-imposed July 31 deadline to submit material to OASH, when the legal theory has clearly been available to PPGNY since it received

the notices of award and the OASH Notice. These developments underscore that a preliminary injunction should not issue here due to lack of irreparable harm.

## II.    Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims.

### A.  Plaintiffs Are Unlikely to Prevail on Their APA Claims

1.  <u>Plaintiffs' Claims Are Not Justiciable Under the APA</u>

Plaintiffs purport to bring all of their substantive claims, including their constitutional due process claim, their contrary to law claim, and their arbitrary-and-capricious claim, through the APA. TRO Opp. 8 (invoking 5 U.S.C. § 706(2)(B) with respect to their due process claims). At this time, the APA does not give rise to a cause of action to challenge HHS's conduct. HHS has not yet taken final agency action. And the field of grantmaking is one that classically involves choices committed to agency discretion as a matter of law.

a.  <u>The Issuance of the OASH Notice Was Not Final Agency Action.</u>

The OASH Notice is not reviewable under the APA because it is not a final agency action. The APA generally authorizes judicial review only of final agency actions. 5 U.S.C. § 704. "An agency action is final only if it is *both* 'the consummation of the agency's decisionmaking process' *and* a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Whether steps taken by an agency in administering a grant are final agency action depends, in part, on whether those steps have legal consequences for the grantee, or if further steps are

required to actualize the change. Even if an agency's guidance poses a practical problem for a grantee, that does not mean a reviewable, final agency action is at stake. *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004) (collecting cases); *see also Air Cal. v. U.S. Dep't of Transp.*, 654 F.2d 616, 621–22 (9th Cir. 1981) (holding that a legal interpretation contained in a letter from the general counsel of the FAA to a local airport was non-final, despite serious indirect effects on plaintiff's business).

The OASH Notice firmly fits within this category of non-final agency actions in anticipation of final decisions. Like the March update to the NOFO that preceded Plaintiffs' initial lawsuit, the OASH Notice is intended to "further clarify [the] *expectations* for TPP grantees." OASH Notice 2. Nothing in the OASH Notice—nor anything in the OASH Notice—makes Plaintiffs ineligible for continued funding or limits HHS's discretion regarding continued funding. HHS has requested a submission of materials from PPCCC by mid-August, but has otherwise not taken definitive steps; the agency appears not to have even come this far with PPGNY yet. Under the terms of the NOFO and the initial Notice of Award issued to all Plaintiffs, Plaintiffs are already required to comply with all applicable executive orders. *See* NOFO 61; Sample Notice of Award, Ex. A, at 6. Accordingly, there is no final agency action for Plaintiffs to challenge.

Despite these facts, Plaintiffs assert the OASH Notice is final agency action, TRO Mot. 16, relying primarily on *Planned Parenthood of New York City, Inc. v. United States Department of Health & Human Services* ("*PPNYC*"), 337 F. Supp. 3d 308 (S.D.N.Y. 2018). To start, that out-of-Circuit decision is inconsistent with the precedent in this District, discussed above. But in any event, the facts of that case are not analogous. In *PPNYC*, the court concluded that final agency action was present because the challenged requirements in the TPP program funding announcement itself made the plaintiffs "*not eligible*" to receive funds. *Id.* at 328. Here, there is

no such restriction on eligibility, as Plaintiffs were deemed eligible to receive funding, despite their "under protest" applications. HHS is merely providing guidance to grantees to help them with their preexisting obligations under their grants.

The OASH Notice is intended to assist grantees in conforming their programs to valid changes in policy expressed through executive orders and a recent Supreme Court decision, as contemplated by the grant instruments themselves. It is neither "the consummation of the agency's decisionmaking process," nor "a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Nat'l Mining Ass'n*, 758 F.3d at 250 (quoting *Bennett*, 520 U.S. at 177–78). And "[t]he question is not whether judicial review will be available but rather whether judicial review is available *now*." *Id*. at 253. As it stands, no decision has been made to sanction Plaintiffs for the content of their programs, and Plaintiffs therefore cannot identify a final agency action that is subject to the APA.

> b. The OASH Notice Is Not Reviewable Because It Reflects Policy Preferences Committed to Agency Discretion by Law.

Plaintiffs are also unlikely to prevail on their APA claim because they fail to demonstrate that there are standards for the Court to apply in reviewing the OASH Notice. "[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a)[,]" *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which precludes review under the APA if the challenged agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The APA presumes agency action is judicially reviewable, but "[t]his is 'just' a presumption." *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Under § 701(a)(2), "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. "In such a case," the relevant statutory provision "can be taken to have committed the decisionmaking to the

16

agency's judgment absolutely." *Id.* (internal quotation marks omitted).

An agency's allocation of appropriated funds is typically and presumptively committed to agency discretion by law because "the very point" "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192; *see Milk Train, Inc. v. Veneman*, 310 F.3d 747, 748–51 (D.C. Cir. 2002); *Los Coyotes Band of Cahuilla & Cupeño Indians v. Jewell*, 729 F.3d 1025, 1038 (9th Cir. 2013); *Serrato v. Clark*, 486 F.3d 560, 568–70 (9th Cir. 2007); *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1536 (S.D.N.Y. 1984) (although statute might give court authority to weed out "a project [that] was particularly inappropriate for funding," judicial review unavailable when statute does not "give courts any guidance in sorting among the many projects consistent with the goals stated"), *aff'd*, 805 F.2d 888 (2d Cir. 1986). This is why agencies' grant-award decisions are presumptively unreviewable. *See Lincoln*, 508 U.S. at 191–92 (including "allocation of funds from a lump-sum appropriation" among the "administrative decision[s] traditionally regarded as committed to agency discretion" that have been held "to be presumptively unreviewable"); *see also Milk Train, Inc.*, 310 F.3d at 750–51 (applying *Lincoln* in the context of non-lump-sum appropriations).

Plaintiffs cannot overcome the presumption that the OASH Notice—which merely restates recipients' obligations to comply with executive orders—is unreviewable. Congress has provided HHS sparse guidance for how HHS should distribute Tier 1 grants amounting to tens of millions of dollars. Regarding such grants, Congress instructed HHS only "to fund medically accurate and age appropriate programs that . . . replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral factors underlying teenage pregnancy, or other associated risk factors." OASH Notice 2. That language does not limit HHS's

17

discretion when determining whether to continue funding, much less whether the agency may issue guidance documents requiring compliance with executive orders. *See Hosp. for Special Surgery v. Becerra*, Civ. A. No. 22-2928 (JDB), 2023 WL 5448017, at *7 (D.D.C. Aug. 24, 2023) (concluding that statutory language must be directly related to the decision the plaintiff challenges).

Indeed, at least one court in this District has concluded that grant administration decisions for TPP Program projects specifically are presumptively unreviewable. *See Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75–76 (D.D.C. 2018). In *Policy & Research*, the court remarked that there was "little doubt that HHS's decision to stop funding for Plaintiffs' projects, and to recompete the funds associated with those projects, is the type of agency action that is presumptively unreviewable." *Id.* at 76. The court concluded, however, that agency regulations governing "termination" applied where the agency "shorten[ed] Plaintiffs' project periods" by denying continuation funding, and therefore—as to the "termination" there were standards for the Court to apply—*i.e.*, the agency's regulation in 45 C.F.R. pt. 75. *See Pol'y & Rsch.*, 313 F. Supp. 3d at 76–78. And, therefore, the court reasoned, the court could consider whether HHS's denial of continuation funding was arbitrary and capricious under the APA. *Id.* at 76–79, 83.

Here, however, there has been no "termination." Indeed, despite applying under protest, Plaintiffs received their continuation awards, and HHS has not taking any action to correct any failure to comply with recent executive orders or Supreme Court precedent. Nothing in HHS's regulations, moreover, cabins the agency's discretion to issue instructions to inform the agency's consideration of whether grantees are complying with program requirements. It necessarily follows that, even if the OASH Notice constituted a final agency action (it does not), the decision to issue guidance for grantees on compliance with program requirements is an unreviewable

18

agency decision.

2.   <u>Plaintiffs Are Unlikely to Prevail on Their Fifth Amendment Claim</u>

Plaintiffs challenge the OASH Notice under the Due Process Clause, arguing that it is void for vagueness. TRO Mot. 8–16. Plaintiffs' claim fails at both a threshold level and on the merits.

a.   <u>Plaintiffs Lack a Constitutionally Protected Interest<br>Required for Due Process Protections to Attach</u>

To begin with, the void-for-vagueness doctrine under the Fifth Amendment is inapplicable here. "The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018) (plurality opinion) (emphasis added) (citation omitted). And although courts have applied this doctrine outside of the statutory context, they have done so with respect to regulations of primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (citation omitted)); *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (noting that the Fifth Amendment's "requirement of clarity" applies when the government imposes "civil penalties" (citations omitted)).

There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). No such concerns arise in the context of government grants, where the government is acting as a benefactor, and, indeed, "courts have resisted" applying "due process principles to government contracts" outside "the employment context." *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29

19

(D.D.C. 2014).

Even if the Court were to conclude that the Due Process Clause can reach beyond the regulation of primary conduct, Plaintiffs are unlikely to prevail because they lack an interest that due process protects. As this Court explained recently in *National Urban League v. Trump*, "[a] void-for-vagueness challenge is, at bottom, a due process claim, so Plaintiffs must show that they were deprived of a constitutionally protected property or liberty interest." --- F. Supp. 3d ----, 2025 WL 1275613, at *18 (D.D.C. May 2, 2025) (citations omitted). And the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in liberty or property." *Id.* (quoting *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015)).

Plaintiffs do not assert that they have a protected liberty interest; they rely only on an alleged property interest "in receiving continued TPP Program funding." TRO Mot. 9. The procedural component of the Due Process Clause, however, "does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted).

Applying these principles, the Supreme Court has identified a narrow set of government benefits, so-called "new property," that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collected cases). The due process protections afforded to this set of entitlement-like benefits, however, have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-*

*Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Am. Pub. Health Ass'n v. NIH*, --- F. Supp. 3d ----, 2025 WL 1548611, at *13 (D. Mass. May 30, 2025) (distinguishing *NEA v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) and recognizing "that vagueness standards are relaxed in the government funding context"); *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography*, 54 F. Supp. 3d at 29 ("The Supreme Court 'has never held that government contracts for goods and services create property interests protected by due process.'" (citation omitted)).

The distinction makes sense. As the Second Circuit explained in *S & D Maintenance Co. v. Goldin*, in the new-property line of cases, "the Due Process Clause [was] invoked to protect something more than an ordinary contractual right. Rather, procedural protection [was] sought in connection with a state's revocation of a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure[.]" 844 F.2d 962, 966 (2d Cir. 1988) (footnote omitted). The same logic does not extend to "contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." *Id.* at 967. Indeed, "the doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns[.]" *Id.* at 966.

Plaintiffs briefly address this concern, arguing that their right to receive continuation TPP Program funding is analogous to the loss of benefits at issue in *Roth*. TRO Mot. 9. But none of the cases where analogies to other types of lost benefits were deemed sufficient to bring a due process clause claim were "'ordinary' or 'routine' government contracts" or grants, like the ones at issue here. *Gizzo*, 44 F. Supp. 3d at 385. Put another way, as this Court explained in *National Urban*

21

*League*, Plaintiffs "offer no reason to think that their . . . grants—which are '[o]utside of the employment context'—are different from the 'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles.'" 2025 WL 1275613, at *18 (quoting *New Vision Photography*, 54 F. Supp. 3d at 29). And accepting Plaintiffs' theory that they have a property interest in continuation funding would "'risk . . . transmogrifying virtually every dispute involving an alleged breach of contract by' the government 'into a constitutional case.'" *Id*. (quoting *Redondo-Borges*, 421 F.3d at 10). Because Plaintiffs do not have a property interest in continued funding protected by the Constitution, their Due Process Clause claim necessarily fails.

b. <u>Plaintiffs Fail to Identify Any Constitutional Deficiency.</u>

Even if the Court were to get past that fundamental deficiency in Plaintiffs' Due Process Clause claim, Plaintiffs would still be unlikely to prevail. They raise two primary concerns with the OASH Notice, but neither has merit.

First, Plaintiffs assert that the OASH Notice is vague as to what it means to "align" with executive orders. TRO Mot. 10–11. But this argument is semantic in nature, not substantive. The term "align" is hardly obscure. In this context, it is meant in the ordinary sense of the term: grantees should "come into precise adjustment or correct relative position" with policies set forth in executive orders. Merriam-Webster, *Align*, https://www.merriam-webster.com/dictionary/align (last accessed July 30, 2025). Nor is this use of the term novel in the context of these grants. The NOFO frequently uses the terms "align" or "alignment" to describe the responsibilities of grantees. *See, e.g.*, NOFO 8, 10, 24–28, 36, 43. Vagueness concerns are also ameliorated by the design of the TPP Program itself, which contemplates review and consultation on project adaptations. *Id.* at 17.

In truth, the OASH Notice is not vague or ambiguous. It states—consistent with the NOFO, the March 2025 guidance, and the Notice of Award—that applicants are expected to be aware of recent policy developments contained in executive orders and to "revise their projects to align with executive orders that are currently in force as necessary in order to receive continuation funding." OASH Notice 1. That is consistent with, and no more vague than, the previous requirements— unchallenged by Plaintiffs—to engage in all sorts of "alignment" in preparing their applications, and with the term of previous awards that funding recipients comply with "[a]ll requirements imposed by programs statutes and regulations, *Executive Orders*, and HHS grant administration regulations, as applicable." Ex. A at 6 (emphasis added).

Plaintiffs also argue that the OASH Notice is unconstitutional because it contains a number of "content mandates that lack clear standards and thereby invite arbitrary and discriminatory enforcement." TRO Mot. 12–16. As Plaintiffs' framing of this argument confirms, HHS has yet to take any enforcement steps, and the Court cannot entertain this claim because Plaintiffs have not challenged a final agency action. Even so, this claim lacks merit. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108. This doctrine demands scrutiny of statutes and regulations that identify new conduct for punishment—typically in the context of law enforcement authorities. *See Nat'l Urban League*, 2025 WL 1275613 at *19; *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410 (D.C. Cir. 2017) (law is "void for vagueness" when "it fails to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement" (internal quotation marks and citation omitted)). It has little, if any, application "when the Government is

acting as patron rather than as sovereign," where the effects "of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998); *compare Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971) (holding prohibition of "annoy[ing]" conduct unconstitutionally vague in the context of a criminal ordinance); *Am. Pub. Health Ass'n*, 2025 WL 1548611, at *13. And, indeed, Plaintiffs cite no authority to suggest that the alleged potential for arbitrary "enforcement" in the context of grant decisions is constitutionally problematic. Mot. 23–24. There is no "enforcement," either criminal or civil, when the government makes a funding decision.

### 3.  Plaintiffs' "Contrary to Law" Claim Fails

Plaintiffs are also unlikely to prevail on their contrary to law claim. They advance two primary theories on this score, which the Court should reject.

*First*, Plaintiffs assert that the OASH Notice contravenes the TPP Program appropriation for so-called "Tier 1" grants, because changes to program design run against the requirement that such grants replicate other programs. TRO Mot. 16–18. Again, this argument is difficult to assess because HHS has not been presented with Plaintiffs' plans and cannot determine if changes needed to satisfy the terms of the grant instrument are in fact inconsistent with statutory requirements. But if the Court reaches this claim it should reject it. The OASH Notice does not repudiate Congress's instructions; on the contrary, it reaffirms them. OASH Notice 3. "Replication" does not mean Tier I programs have to be identical to the study being replicated. For example, the NOFO explains that "[a]daptations" to programs are, in fact, permitted, in order to "improve fit and relevancy of the program to the community and population of focus."[2] NOFO 9. Plaintiffs' arguments also present

---

[2] The Court should give no weight at all to the declaration of Dr. Kantor, ECF No. 3-5, an academic and former senior executive for the Planned Parenthood Federation of America. Dr. Kantor has no basis to opine on the meaning of statutory language. *S.E.C. v. Capital Consultants,*

a false choice between replicating programs that have been proven effective to reduce teenage pregnancy and aligning TPP programs with Executive Branch policy priorities as set forth in executive orders. For example, the March 2025 guidance provides examples of potential changes recipients "may make to align their projects," which include "selecting a different evidence-based program for implementation, making adaptations to existing curriculum, and updating policies, staffing, and training, etc." Ex. B at 5. That is hardly a directive to abandon Congress's statutory instructions to fund replication studies.

*Second*, Plaintiffs allege that the OASH Notice is inconsistent with other requirements of the TPP Program appropriation, such as requirements that programs be "medically accurate" and "effective." TRO Mot. 18–20. Leave aside, for a moment, how a Court could determine whether such requirements have been met before a final agency action has been taken with respect to a particular program, or how it ought to give meaning to these terms in the context of a federal grantmaking program when Congress has provided no guideposts for how courts should interpret those terms. As before, the OASH Notice does not repudiate either of these requirements for Tier 1 TPP Program grants. Moreover, nothing in the NOFO that preceded the current Tier 1 funding cycle precludes the sorts of programs that Plaintiffs deem to be "ineffective in changing adolescent sexual behavior," TRO Mot. 18, and by its terms, the NOFO views teenage abstinence as a reasonable and laudable goal. NOFO 12 ("Many adolescents believe it is easier to postpone sexual activity and avoid unintended pregnancy if they can have open and honest conversations about these topics with their parents.").

---

*LLC*, 397 F.3d 733, 749 (9th Cir. 2005) ("Experts may interpret and analyze factual evidence but may not testify about the law."). And APA cases are not decided on the basis of outside expert opinions, but on the record before the agency when it chose to act; they are not "a forum for the experts to debate the merits of" a particular policy. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 981, 991-93 (9th Cir. 2014).

4.  <u>Plaintiffs' Arbitrary and Capricious Claim Fails</u>

There is also no merit to Plaintiffs' assertions that the OASH Notice is an unexplained change in the agency's position, or that Plaintiffs lacked fair notice. *See* TRO Mot. 20–29. "[R]eview under [the arbitrary and capricious] standard is deferential," requiring a "court simply [to] ensure[] that the agency has acted within a zone of reasonableness and … reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As an initial matter, the NOFO that announced TPP program grants for the operative appropriation itself required certification of compliance with executive orders governing financial assistance awards, NOFO 63, and the Notice of Award all recipients received in 2023 further required compliance with "all requirements imposed by . . . Executive Orders . . . as applicable," Ex. A at 6. The OASH Notice is of a piece with these documents, and attempts to provide further, helpful guidance to grantees about how to adjust their programs in light of changing policy mandates. There is therefore no change in position for HHS to explain. To the extent HHS's decision-making is viewed this way, it has clearly articulated a reasoned basis for proceeding in the way that it did. Plaintiffs' five arbitrary and capricious theories do not fare well when considered in more detail, either.

*First*, Plaintiffs fault HHS for relying on factors that Congress did not intend HHS to consider by taking into account "political concerns" instead of "program effectiveness." TRO Mot. 20–22. The factors that Congress *did* intend to have HHS rely upon are the ones in the statute itself, and HHS is not disregarding those factors. Plaintiffs provide no reliable rubric for how the Court would sort out claims that particular research agendas are "ideological" instead of "evidence based," particularly in a field that is as politically charged as sex education, which is why courts typically refrain from reviewing such choices under the APA.

*Second*, Plaintiffs argue HHS didn't consider that the OASH Notice could be read so as to preclude providing any information about sexuality at all, because such materials might be "sexually explicit" or "normalize" sexual activity. TRO Mot. 22–23. This assumes, without foundation, that there is no space between "obscene, indecent, or sexually explicit content" and medically accurate sex education materials that are appropriate for classroom discussion. Similarly, the OASH notice reasonably explains that, particularly in light of new guidance received in executive orders, "healthy equity" and "inclusivity" should not be applied in such as a way as to "exceed the statutory scope of the TPP Program." OASH Notice 5.

*Third*, Plaintiffs assert HHS did not consider "reliance interests" in recasting the program. TRO Mot. 23–24. Not so. The OASH Notice clarifies that HHS is "aware that curricula and other materials . . . were previously approved by OASH." OASH Notice 5–6. But having considered such interests, HHS was entitled to "conclude that reliance interests in [policies] that it views as unlawful are entitled to no or diminished weight." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020).

*Fourth*, Plaintiffs aver that HHS's explanations run counter to evidence that present programming has proven effective in reducing teen pregnancy rates, and to "widely available scientific evidence" that rejects HHS's views about biological sex. TRO Mot. 25–26. To be clear, at this early stage, OASH has stated it "may re-evaluate the effectiveness of programs consistent with the statutory text and this PPN," but it has not had occasion to do so yet. OASH Notice 6. But Plaintiffs are not the ones who make these judgments in APA review. Rather, such decisions are "squarely within the agency's expertise" and courts have "no business second-guessing the agency's decision to fund one program over another." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 659 & 660 n.17 (D. Md. 2018).

27

*Finally*, Plaintiffs argue that HHS has not shown a "good cause for changing policy." TRO Mot. 26–29. Again, HHS has not changed policy here, as TPP Program grants have always been awarded subject to Executive Branch policy in the form of executive orders. To the extent it does not simply reiterate other arguments, this theory reduces down to the dissatisfaction of Plaintiffs with Defendants' clearly articulated reasons for issuing the OASH Notice and requiring program alignment with recent executive orders and Supreme Court precedent.

As explained above, there is no need for the Court to reach Plaintiffs' arbitrary and capricious claims on a TRO briefing schedule, before any harm is visited on Plaintiffs and before any final agency action has been taken, in an area committed to agency discretion by law. As explained above, if the Court does reach the issue, it should find Defendants are likely to succeed on the merits.

### B.  Plaintiffs Are Unlikely to Prevail on their Ultra Vires Claim

Ultra vires review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). More specifically, ultra vires review of agency action is only available when an agency's error is "patently a misconstruction of [statute;]" "when the agency has disregarded a specific and unambiguous statutory directive[;]" or "when the agency has violated some specific command of a statute." *Griffith v. Fed. Labor Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotations omitted). "Garden-variety errors of law or fact are not enough." *Id.*

Providing instructions to grant recipients that they should conform their programs to executive orders—particularly when grantees applied for and accepted funds in the first place with the understanding that such compliance was required—is hardly the type of fundamental error that

justifies ultra vires review. Plaintiffs fail to point to anything "specific and unambiguous" in Congress's appropriation of funds for the TPP program that prohibits the OASH Notice, because none exists, and therefore Plaintiffs' ultra vires claim fails.

Plaintiffs' ultra vires claim faces another insurmountable hurdle. Both the Supreme Court and D.C. Circuit have made clear that an ultra vires claim is unavailable where an alternative remedial forum exists in which a plaintiff may pursue the challenge. *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights"); *Lepre v. Dep't of Labor*, 275 F.3d 59, 72 (D.C. Cir. 2001) (a "critical" requirement for ultra vires review is "the lack of any alternative means of judicial review for the plaintiffs"); *see also Nyunt*, 589 F.3d at 449.

If Plaintiffs' funding is terminated for failure to comply with grant conditions, they may pursue relief at that time. The potential for review after a decision to terminate funding thus provides a plausible alternate avenue for Plaintiffs to pursue relief, if they are, in fact, denied funding. Plaintiffs are therefore unlikely to prevail on their ultra vires claim.

## III.    The Balance of Equities and Public Interest Weigh Against Relief

A party seeking a temporary restraining order must also demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two "factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

In arguing that the public interest weighs in their favor, Plaintiffs mostly repackage their arguments on alleged irreparable harm and on the merits. For all the reasons described above, Plaintiffs' harm and merits arguments fail. On the other hand, granting Plaintiffs' motion would upend the anticipated process for HHS to review program materials. *See Trump v. Wilcox*, --- S.

Ct. ---, 2025 WL 1464804, at *1 (May 22, 2025) (granting request for stay of injunction "to avoid [ ] disruptive effects" on government operations). Therefore, the balance of the equities and public interest favor denying Plaintiffs' request for injunctive relief, particularly given that the agency has not made any decision to termination Plaintiffs' funding.  It also would not be equitable to reward Plaintiffs for their decision to voluntarily dismiss *PPGNY I*, where they could have made and briefed the claims at issue here on the expedited summary judgment briefing schedule entered by Judge Kelly, and to instead wait nearly a month to file a new case and seek a TRO two days before purporting to need relief.

## IV.    Any Injunctive Relief Should Be Narrowly Tailored and Permit Lawful Agency Action

The Court should deny Plaintiffs' motion for a temporary restraining order. But if the Court were to provide such relief, it should be narrowly tailored. It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Lewis v. Casey*, 518 U.S. 343, 360 (1996) (explaining that an injunction should not provide "a remedy beyond what [is] necessary to provide relief" to the injured parties). In line with these principles, to the extent the Court intends to grant Plaintiffs' request, that the relief be limited to PPGNY.

There is no basis for extending relief to non-parties in this suit, as Plaintiffs propose. ECF No. 3, at 1–2. 8, or to Plaintiffs that have not justified emergency relief. Accordingly, any TRO should confirm that all obligations in the injunctive order apply only with respect to any grants involving PPGNY specifically. *Trump v. CASA, Inc.*, 606 U.S. ---, 2025 WL 1773631, at *4 (2025).

## V.    A Bond Should Accompany Any Injunctive Relief

If the Court were to grant Plaintiffs' motion, Defendants respectfully request that any

injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." As the D.C. Circuit recently clarified, "injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). The Court has broad discretion to determine the amount of an appropriate bond. If the Court were to enter an injunction, Defendants ask that the bond amount reflect the cost and disruption to HHS's administration of the TPP program resulting from Plaintiffs' requested relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

Dated: July 30, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Director, Federal Programs Branch

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI
(D.C. Bar No. 1017949)
Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 616-0680
Michael.J.Gerardi@usdoj.gov

*Counsel for Defendants*

31