# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PLANNED PARENTHOOD OF GREATER NEW YORK *et al.*, | ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 25-cv-2453 |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

    A.   The TPP Program ................................................................................................. 2

    B.   The TPP Program Application and Award Process ............................................. 3

    C.   HHS's Imposition of New Requirements on the TPP Program............................. 5

    D.   The Policy Notice's Ongoing Impact on Plaintiffs' TPP Projects and Services ................ 6

    E.   Procedural History ............................................................................................... 7

LEGAL STANDARD........................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

    I.   The Policy Notice Violates the APA Because it is Contrary to Law and Arbitrary and Capricious ................................................................................................................ 9

        a.   The Policy Notice is Quintessential Final Agency Action ........................ 10

        b.   The Policy Notice Contravenes Congress's Directives for the TPP Program .......... 15

        c.   The Policy Notice Violates the APA Because it is Arbitrary and Capricious .......... 19

    II.   The Policy Notice Is Unconstitutionally Vague in Violation of the Fifth Amendment ... 34

    III.   The Policy Notice is *Ultra Vires*................................................................................ 36

    IV.   Vacatur Is Warranted ................................................................................................ 37

CONCLUSION.................................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)................................................................................................10, 11

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
    770 F. Supp. 3d 121 (D.D.C. 2025)........................................................................28, 29

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014)....................................................................................38

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    934 F.3d 649 (D.C. Cir. 2019)......................................................................................37

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    318 F. Supp. 3d 370 (D.D.C. 2018)................................................................................9

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019)........................................................................................9

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
    No. 25-cv-10787, 2025 WL 1822487 (D. Mass. July 2, 2025) ..................................22

*Appalachian Power Co. v. EPA*,
    208 F.3d 1015 (D.C. Cir. 2000)..............................................................................13, 14

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
    273 F.3d 1229 (9th Cir. 2001) .....................................................................................20

*Ark Initiative v. Tidwell*,
    816 F.3d 119 (D.C. Cir. 2016).....................................................................................30

*Ass'n of Am. Univs v. Nat'l Sci. Found.*,
    No. 1:25-cv-11231-IT, 2025 WL 1725857 (D. Mass. June 20, 2025) ...................32, 33

*Bd. of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972).....................................................................................................35

*Beckles v. United States*,
    580 U.S. 256 (2017).....................................................................................................35

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................................10, 12

*California v. Trump,*
    2025 WL 1667949 (D. Mass. June 13, 2025) .................................................................36, 37

*Chicago Women in Trades v. Trump,*
    2025 WL 1118659 (N.D. Ill. Apr. 15, 2025) ........................................................................25

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012).............................................................................................................20

*Ciba-Geigy Corp. v. U.S.E.P.A.,*
    801 F.2d 430 (D.C. Cir. 1986).............................................................................................11

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971).............................................................................................................26

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009).................................................................................................30

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024).............................................................................................................37

*CropLife Am. v. EPA,*
    329 F.3d 876 (D.C. Cir. 2003).......................................................................................10, 12

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020)...........................................................................................................28, 29

*Eagle Tr. Fund v. U.S. Postal Serv.,*
    365 F. Supp. 3d 57 (D.D.C. 2019).......................................................................................36

*Eagle Tr. Fund v. U.S. Postal Serv.,*
    811 F. App'x 669 (D.C. Cir. 2020) .....................................................................................36

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016).............................................................................................................29

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).................................................................................................20, 29, 32

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012).......................................................................................................21, 35

*Fed. Express Corp. v. United States Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022)..............................................................................................36

*Firearms Regul. Accountability Coal., Inc. v. Garland,*
    112 F.4th 507 (8th Cir. 2024) .........................................................................................20, 22

*Frozen Food Exp. v. United States*,
    351 U.S. 40 (1956) ...................................................................................................11

*Gen. Elec. Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995) ...............................................................................20

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ...............................................................................31

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ...............................................................................37

*Healthy Teen Network v. Azar*,
    322 F. Supp. 3d 647 (D. Md. 2018) ........................................................................26

*Her Majesty the Queen in Right of Ontario v. EPA*,
    912 F.2d 1525 (D.C. Cir. 1990) .............................................................................12

*Hill v. Colorado*,
    530 U.S. 703 (2000) ...............................................................................................36

*Ipsen Biopharms., Inc. v. Azar*,
    943 F.3d 953 (D.C. Cir. 2019) ...............................................................................14

*Johnson v. United States*,
    576 U.S. 591 (2015) ...............................................................................................35

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ...............................................................................35

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ...............................................................................................36

*Mahmoud v. Taylor*,
    606 U.S. __ (2025) .................................................................................................23

*Marin Audubon Soc'y v. FAA*,
    121 F.4th 902 (D.C. Cir. 2024) .............................................................................14

*Marshall Cnty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ...............................................................................8

*Massachusetts v. Nat'l Insts. of Health*,
    770 F. Supp. 3d 277 (D. Mass. 2025) ....................................................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................9, 20, 27, 30

*Multnomah Cnty. v. Azar,*
    340 F. Supp. 3d 1046 (D. Or. 2018) ................................................................18

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.,*
    2025 WL 1188160 (D.N.H. Apr. 24, 2025).....................................................35

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.,*
    779 F. Supp. 3d 149 (D.N.H. 2025).............................................................21, 22

*Nat'l Min. Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014).....................................................................13, 15

*Nat'l Mining Assoc'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) ..................................................................12

*Nebraska v. Su,*
    121 F.4th 1 (9th Cir. 2024) ............................................................................25

*Nissan Chem. Corp. v. FDA,*
    744 F. Supp. 3d 1 (D.D.C. 2024) ...............................................................20, 21

*Ohio v. EPA,*
    603 U.S. 279 (2024)........................................................................................27

*Orr v. Trump,*
    778 F. Supp. 3d 394 (D. Mass. 2025) .............................................................19

*Planned Parenthood of Greater N.Y. v. HHS* (*PPGNY I*), No. 25-1334 (TJK)
    (D.D.C. May 1, 2025), Dkt. No. 1 ....................................................................5

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS,*
    946 F.3d 1100 (9th Cir. 2020) ...................................................................16, 17

*Planned Parenthood of NYC, Inc. v. HHS,*
    337 F. Supp. 3d 308 (S.D.N.Y. 2018).................................................9, 17, 28, 37

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009) .........................................................................8

*Richards v. INS,*
    554 F.2d 1173 (D.C. Cir. 1977) ......................................................................9

*Sackett v. E.P.A.,*
    566 U.S. 120 (2012)........................................................................................10

*Sierra Club v. Mainella,*
    459 F. Supp. 2d 76 (D.D.C. 2006) ..................................................................9

*Solondz v. Fed. Aviation Admin.*,
    141 F.4th 268 (D.C. Cir. 2025) ....................................................................20

*Soundboard Ass'n v. Fed. Trade Comm'n*,
    888 F.3d 1261 (D.C. Cir. 2018) ...................................................................10

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*,
    357 F. Supp. 3d 30 (D.D.C. 2019) ...............................................................37

*Timpinaro v. SEC*,
    2 F.3d 453 (D.C. Cir. 1993) ...................................................................20, 35

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) .................................................................................37

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ................................................................................11, 15

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017) ...................................................................35

*United States v. Williams*,
    553 U.S. 285 (2008) .....................................................................................24

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ...................................................................37

*Urban Sustainability Dirs. Network v. U.S. Dep't of Ag.*,
    2025 WL 2374528 (D.D.C. Aug. 14, 2025) ................................................35

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .....................................................................................10

**Constitutions**

U.S. Const. amend. V ..............................................................................................34

**Statutes**

5 U.S.C. § 706(2) .......................................................................................8, 19, 37

42 U.S.C. § 713(e)(2) .......................................................................................18, 33

Pub. L. No. 111-117, 123 Stat. 3034 (2009) ..............................................................2

Pub. L. No. 118-47, 138 Stat. 460 (2024) ........................2, 3, 15, 17, 18, 26, 28, 36

## Regulations

2 C.F.R.
§ 180.800(b)(3) .................................................................................13
§ 200.340(a)(1) .................................................................................13
§ 200.340(a)(4) .................................................................................13

45 C.F.R.
§ 52.6 ...............................................................................................3
§ 52.6(c) ...........................................................................................4
§ 75.371 ..........................................................................................13
§ 75.372(a) ......................................................................................13
§ 75.403 ..........................................................................................13
§ 75.404 ..........................................................................................13
§ 75.405 ..........................................................................................13

Exec. Order No. 14161, 90 Fed. Reg. 8,451 (Jan. 20, 2025) ........................................25

Exec. Order No. 14172, 90 Fed. Reg. 8,629 (Jan. 20, 2025) ........................................25

Exec. Order No. 14190, 90 Fed. Reg. 8,853 (Jan. 29, 2025) ........................................22

## Court Rules

Fed. R. Civ. P. 56(a) ...........................................................................................9

## Other Authorities

*Align*, Merriam Webster, https://www.merriam-webster.com/dictionary/align; ..........................14

Claire Ainsworth, *Sex Redefined*, 518 NATURE 288 (February 19, 2015) ...................................31

*Comply*, Merriam Webster, https://www.merriam-webster.com/dictionary/comply ...................14

H. Comm. on Gov't Operations, 85th Cong., Executive Orders and Proclamations:
A Study of a Use of Presidential Powers 1 (Comm. Print 1957) ..............................................24

HHS, *ASPE Research Brief: Making Sense of Replication Studies* (May 2015),
https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//55351/rb_TPP_
Replication.pdf ....................................................................................................30

HHS, *Making Adaptations Tip Sheet*,
https://acf.gov/sites/default/files/documents/prep-making-adaptations-ts_0.pdf ...................16

Jessica Tollestrup, Cong. Rsch. Serv., R45183, Adolescent Pregnancy: Federal
Prevention Programs 22 (2024) ........................................................................2, 18, 25

John S. Santelli, M.D., M.P.H. *et al.*, *Abstinence-Only-Until-Marriage Policies
and Programs*, 61 J. ADOLESCENT HEALTH 400 ...........................................................30

*Litigation Tracker: Legal Challenges to Trump Administration Actions*, Jus Security (July 22 2025), https://perma.cc/8JKK-NJUG ........................................................25

Notice of Voluntary Dismissal, *PPGNY I*, No. 25-1334 (D.D.C. July 11, 2025), Dkt. No. 34 .......................................................................................................................6

OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review*, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review#ftn1 ...................................................3, 16

Pediatric Endocrine Soc'y, *The Biological Reality of Sex and Intersex: A Response to the Executive Order* (Feb. 11, 2025), https://pedsendo.org/wp-content/uploads/2025/02/Society-Statement-on-Biological-Sex-Developand-DSD-2025.pdf......................................................................................................................19

*Replicate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/replicate .........................................................................17

Tiffany Jones, *Intersex Studies: A Systematic Review of International Health Literature*, 8 SAGE OPEN 2 (April 2018) ............................................................................31

**INTRODUCTION**

This case challenges the U.S. Department of Health and Human Services' (HHS) unlawful imposition of sweeping new requirements on the Teen Pregnancy Prevention (TPP) Program, an evidence-based, congressionally mandated public health initiative that has successfully reduced unintended teen pregnancy and related health problems for over fifteen years. HHS's July 1, 2025, *OASH Teen Pregnancy Prevention Program Policy Notice* (Policy Notice), unlawfully conditions access to continued TPP Program funding on grant recipients' compliance with amorphous requirements that are contrary to law, unsupported by evidence, and directly contravene the very purpose of the TPP program—to provide effective, medically accurate programming to reduce teen pregnancy and associated health risks.

Plaintiffs Planned Parenthood of Greater New York (PPGNY), Planned Parenthood of California Central Coast (PPCCC), and Planned Parenthood of the Heartland (PPH) are nonprofit organizations whose TPP projects have been upended by HHS's unlawful actions despite having successfully operated for years and having already been approved by HHS through the agency's rigorous evidence review process. Three years into their five-year grants, the Policy Notice has forced Plaintiffs into a Hobson's choice: alter their programs to conform to the Policy Notice's unlawful requirements, risk enforcement action by continuing their approved programming, or shut down their projects entirely. The Policy Notice's mandates violate the Administrative Procedure Act (APA), infringe Plaintiffs' constitutional rights, and exceed HHS's statutory authority.

The Policy Notice is final agency action with immediate legal consequences. It compels Plaintiffs to revise their programming, threatens suspension and termination of funding, and imposes content restrictions that defy congressional directives. Because the Policy Notice is contrary to law, arbitrary and capricious, unconstitutionally vague, and *ultra vires*, it must be set

aside.[1] Plaintiffs respectfully request that the Court grant summary judgment and vacate the Policy Notice in its entirety.

## STATEMENT OF FACTS

### A. The TPP Program

Teenage pregnancy has long been a significant public health concern in the United States because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society. *See* Statement of Mat. Facts Pursuant to L.Cv.R. 7(h) in Support of Pls.' Mot. for Summ. J. (Pls.' SOMF) ¶ 1 (citing Alexandria K. Mickler & Jessica Tollestrup, Cong. Rsrch. Serv., R45184, Teen Births in the United States: Overview and Recent Trends 1 (2025)). Despite a substantial decline over the past two decades, the rate of unintended adolescent pregnancy in the United States remains higher than that of comparable high-income countries, with persistent racial, ethnic, and geographic disparities. *Id.*

In 2009, Congress created the TPP Program to fund a wide array of evidence-based, scientifically rigorous approaches to reducing teen pregnancy and associated health risks. Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). In doing so, Congress appropriated $110 million "to fund medically accurate and age appropriate programs that reduce teen pregnancy." *Id.* Since then, Congress has continuously funded the TPP Program at approximately the same funding and with the same statutory requirements. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024).

Congress requires HHS to fund two tiers of TPP Programs, "Tier 1" and "Tier 2." Pls.' SOMF ¶ 6. At issue in this case is Tier 1, which requires grantees to "replicat[e]" "medically accurate and age appropriate programs" that have "been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or

---

[1] Plaintiffs are no longer pursuing their claim that the Policy Notice violates the First Amendment.

other associated risk factors." 138 Stat. at 671.[2] Consistent with this mandate, HHS designates programs eligible for "replication" through the agency's Teen Pregnancy Prevention Evidence Review (TPPER) process, a rigorous process akin to peer review. Pls.' SOMF ¶ 12 (citing OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review*, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evi dence-review#ftn1 (last visited Aug. 24, 2025) (OASH, *TPPER Findings*)). Relying on a systematic review of studies and program evaluations, TPPER determines whether a program has been proven effective in serving the required TPP goals: reducing teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors. *Id.* ¶ 13 (citing OASH, *TPPER Findings*). Each Plaintiffs' Tier 1 TPP project has been approved to replicate, with fidelity, at least one of the evidence-based programs that HHS has identified on its pre-approved list as effective and consistent with Congress's mandate for the program. *See id.* ¶ 47 (citing Decl. of Wendy Stark (PPGNY Decl.) ¶¶ 13-14; Decl. of Jenna Tosh (PPCCC Decl.) ¶ 26, 28; Decl. of Christine Cole (PPH Decl.) ¶ 12-13, 16).

## B. The TPP Program Application and Award Process

TPP Program grant recipients, including Plaintiffs, receive project funding through two related processes: a competitive award cycle and an annual non-competitive continuing award process. Pls.' SOMF ¶ 17. Consistent with HHS's regulations, 45 C.F.R. § 52.6, the TPP Program's competitive award cycle begins with a notice of funding opportunity (NOFO), by which the agency declares its intention to award funds and outlines the program goals, objectives, and conditions for applying. Pls.' SOMF ¶ 18 (citing HHS, OASH, OPA, Advancing Equity in

---

[2] Tier 2 grantees are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing]" new "medically accurate and age appropriate programs" "for preventing teenage pregnancy." 138 Stat. at 671.

Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services, Notice of Funding Opportunity, AH-TP1-23-001, (2023 NOFO) at 5-6).

HHS grants these awards for a "project period," during which HHS "intends to support the project without requiring the project to recompete for funds." 45 C.F.R. § 52.6(c). Each year, grantees submit a non-competing continuation award application (NCC application) consisting of a progress report for the current budget year and a work plan, budget, and budget justification for the upcoming year. Pls.' SOMF ¶ 20 (citing 2023 NOFO at 56).

Plaintiffs PPGNY, PPCCC, and PPH are grantees whose projects were designed in response to HHS's 2023 Tier 1 TPP NOFO, which solicited applications for projects in communities and populations with the greatest unmet needs that replicated evidence-based programs that were "culturally and linguistically appropriate, trauma-informed, and inclusive of all youth." Pls.' SOMF ¶ 21 (citing 2023 NOFO at 11). Each grantee's project was approved for a five-year performance period from 2023 to 2028, subject to the annual non-compete continuation funding application process. Pls. SOMF ¶ 22 (citing PPGNY Decl. ¶¶ 12, 19; PPCCC Decl. ¶ 26; PPH Decl. ¶ 9). Each Plaintiffs' third-year of funding was approved on July 2, 2025. *Id.* (citing PPGNY Decl. ¶ 25; PPCCC Decl. ¶ 39; PPH Decl. ¶ 24).

When a TPP continuation award is granted, the funds are made available in an online account, and Plaintiffs "draw down" funds as needed to reimburse them for their approved project expenses. Pls.' SOMF ¶ 23. Through the process of accessing funds already awarded to them—i.e., "drawing down" the awarded funds—TPP funding recipients certify that they will comply with program policies, including, as of July 2, 2025, the Policy Notice. *Id.* Plaintiffs have not drawn down any funds since HHS issued the Policy Notice on July 2, 2025. *Id.* ¶ 49 (citing PPGNY Decl. ¶ 60; PPCCC Decl. ¶ 83; PPH Decl. ¶ 61).

4

### C. HHS's Imposition of New Requirements on the TPP Program

Over the past several months, HHS has engaged in a pattern of escalating efforts to undermine the statutory goals of the TPP Program—first through the imposition of an Executive Order "alignment" requirement on Plaintiffs' NCC applications, and now through a sweeping Policy Notice that not only requires Plaintiffs to "align" with Executive Orders as a condition of continued funding but also imposes a host of additional content-based restrictions that are vague, lack scientific reasoning, and are fundamentally incompatible with the purposes and statutory requirements of the TPP Program.

A little more than two weeks before the Tier 1 NCC application deadlines, OASH issued its *Guidance for Preparing a Non-Competing Continuation (NCC) Award Application, Teen Pregnancy Prevention (TPP) Program Recipients (AH-TP1-23-001)* (2025) (NCC Notice) to Tier 1 TPP funding recipients. Pls.' SOMF ¶ 24. The NCC Notice imposed, for the first time, a requirement that grantees "align" their programs with *all* Executive Orders. *Id.* (citing NCC Notice at 4-5). Plaintiffs all submitted their NCC applications without certifying compliance with the Executive Order "alignment" requirement. *Id.* ¶ 25 (citing PPGNY Decl. ¶ 24; PPCCC Decl. ¶ 38; PPH Decl. ¶ 23.). HHS granted Plaintiffs' NCC applications, after they and others filed a lawsuit challenging the Tier 1 NCC Notice. *Id.* ¶ 26 (citing *Planned Parenthood of Greater N.Y. v. HHS* (*PPGNY I*), No. 25-1334 (TJK) (D.D.C. May 1, 2025), Dkt. No. 1).

On July 2, 2025, HHS granted Plaintiffs' NCC applications—albeit subject to the terms of the Policy Notice, which it published that same day. Pls.' SOMF ¶¶ 26, 27. As a result, the *PPGNY I* plaintiffs no longer faced harm from the potential denial of their applications and voluntarily dismissed the case on July 11, 2025, before the Court had resolved the merits of any of the plaintiffs' claims. Notice of Voluntary Dismissal, *PPGNY I*, No. 25-1334 (D.D.C. July 11, 2025), Dkt. No. 34.

5

While HHS characterizes its Policy Notice as merely "clarify[ing] OASH policy," Policy Notice at 1, the Policy Notice in fact imposes new and substantive conditions on continued funding—both via its Executive Order "alignment" requirement and by imposing additional sweeping new content mandates. Specifically, the Policy Notice imposes five content mandates: (1) an **anti-DEI mandate** that prohibits TPP programming from including "discriminatory equity ideology," and "diversity, equity, or inclusion-related discrimination"; (2) a **prohibition of certain LGBTQ+-inclusive content** that explicitly bans so-called "gender ideology"; (3) an **anti-"normalizing" sex mandate** that prohibits TPP programming from including any "sexually explicit content" or "content that encourages, normalizes, or promotes sexual activity for minors"; (4) the **redefining of "medically accurate"** in a manner that is both medically *in*accurate and exceptionally burdensome on program participants, as well as particularly impractical in a group educational context; and (5) **an opt-out requirement** that TPP programs must "provide parents advance notice . . . and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." *See* Policy Notice at 3-5.

**D. The Policy Notice's Ongoing Impact on Plaintiffs' TPP Projects and Services**

HHS's actions directly threaten Plaintiffs' ongoing TPP projects and their ability to access funds in order to execute those projects. Despite HHS approving Plaintiffs' TPP projects for a third year, the Policy Notice's unlawful requirements present Plaintiffs with an impossible choice, whether to (1) alter their TPP programs to draw down the awarded funds (which requires certifying compliance with the Policy Notice) and risk undermining the effectiveness of their projects, contravening their missions, and alienating the vulnerable populations they serve, (2) continue on with their TPP programming as previously approved with the likely outcome of an enforcement

action by HHS, or (3) shut down their programs entirely to avoid these negative outcomes, abandoning their partnerships and the communities they serve. Pls.' SOMF ¶ 48 (citing PPGNY Decl. ¶ 40; PPCCC Decl. ¶ 65; PPH Decl. ¶ 38).

Plaintiffs designed their budgets, programming, staffing, and partnerships with community organizations based on the understanding that HHS would provide continued funding. Pls.' SOMF ¶ 50 (citing PPGNY Decl. ¶¶ 61-63; PPCCC Decl. ¶ 74; PPH Decl. ¶¶ 61-63). By conditioning that funding on Plaintiffs' acceding to unlawful and standardless requirements, the Policy Notice disrupts Plaintiffs' operations, thwarts their ability to provide the funded TPP programs and education services, and threatens their reputation, stakeholder relationships, and community goodwill with many local partners in areas where programming is offered. *Id.* (citing PPGNY Decl. ¶ 67-68; PPCCC Decl. ¶ 68; PPH Decl. ¶ 45). These disruptions threaten Plaintiffs' ability to provide public health programming to communities that HHS has identified as having the highest unmet need and perpetuate the negative health outcomes this program was designed to address. *Id.* (citing PPGNY Decl. ¶ 68-70; PPCCC Decl. ¶ 67; PPH Decl. ¶ 45-47).

### E. Procedural History

Plaintiffs filed this litigation on July 29, 2025. ECF No. 1. That same day, PPGNY and PPCCC filed a motion for a temporary restraining order. ECF No. 3. The Court held argument and denied the motion on July 31, on the grounds that PPGNY and PPCCC had not demonstrated imminent irreparable harm. ECF No. 18. None of the Plaintiffs have been able to draw down funds for year three of their TPP projects, which began July 1, as a result of the Policy Notice. Pls.' SOMF ¶ 49 (citing PPGNY Decl. ¶ 60; PPCCC Decl. ¶ 83; PPH Decl. ¶ 61).

Since the Court's denial of Plaintiffs' Motion for a Temporary Restraining Order, PPGNY has been forced to shut down its TPP project due to the loss of access to funds, but PPGNY remains

in the TPP program and will attempt to restart its project if this case provides relief.[3] Pls.' SOMF ¶ 51 (citing PPGNY Decl. ¶¶ 62-63, 66). PPCCC has had to allocate its limited, unallocated reserves to pay staff and cover other program expenses due to the loss of access to TPP grant funds, which it can only do for a brief period; without relief, PPCCC has no other funds to cover the costs of its TPP project and will soon be forced to shut down its program and furlough staff. *Id.* ¶ 52 (citing PPCCC Decl. ¶¶ 83-85). PPH has also briefly kept its project afloat by reallocating resources and pausing certain contracts, but can only operate its project on this reduced budget for a short time and will soon have to shut down its TPP project absent relief. *Id.* ¶ 53 (citing PPH Decl. ¶¶ 62-63).

## LEGAL STANDARD

The APA instructs the reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as agency action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). In APA cases, "[t]he entire case on review is a question of law." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)). Thus, summary judgment in APA cases "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."

---

[3] In its declaration submitted with the TRO briefing to this Court, PPGNY stated "[g]iven the options before us and absent relief from this Court, PPGNY will leave the TPP Program, which means that it will have to shut down its Project STAR programming." Dkt. No. 3-6 ¶ 47. However, PPGNY has since come to understand that it may remain in the program without drawing down its allocated funds while this case proceeds. To be clear, the anticipated harm has indeed occurred—PPGNY has had to shut down its Project STAR due to the loss of access to its TPP funds. But because the Policy Notice is the reason PPGNY is unable to draw down those funds, PPGNY hopes to attempt to rebuild its project should the Court grant relief at this stage.

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

As for constitutional claims, Rule 56 requires courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n the context of *ultra vires* . . . claims, there are no questions of fact, because whether or not a statute or the Constitution grants the President the power to act in a certain way is a pure question of law." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 394 (D.D.C. 2018), *rev'd and vacated on other grounds*, 929 F.3d 748 (D.C. Cir. 2019).

## ARGUMENT

Under threat of grant termination and suspension, the Policy Notice requires TPP grantees to "align" their projects with Executive Orders and imposes a range of content mandates that (1) violate the APA because they are contrary to law and arbitrary and capricious; (2) invite arbitrary and discriminatory enforcement in violation of the Fifth Amendment, and (3) exceed the authority Congress assigned to HHS, and are thus *ultra vires*. Because the Policy Notice violates the APA, vacatur is appropriate.

### I.     The Policy Notice Violates the APA Because it is Contrary to Law and Arbitrary and Capricious

Agency action should be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983). As a threshold matter, the Policy Notice is final agency action that is therefore reviewable under the APA. *See Planned Parenthood of NYC, Inc. v. HHS (PPNYC)*, 337 F. Supp. 3d 308, 326 (S.D.N.Y. 2018) (concluding that terms of TPP Program funding are final agency action that applicants may challenge). The Policy Notice violates the APA

because it is contrary to law, as it contravenes Congress's directives for the TPP Program, and because it is arbitrary and capricious.

### a.  The Policy Notice is Quintessential Final Agency Action

The Policy Notice represents HHS's final word on continuing obligations for TPP Program participants, and it carries immediate legal consequences for grantees. Plaintiffs need not wait until HHS takes an enforcement action against them. It is well established that a program participant may challenge an agency's generally applicable requirements before they are applied in an individual case. Plaintiffs are also not free to ignore HHS's new requirements, as failure to comply carries explicit legal consequences, including termination and suspension. The Policy Notice thus meets both of the requirements for final agency action that is subject to APA review. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

***The Policy Notice is the Consummation of the Agency's Process.*** On its face, the Policy Notice plainly represents HHS's complete and final decision to fundamentally alter the TPP Program's terms. These dramatic changes—including broad content mandates, an amorphous "alignment" requirement, revised definitions, and an opt-out requirement—are not interim in nature. They are not "informal, or only the ruling of a subordinate official, or tentative." *Soundboard Ass'n v. Fed. Trade Comm'n,* 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967)). Rather, they represent HHS's "last word on the matter." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Plaintiffs "will be afforded no additional opportunity to make the arguments to the agency that they now present in this" lawsuit. *CropLife Am. v. EPA*, 329 F.3d 876, 882 (D.C. Cir. 2003); *see also Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) (finding final agency action where plaintiffs have "no entitlement to further Agency review"). Neither the Policy Notice nor HHS regulations provide a mechanism for reconsideration of the Policy Notice's terms, which are fixed. HHS is, of course, free to revisit its

10

decision to impose these new requirements on the program. But this possibility of rescinding the requirements "does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). And the Policy Notice declares—point blank—that "OASH will not continue to fund materials or activities" not in compliance with its newfound understanding of the "TPP Program's statutory scope." Policy Notice at 6.

Under basic administrative law principles, it does not matter whether HHS has already enforced the Policy Notice against Plaintiffs. Courts have long understood that the reviewability of an agency's later individualized decision does not affect the final nature of a generally applicable regulation. *See Abbott Labs.*, 387 U.S. at 149-51; *Hawkes Co.*, 578 U.S. at 599-600 (2016) (explaining that agency action may be final even if it "would have effect only if and when" it was implemented "against a particular [regulated party]" (quoting *Abbott Labs.* 387 U.S. at 150)); *Frozen Food Exp. v. United States*, 351 U.S. 40, 44 (1956) (finding order defining regulatory exemptions to be final because of effects on regulated parties' "civil and criminal risks"). HHS has "publicly articulate[d] an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position." *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 436 (D.C. Cir. 1986). As a result, "the agency has voluntarily relinquished the benefit of postponed judicial review." *Id.*

Applicable cases demonstrate that Plaintiffs can challenge the Policy Notice now rather than waiting to contest an enforcement decision. In *CropLife America*, for instance, the D.C. Circuit held that a press release changing criteria for pesticide safety evaluations represented final agency action because the "directive constitute[d] a binding regulation that [wa]s directly aimed at and enforceable against" the petitioners, and its "clear and unequivocal language . . . reflect[ed] an obvious change in established agency practice" creating a "binding norm." 329 F.3d 876, 881

(D.C. Cir. 2003). The Policy Notice, which expressly says the agency had previously "erred in approving such material," Policy Notice at 5-6, here similarly represents "an obvious change in established agency practice" through "clear and unequivocal language" "directly aimed at" Plaintiffs, *CropLife Am.*, 329 F.3d at 881; *see also Nat'l Mining Assoc'n v. Jackson*, 768 F. Supp. 2d 34, 38, 44 (D.D.C. 2011) (finding that an agency took final action when it "implemented a change in the permitting process" through "a series of memoranda and a detailed guidance" absent any "grant or denial of the various permits at issue").

*Legal Consequences Flow from the Policy Notice.* The Policy Notice speaks in mandatory terms and imposes "obligations" on TPP grantees. *Bennett*, 520 U.S. at 178. By its terms, TPP Program grant recipients that are "noncompliant with the [Policy Notice] may face grant suspension . . . and grant termination." Policy Notice at 5. In other words, the Policy Notice "has a direct and immediate . . . effect on [Plaintiffs'] day-to-day business." *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). This present binding effect is patent from the Policy Notice's plain text. The Policy Notice changes "OASH policy for [TPP Program] grant recipients," and "delineate[s] when materials and activities are not 'medically accurate,' 'age appropriate,' do not 'reduce teen pregnancy,' or are otherwise outside the scope of the TPP Program." Policy Notice at 1. It introduces "obligations" to include an opt-out mechanism in TPP programming and "outlines [new] evaluation standards for TPP Program grant recipients and evidence-based programs." *Id.*

The Policy Notice does not equivocate. These requirements "appl[y] to TPP Program grant recipients" now. *Id.* The notice makes clear that Plaintiffs must adhere to these instructions, specifying that grant recipients "are expected to ensure all program materials comply with this [Policy Notice]." *Id.* at 5. HHS explains that programs "cannot" receive TPP funding "if they

include . . . ideological content such as the content at issue in *Mahmoud*, gender ideology, or discriminatory equity ideology (as such terms are defined in Executive Order 14190)." *Id.* at 3-4. Grant recipients are also "expected to" implement an opt-out mechanism. *Id.* at 3.

If there were any lingering doubt as to the compulsory nature of these mandates, HHS attaches severe legal sanctions for failure to comply with the revised requirements in a section titled "Compliance." *Id.* at 6. "[T]hose determined noncompliant with the [Policy Notice] may face grant suspension under 45 C.F.R. § 75.371 and grant termination under 45 C.F.R. § 75.372(a) before October 1, 2025, and, starting October 1, 2025, termination under 2 CFR §§ 200.340(a)(1)-(4)." *Id.* at 6; *see also* 2 C.F.R. § 180.800(b)(3) (providing for government-wide debarment for violation of program requirements). HHS then threatens that "any expenditures associated" with activities it deems to violate the Policy Notice "are not allowable, reasonable, or allocable to programs that include such content," thus subjecting expenditures inconsistent with the Notice to potential clawback and other sanctions. *Id.* at 5 (citing 45 C.F.R. §§ 75.403-405). By stating these legal consequences explicitly, HHS has made unmistakably clear that the Policy Notice binds TPP grant recipients.

The Policy Notice thus "tell[s] regulated parties what they must do or may not do in order to avoid liability." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). Plaintiffs are not "free to ignore" the Policy Notice because it may "be the basis for an enforcement action against" them. *Id.* The Policy Notice "from beginning to end . . . reads like a ukase. It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). The D.C. Circuit has found far less compulsory language indicative of final agency action, holding that action is reviewable even when a guidance document insists that it carries no legal consequences whatsoever. *See id.*; *see also Ipsen Biopharms., Inc. v. Azar*, 943 F.3d 953, 957-58

13

(D.C. Cir. 2019) (holding that a *letter* amounted to final agency action where it subjected party to increased legal risk).

Furthermore, the Policy Notice imposes new requirements and does not simply reiterate Plaintiffs' pre-existing obligations. There is no question that the anti-DEI mandate, prohibition of certain LGBTQ+-inclusive content, anti-"normalizing" sex mandate, and redefinition of "medically accurate" represent new directives that were not present in the NOFO or the NCC Notice.[4] Nor can the opt-out requirement be found in prior guidance. With respect to the Executive Order "alignment" requirement, although the NOFO requires grant recipients to "comply" with Executive Orders, the Policy Notice's alignment requirement imposes additional restrictions on Plaintiffs' programs. For one, "align" and "comply" mean different things—to "align" means to "array on the side of or against a party or cause," while "comply" means to "to conform … as *required*."[5] That distinction is especially acute when applying Executive Orders, which typically "focus[] solely on the internal management of the Executive Branch" and impose no direct obligations on private parties. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 913 (D.C. Cir. 2024). That is, absent the new alignment requirements, most Executive Orders do not on their own require Plaintiffs to "comply" with anything at all. That is true of the Executive Orders at issue here, all of which direct only *federal agencies* to take specific action and impose no direct requirements on grantees. *See* Policy Notice at 2-3. Indeed, government counsel has characterized the alignment requirement as mandating that grantees "'comport' your project with the policy goals set by the

---

[4] HHS tries to obscure the novel nature of these requirements by insisting that the Policy Notice simply "clarifies" grant recipients' responsibilities that flow from their "preexisting obligations." *See* Policy Notice at 1. The Policy Notice does no such thing. It instead represents a complete about-face on core aspects of the TPP Program. The government's language appears only intended to frustrate judicial review of its final agency action.

[5] *Align*, Merriam Webster, https://www.merriam-webster.com/dictionary/align; *Comply*, Merriam Webster, https://www.merriam-webster.com/dictionary/comply (emphasis added).

President" notwithstanding that "[m]any executive orders don't apply to individuals or recipients, they apply to agencies." Tr. of Prelim. Inj. Hr'g at 53:2-8, *PPGNY I*, No. 25-1334 (D.D.C. June 4, 2025).

The reviewability of HHS's action is especially clear given courts' "'pragmatic' approach . . . to finality." *Hawkes*, 578 U.S. at 599. The Policy Notice has the "actual legal effect" of compelling Plaintiffs to change their TPP Programs under threat of noncompliance proceedings, which may involve funding clawbacks, administrative investigations, suspension, and termination. *Nat'l Min. Ass'n*, 758 F.3d at 252; Policy Notice at 5-6. HHS's threat of legal sanctions has compelled Plaintiffs to choose between violating the Policy Notice, substantially modifying their programs, or ending their education programming. *See* Pls.' SOMF ¶ 48 (citing PPGNY Decl. ¶ 40; PPCCC Decl. ¶ 65; PPH Decl. ¶ 38). The practical effect of HHS's action is undeniable, and Plaintiffs feel its legal consequences now.

### b.  The Policy Notice Contravenes Congress's Directives for the TPP Program

The Policy Notice violates the APA because it is contrary to law. To the extent the Policy Notice's requirements are discernable, they defy at least three of Congress's longstanding directives: (1) that Tier 1 funding "shall be used for *replicating* programs" (2) that "have been proven *effective* through rigorous evaluation," and (3) that all TPP programming must be "medically accurate." 138 Stat. at 671 (emphasis added).

#### 1.  *The Policy Notice contravenes the statutory replication requirement.*

Congress has mandated that Tier 1 funding be used for "*replicating* programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 138 Stat. at 671 (emphasis added). Consistent with this mandate, programs are identified as effective and eligible for "replication" through HHS's TPPER process, a rigorous process akin to peer review. OASH,

*TPPER Findings*. What it means to "replicate[] a program" is well established in the public health field and for the TPP Program: it requires the program administrator to "provid[e] the program the way it was conducted when it was researched and found to be effective." Pls.' SOMF ¶ 9 (quoting Decl. of Leslie M. Kantor, PhD, MPH (Kantor Decl.) ¶ 24b). Though minor adaptations of approved programs are permitted, such adaptations must be carefully thought out. *Id.* (citing Kantor Decl. ¶¶ 48-49). Indeed, "the Office of Population Affairs has issued very specific guidelines about the types of permissible adaptations, which exclude any components "critical to a program's ability to produce outcomes." *Id.* (citing Kantor Decl. ¶ 49); *see, e.g.*, HHS, *Making Adaptations Tip Sheet*, https://acf.gov/sites/default/files/documents/prep-making-adaptations-ts_0.pdf ("All adaptation changes, regardless of their motives, need to be reviewed and approved in the context of maintaining fidelity to the core components.").

The Policy Notice violates the statutory requirement that Tier 1 programs "replicat[e] programs that have been proven effective," because it expressly "require[s] some grantees to revise their TPP Program curricula and content"—apparently on an ad hoc basis—to meet the Policy Notice's newly imposed requirements, including to excise proscribed "ideological content" and to "align" with all Presidential Executive Orders. Policy Notice at 6; *see also id.* at 5-6 (stating even those participants whose programs have been approved must "ensure all program materials comply with this [Policy Notice]"). To "revise" a program is the opposite of "replicating" it and plainly contravenes the statutory replication requirement as it would require removal of materials and content and implementation of such programs in a manner that has not been proven effective. *See Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1113 (9th Cir. 2020) ("[T]he 2018 Tier 1 [NOA] would incorrectly permit grants for programs not proven effective, contrary to the TPPP"); *id.* ("A replication requires an original implementation."); *PPNYC*, 337 F.

16

Supp. 3d at 331-37 ("Defendants have violated their statutory obligation to select model 'programs' 'proven effective through rigorous evaluation.").

As set forth in the Policy Notice, the unspecified changes required for Executive Order and ideological alignment may be substantial, and include, among other changes, major adaptations to existing curricula, and updating policies, staffing, and training. *See* Policy Notice at 6 ("We understand that compliance with this PPN may require some grantees to revise their TPP Program curricula and content."). Making substantial "revis[ions]" to approved programs and curricula without a rigorous analysis of how such changes affect the program's core components, *id.*, is the opposite of "replicating" them, 138 Stat. at 671; *see Replicate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/replicate (last visited July 27, 2025) (defining "replicate" as to "duplicate" or "repeat"). Because the Policy Notice requires excision and addition of content from curricula, its requirements are irreconcilable with the statutory requirement that grantees "replicate" programs that have been proven effective through rigorous evaluation.

2. *The Policy Notice contravenes the statutory "effectiveness" requirement.*

The Policy Notice's prohibition on "normaliz[ing]" sex is fundamentally incompatible with effective teen pregnancy prevention and could, in effect, be enforced as an abstinence-only requirement. Comprehensive sexual education includes topics like contraception, consent, and healthy relationships—acknowledging that some teens are or will become sexually active. Pls.' SOMF ¶ 41 (citing Kantor Decl. ¶¶ 44-45). If such content is forbidden for "normalizing" sex, educators will be left with abstinence as the only permissible message. Abstinence-only-until-marriage programs have been shown to be ineffective in changing adolescent sexual behavior. *Id.* ¶ 40 (citing Kantor Decl. ¶¶ 21, 43) *see also id.* ¶ 5 ("The impact evaluation found that youth who received abstinence education under the program did not have different outcomes than youth in the control . . . ." (quoting Jessica Tollestrup, Cong. Rsch. Serv., R45183, Adolescent Pregnancy:

17

Federal Prevention Programs 22 (2024))). Thus, by framing medically accurate, developmentally appropriate, and evidence-based information and programs about safe sex as impermissible "normalization," the anti-normalizing sex mandate suppresses critical health education and undermines the statutory requirement that Tier 1 TPP programs replicate "effective" programming approved through the TPPER process. *See* 138 Stat. at 671; *cf. Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1067-68 (D. Or. 2018) (vacating 2018 Tier 1 Funding Announcement as "not in accordance with law" because "HHS … ignore[d] the qualifier that the programs 'must be proven effective by rigorous evaluation.'"). For these reasons, Plaintiffs cannot and do not provide programming that promotes abstinence as the only appropriate behavior for youth as it is not an approach rooted in evidence and reflective of the real world decisions that our participants are contemplating. Pls.' SOMF ¶ 40 (citing PPGNY Decl. ¶ 48; PPCCC Decl. ¶ 56; PPH Decl. ¶ 42).

3. *The Policy Notice contravenes the statutory requirement that TPP programs be "medically accurate."*

The Policy Notice's requirement that TPP programs adhere to the "biological reality of sex" as including only "males and females" contravenes the statutory requirement that TPP programs be "medically accurate." It is long-standing and well-established, both by HHS and the scientific community, that medical accuracy means: "Verified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." Pls.' SOMF ¶¶ 34-35; *see also* 42 U.S.C. § 713(e)(2) (defining medical accuracy in the context of personal responsibility education programs). HHS's assertion that "information" is not "medically accurate" if it "denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females," Policy Notice at 5, erases the existence of intersex and

transgender individuals and is directly contrary to widely available and accepted, and peer-reviewed scientific evidence. *See, e.g.*, Pls.' SOMF ¶ 38 ("[A] large scientific literature on the biological basis of sex . . . concludes that there is significant variation within the category of biological sex." (quoting Kantor Decl. ¶ 57)); Pediatric Endocrine Soc'y, *The Biological Reality of Sex and Intersex: A Response to the Executive Order* (Feb. 11, 2025), https://pedsendo.org/wp-content/uploads/2025/02/Society-Statement-on-Biological-Sex-Development-and-DSD-2025.pdf ("The proposed definitions of biological sex within the Executive Order should not and cannot apply to people born with biological conditions known as Differences of Sex Development . . . a collection of rare medical conditions that occur before birth in which biological sex development does not follow the typical path."); *Orr v. Trump*, 778 F. Supp. 3d 394, 415 (D. Mass. 2025) ("Viewed as a whole, the language of the Executive Order is candid in its rejection of the identity of an entire group—transgender Americans—who have always existed and have long been recognized in, among other fields, law and the medical profession."). By defining "medical accuracy" in a manner that denies the existence of intersex and transgender individuals, the Policy Notice's binary definition of sex fails to reflect medical reality and violates the statutory requirement for TPP programs to be medically accurate.

### c.  The Policy Notice Violates the APA Because it is Arbitrary and Capricious

The Policy Notice is also unlawful because it is arbitrary and capricious. Under the APA, courts must "hold unlawful and set aside" arbitrary or capricious agency action. 5 U.S.C. § 706(2). The Policy Notice is arbitrary and capricious because it: (1) is so vague that it fails to provide adequate notice and ensure nonarbitrary enforcement; (2) "relied on factors which Congress has not intended it to consider," (3) "entirely failed to consider an important aspect of the problem," (4) "offered an explanation for its decision that runs counter to the evidence before the agency," *Solondz v. Fed. Aviation Admin.*, 141 F.4th 268, 276 (D.C. Cir. 2025) (quoting *State Farm*, 463

U.S. at 43), and (5) failed to provide a sound reason for any changes in the agency's position, *FCC v. Fox Television Stations, Inc.* (*Fox I*), 556 U.S. 502 (2009).

1.    *The Policy Notice is so vague that it is arbitrary and capricious*

The Policy Notice violates the APA because it is so vague that it is arbitrary and capricious. Due Process vagueness principles "extend[] beyond the Fifth Amendment Due Process Clause" as a "well-established principle of administrative law." *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 8 n.3 (D.D.C. 2024); *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1233 (9th Cir. 2001) ("We also find that it was arbitrary and capricious for the [agency] to issue terms and conditions so vague as to preclude compliance therewith."); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("[A]s long ago as 1968, we recognized [the Due Process] 'fair notice' requirement in the civil administrative context."). Under the APA, it is "*necessary* to give guidance on how the [agency] is likely to apply the [rule] in future instances." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024) (emphasis added). Here, the Policy Notice is so vague that it is ripe for arbitrary and discriminatory enforcement in violation of this requirement. *See also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations . . . it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable . . . in an enforcement proceeding . . ."). Moreover, agencies must consider vagueness in enacting rules, *see Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993), *as amended on denial of reh'g* (Nov. 9, 1993) (remanding rule where "the SEC Order adopting the Rule manifests no concern about its possible

20

vagueness"), which HHS failed to do here. Specifically, the Policy Notice is vague as to what its content mandates prohibit and vague as to what it means to "align" with Executive Orders. [6]

**Vague as to what content mandates prohibit.** The Policy Notice imposes a series of content mandates that lack clear standards and thereby invite arbitrary and discriminatory enforcement. These include the anti-DEI mandate, a prohibition on so-called "harmful ideologies," the anti-normalizing sex mandate, redefinition of what qualifies as "medically accurate" information, and the imposition of an opt-out requirement. Each of these mandates uses open-ended language that grants officials broad, subjective discretion to decide when a grantee's content violates the Program's requirements, allowing for arbitrary enforcement and making the Policy Notice arbitrary and capricious.

The Policy Notice targets what the administration might view as "DEI" initiatives, prohibiting TPP programs from including "discriminatory equity ideology" and "diversity, equity, or inclusion-related discrimination." Policy Notice at 4-5. These broad and undefined terms confer sweeping discretion on agency officials to determine when a grantee's content or approach runs afoul of the Policy Notice's requirements. By declining to tie these prohibitions to established anti-discrimination standards or provide any limiting principles, the Policy Notice authorizes

---

[6] Unlike a Due Process Clause claim, discussed in Section III below, which requires that plaintiffs have a protected property interest at stake, APA claims that challenge agency action as so vague as to be arbitrary and capricious do not require courts to evaluate whether there is a protected property interest. *See Nissan Chem. Corp.*, 744 F. Supp. 3d at 9 n.3 ("It is therefore not necessary for the Court to address . . . whether a patent term is a constitutionally protected property interest" because "the fair notice doctrine has extended beyond the Fifth Amendment Due Process Clause [into] administrative law"); *FCC v. Fox Television Stations, Inc.* (*Fox II*), 567 U.S. 239, 253-54 (2012) (remanding an unconstitutionally vague rule without finding a property interest); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 185 (D.N.H. 2025) (without addressing a property interest, finding that where a letter is 'action . . . by which rights or obligations have been determined, or from which legal consequences will flow,' . . . due process requires that it 'give fair notice of conduct that is forbidden or required'" (citations omitted)).

enforcement based on subjective judgments. Federal courts across the country have struck down similar broad DEI prohibitions as arbitrary and capricious. *See, e.g.*, *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, No. 25-cv-10787, 2025 WL 1822487, at *17 (D. Mass. July 2, 2025) ("Reliance on an undefined term of DEI (or any other category) 'is arbitrary and capricious because it allows the [Public Officials] to arrive at whatever conclusion it wishes without adequately explaining the standard on which its decision is based.'" (quoting *Firearms Regul. Accountability Coal.*, 112 F.4th at 525)); *Nat'l Educ. Ass'n*, 779 F.Supp.3d at 187 (finding likelihood of success because on vagueness claim because "to label a program as a 'diversity, equity, and inclusion' program necessarily involves 'appeals to abstract principles'"). That risk is particularly great given that the Policy Notice defines DEI not in terms of applicable federal antidiscrimination laws, but instead to include any "ideology" that purportedly "minimizes agency, merit, and capability in favor of immoral generalizations." Exec. Order No. 14,190, 90 Fed. Reg. 8,853 (Jan. 29, 2025); *see* Policy Notice at 4 (incorporating Executive Order 14,190's definitions).

The Policy Notice also broadly prohibits TPP programming from including certain "ideological content" that the government deems "harmful," but provides no objective standards for identifying what qualifies as such content. To the extent the Policy Notice references specific categories—such as "content at issue in *Mahmoud*," "gender ideology," and "discriminatory equity ideology"—it offers no definitions or limiting principles to guide enforcement. *See* Policy Notice at 4. These vague and entirely subjective terms grant agency officials sweeping discretion to determine what ideologies are deemed "harmful."

The Policy Notice additionally imposes a prohibition on "sexually explicit content" and "content that encourages, normalizes, or promotes sexual activity for minors." Policy Notice at 4-5. The Policy Notice does not define the terms "encourages," "normalizes" or "promotes," nor

does it provide guidance as to how the agency will enforce those terms. This problem is compounded by the obvious fact that any discussion of teen pregnancy prevention necessarily requires discussion, and acknowledgment, of sexual activity and anatomy to ensure that the program is effective. *See* Pls.' SOMF ¶ 39. Sex education unavoidably entails education about sex. In practice, the Policy Notice enables penalizing medically accurate and evidence-based education in favor of abstinence-only messaging, even where not expressly required. At best, opening this door is so vague as to be arbitrary and capricious. At worst, it runs directly counter to Congress's statutory mandate for the TPP program. *See supra* subpart I(b).

Additionally, while the Policy Notice states that "OASH is concerned" about several definitions used in prior NOFOs, it fails to articulate what aspects of those definitions are objectionable or how grantees are expected to respond. Policy Notice at 4. This ambiguity grants officials broad discretion to retroactively penalize program content already approved by the agency without any objective standard. As one example, the Policy Notice redefines "medically accurate" to require instruction on the "full range of health risks" associated with contraceptives, but offers no guidance as to what level of detail is required, or how that threshold will be judged, or even how that could be accomplished in a classroom setting. Policy Notice at 5. This vague and open-ended requirement enables agency officials to enforce compliance based on subjective views about contraception or public health messaging. For instance, agency officials could claim that a grantee is noncompliant because every mention of contraception must be accompanied by an exhaustive, disclaimer-style disclosure akin to the fine print in a pharmaceutical advertisement.

Finally, the Policy Notice, invoking the U.S. Supreme Court decision in *Mahmoud v. Taylor*, 606 U.S. __ (2025), imposes an opt-out requirement on TPP programs: to "provide parents advance notice (including relevant specifics [presumably about the program's contents]) and the

ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." Policy Notice at 3. The Policy Notice offers no standards for proscribing what content "may burden" religious exercise, nor does it specify how the opt-out mechanism is expected to function or what content must trigger it. This absence of clear criteria delegates sweeping discretion to agency officials to determine whether a grantee's program is compliant, allowing enforcement to turn on officials' subjective or ideological assessments of religious burden. The lack of standards for this requirement render it arbitrary and capricious.

*Vagueness As To What It Means To "Align" with Executive Orders*. Moreover, the Policy Notice's "alignment" requirement invites arbitrary and discriminatory enforcement by granting officials unchecked discretion to determine whether a grantee's project sufficiently "aligns" with Executive Orders. The Policy Notice requires TPP Program recipients to "revise their projects to align with Executive Orders." Policy Notice at 1. Yet it offers no objective standards or limiting principles for determining what "alignment" entails. Notably, the Policy Notice does not require applicants to "*comply*" with the Executive Orders, which themselves impose no direct obligations on private parties and instead provide direction only for specified *governmental* actors.[7] Unlike a word like "comply" that has a settled legal meaning, the word "alignment"—like the words "'annoying' or 'indecent'"—has a meaning that turns on "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). The vagueness of the "alignment" requirement is exacerbated by the fact that of the more than 190 Executive Orders issued since January 20, 2025, most (if not all) are

---

[7] *See* H. Comm. on Gov't Operations, 85th Cong., Executive Orders and Proclamations: A Study of a Use of Presidential Powers 1 (Comm. Print 1957) ("Executive orders are generally directed to, and govern actions by, Government officials and agencies. They usually affect private individuals only indirectly.").

entirely irrelevant to teenage pregnancy prevention, addressing topics from national security to immigration to cultural-renaming initiatives.[8] Several have already been enjoined.[9] The Policy Notice vests unbounded discretion in agency officials by offering no standards for reconciling potentially conflicting directives within and among Executive Orders, or for determining how "alignment" with the President's policy goals should be enforced, and is thus arbitrary and capricious.

## 2. *The Policy Notice relies on factors not intended by Congress.*

At the outset, the Policy Notice relies on factors not intended by Congress, including "the President's clear policy directive to protect children from harmful ideologies" without consideration of how those ideological preferences impact the program's effectiveness. Policy Notice at 3; *cf. Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) (holding that an agency action violates the APA when the action relied on political directives not authorized by statute). Congress made a deliberate choice to pursue *evidence-based* social policy initiatives through the tiered evidence approach. Pls.' SOMF ¶ 16 (citing Tollestrup, *supra*, at 4). "The creation of the TPP Program as an evidence-based model coincided with a larger movement across the federal government to engage in evidence-based policymaking, which sought to ensure that public funds were appropriated for approaches backed by evidence and that investments were made in

---

[8] *See, e.g.*, Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) (entitled "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats"); Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025) (entitled "Restoring Names That Honor American Greatness").

[9] *See, e.g.*, *Chicago Women in Trades v. Trump*, 2025 WL 1118659, at *1 (N.D. Ill. Apr. 15, 2025) (enjoining enforcement of EOs 14151 and 14173 insofar as they mandated termination of equity-related grant or compliance certification by grantee); *see also Litigation Tracker: Legal Challenges to Trump Administration Actions*, Just Security (July 22, 2025), https://perma.cc/8JKK-NJUG (collecting cases in which injunctions have been issued). The Policy Notice's failure to distinguish those Executive Orders that remain in effect from others compounds both the arbitrariness and vagueness of the "alignment" requirements.

evaluations to help build out the evidence base related to solving particular problems." *Id.* (quoting Kantor Decl. ¶ 25). Congress meant what it said when it deployed the TPP Program statutory framework: Tier 1 funds must be spent on "replicating" programs that have been empirically "proven effective" to reduce teen pregnancy. 138 Stat. at 671; *see also Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 659 (D. Md. 2018) ("[T]he [TPP] appropriation was not an unrestricted sum of money to use for any purpose that might fall within HHS's broad mandate, but rather directs the agency to use the funds to support proven or innovative medically accurate methods of preventing teenage pregnancy."). It did not authorize HHS to instead allocate or withhold funds based on its ideological preferences that undermine or jeopardize the program's effectiveness.

By eschewing evidence-based decision-making in favor of unreasoned viewpoint requirements, the agency exceeded the "small range of choices" Congress allowed it. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The agency erred here in basing the Policy Notice and continued TPP funding on political concerns instead of program effectiveness, requiring "alignment" with over 190 of Executive Orders[10] and imposing content mandates restricting viewpoints that it deems as harmful. *See* Policy Notice at 1-4. HHS additionally considered impermissible factors when it short-circuited the tiered evidence approach by declaring that TPP Program grantees must not "den[y] the biological reality of sex or otherwise fail[] to distinguish appropriately between males and females," *id.* at 5—a mandate that is "clearly medically inaccurate," Pls.' SOMF ¶ 38 (quoting Kantor Decl. ¶ 64). These considerations are

---

[10] The Policy Notice highlights five particular Executive Orders: *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (14168), *Ending Radical Indoctrination in K-12 Schooling* (14190), *Protecting Children From Chemical and Surgical Mutilation* (14187), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (14151), and Ending *Illegal Discrimination and Restoring Merit-Based Opportunity* (14173). Policy Notice at 1-2.

plainly incompatible with the statutory text, which instructs the agency to select programs by their medical accuracy and proven effectiveness as opposed to their "alignment" with unrelated ideological priorities.

### 3. *The Policy Notice fails to consider an important aspect of the problem.*

In issuing the Policy Notice, the agency also "ignore[d]" the most "important aspect of the problem" before it: effective prevention of teen pregnancy. *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43). The Policy Notice prohibits content that is "sexually explicit" or "encourages, normalizes, or promotes" sexual activities. Policy Notice at 4-5. "Normaliz[ing]" sexual activities could encompass providing any information about them at all. But effective sex education is impossible without talking about sex. *See* Pls.' SOMF ¶ 39 (citing Kantor Decl. ¶¶ 43-45). Indisputably, any discussion of teen pregnancy prevention necessarily requires discussion, and acknowledgment, of sexual activity and anatomy to ensure that the program is effective. The Policy Notice's prohibition failed to account for how evidence-based programming that had been proven effective could be implemented without acknowledgment of sexual activity.

The agency similarly undertook no effort to spell out how its changes to the concepts of "health equity" and "inclusivity" might further the TPP Program's evidence-based goals. *See* Policy Notice at 4-5. To state the obvious: teens of different backgrounds and gender identities can become pregnant. Excluding inclusive content does nothing to prevent pregnancy; and it ignores the reality that teens from diverse backgrounds still need effective education. *See also, e.g.*, Pls.' SOMF ¶ 45 ("Cultural and linguistic appropriateness is essential to ensure that programs meet the needs of youth who, in a country as large and varied as the United States, come from different settings (*e.g.*, rural, suburban and urban), cultural backgrounds, and may or may not speak English as a first language." (quoting Kantor Decl. ¶ 54)). The agency also failed to consider that the most

effective way to reach different populations is to customize programming to their cultural backgrounds and unique needs. Here, Plaintiffs selected and implemented their projects to meet unique needs of underserved communities, Pls.' SOMF ¶ 47; *id.* (PPGNY's project was "intended to ensure that its programming addressed gaps in existing curricula that failed to account for unique needs of many communities including LGBTQ+ youth" (quoting PPGNY Decl. ¶ 42)); *see id.* ("Due to challenges, such as language and transportation barriers, members of these communities are often unable to benefit from other sex education programs . . . PPCCC designed a project to meet these gaps in services." (quoting PPCCC Decl. ¶ 80)); *id.* ("PPH designed its TPP Project to meet the needs of underserved communities within the areas that we serve" including "rural Nebraskan counties" and "Nebraska tribes" (quoting PPH Decl. ¶¶ 13-16)).

Nor does the Policy Notice grapple with Congress's directives governing the TPP Program. The notice does not explain, for example, how requiring program participants to revise their programs will further or even comply with Congress's mandate that Tier 1 programs must "replicat[e] programs that have been proven effective through rigorous evaluation." 138 Stat at 671. To the contrary, "'replicating' requires the prior existence of something that is to be duplicated, repeated, copied, or reproduced." *PPNYC*, 337 F. Supp. 3d at 333. By mandating and prohibiting content at odds with the core curricula that make the models HHS already approved successful, the notice nullifies the replication requirement that both Congress and HHS established.

In addition, because the agency "was 'not writing on a blank slate,' it was required to assess whether there were reliance interests, determine whether they were significant, and weigh them against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (citation omitted and emphasis removed); *see, e.g., AIDS Vaccine Advoc. Coal.*

*v. Dep't of State*, 770 F. Supp. 3d 121, 139 (D.D.C. 2025) (finding agency action arbitrary and capricious where it ignored the reliance interests of grantees). Reliance interests here are substantial. Plaintiffs are entering year three of their five-year grant cycle. They have designed their budgets, programming, staffing, and partnerships with community organizations based on the understanding that HHS would provide continued funding. Pls.' SOMF ¶ 50 (citing PPGNY Decl. ¶¶ 61-63; PPCCC Decl. ¶ 74; PPH Decl. ¶¶ 61-66). The agency further failed to consider how the new requirements, in conjunction with their vague mandates, would affect schools and local communities that rely on effective public health programming. *Cf. Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 309 (D. Mass. 2025) (finding action arbitrary and capricious where it "fails to consider the impact . . . on public health.").

The agency paid only lip service to these concerns, acknowledging that some materials "previously approved by OASH" would now need to be revised but claiming—without explanation—that it had "taken that into account." Policy Notice at 5. Its only justification was a bare assertion that the prior administration's approach was unlawful. *See id.* at 6. Yet an agency's novel and unsupported claim that its prior action was unlawful provides no license to run roughshod over regulated parties' reliance interests or dispense with the APA's requirement of reasoned decision-making. *Regents of the Univ. of Cali.*, 591 U.S. at 30 (holding that the agency's decision to rescind DACA failed to consider "legitimate reliance" even though the government thought the program unlawful). "[C]onclusory statements" like these fall far short of what the law demands. *Nat'l Institutes of Health*, 770 F. Supp. 3d at 310 (D. Mass. 2025); *see also AIDS Vaccine Advoc. Coal.*, 770 F. Supp. 3d at 139 (similar); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision.") (citing *Fox I*, 556 U.S. at 515-16)).

4. *The Policy Notice's explanation runs counter to evidence.*

Courts "have not hesitated to vacate" agency action "when the agency has not responded to empirical data or to an argument inconsistent with its conclusion." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). An agency action is arbitrary and capricious when it has "offered an explanation for its decision that runs counter to the evidence." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). Given the consensus of scientific literature and the evidence developed through the program materials HHS has already approved, at least two aspects of the Policy Notice violate this cardinal rule.

First, HHS ignored evidence that present programming has been proven effective at reducing teen pregnancy and plainly furthers Congress's statutory mandate. In the last few decades, "teen pregnancy prevention researchers have achieved notable success in identifying programs that can be effective in reducing teen pregnancy, [STIs], and associated sexual risk behaviors." HHS, *ASPE Research Brief: Making Sense of Replication Studies*, at 1 (May 2015), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//55351/rb_TPP_Replication.pdf. And "[m]uch of the supporting research evidence" for HHS's approved Tier 1 programs, like those replicated by PPGNY and PPCCC, "comes from rigorous randomized controlled trials, considered the 'gold standard' in evaluation research." *Id.* at 1. On the other hand, the Policy Notice's anti-normalizing sex requirement could be enforced as requiring abstinence-only programming, which has been scientifically shown to be ineffective at preventing teenage pregnancy and other associated risk behaviors. *See, e.g.*, John S. Santelli, M.D., M.P.H. *et al.*, *Abstinence-Only-Until-Marriage Policies and Programs*, 61 J. ADOLESCENT HEALTH 400, 400 ("[Abstinence only] programs are not effective in delaying initiation of sexual intercourse or changing other

behaviors."). Indeed, for this very reason, Congress diverted funding from abstinence-only sexual education programs to the TPP Program's tiered, evidence-based model. Pls.' SOMF ¶ 16. As recognized by Congress and HHS—and supported by overwhelming scientific evidence— effective sexual education requires acknowledging the reality that some adolescents are or will become sexually active. *Id.* ¶ 41 (citing Kantor Decl. ¶¶ 20-21). The Policy Notice's anti-normalizing sex requirement ignores this reality.

Second, as previously explained, the Policy Notice's assertion that "information" is not "medically accurate" if it "denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females," Policy Notice at 5, runs directly counter to widely available scientific evidence. *See, e.g.*, Tiffany Jones, *Intersex Studies: A Systematic Review of International Health Literature*, 8 SAGE OPEN 2 (April 2018) ("Research has generally estimated that 1.7% to 4% of people go on to actually have intersex variations."); Claire Ainsworth, *Sex Redefined*, 518 NATURE 288, 288-90 (February 19, 2015) ("[D]octors have long known that some people straddle the boundary—their sex chromosomes say one thing, but their gonads (ovaries or testes) or sexual anatomy say another."). The agency's decision to redefine sex—and in doing so erase the existence of individuals with intersex characteristics and transgender individuals— therefore cannot be sustained because it "rests upon a factual premise that is unsupported." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018) (citation and quotation marks omitted).

5. *There is no good cause for HHS changing policy.*

Although the Policy Notice purports merely to "clarify" program requirements, its stark departure from evidence-based decision-making and imposition of new ideological requirements mark a significant change in agency policy. *See* Policy Notice at 1, 4-6 (explaining that the agency

was correcting supposed "deficiencies" in existing definitions of statutory language and claiming it "erred" in prior project approvals). Where, as here, an agency changes its policy, it must show "good reasons" for doing so. *Fox I*, 556 U.S. at 514-15. HHS "must provide a more detailed justification than would suffice for a policy 'created on a blank slate' where 'its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.'" *Ass'n of Am. Universities v. Nat'l Sci. Found.*, 2025 WL 1725857, at *16 (D. Mass. June 20, 2025) (quoting *Fox I*, 556 U.S. at 515). When an agency changes its position, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* (quoting *Fox I*, 556 U.S. at 516). The Policy Notice offers no such reasoned explanation.

The Policy Notice does not even recognize that the Executive Order "alignment" mandate far exceeds the requirement in HHS's prior NOFOs that grant recipients "comply" with Executive Orders. And where the Policy Notice does recognize a change in position, it gives no good reason for doing so. *See, e.g.*, Policy Notice at 4 (indicating "concern[s]" about prior definitions, but not specifying what is concerning or why the definitions are not within the statutory scope of the TPP Program); *id.* at 6 (concluding that the prior administration "erred" in approving some TPP Program materials, but giving no substantive reason for why or how it has determined what is "unrelated to reducing teen pregnancy"). The Policy Notice asserts that certain materials or ideologies are beyond the scope of the TPP Program but does not provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox I*, 556 U.S. at 516. For instance, the Policy Notice does not explain how excluding content that is inclusive of all gender identities from the program will further the prevention of unintended teen pregnancy. Nor does it explain any change in facts or circumstances as to why inclusive

programming no longer falls within the scope of the TPP Program, where such programming was *required* by the agency in earlier years. *See* Pls.' SOMF ¶ 47 ("The 2023 NOFO required recipients "to make materials and information . . . inclusive of all youth." (quoting 2023 NOFO at 11)).

The Policy Notice also fails to give any reason for abandoning the agency's prior definitions of "adolescent-friendly services," "age appropriateness," "equitable environment," "health equity," "inclusivity," and "medical accuracy." Policy Notice at 5-6. Indeed, the Policy Notice does not even identify *how* the agency's prior interpretations erred, stating only that the agency "is concerned" that these definitions may "include deficiencies based on the statutory language." *Id.* at 4. Nebulous "concern[]" is no substitute for reasoned decision-making.

The agency's redefining of "medical accuracy" is particularly egregious. Previously, the agency defined medical accuracy as: "Verified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." *Id.* Not only is this definition consistent with the well-established and longstanding meaning of medical accuracy within public health and evidence-based policy, Pls.' SOMF ¶ 35, but it is also identical to the definition of "medically accurate and complete" that Congress provided for under the Personal Responsibility Education Program in 42 U.S.C. § 713(e)(2), another federally-funded sex education program. HHS does not identify what is "deficient" in this definition nor any factual findings that contradict it. Instead, the agency redefines medical accuracy in a manner that, as previously discussed, is itself medically inaccurate. *Cf. Ass'n of Am. Universities*, 2025 WL 1725857 at *18 (finding an agency's action was "arbitrary and capricious because it ignores important aspects of the problem, namely [the agency's] statutory directive to 'support basic

scientific research and programs to strengthen scientific research potential and scientific education programs.'" ((quoting 42 U.S.C. § 1862(a)(1)).

Moreover, the Policy Notice's prohibition on teaching "gender ideology," Policy Notice at 5, appears to "disallow discussions about gender roles which are essential to helping young people learn to communicate, negotiate and refuse unprotected sexual activity." Pls.' SOMF ¶ 42 (quoting Kantor Decl. ¶ 63). "[A] review of studies on teen pregnancy prevention programs . . . shows that teen pregnancy prevention programs that address issues of gender are more likely to result in reductions of sexually transmitted diseases and teen pregnancy." *Id.* ¶ 44 (quoting Kantor Decl. ¶ 63). "Examining how gender roles and expectations may influence how adolescents engage in relationships is a very important component of pregnancy prevention." *Id.* (quoting Kantor Decl. ¶ 63). HHS did not provide any justification for its change of position on why, contrary to research, such discussions fall outside the scope of Congress's directives for the TPP Program.

Lastly, the Policy Notice fails to explain why teen pregnancy prevention curricula, which are selected based on their effectiveness in reaching particular communities in which they are offered, would be less effective if they contain purported "DEI"-related materials that are lawful. Nor could it: Plaintiffs' sex education programs are taught on an individualized basis, specifically crafted for the communities that receive them—communities HHS has, in the past, recognized experience particularly high rates of teen pregnancy and STIs. Pls.' SOMF ¶ 47 (citing Tier 1 NOFO at 5-6, 11).

## II.    The Policy Notice Is Unconstitutionally Vague in Violation of the Fifth Amendment

The Policy Notice is unconstitutionally vague, in violation of the Fifth Amendment, which guarantees that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V. A core requirement of due process is that laws and regulations must contain

adequate safeguards to prevent arbitrary and discriminatory enforcement. *See Beckles v. United States*, 580 U.S. 256, 262 (2017). A regulation that is "so standardless that it invites arbitrary enforcement" offends due process. *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

As a threshold issue, Plaintiffs have a property interest protected by due process here: an interest in receiving continued TPP Program funding. *See, e.g.*, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972) ("[A] person receiving [governmental] benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process."). The void for vagueness doctrine has long been held to protect the interests that derive from similar benefits, even if the vague government requirement appears in an administrative action rather than a statute or rule. *See, e.g.*, *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (upholding vagueness challenge to revocation of a White House press pass); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) (upholding vagueness challenge to an agency letter threatening to revoke federal funding); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993) (remanding unconstitutionally vague SEC rule); *see also Fox II*, 567 U.S. at 253-54 (similar).

To be sure, this Court recently concluded that other grant recipients had no protected property interest in receiving funding terminable by an agency at will. *See Urban Sustainability Dirs. Network v. U.S. Dep't of Ag.*, 2025 WL 2374528, at *23 (D.D.C. Aug. 14, 2025). The Court need not reach the question of whether Plaintiffs have a protected property interest here, or whether the Policy Notice is unconstitutionally vague, because summary judgment should be granted for Plaintiffs' for all the independent reasons set forth in Part I above. However, if the Court does reach the issue, it should hold that Plaintiffs have a protected property interest because the TPP

Program's two-track application process plainly creates an expectation that program participants will receive continued funding—or at least be eligible to receive funding on like terms—during their approved five-year project period. And the Policy Notice also clearly meets the standard for unconstitutional vagueness because it "authorizes or even encourages arbitrary and discriminatory enforcement," *Hill v. Colorado*, 530 U.S. 703, 732 (2000), as detailed in subpart I(b)(1), *supra*.

### III.    The Policy Notice is *Ultra Vires*

"Judicial review for *ultra vires* agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law." *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up). "Stated simply, a claim that an agency acted *ultra vires* is a claim that the agency acted 'in excess of its delegated powers.'" *Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019), *aff'd*, 811 F. App'x 669 (D.C. Cir. 2020) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). "Accordingly, an agency acts *ultra vires* if it attaches conditions to formula grants that are unauthorized by statute." *California v. Trump*, 2025 WL 1667949, at *14 (D. Mass. June 13, 2025).

Here, Defendants have imposed funding conditions that are not authorized by Congress and are directly at odds with the TPP Program's governing statute. The statute allocates funds for "medically accurate and age appropriate programs that reduce teen pregnancy," with specific requirements for Tier 1. 138 Stat. at 671. The Policy Notice's Executive Order "alignment" requirement and five content mandates impose additional obligations not contemplated by Congress. These requirements conflict with the statutory mandate that Tier 1 programs "replicate" rigorously evaluated models and that all programs be "medically accurate"—terms with well-established meanings in public health. *See* Pls.' SOMF ¶¶ 34-35; *supra* subpart I(b)(3). The Policy Notice's requirement to define sex in a manner that excludes transgender persons directly

36

contradicts the statute's mandate that programs be "medically accurate." *See* Pls.' SOMF ¶ 38; *supra* subpart I(b)(2)*.* And requiring programs to make modifications to "align" with Executive Orders and exclude certain "ideologies" defy the requirement that TPP Tier 1 recipients "replicat[e]" programs already approved by HHS. *PPNYC*, 337 F. Supp. 3d at 333. By conditioning appropriated funds on the fulfillment of criteria irreconcilable with those Congress prescribed, Defendants have acted beyond their authority, violated the separation of powers and encroached upon Congress's spending power, and thereby acted *ultra vires*. *Cf. California*, 2025 WL 1667949, at *15.

## IV.    Vacatur Is Warranted

Section 706 requires that "[t]he reviewing court *shall* . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (emphasis added). Under the APA, "[v]acatur is the presumptive remedy for arbitrary and capricious agency action." *St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 357 F. Supp. 3d 30, 38 (D.D.C. 2019); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). "Over the decades, [the Supreme Court] has affirmed countless decisions that vacated agency actions, including agency rules." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830 (2024) (Kavanaugh, J., concurring). "In the words of the D.C. Circuit: 'When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Id.* (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495, n.21 (D.C. Cir. 1989)); *see also Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J., concurring) (similar).

That ordinary remedy is appropriate here. The Policy Notice is unlawful to its core. It conflicts with Congress's express requirements for the TPP Program, deprives program

participants of due process by subjecting them to the risk of arbitrary enforcement, and reflects total disregard for the substantial reliance interests at stake and the harm on vulnerable populations it inflicts. Although courts "sometimes" impose a lesser remedy like remand, *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), there is no sound reason to do so here. The Policy Notice "fundamental[ly]" conflicts with statutory requirements, and keeping program terms in limbo for the ongoing award year would be far more disruptive than returning to the pre-Policy Notice terms that governed participants' programs during the first two years of their grants. *Id.* Consistent with the APA's clear instruction, the Court should set the unlawful Policy Notice aside.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated: August 25, 2025                     Respectfully submitted,

                                By:    */s/ Andrew T. Tutt*
                                       Drew A. Harker (DC Bar # 412527)
                                       Andrew T. Tutt (DC Bar # 1026916)
                                       Bonnie E. Devany (*pro hac vice*)*
                                       Daniel Yablon (DC Bar # 90022490)
                                       John V. Hoover (DC Bar # 90006181)
                                       ARNOLD & PORTER KAYE SCHOLER LLP
                                       601 Massachusetts Avenue, NW
                                       Washington, DC 20001
                                       (202) 942-5000
                                       drew.harker@arnoldporter.com
                                       andrew.tutt@arnoldporter.com
                                       bonnie.devany@arnoldporter.com
                                       daniel.yablon@arnoldporter.com
                                       jack.hoover@arnoldporter.com

                                       Emily Nestler (DC Bar # 973886)
                                       PLANNED PARENTHOOD FEDERATION OF
                                       AMERICA
                                       1100 Vermont Avenue NW
                                       Washington, DC 20005

---

* *Admitted only in Texas; practicing in D.C. pursuant to D.C. Ct. of Appeals R. 49(c)(8), under supervision of D.C. Bar Members.*

(202) 973-4800
emily.nestler@ppfa.org

Valentina De Fex (*pro hac vice*)
Melissa Shube (DC Bar # 241034)
PLANNED PARENTHOOD FEDERATION OF
AMERICA
123 William Street, 9th Floor
New York, NY 10038
Phone: (212) 261-4696
valentina.defex@ppfa.org
melissa.shube@ppfa.org