UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLANNED PARENTHOOD OF ) <br> GREATER NEW YORK *et al.* ) <br> ) <br> Plaintiffs, ) <br> v.  ) <br> ) <br> U.S. DEPARTMENT OF HEALTH AND ) <br> HUMAN SERVICES *et al.* ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. 25-cv-2453 |

**STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 7(h)
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**The TPP Program**

1. Teenage pregnancy has long been a significant public health concern in the United States because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society. Alexandria K. Mickler & Jessica Tollestrup, Cong. Rsrch. Serv., R45184, Teen Births in the United States: Overview and Recent Trends 1 (2025).

2. While unintended teenage pregnancy rates in the United States have steadily decreased since the 1960s, the rate of unintended adolescent pregnancy in the United States remains higher than that of comparable high-income countries, with persistent racial, ethnic, and geographic disparities. Mickler & Tollestrup, *supra*, at 1.

3. Teenage pregnancy continues to be a "significant public health concern" in this country "because of the range of health, social, and economic effects adolescent childbearing can have on adolescents, their children, and broader society." Mickler & Tollestrup, *supra*, at 1.

4. In 2009, Congress shifted most of the prior federal spending for teen pregnancy prevention and sex education away from abstinence-only-until-marriage programs and towards a new funding stream, the Teenage Pregnancy Prevention (TPP) Program, which focused on evidence-based approaches to teen pregnancy prevention. Decl. of Leslie M. Kantor, PhD, MPH (Kantor Decl.) ¶ 21 (attached hereto as Ex. A). Congress appropriated $110 million "to fund medically accurate and age appropriate programs that reduce teen pregnancy." Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

5. The TPP Program was created in response to the growing body of literature showing abstinence-only-until-marriage programs had little to no effect on adolescent behavior, and evidence showing that teen pregnancy and HIV prevention programs with specific characteristics were effective in promoting healthy behaviors. Kantor Decl. ¶ 21; *see also* Jessica Tollestrup, Cong. Rsch. Serv., R45183, Adolescent Pregnancy: Federal Prevention Programs 22 (2024) ("The impact evaluation found that youth who received abstinence education under the program did not have different outcomes than youth in the control . . . .").

6. Since then, Congress has continuously funded the TPP Program at approximately the same level with the same statutory requirements. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024).

7. Congress requires the U.S. Department of Health and Human Services' (HHS) to fund two tiers of TPP Programs, "Tier 1" and "Tier 2."

8. Tier 1 grantees are required to "replicat[e]" "medically accurate and age appropriate programs" that have "been proven effective through rigorous evaluation to reduce teenage

pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 138 Stat. at 671.[1]

9. It is well established in the public health field and for the TPP Program that replicating a program requires "providing the program the way it was conducted when it was researched and found to be effective." Kantor Decl. ¶ 24.

10. Tier 1 Grantees are required to replicate evidence-based programs with fidelity. Replication with fidelity requires adhering very closely to the way the program was conducted when it was researched and found to be effective and adhering to the core components of a program. Kantor Decl. ¶ 24(b); HHS, OASH, OPA, Advancing Equity in Adolescent Health through Evidence-Based Teen Pregnancy Prevention Programs and Services, Notice of Funding Opportunity, AH-TP1-23-001, (2023 NOFO) at 8, 65 (defining "Fidelity" as "Degree to which an implementer adheres to the core components of an evidence-based program") (attached hereto as Ex. B). Though minor adaptations of approved programs are permitted, such adaptations must be carefully thought out. Kantor Decl. ¶¶ 48-49. Indeed, "[i]n the past, any adaptations that were made to evidence based teen pregnancy programs were closely overseen by the Office of Population Affairs," which issued very specific guidelines about the types of adaptations that could be made. *Id.* ¶ 48; *see, e.g.*, HHS, *Making Adaptations Tip Sheet*, https://acf.gov/sites/default/files/documents/prep-making-adaptations-ts_0.pdf ("All adaptation changes, regardless of their motives, need to be reviewed and approved in the context of maintaining fidelity to the core components.").

---

[1] Tier 2 grantees, by contrast, are responsible for "develop[ing], replicat[ing], refin[ing], and test[ing]" new "medically accurate and age appropriate programs" "for preventing teenage pregnancy." 138 Stat. at 671.

11. Core components are "[t]he parts of the evidence-based program or its implementation that is determined by the developer to be the key ingredients related to achieving the outcomes associated with the program." 2023 NOFO at 64.

12. HHS designates programs eligible for "replication" through the agency's Teen Pregnancy Prevention Evidence Review (TPPER) process, a rigorous process akin to peer review. The evidence-based programs that TPPER identifies as pre-approved are placed on a list and can be selected for replication by TPP Tier 1 program applicants and participants. OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review*, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review#ftn1 (last visited Aug. 24, 2025) (hereinafter OASH, *Updated Findings*).

13. Relying on a systematic review of studies and program evaluations, the TPPER is used to determine whether a program is proven effective in serving the required TPP goals: reducing teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors. OASH, *Updated Findings*.

14. "[T]een pregnancy prevention researchers have achieved notable success in identifying programs that can be effective in reducing teen pregnancy, sexually transmitted infections (STIs), and associated sexual risk behaviors." HHS, *ASPE Research Brief: Making Sense of Replication Studies*, at 1 (May 2015), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//55351/rb_TPP_Replication.pdf (hereinafter HHS, *ASPE Research*).

15. And "[m]uch of the supporting research evidence" for HHS's approved Tier 1 programs "comes from rigorous randomized controlled trials, considered the 'gold standard' in evaluation research." HHS, *ASPE Research* at 1.

4

16. Congress made a deliberate choice to pursue *evidence-based* social policy initiatives through the tiered evidence approach. *See* Tollestrup, *supra*, at 4. The TPP Program's creation "as an evidence-based model coincided with a larger movement across the federal government to engage in evidence-based policymaking, which sought to ensure that public funds were appropriated for approaches backed by evidence and that investments were made in evaluations to help build out the evidence base related to solving particular problems." Kantor Decl. ¶ 25.

**The TPP Program Application and Award Process**

17. TPP Program grant recipients, including Plaintiffs, receive project funding through two distinct processes: a competitive award cycle and an annual non-competitive continuing award process.

18. Consistent with HHS's regulations, 45 C.F.R. § 52.6, the TPP Program's competitive award cycle begins with a notice of funding opportunity (NOFO), by which the agency declares its intention to award funds and outlines the program goals, objectives, and conditions for applying. *See, e.g.*, 2023 NOFO at 5-7.

19. HHS grants these awards for a "project period," during which HHS "intends to support the project without requiring the project to recompete for funds." 45 C.F.R. § 52.6(c).

20. Each year, grantees submit a non-competing continuation award application (NCC application) consisting of a progress report for the current budget year, and a work plan, budget, and budget justification for the upcoming year. 2023 NOFO at 56.

21. Plaintiffs, Planned Parenthood of Greater New York (PPGNY), Planned Parenthood of California Central Coast (PPCCC), and Planned Parenthood of the Heartland (PPH) are Tier 1 TPP grantees whose projects were designed in response to HHS's 2023 NOFO, which

solicited applications for projects in communities and populations with the greatest unmet needs that replicated evidence-based programs that were "culturally and linguistically appropriate, trauma-informed, and inclusive of all youth." 2023 NOFO at 11.

22. Each grantee's project was approved for a five-year performance period from 2023 to 2028, subject to an annual non-compete continuation funding application process. Decl. of Wendy Stark (PPGNY Decl.) ¶¶ 12, 19 (attached hereto as Ex. C); Decl. of Jenna Tosh (PPCCC Decl.) ¶ 26 (attached hereto as Ex. D); Decl. of Christine Cole (PPH Decl.) ¶ 9 (attached hereto as Ex. E). Each Plaintiffs' third-year of funding was approved on July 2, 2025. PPGNY Decl. ¶ 25; PPCCC Decl. ¶ 39; PPH Decl. ¶ 24.

23. When a TPP continuation award is granted, the funds are made available in an online account, and Plaintiffs "draw down" funds as needed to reimburse them for their approved project expenses. PPH Decl. ¶ 26. Through the process of accessing funds already awarded to them—i.e., "drawing down" the awarded funds—TPP funding recipients certify that they will comply with program policies. *Id.*

**HHS's Imposition of New Requirements on the TPP Program**

24. A little more than two weeks before the Tier 1 NCC application deadlines, OASH issued its *Guidance for Preparing a Non-Competing Continuation (NCC) Award Application, Teen Pregnancy Prevention (TPP) Program Recipients (AH-TP1-23-001)* (NCC Notice) to Tier 1 TPP funding recipients. *See* OPA, Guidance for Preparing a Non-Competing Continuation (NCC) Award Application, Teen Pregnancy Prevention (TPP) Program Recipients (AH-TP1-23-001) (2025) (NCC Notice) (attached hereto as Ex. F). The NCC Notice imposed a new requirement that grantees "align" their programs with *all* Executive Orders. *Id.* at 4-5.

6

25. Plaintiffs all submitted their NCC applications without certifying compliance with the Executive Order "alignment" requirement. PPGNY Decl. ¶ 24; PPCCC Decl. ¶ 38; PPH Decl. ¶ 23.

26. HHS granted Plaintiffs' NCC applications, after they and others filed a lawsuit challenging the Tier 1 NCC Notice. *See Planned Parenthood of Greater N.Y. v. HHS* (*PPGNY I*), No. 25-1334 (TJK) (D.D.C. May 1, 2025), Dkt. No. 1. On July 2, 2025, HHS granted Plaintiffs' NCC applications. PPGNY Decl. ¶ 25; PPCCC Decl. ¶ 39; PPH Decl. ¶ 24. As a result, the *PPGNY I* plaintiffs no longer faced the potential denial of their applications and voluntarily dismissed *PPGNY I* on July 11, 2025, before the Court had resolved the merits of any of the *PPGNY I* plaintiffs' claims. Notice of Voluntary Dismissal, *PPGNY I*, No. 25-1334 (D.D.C. July 11, 2025), Dkt. No. 34.

27. The same day that HHS granted Plaintiffs' NCC applications, it also published the OASH, *OASH Teen Pregnancy Prevention Program Policy Notice* (Policy Notice) (dated July 1, 2025), attached hereto as Exhibit G. *See* OASH, HHS, *HHS Issues Policy to Stop the Radical Indoctrination of Children and Ensure Parental Oversight for Teen Pregnancy Prevention Grants* (Jul. 2, 2025), https://health.gov/news/hhs-issues-policy-stop-radical-indoctrination-children-and-ensure-parental-oversight-teen. The Policy Notice states that TPP program recipients that are "noncompliant with [its terms] may face grant suspension . . . and grant termination." Policy Notice at 5.

28. The Policy Notice purports to "clarify OASH policy for [TPP Program] grant recipients." Policy Notice at 1. "Additionally, [the Policy Notice] outlines evaluation standards for TPP Program grant recipients and evidence-based program" and "delineate[s] when materials and

7

activities are not 'medically accurate,' 'age appropriate,' do not 'reduce teen pregnancy,' or are otherwise outside the scope of the TPP Program." *Id.*

29. Specifically, the Policy Notice states that TPP projects "must . . . not instruct[] . . . ideological content," such as "discriminatory equity ideology," the "content at issue in *Mahmoud*," which the Policy Notice identifies as "LGBTQ+-inclusive" content, and "gender ideology." Policy Notice at 4. The Policy Notice also states that "material or instruction outside the scope of the TPP Program" includes "content that encourages, normalizes, or promotes sexual activity for minors, including anal and oral sex, or masturbation, including through sexually themed roleplay" and "content on the eroticization of birth control methods." *Id.* The Policy Notice adopts new definitions in lieu of previously-established agency definitions for the TPP Program, including the definition of "Medical Accuracy," such that "[c]ontent that is not 'medically accurate' may include inaccurate information about methods of contraception, including associated health risks, or information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." *Id.* at 4-5. Finally, the Policy Notice states that TPP programs have an "obligation[]" to "provide parents advance notice . . . and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise." *Id.* at 3-5. These requirements "appl[y] to TPP Program grant recipients" now. *Id.* at 1. And grant recipients "are expected to ensure all program materials comply with [the Policy Notice]." *Id.* at 6.

30. While the Policy Notice states that "OASH is concerned" about several definitions used in prior NOFOs "based on the statutory language and Congressional intent of the TPP Program," it does not point to specific terms within those definitions that are of concern nor does

8

it identify other specific aspects of the definitions themselves that are objectionable. Policy Notice at 4-5.

31. The Policy Notice's new definition of "medically accurate" requires instruction on the "full range of health risks" associated with contraceptives, but offers no guidance as to what level of detail is required or how that threshold will be judged. Policy Notice at 5.

32. The Policy Notice also asserts that "[c]ontent that is not 'medically accurate' may include inaccurate information about methods of contraception, including associated health risks, or information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy.'" Policy Notice at 5.

33. The Policy Notice further states that "the prior administration erred in approving [some program] materials" and that "compliance with this PPN may require some grantees to revise their TPP Program curricula and content." Policy Notice at 6.

**The Policy Notice's Content Mandates Contradict Widely Available and Peer-Reviewed Scientific Evidence and Risks Undermining the TPP Program's Efficacy**

34. HHS previously defined medical accuracy as: "Verified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." 2023 NOFO at 65.

35. The previous definition was consistent with the well-established and longstanding meaning of medical accuracy within public health and evidence-based policy, Kantor Decl. ¶ 22, and identical to the definition of "medically accurate and complete" that Congress provided for under the Personal Responsibility Education Program in 42 U.S.C. § 713(e)(2).

9

36. In the Policy Notice, the agency declared it was "concerned" about this definition and offered an alternative definition for Medical Accuracy. Policy Notice at 5.

37. The Policy Notice's defines medical accuracy as requiring teaching that there are only two sexes and denying the existence of gender diversity. Policy Notice. at 5.

38. Teaching that there are only two sexes is "clearly medically inaccurate" based on a review of the scientific literature about biology and the expert opinions of key professional organizations such as the American Psychological Association and contradicts widely available and accepted, and peer-reviewed scientific evidence recognizing the existence of intersex and transgender individuals. *See, e.g.*, Kantor Decl. ¶ 64; *id.* ¶ 57 ("[A] large scientific literature on the biological basis of sex . . . concludes that there is significant variation within the category of biological sex."); Pediatric Endocrine Soc'y, *The Biological Reality of Sex and Intersex: A Response to the Executive Order* (Feb. 11, 2025), available at https://pedsendo.org/public-policy/the-biological-reality-of-sex-and-intersex-a-response-to-the-executive-order-defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/ ("The proposed definitions of biological sex within the Executive Order should not and cannot apply to people born with biological conditions known as Differences of Sex Development . . . a collection of rare medical conditions that occur before birth in which biological sex development does not follow the typical path."); *see also* Tiffany Jones, *Intersex Studies: A Systematic Review of International Health Literature*, 8 SAGE OPEN 2 (May 2018) ("Research has generally estimated that 1.7% to 4% of people go on to actually have intersex variations."), available at https://journals.sagepub.com/doi/10.1177/2158244017745577; Claire Ainsworth, *Sex Redefined*, 518 NATURE 288, 288-90 (February 19, 2015) ("[D]octors have long known that some

10

people straddle the boundary—their sex chromosomes say one thing, but their gonads (ovaries or testes) or sexual anatomy say another."), available at https://www.nature.com/articles/518288a.

39. The Policy Notice does not define how the agency will assess whether content is "sexually explicit" or "encourages", "normalizes", or "promotes" sexual activity for minors in assessing compliance. *See generally*, Policy Notice.

40. This prohibition could be implemented to require abstinence-only programming, which has been scientifically shown to be ineffective at preventing teenage pregnancy and other associated risk behaviors. *See, e.g.*, John S. Santelli, M.D., M.P.H. *et al.*, *Abstinence-Only-Until-Marriage Policies and Programs*, 61 J. ADOLESCENT HEALTH 400, 400 ("[Abstinence only] programs are not effective in delaying initiation of sexual intercourse or changing other behaviors."), available at https://www.jahonline.org/article/S1054-139X(17)30297-5/fulltext; *see also* Kantor Decl. ¶¶ 21; 43. Plaintiffs cannot and do not provide programming that promotes abstinence as the only appropriate behavior for youth as it is not an approach rooted in evidence and reflective of the real world decisions that our participants are contemplating. *See* PPGNY Decl. ¶ 48; PPCCC ¶ 56; PPH Decl. ¶ 42.

41. Congress, HHS, and overwhelming scientific evidence have recognized that effective sexual education requires acknowledging the reality that some adolescents are or will become sexually active. Kantor Decl. ¶¶ 20-21. Comprehensive sexual education includes topics like contraception, consent, and healthy relationships—acknowledging that some teens are or will become sexually active. *Id.* ¶¶ 44-45.

42. The Policy Notice's prohibition on teaching "gender ideology," Policy Notice at 4, appears to "disallow discussions about gender roles which are essential to helping young people learn to communicate, negotiate and refuse unprotected sexual activity." Kantor Decl. ¶ 63.

11

43. Discussions about gender roles and expectations are an important component of effective sexual education programs and essential to helping young people learn to communicate, negotiate, and refuse unprotected sexual activity. Kantor Decl. ¶ 63.

44. "[A]a review of studies on teen pregnancy prevention programs . . . shows that teen pregnancy prevention programs that address issues of gender are more likely to result in reductions of sexually transmitted diseases and teen pregnancy." Kantor Decl. ¶ 63. "Examining how gender roles and expectations may influence how adolescents engage in relationships is a very important component of pregnancy prevention." *Id.*

45. Finally, the Policy Notice prohibits certain kinds of content that makes the program inclusive to various communities and identities. Excluding inclusive content does nothing to prevent pregnancy; and it directly contravenes the TPP Program grants at issue, which were expressly solicited to serve communities and populations with greatest unmet needs and thus to replicate evidence-based programs that were "culturally and linguistically appropriate, trauma-informed, and inclusive of all youth." 2023 NOFO at 8, 11, 25, 44; *see also, e.g.*, Kantor Decl. ¶ 54 ("Cultural and linguistic appropriateness is essential to ensure that programs meet the needs of youth who, in a country as large and varied as the United States, come from different settings (e.g., rural, suburban and urban), cultural backgrounds, and may or may not speak English as a first language.").

**The Policy Notice's Impact on Plaintiffs' TPP Programming and Services**

46. Plaintiffs PPGNY, PPCCC, and PPH are Tier 1 TPP grantees whose projects were designed and approved for a five-year performance period pursuant to HHS's 2023 NOFO, and for the current year of non-compete continuation funding, which is the third year of the five-year grant cycle. *See* PPGNY Decl. ¶ 11-12; PPCCC Decl. ¶¶ 21-26; PPH Decl. ¶¶ 10-12.

47. Each of Plaintiffs' Tier 1 TPP Program projects has been approved to replicate, with fidelity, at least one of the evidence-based programs that HHS has identified on its pre-approved list as effective and consistent with Congress's mandate for the program. *See* PPGNY Decl. ¶¶ 13-14, 16; PPCCC Decl. ¶¶ 26, 28; PPH Decl. ¶¶ 12-13, 16. The 2023 NOFO required recipients "to make materials and information culturally and linguistically appropriate, trauma-informed, and inclusive of all youth," and to "advance equity in . . . communities and populations with the greatest needs." 2023 NOFO at 5-6, 11. And Plaintiffs selected and implemented their projects to meet unique needs of underserved communities. *See* PPGNY Decl. ¶ 42 (PPGNY's project was "intended to ensure that its programming addressed gaps in existing curricula that failed to account for unique needs of many communities including LGBTQ+ youth"); PPCCC Decl. ¶ 80 ("Due to challenges, such as language and transportation barriers, members of these communities are often unable to benefit from other sex education programs . . . PPCCC designed a project to meet these gaps in services."); PPH Decl. ¶¶ 13-16 ("PPH designed its TPP Project to meet the needs of underserved communities within the areas that we serve" including "rural Nebraskan counties" and "Nebraska tribes").

48. Despite HHS approving Plaintiffs' TPP projects for a third year, the Policy Notice's requirements present Plaintiffs with the impossible choices as to whether to (1) alter their TPP programs to draw down the awarded funds (which requires certifying compliance with the Policy Notice) and risk alienating the vulnerable populations they serve, (2) continue on with their TPP programming as previously approved with the likely outcome of an enforcement action by HHS, or (3) shutting down their programs entirely to avoid these negative outcomes, abandoning their partnerships and the communities they serve. *See* PPGNY Decl. ¶ 40; PPCCC Decl. ¶ 65; PPH Decl. ¶ 38.

49. As a result of the Policy Notice, and specifically because the process of drawing down funds requires TPP funding recipients to certify that they will comply with program policies–including the Policy Notice, none of the Plaintiffs have drawn down funds for year three of their TPP projects. PPGNY Decl. ¶ 60; PPCCC Decl. ¶ 83; PPH Decl.¶ 61.

50. Plaintiffs designed their budgets, programming, staffing, and partnerships with community organizations based on the understanding that HHS would provide continued funding. *See* PPGNY Decl. ¶¶ 61-63; PPCCC Decl. ¶ 74; PPH Decl. ¶¶ 61-63. As Plaintiffs' declarations explain, the Policy Notice disrupts Plaintiffs' operations, thwarts their ability to provide the funded TPP programs and education services, and threatens their reputation, stakeholder relationships, and community goodwill with many local and geographic partners in areas where programming is offered. PPGNY Decl. ¶¶ 67-68; PPCCC Decl. ¶ 68; PPH Decl. ¶ 45. These disruptions threaten Plaintiffs' ability to provide public health programming to communities that HHS has identified as having the highest unmet need and perpetuate the negative health outcomes this program was designed to address. PPGNY Decl. ¶¶ 68-70; PPCCC Decl. ¶ 67; PPH Decl. ¶¶ 45-47.

51. Since the Court's denial of Plaintiffs' Motion for a Temporary Restraining Order, PPGNY has been forced to shut down its TPP programming due to the loss of access to funds. PPGNY Decl. ¶ 62. PPGNY has also issued staff layoff notices. *Id.*¶ 63. PPGNY remains in the TPP program and will work to rebuild its project if this case provides relief. *Id.* ¶ 66.

52. PPCCC has had to reallocate its limited, unbudgeted reserves to pay staff and cover other program expenses due to the loss of access to TPP grant funds, which it can only do for a brief period; without relief, PPCCC has no other funds to cover the costs of its TPP project and will soon be forced to shut down its program and furlough staff. PPCCC Decl. ¶ 84.

53. PPH has also briefly kept its project afloat by reallocating resources and pausing certain contracts, but can only operate its project on this reduced budget for a short time and will soon have to shut down its TPP project without relief. PPH Decl. ¶¶ 62-63.

Dated: August 25, 2025

Respectfully submitted,

By: /s/ *Andrew T. Tutt*
Drew A. Harker (DC Bar # 412527)
Andrew T. Tutt (DC Bar # 1026916)
Bonnie Devany (*pro hac vice*)[2*]
Daniel Yablon (DC Bar # 90022490)
John V. Hoover (DC Bar # 90006181)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
drew.harker@arnoldporter.com
andrew.tutt@arnoldporter.com
bonnie.devany@arnoldporter.com
daniel.yablon@arnoldporter.com
jack.hoover@arnoldporter.com

Emily Nestler (DC Bar # 973886)
PLANNED PARENTHOOD FEDERATION OF AMERICA
1100 Vermont Avenue NW
Washington, DC 20005
(202) 973-4800
emily.nestler@ppfa.org

Valentina De Fex (*pro hac vice*)
Melissa Shube (DC Bar # 241034)
PLANNED PARENTHOOD FEDERATION OF AMERICA
123 William Street, 9th Floor
New York, NY 10038
Phone: (212) 261-4696
valentina.defex@ppfa.org
melissa.shube@ppfa.org

---

[2*] *Admitted only in Texas; practicing in D.C. pursuant to D.C. Ct. of Appeals R. 49(c)(8), under supervision of D.C. Bar Members.*

15