# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **)** | | |
| **)** | | |
| PLANNED PARENTHOOD OF **)** | | |
| GREATER NEW YORK *et al.*, **)** | | |
| **)** | | |
| Plaintiffs, **)** | | |
| v. **)** | Civil Action No. 25-cv-2453 |
| **)** | | |
| U.S. DEPARTMENT OF HEALTH AND **)** | | |
| HUMAN SERVICES *et al.*, **)** | | |
| **)** | | |
| Defendants. **)** | | |
| **)** | | |

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION
# FOR SUMMARY JUDGMENT AND OPPOSITION TO
# DEFENDANTS' CROSS-MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

   I.    This Court Has Jurisdiction ................................................................................ 3

      a.   Plaintiffs Have Standing to Challenge the Policy Notice ............................. 3

      b.   Plaintiffs' Claims Are Ripe .......................................................................... 7

      c.   The Tucker Act Poses No Bar to Plaintiffs' Claims ..................................... 8

   II.   The Policy Notice Violates the Administrative Procedure Act ......................... 9

      a.   The Policy Notice is Final Agency Action ................................................. 10

      b.   The Policy Notice Contravenes Congress's Directives for the TPP Program ............. 14

      c.   The Policy Notice is Arbitrary and Capricious ........................................... 20

   III.   The Policy Notice Violates the Fifth Amendment Because it is Unconstitutionally Vague.. ................................................................................................................. 29

   IV.   The Policy Notice is *Ultra Vires* ................................................................... 30

CONCLUSION ................................................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)...................................................................................7, 10, 11

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
273 F.3d 1229 (9th Cir. 2001) ...............................................................................21

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972)...........................................................................................29, 30

*Bellion Spirits, LLC v. United States*,
7 F.4th 1201 (D.C. Cir. 2021)..................................................................................8

*Bennett v. Spear*.
520 U.S. 154 (1997).................................................................................................10

*Bostock v. Clayton County*,
590 U.S. 644 (2020).................................................................................................19

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962).................................................................................................27

*Cherokee Nation v. Dep't of the Interior*,
643 F. Supp. 3d 90 (D.D.C. 2022) ...........................................................................4

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012).................................................................................................21

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).................................................................................................24

*City of Duluth v. Jewell*,
968 F. Supp. 2d 281 (D.D.C. 2013) .......................................................................26

*Cohen v. United States*,
650 F.3d 717 (D.C. Cir. 2011) .................................................................................7

*Columbia Broad. Sys. v. United States*,
316 U.S. 407 (1942).................................................................................................10

*Comcast Corp. v. FCC*,
579 F.3d 1 (D.C. Cir. 2009) ...................................................................................26

*Corbett v. Transp. Sec. Admin.,
  19 F.4th 478 (D.C. Cir. 2021) ..................................................................3, 6, 7, 9

Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,
  603 U.S. 799 (2024) ..................................................................................................10

Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,
  452 F.3d 798 (D.C. Cir. 2006) ................................................................................13

DHS v. Regents of the Univ. of Cali.,
  140 S. Ct. 1891 (2020) ..............................................................................................26

*FCC v. Fox Television Stations, Inc.,
  556 U.S. 502 (2009) ..................................................................................20, 28, 29

FCC v. Fox Television Stations, Inc.,
  567 U.S. 239 (2012) ..................................................................................................23

FDA v. All. for Hippocratic Med.,
  602 U.S. 367 (2024) ....................................................................................................5

Fed. Express Corp. v. U.S. Dep't of Commerce,
  39 F.4th 756 (D.C. Cir. 2022) ................................................................................31

Firearms Regul. Accountability Coal., Inc. v. Garland,
  112 F.4th 507 (8th Cir. 2024) ................................................................................22

Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,
  561 U.S. 477 (2010) ....................................................................................................6

Gen. Elec. Co. v. EPA,
  53 F.3d 1324 (D.C. Cir. 1995) ................................................................................21

Goss v. Lopez,
  419 U.S. 565 (1975) ..................................................................................................30

Ibrahim v. DHS,
  669 F.3d 983 (9th Cir. 2012) ....................................................................................7

Ipsen Biopharmaceuticals, Inc. v. Azar,
  943 F.3d 953 (D.C. Cir. 2019) ................................................................................13

Johnson v. United States,
  576 U.S. 591 (2015) ..................................................................................................30

League of United Latin Am. Citizens v. Exec. Off. of the President,
  780 F. Supp. 3d 135 (D.D.C. 2025) ................................................................11, 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................3, 4

*Marcum v. Salazar*,
    751 F. Supp. 2d 74 (D.D.C. 2010) ..............................................................28

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................................4

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State*,
    851 F.3d 1 (D.C. Cir. 2017) ..........................................................................11

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
    606 U.S. 146 (2025) ......................................................................................10

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ......................................................................................11

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto.
Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................20, 24, 27, 29

*N.Y. v. Biden*,
    636 F. Supp. 3d 1 (D.D.C. 2022) ................................................................31

*Nat'l Ass'n of Home Builders v. EPA*,
    786 F.3d 34 (D.C. Cir. 2015) ........................................................................4

*Nat'l Min. Ass'n v. Fowler*,
    324 F.3d 752 (D.C. Cir. 2003) ......................................................................8

*Nat'l Min. Ass'n v. Jackson*,
    856 F. Supp. 2d 150 (D.D.C. 2012) ............................................................28

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ......................................................11, 12, 13

*Nat'l Urban League v. Trump*,
    783 F. Supp. 3d 61 (D.D.C. 2025) ................................................................5

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024) ..........................................................................24

*New York v. DOL*,
    363 F. Supp. 3d 109 (D.D.C. 2019) ..............................................................6

*NIH v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) ................................................................................8, 9

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ...................................................................................31

*Ohio v. EPA*,
    603 U.S. 279 (2024) ....................................................................................................24

*Orr v. Trump*,
    778 F. Supp. 3d 394 (D. Mass. 2025) ........................................................................19

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ....................................................................................................29

*PFLAG, Inc. v. Trump*,
    769 F. Supp. 3d 405 (D. Md. 2025) ..........................................................................19

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
    946 F.3d 1100 (9th Cir. 2020) ...............................................................................4, 15

*Planned Parenthood of N.Y.C., Inc. v. HHS*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) .......................................................................15

*Sabre, Inc. v. DOT*,
    429 F.3d 1113 (D.C. Cir. 2005) ...................................................................................7

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) .....................................................................................4

*State Nat'l Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) ...................................................................................3, 6

*Timpinaro v. SEC*,
    2 F.3d 453 (D.C. Cir. 1993) .......................................................................................25

*Tyler v. Hennepin County*,
    598 U.S. 631 (2023) ......................................................................................................4

*United States v. Bronstein*,
    849 F.3d 1101 (D.C. Cir. 2017) .................................................................................30

*Univ. of Colo. Health at Mem'l Hosp. v. Burwell*,
    151 F. Supp. 3d 1 (D.D.C. 2015) ..............................................................................28

**Statutes**

5 U.S.C. § 704 ..............................................................................................................31

5 U.S.C. § 706 .......................................................................................................20, 31

28 U.S.C. § 1491(a)(1) ...................................................................................................9

42 U.S.C. § 713(e)(2)..................................................................................................18

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat.
    460....................................................................................................14, 20, 24

**Regulations**

45 C.F.R. § 52.6(c)....................................................................................................30

45 C.F.R. § 75.373 ....................................................................................................10

**Other Authorities**

HHS, *ASPE Research Brief: Making Sense of Replication Studies* (May 2015),
    https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//55351/rb_TPP_
    Replication.pdf.......................................................................................................27

John S. Santelli, M.D., M.P.H. *et al.*, *Abstinence-Only-Until-Marriage Policies
    and Programs*, 61 J. ADOLESCENT HEALTH 400 (2017)........................................17

OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence
    Review*, https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-
    program-evaluations/tpp-evidence-review#ftn1 (last visited Sept. 15, 2025).............14, 15, 27

**INTRODUCTION**

The Department of Health and Human Services' (HHS) abrupt decision to impose sweeping content mandates for the Teen Pregnancy Prevention (TPP) Program violates the Administrative Procedure Act (APA) because it is contrary to law and arbitrary and capricious. And by imposing these vague new requirements on Plaintiffs' existing programs and subjecting them to arbitrary enforcement, HHS's July 1, 2025, *OASH Teen Pregnancy Prevention Program Policy Notice* (Policy Notice) treads on Plaintiffs' due process rights. Defendants hardly bother to defend the Policy Notice's new requirements on the merits. They offer no explanation as to how omitting inclusive programming that the agency previously deemed essential could comply with the TPP Program's statutory mandate to ensure efficacious sex education. Nor do they explain how medically accurate and effective sex education curricula can plausibly avoid "normalizing" sex. And their insistence that the Policy Notice's requirements are unknowable until HHS commences enforcement proceedings—which the Policy Notice expressly threatens for any violations of the Policy Notice's requirements—only underscores its impermissible vagueness and potential for arbitrary enforcement.

None of Defendants' arguments have merit. *First*, Defendants raise a variety of procedural objections that turn decades of administrative law on its head. Contrary to Defendants' claims, Plaintiffs obviously have standing, the Policy Notice is plainly final agency action, and this issue is ripe for resolution now. The D.C. Circuit has repeatedly held that parties directly regulated by agency action like Plaintiffs here may challenge agency rules before enforcement proceedings are brought against them. That is particularly true where, as here, an agency document purports to establish binding requirements for private parties backed by the threat of sanctions. And there can be no doubt that the Policy Notice does just that. It imposes discrete content mandates that not only lack any basis in the Notice of Funding Opportunity under which HHS issued Plaintiffs'

awards, but in fact directly contradict the NOFO's invitation and requirement for inclusive programming that serves areas of greatest need. Indeed, the Policy Notice now declares that HHS "erred" in previously approving such programs—but offers no reasoned explanation for that conclusion. Whether packaged as arguments on standing, ripeness, or finality, precedent compels the same result: program participants need not wait for Damocles's sword to fall in order to challenge binding changes to program terms.

*Second*, the Policy Notice is unlawful for four independent reasons. It is (1) contrary to the TPP Program's statutory requirements; (2) arbitrary and capricious because it is unconstitutionally vague; (3) objectively unreasonable as shown by the virtually nonexistent administrative record; and (4) manifestly inadequately explained. Any one of those defects would be fatal to the Policy Notice. All of them are present here. The Policy Notice exhibits none of the reasoned and reasonable decisionmaking that the APA demands. Its defects are apparent on its face. By directing program participants to make ad hoc changes to their programming from the vetted, proven-effective programs HHS previously approved, the Policy Notice contravenes the TPP Program statute's replication and medical-accuracy requirements. The Policy Notice fails to reasonably explain HHS's decision and the administrative record index confirms that HHS failed to consider important aspects of the problem. In abruptly upending the TPP Program, the agency apparently considered no evidence whatsoever, ignored important reliance interests, and changed longstanding agency policy without regard for statutory program goals. Both the APA and due process require the government to furnish intelligible standards for compliance, not open-ended mandates whose enforcement depends only on agency whim.

The Court should deny Defendants' motion to dismiss, grant Plaintiffs' motion for summary judgment, and vacate the Policy Notice and enjoin its implementation.

**ARGUMENT**

The Court should grant Plaintiffs' motion for summary judgment. The Policy Notice is contrary to law, arbitrary and capricious, unconstitutionally vague, and *ultra vires*. Defendants' counterarguments are meritless. They have no serious response to Plaintiffs' merits claims. And their threshold arguments all fail. Plaintiffs have Article III standing, the Policy Notice is final agency action, the case is ripe for resolution, and the Tucker Act is irrelevant to this APA suit seeking vacatur of an agency final rule.

**I.        This Court Has Jurisdiction**

Defendants argue that any challenge to the Policy Notice must await HHS's enforcement decisions. Defs.' Mem. in Opp. of Pls.' Summ. J. Mot. & in Supp of Defs.' Cross-Mot. to Dismiss (Defs.' Opp.) at 11-15, ECF No. 25-1. That ignores the factual record and flies in the face of longstanding precedent allowing challenges to agency rules and regulations before any enforcement action is commenced. As parties "directly regulated" by the Policy Notice, Plaintiffs "plainly ha[ve] standing" to challenge it. *Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 483-84 (D.C. Cir. 2021). Indeed, under Defendants' theory, it is difficult to see how any agency rules could be subject to the judicial review the APA requires. Neither standing, ripeness, nor the Tucker Act pose any bar to Plaintiffs' challenge to an agency rule that regulates their conduct backed by significant financial penalties.

**a.    Plaintiffs Have Standing to Challenge the Policy Notice**

Plaintiffs have Article III standing to challenge the Policy Notice. "The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). A "petitioner's standing to seek review of administrative action is self-

evident" where "the complainant is 'an object of the action (or forgone action) at issue.'" *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561-62); *see also Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 43 (D.C. Cir. 2015) ("[R]egulated entities' standing to challenge the rules that govern them is normally not an issue . . . ." (quotation marks omitted)). Defendants offer no justification for departing from that well-settled rule here.

*First*, the Policy Notice has injured Plaintiffs in a "concrete and personal way." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Lujan*, 504 U.S. at 581 (Kennedy, J., concurring)). It directly regulates TPP Program participants—and no one else—by prescribing rules for what they may and may not say in their curricula and discussions with students and imposing burdensome new opt-out and "full range of health risks" disclosure requirements. *See* Policy Notice at 2-5. And it backs those regulations of Plaintiffs' primary conduct with substantial financial penalties, stating that noncompliance may result in grant suspension or termination, which carries with it the clawback of expended program funds. *See id.* at 5. Both the costs of modifying curricula to conform to new requirements and the threat of grant terminations are "classic pocketbook injur[ies] sufficient to give [plaintiffs] standing." *Tyler v. Hennepin County*, 598 U.S. 631, 636 (2023).

*Second*, those injuries are fairly traceable to the Policy Notice and redressable by setting it aside. "Generally, this is a 'but for' test—if some part of the alleged injury would not have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action." *Cherokee Nation v. Dep't of the Interior*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022); *see also Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100, 1108-09 (9th Cir. 2020) (where agency action impairs a plaintiff's ability to compete for federal funding, "causation and redressability then derive from basic economic logic" (cleaned up)). At the very

least, the Policy Notice requires program participants like Plaintiffs to reassess their programming and incur the costs of modifying their curricula and retraining their staff. Those costs flow directly from the Policy Notice, and setting it aside redresses their harm.

Here, Plaintiffs' declarations (which the Court plainly may consider when determining its jurisdiction) demonstrate that their injuries are not merely imminent, but manifest. Drawing down program funds requires TPP funding recipients to certify compliance with all program policies, including the Policy Notice. Statement of Mat. Facts Pursuant to L.Cv.R. 7(h) in Support of Pls.' Mot. for Summ. J. (Pls.' SOMF) ¶ 23, ECF No. 22-2. Such a requirement subjects grantees to a "forced choice": "change their programming to enable them to make the certification; make the certification without changes and risk a false certification; or give up federal funds and contracts." *Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61, 85 (D.D.C. 2025). Under these circumstances "'both the injury in fact and causation requirements' are 'almost invariably satisf[ied].'" *Id.* (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024)). Indeed, PPGNY has already suspended its TPP programming because it "has been unable to draw down funds as a result of the Policy Notice's unlawful requirements" and "does not have financial resources with which it can continue." Decl. of Wendy Stark (PPGNY Decl.) ¶¶ 60-61, ECF No. 22-5; *see also* Decl. of Jenna Tosh (PPCCC Decl.) ¶ 83, ECF No. 22-6 (explaining that "PPCCC has continued to incur staff and other expenses" while being unable to draw down funds); Decl. of Christine Cole (PPH Decl.) ¶ 62, ECF No. 22-7 (explaining that PPH has had to pause third-party contracts and administer TPP programming with non-federal funds). All three Plaintiffs have also incurred and, to the extent still operating their TPP programming, continue to incur substantial financial costs to evaluate the

Policy Notice's requirements and make the curricular modifications it demands. *See* PPGNY Decl. ¶ 54; PPCCC Decl. ¶¶ 66-67.[1]

Defendants' argument that only enforcement proceedings can give rise to standing to challenge the Policy Notice defies extensive binding precedent. Rejecting precisely that argument in *Corbett*, the D.C. Circuit held that an individual subject to a Transportation Security Administration rule had standing to challenge it because "he face[d] the *threat* of enforcement and ensuing penalties should he fail to comply." *Corbett*, 19 F.4th at 483 (emphasis added). That rule, like the Policy Notice here, thus "forced [him] to comply" with the agency's directives, *id.* at 483; that is, it regulated his conduct. "[R]egulated parties generally need not violate a law in order to challenge the law." *State Nat'l Bank of Big Spring*, 795 F.3d at 54. "As the Supreme Court stated in *Free Enterprise Fund*, it would make little sense to force a regulated entity to violate a law (and thereby trigger an enforcement action against it) simply so that the regulated entity can challenge [it]." *Id.* (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010)). That is particularly true given that plaintiffs "ha[ve] also already incurred costs due to the [Policy Notice]." *New York v. DOL*, 363 F. Supp. 3d 109, 126 (D.D.C. 2019).

Nor would it make any difference if HHS could commence enforcement proceedings against Plaintiffs based on terms of their awards unaltered by the Policy Notice. As explained in Plaintiffs' motion for summary judgment at 5-6, ECF No. 22-1, the Policy Notice imposes sweeping new content mandates untethered to any terms in their initial program awards under the

---

[1] Defendants suggests that PPGNY and PPCCC have drawn down funds under their current grant awards. Defs.' Opp. at 9. That is incorrect. PPGNY and PPCCC have drawn down funds only for reimbursement of expenses incurred prior to the imposition of the Policy Notice. *See* Supp. Decl. of Wendy Stark (Supp. PPGNY Decl.) ¶¶ 5-11 (attached hereto as Ex. 1); Supp. Decl. of Jenna Tosh (Supp. PPCCC Decl.) ¶¶ 4-5 (attached here to as Ex. 2). None of the Plaintiffs have drawn down any funds under the current (year three) grant awards. Supp. PPGNY Decl. ¶ 12; Supp. PPCCC Decl. ¶ 7.

NOFO. And the Policy Notice expressly modifies regulatory definitions adopted in the NOFO, explaining that its new requirements themselves may "require some grantees to revise their TPP Program curricula and content" that HHS already approved. Policy Notice 4-6. But *even if* Defendants could impose these requirements consistent with the preexisting award terms, the D.C. Circuit has unequivocally held that this would pose no bar to review. "A challenger is 'not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time.' " *Corbett*, 19 F.4th at 484 (quoting *Ibrahim v. DHS*, 669 F.3d 983, 993 (9th Cir. 2012)). Thus, again rejecting exactly the argument Defendants makes here, the D.C. Circuit in *Corbett* held that the existence of "similar regulations" prohibiting the same conduct "does not preclude [a regulated party] from challenging [an agency rule]." *Id.*

"In sum, as an object of the action at issue, there is little question that [the Policy Notice] has caused [plaintiffs] injury, and that a judgment preventing the action will redress it." *Id.* (quotation marks and alterations omitted). Plaintiffs therefore have standing.

**b.  Plaintiffs' Claims Are Ripe**

Plaintiffs' claims are ripe for resolution now, and Defendants' attempt to repackage its Article III standing argument as a ripeness problem, Defs.' Opp. at 13-14, misses the mark. For more than a half century, the Supreme Court has permitted pre-enforcement challenges to agency rules where, like here, "the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; [and] if they fail to observe the [agency's] rule they are quite clearly exposed to the imposition of strong sanctions." *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967). The D.C. Circuit "has long understood the approach in *Abbott Labs* to incorporate a presumption of reviewability" before an agency enforces rules against individual regulated parties. *Cohen v. United States*, 650 F.3d 717, 735 (D.C. Cir. 2011) (en banc) (quoting *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1119 (D.C. Cir. 2005)).

As Plaintiffs' declarations demonstrate, they suffer significant hardship now, and the legal issues are sufficiently crystalized to permit this Court's review. *See* Pls.' SOMF ¶¶ 46-53 (citing PPGNY Decl., PPCCC Decl., PPH Decl.). Plaintiffs' claims that the Policy Notice is unconstitutionally vague and fatally vague under the APA turn only on the text of the Policy Notice itself; no further factual development is necessary. The Court can similarly determine whether, with the benefit of the administrative record index, ECF No. 23-1, the Policy Notice satisfies the APA's requirements of reasoned and reasonable decisionmaking and adequately justifies its decision to depart from past HHS practice. Defendants contend that the "exact scope" of the agency's enforcement actions are unclear, Defs.' Opp. at 13, but that is beside the point. The "purely legal" claims plaintiffs raise are fit for judicial resolution now. *Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003). Regulated parties need not "flout[] [agency rules], thereby risking the imposition of civil and potentially criminal penalties," on the mere chance that an agency will decide not to enforce its rules against them. *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021).

### c. The Tucker Act Poses No Bar to Plaintiffs' Claims

Defendants' argument that the Tucker Act somehow precludes jurisdiction here is mistaken. Defs.' Opp. at 14-15. As Justice Barrett recently explained—expressing the view of a five-justice majority—cases like this one belong in federal district court under the APA. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring).

Defendants concede that Supreme Court precedent permits federal grantees to challenge agency documents imposing new grant terms under the APA. Defs.' Opp. at 15; *see NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). As Justice Barrett explained in her controlling concurrence in *NIH*, "[v]acating the guidance does not reinstate terminated grants," and so a claim seeking that remedy presents no claim "'founded . . . upon' contract that only the [Court of Federal Claims]

can hear." *Id.* (quoting 28 U.S.C. § 1491(a)(1)). Plaintiffs do not seek to reinstate terminated grants. HHS has not terminated their grants.[2] The APA thus confers jurisdiction on this Court to adjudicate their challenge to the Policy Notice—agency action that causes Plaintiffs current harm independent of possible future grant terminations.

Unable to refute this point, Defendants invoke an irrelevant hypothetical: that HHS might otherwise "still be free to pursue enforcement proceedings against any grantee that it believed to be in violation of the terms and conditions of its grant, so long as it relies on the terms of the grants themselves." Defs.' Opp. at 14. But the possibility that HHS could seek to terminate awards on *other* grounds makes no difference. When an agency action—here, the Policy Notice—causes plaintiffs harm, setting that action aside redresses it. *Corbett*, 19 F.4th at 484. Absent the Policy Notice, Plaintiffs would be free to proceed with their TPP programming as authorized by the NOFO and previously (and repeatedly) approved by HHS. Proper venue for other, hypothetical claims challenging actions the agency has not taken is simply beside the point.[3]

## II.    The Policy Notice Violates the Administrative Procedure Act

The Policy Notice violates the APA both because it is contrary to law and because it is arbitrary and capricious. As detailed below, none of Defendants' attempts to evade the substance of the Policy Notice have merit. The Policy Notice constitutes final agency action because it makes binding changes to the TPP Program that are backed by legal consequences for noncompliance.

---

[2] For the same reasons, nothing in *NIH* prohibits related relief like enjoining Defendants from giving effect to the Policy Notice if the Court sets it aside. Such relief targets agency action distinct from grant terminations and so is not founded upon any contract with the United States.

[3] Nor would it make any difference to this Court's jurisdiction even if HHS *had* terminated Plaintiffs' awards based on the Policy Notice. In such a case, plaintiffs may "proceed sequentially," *NIH*, 145 S. Ct. at 2662, obtaining a determination in district court that the Policy Notice was unlawful and later seeking award reinstatement or money damages in the Court of Federal Claims. The Supreme Court has expressly approved this sort of "[t]wo-track" approach when an agency relies on an action subject to APA review to subsequently terminate federal grants. *Id.*

### a.   The Policy Notice is Final Agency Action

The Policy Notices makes fixed changes to the TPP Program that prescribe and proscribe the content and materials that may be taught by TPP-funded programs and explicitly threaten serious legal consequences for noncompliance with its terms. It is, therefore, final agency action reviewable by this Court under *Bennett v. Spear*. *See* 520 U.S. 154, 177-78 (1997). Defendants' position that the Policy Notice is nonfinal because the agency has not yet enforced it contravenes longstanding precedent predating even *Abbott Labs*. There, the Court explained that "regulations have the force of law before their sanctions are invoked as well as after," and so when "expected conformity to [regulations] causes injury cognizable by a court of equity, they are appropriately the subject of attack." *Abbott Labs.*, 387 U.S. at 150 (quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 418 (1942)); *see, e.g.*, *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 157 (2025) (explaining that *Abbott Labs* "revolutionized administrative law by more regularly allowing pre-enforcement challenges to agency rules and orders under the APA"); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 840 (2024) (Kavanaugh, J., concurring) (observing that after *Abbott Labs*, "'preenforcement review of agency rules' became 'the norm, not the exception'").

### (i)    Plaintiffs are not required to incur liability prior to initiating suit.

Ignoring this precedent altogether, HHS contends that the Policy Notice is nonfinal because HHS regulations would permit Plaintiffs to defend themselves in "[any] suspension or termination action." Defs.' Opp. at 18 (quoting 45 C.F.R. § 75.373). According to Defendants, until the agency "initiate[s] such an action against any TPP Program grantee," the Policy Notice does not "bear in a tangible way on Plaintiffs." *Id.* at 18; *see also id.* (encouraging the Court to "withhold[] review until the agency" takes "enforcement actions" against grantees). This argument runs headlong into well-established precedent that "a plaintiff is not required 'to expose himself to liability before

bringing suit to challenge the basis' for an enforcement action by the government." *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 851 F.3d 1, 4 (D.C. Cir. 2017) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007)); *see also Abbott Labs.*, 387 U.S. at 153 ("To require [plaintiffs] to challenge these regulations only as a defense to an action brought by the Government might harm them severely and unnecessarily.").

    (ii)    <u>The Policy Notice is a legislative rule that imposes binding duties and restrictions.</u>

The agency next hopes to duck this Court's authority by claiming that the Policy Notice has no legal effect. According to Defendants, the Policy Notice is a mere "guidance document," Defs.' Opp. at 19, that "neither determines the legal rights and obligations of Plaintiffs nor results in any immediate legal consequences," *id.* at 18. That is false. "Simply stated, agency action that purports to create binding obligations or prohibitions is a legislative rule." *League of United Latin Am. Citizens ("LULAC") v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 174-75 (D.D.C. 2025) (citing *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014)). The Policy Notice does just that, stating that "those determined noncompliant with the [Pilcy Notice] may face grant suspension . . . and grant termination." Policy Notice at 5, ECF No. 22-9. Defendants acknowledge that the Policy Notice is "incorporat[ed] . . . into Plaintiffs' grant awards." Defs.' Opp. at 18; that is, that it alters their legal rights and obligations. The Policy Notice also announces the agency's definitive positions on TPP Program standards. For example, it "describes" the "medically accurate" and "age appropriate" materials and activities that HHS now considers outside the scope of the TPP Program's scope. Policy Notice at 5. In addition, it plainly states that "all program materials" must now "comply with the PPN," which by its terms takes precedence over program participants' prior HHS approvals. *Id.*; *see also id.* at 6 (discussing grantees'

"compliance with this PPN"). HHS could not have more decisively communicated to grantees that the Policy Notice imposes new binding requirements that they must comply with *or else*.

Defendants recognize that the Policy Notice is binding and acknowledge that "[t]he Policy Notice acknowledges the possibility of future enforcement actions," Defs.' Opp. at 18 (emphasis removed), and that it precedes "enforcement," *id.* at 19; *see also McCarthy*, 758 F.3d at 252 (explaining that plaintiffs may challenge an agency action that may "be the basis for an enforcement action against" them). The Policy Notice is thus a "rule[]" that "may be subject to pre-enforcement review." *LULAC*, 780 F. Supp. 3d at 175.

(iii)    The Policy Notice finalizes HHS's changes to the TPP Program.

Furthermore, Defendants decline to engage at all with Plaintiffs' observation that the Policy Notice marks the consummation of the agency's decisional process because it "represents HHS's complete and final decision to fundamentally alter the TPP Program's terms," including by instituting content mandates, revising program definitions, and imposing opt-out requirements. Pls.' Mot. for Summ. J. at 10 (Pls.' MSJ), ECF No. 22-1. Contrary to Defendants' assertions, these are obviously concrete requirements, which cannot reasonably be characterized as an "interlocutory step in the agency's decision-making process of how to reconcile the directives of recently issued Executive Orders and the Supreme Court's decision in *Mahmoud* with the TPP Program." Defs.' Opp. at 18. The government does not assert that the Policy Notice is merely a proposal or that HHS plans further deliberative steps before publishing a final version. Thus, the only relevant question here is whether HHS has finalized its alterations to the TPP Program—and the government does not dispute that it has.

(iv)    <u>Defendants supporting authorities are distinguishable and off point.</u>

Finally, Defendants' citations to cases in which agency actions were found to be unreviewable guidance documents are of little help, especially because none of those cases involved potential enforcement actions against regulated parties. In *Center for Auto Safety*, the National Highway Safety Administration issued guidelines for manufacturers seeking to recall automobiles. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 802-03 (D.C. Cir. 2006). Yet the guidance document there threatened no legal consequences, *see id.* at 803, the agency wholly lacked "authority to issue guidelines with binding effect," *id.* at 810, and compliance was entirely "voluntary," *id.* at 811. Those facts are far afield from this case, where HHS has the power to bind grantees and has affirmatively threatened in the Policy Notice to impose severe consequences for noncompliance through enforcement actions. In *McCarthy*, the Environmental Protection Agency issued guidance setting a recommended level of water conductivity for mining permits and advising staff to ask state authorities to assess changes to water conditions before approving permits. *See* 758 F.3d at 248. Unlike here, that guidance did "not tell regulated parties what they must do or may not do in order to avoid liability," and "caveats" denying its compulsory nature "r[a]n throughout the document," which lacked any "commands" whatsoever. *Id.* at 252-53. In contrast, the Policy Notice unequivocally compels grantees' compliance by redefining terms, limiting program content, and imposing legal consequences for failure to implement those changes. *See* Policy Notice at 5. Courts have found agency action to be final in situations, like this one, where a plaintiff faced an "increased risk" of "penalties." *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 957 (D.C. Cir. 2019).

13

The Policy Notice demands that Plaintiffs change their TPP Programs and threatens to terminate their funding and clawback funds if they do not comply. It therefore represents final agency action subject to pre-enforcement review.

### b. The Policy Notice Contravenes Congress's Directives for the TPP Program

Congress's mandate for implementation of the TPP Program includes requirements that Tier 1 funding be used for "replicating programs," that have been demonstrated as "effective through rigorous evaluation," and are "medically accurate." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 671. As discussed more fully in Plaintiffs' opening papers and below, the Policy Notice contravenes each requirement. Defendants attempt to sweep under the rug Plaintiffs' argument that the Policy Notice violates statutory requirements requiring programs be replicable by noting that grantees have been allowed to make changes to non-core components of their programs when they will not affect program outcomes. *See* Defs' Opp. at 21-22. That entirely misses the point. As explained in Plaintiffs' opening brief, what it means to "replicat[e] a program" is well established for the TPP Program—it requires "maintaining fidelity to [the program's] core components." Pls.' MSJ at 16 (citation omitted). By contrast, the Policy Notice does not impose minor changes to non-core components—it requires fundamental changes that impact the ways in which these programs were researched and found to be effective. That is not replication.

Funding under the TPP Program is available only for "programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." 138 Stat. at 671. Effective programs are eligible for "replication" because they have been vetted through HHS's rigorous Teen Pregnancy Prevention Evidence Review process. Pls.' SOMF ¶ 12 (citing OASH, *Updated Findings from the HHS Teen Pregnancy Prevention Evidence Review*,

https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-program-evaluations/tpp-evidence-review#ftn1 (last visited Sept. 15, 2025) (hereinafter OASH, *Updated Findings*)).

Defendants concede that the Policy Notice may require TPP grantees to change their programs and that those changes may prevent them from continuing to implement "replicable" programs that have been "previously demonstrated to have success at reducing teen pregnancy." Defs.' Opp. at 22. Indeed, the Policy Notice itself acknowledges that "some grantees" will have "to revise their TPP Program curricula and content," to comply with the Policy Notice. Policy Notice at 6.

Defendants further suggest that Plaintiffs may need to abandon approved and replicable projects and programs as required by Congress and select entirely different curricula from an unknown set of eligible programs in response to the Policy Notice's requirements. *See* Defs.' Opp. at 22 (explaining grantees would need to "select[] a different evidence-based program for implementation" if a program cannot be replicated consistent with the terms of their grants"). Defendants' nonchalant assertion that grantees can either revise or replace their approved programs—with no demonstrable evidence that the programs would still meet the strict requirements used to establish it initially without all of the original components—does not meet statutory requirements that grantees *replicate* programs that have been proven effective. *See Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 337 (S.D.N.Y. 2018) (explaining "proof" that a program is replicable is "what the statute requires"); *Planned Parenthood of Greater Wash. & N. Idaho*, 946 F.3d at 1113 (similar).

Defendants' argument disregards the underlying fundamental issue that Plaintiffs and other TPP grantees face if required to modify their curricula: that they are required to implement the approved programs in an accurate manner in order to comply with the *statutory* replication

requirement. *See* Pls.' MSJ at 15-17. For example, PPGNY's approved program includes lessons whose content would be required to be removed under the Policy Notice. PPGNY Decl. ¶ 44 (detailing lesson content that discusses "methods of preventing HIV, AIDS, and other [sexually-transmitted infections]," and teaches how certain "high risk sexual behaviors [ ] may result in exposure and transmission" including "exposure during anal and oral sex."). But removing those lessons would make PPGNY unable to replicate its program in accordance with the statutory requirements. *Id.* ("PPGNY cannot remove these lessons without violating the program requirement that [TPP programs] are replicated with fidelity").[4]

It is unclear which programs—or which modules or lessons of those programs—can continue to operate in compliance with the Policy Notice. While Defendants simply advocate for ad hoc revisions, they fail to address whether these revised programs will maintain their efficacy.

(i)    The Policy Notice contravenes the statutory "effectiveness" requirement.

Defendants fail to meaningfully rebut arguments that the Policy Notice's prohibition on content "that encourages, normalizes, or promotes sexual activity for minors" contravenes the statutory "effectiveness" requirement. No party disputes that the Policy Notice, on its face, prohibits any content "that encourages, normalizes, or promotes sexual activity for minors." Policy Notice at 4. But the Policy Notice and Defendants fail to delineate how one would draw the line between teaching about sexual activity and "normalizing" it.

---

[4] Defendants' suggestion that this problem could be solved by choosing a different program to replicate is wrong. For the reasons set forth in Plaintiffs' opening brief, the approved programs that could realistically satisfy the Policy Notice's requirements would amount to a small sample of primarily (if not entirely) abstinence-only programs that would not be effective for the communities Plaintiffs serve. In any event, it would be impractical for Plaintiffs to start over with a different program in the third year of their five-year programs when they have already trained staff and developed partnerships and materials that are bespoke to the programs that they have been implementing (and received funding for). *See* Pls.' SOMF ¶ 50 (discussing reliance interests).

The Policy Notice appears to favor abstinence-only sex education programs. Defendants'
response—that abstinence-only approaches are not prohibited so long as they are "effective,"
Defs.' Opp. at 22—wholly misses the point. Evidence of the ineffectiveness of abstinence-only
sex education programs was fundamental in the creation of the TPP program. Congress, HHS, and
overwhelming scientific evidence have recognized that effective sexual education requires
acknowledging the reality that some adolescents are or will become sexually active. Pls.' SOMF
¶ 41 (citing Decl. of Leslie M. Kantor Decl., PhD, MPH (Kantor Decl.) ¶¶ 20-21, ECF No. 22-3).
Evaluations of abstinence-only programs have shown limited effects on altering teen sexual
behaviors and no effect on participants' use of birth control and condoms. Pls.' SOMF ¶ 40 (citing
Kantor Decl. ¶¶ 21, 43); *see also id.* ¶ 40 ("[Abstinence only] programs are not effective in
delaying initiation of sexual intercourse or changing other behaviors." (citing John S. Santelli,
M.D., M.P.H. *et al.*, *Abstinence-Only-Until-Marriage Policies and Programs*, 61 J. ADOLESCENT
HEALTH 400, 400 (2017)). The TPP program mandate to include "effective" programming is
undermined by limiting funding only to lessons that do not "normalize[]" sex. Moreover, while
abstinence-only programs have been approved and may be effective in certain communities or
target populations, that does not mean that those programs would be effective in every
circumstance; Plaintiffs have selected programs, based on HHS's rigorous evaluation process, that
are effective to the communities they serve—communities where abstinence-only programs are
not the right approach.

Notably, Defendants suggest that educators teach lessons that "instruct on pregnancy
prevention, including contraceptive techniques" while at the same time requiring instructors to
make clear that those things are not normal in order to comply with the Program Notice. Def's
Opp. at 22. Beyond suggesting an unworkable directive, this mixed-messaging required by the

17

Policy Notice does not comport with the Congressional-mandate to fund programs that are "effective" in reducing teen pregnancies.

(ii) <u>The Policy Notice contravenes the statutory requirement that TPP programs be "medically accurate."</u>

The Policy Notice also contravenes the statutory requirement that TPP programs be "medically accurate," a term with a settled meaning both in public health practice and in related federal programs. Within the context of TPP, HHS itself previously defined "medical accuracy" to mean information "[v]erified or supported by the weight of research conducted in compliance with accepted scientific methods; and published in peer-reviewed journals, where applicable or comprising information that leading professional organizations and agencies with relevant expertise in the field recognize as accurate, objective, and complete." Policy Notice at 5; 2023 NOFO at 65, ECF No. 22-4. This definition mirrors Congress's definition of "medically accurate and complete" in another statutory scheme governing another federally funded sexual education program. *See* 42 U.S.C. § 713(e)(2). While the Policy Notice blanketly asserts that this definition, among others, "includes deficiencies," it does not identify what HHS considers to be plausibly wrong with the prior definition. Instead, the Policy Notice inserts a categorical determination that information is not "medically accurate" if it "denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females." Policy Notice at 5; *see also id.* at 1 (requiring programs to "align" with Executive Order 14168 which asserts that "[i]t is the policy of the United States to recognize two sexes, male and female" and that "women are biologically female, and men are biologically male" and "[t]hese sexes are not changeable"). In effect, the Policy Notice prohibits TPPP program participants from utilizing content and materials that acknowledges the identity of an individual that differs from one's sex assigned at birth. *See* Pls.' MSJ at 18-19. This prohibition contradicts widely available, accepted, and peer-reviewed scientific

evidence recognizing the existence of intersex and transgender individuals. *Id.*; *see* Pls.' SOMF ¶¶ 37-38.

Defendants' arguments to the contrary fail for multiple reasons. First, Defendants' argument[5] that there is no "irreconcilable conflict" between the Policy Notice and medically accurate programming, Defs.' Opp. at 23-24, ignores the plain meaning of the Policy Notice, and the EO language it incorporates: that HHS prohibits the acknowledgment of content or material that recognizes gender diversity, including the existence of intersex and transgender individuals. *See* Pls.' MSJ at 18-19; *see also Orr v. Trump*, 778 F. Supp. 3d 394, 415 (D. Mass. 2025) (recognizing that the language of EO 14168 is "candid" in rejecting the identity of transgender individuals); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 443 (D. Md. 2025) ("The Gender Identity Order, appears, however, to deny the existence of transgender persons altogether."); *Bostock v. Clayton County*, 590 U.S. 644, 653-54 (2020) (recognizing the existence of transgender individuals).

Alternatively, Defendants' attempts to characterize this conflict as mere "disagreement as to the Policy Notice's views on these issues," and then contend the agency is entitled to discretion in determining what views it considers "medically accurate." Defs.' Opp. at 24. But neither the Policy Notice nor Defendants' administrative record discuss, much less include, a *single* scientific or peer reviewed study that supports Defendants' position. Defendants cannot acknowledge the significant scientific body of evidence recognizing the existence of intersex and transgender individuals and then invoke agency discretion in defense of a position that is not rooted in the administrative record or otherwise supported by evidence described in the Policy Notice. *See*

---

[5] To the extent Defendants suggest Plaintiffs' challenge to their amended definition are not ripe until "some specific enforcement action about content in Plaintiffs' programs," Defs.' Opp. at 24, that ripeness argument fails for the reasons set forth in subpart supra I(b), *supra*.

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Accordingly, the Policy Notice contravenes Congress's mandate that TPP programming must be "medically accurate," 138 Stat. at 671, by prohibiting TPP program participants from utilizing content and material that acknowledges the identity of an individual that differs from that individual's sex assigned at birth. Nothing in Defendants' opposition explains or justifies this unlawful departure from the program's longstanding definition.

### c. The Policy Notice is Arbitrary and Capricious

The Policy Notice is also unlawful because it is arbitrary and capricious. *See* 5 U.S.C. § 706(2). Defendants' arguments fail to meaningfully rebut the obvious: the Policy Notice fails every requirement of reasoned decisionmaking: it is impermissibly vague, relies on factors Congress never intended, ignores key aspects of the problem, contradicts the evidence, and offers no sound explanation for reversing prior policy. *State Farm*, 463 U.S. at 43; *FCC v. Fox Television Stations, Inc.* (*Fox I*), 556 U.S. 502, 515 (2009).

#### (i) The Policy Notice is arbitrary and capricious because it is impermissibly vague.

Defendants fail to demonstrate that the Policy Notice is not arbitrary and capricious because it is impermissibly vague. Defendants contend that the Policy Notice merely provides "general policy guidance" and that any vagueness is cured by future enforcement discretion. Defs.' Opp. at 25-26. But this argument ignores the fundamental requirement that agencies provide standards intelligible to those subject to their regulation so that they can fairly adjust their conduct and avoid enforcement in the first place.

The Policy Notice is itself a term and condition of continued participation in the TPP Program. *See* Defs.' Opp. at 18 (acknowledging the "incorporation of [the Policy Notice's] guidance into Plaintiffs' grant awards"). And "it was arbitrary and capricious for the [agency] to issue terms and conditions so vague as to preclude compliance therewith," *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1233 (9th Cir. 2001), both as to what content the Policy Notice prohibits and as to what it means to "align" with executive orders. The D.C. Circuit has long recognized that principles of fair notice constrain agency decisionmaking. *See, e.g.*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("[A]s long ago as 1968, we recognized [the Due Process] 'fair notice' requirement in the civil administrative context."). Indisputably, agencies cannot issue vague pronouncements that both alter prior agency position and threaten funding termination without providing ascertainable standards. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations . . . it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable . . . in an enforcement proceeding . . .").

Defendants' opposition underscores that the Policy Notice leaves wide and unbridled enforcement discretion to discern what content "encourages, normalizes, or promotes" sexual activity, what constitutes "ideological" instruction, or what level of detail satisfies the new "full range of health risks" mandate. Policy Notice at 3-4. For example, Defendants' argue that the Policy Notice does not prohibit discussing sex, and that there is "space between" "'obscene, indecent, or sexually explicit content' and 'content that encourages, normalizes, or promotes sexual activity for minors,' on the one hand, and the sort of 'medically accurate' and 'age appropriate' pregnancy prevention education materials . . . on the other." Defs.' Opp. at 28. But

Defendants do not even attempt to identify where HHS draws the line. Under the APA, it is "*necessary* to give guidance on how the [agency] is likely to apply the [rule] in future instances." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 526 (8th Cir. 2024) (emphasis added). Providing "*examples* of the types of conduct that *might* be deemed to 'promote[] sexual activity for minors,'" Defs.' Opp. at 26 (emphases added), does not cure this fundamental defect.

Despite the Policy Notice identifying "concern[s]" about certain definitions the agency previously used, Defendants further contend that it did not "*completely* repudiate prior program definitions" and that it instead "merely note[d] that these terms 'should not be construed to exceed the statutory scope of the TPP program[.]'" Defs.' Opp. at 28, 31 (emphasis added). That does not help their case. The Policy Notice provides program participants no guidance whatsoever to determine which program materials "the prior administration erred in approving" or whether an individual participant is among those who may be "require[d] … to revise their TPP Program curricula and content," while threatening participants with harsh sanctions for noncompliance with these requirements. *See id.*; Policy Notice at 5-6.

Next, Defendants improperly attempt to evade the vagueness issues relating to the "opt out" requirement by noting that the Supreme Court's decision in *Mahmoud* "was decided just days prior to the deadline for granting Plaintiffs' continuation awards." Defs.' Opp. at 26. Yet, in the intervening months Defendants still have failed to issue any further guidance on how to satisfy this requirement. Defendants were swift to adopt a hazy requirement but have still failed to provide Plaintiffs and other TPP program participants with information as to how the agency will enforce such obligations. Separately, Defendants fail to address the Policy Notice's invocation of *Mahmoud* beyond the contours of an opt-out mechanism to prohibit LGBTQ+-inclusive content

or how HHS will enforce this prohibition. *See* Policy Notice at 5 ("The statute does not . . . authorize teaching minors about" "ideological content such as the content at issue in *Mahmoud*").

Finally, the Policy Notice also invites arbitrary and discriminatory enforcement by granting officials unchecked discretion to determine whether a grantee's project sufficiently "aligns" with Executive Orders. In contending otherwise, Defendants conflate the terms "align" and "comply," asserting that the new alignment requirement merely echoes existing grantee obligations to *comply* with Executive Orders. *See* Defs.' Opp. at 2, 27. That claim directly contradicts Government counsel's statement in prior TPP Program litigation that program participants must "'align' or 'comport' [their] project[s] with the *policy goals* set by the President through executive orders." Hearing Tr. 53:2-8, *PPGNY v. HHS*, No. 25-1334 (D.D.C. June 4, 2025). And it makes no sense given that Executive Orders—including those cited in the Policy Notice—typically govern the conduct of federal agencies and themselves impose no obligations on private parties with which they can "comply." Separately, the Policy Notice exceeds the substance of existing orders. For example, no Executive Order mentions birth control risks or prohibits grantees from normalizing sexual activity. These vague standards create uncertainty so severe that Plaintiffs must either overcomply or risk arbitrary enforcement—grantees have no way to judge whether, in the agency's view, their programs sufficiently align with the President's policy goals. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way . . . [and] to ensure that ambiguity does not chill protected speech.").

     (ii)    The Policy Notices relies on factors not intended by Congress.

Defendants fail to demonstrate that the Policy Notice does not rely on factors not intended by Congress. Defendants contend that prohibiting certain "ideological" content is justified because the statute does not mention ideologies. Defs.' Opp. at 26-28. This circular argument disregards

the language of the statute, which does not identify *any* specific topics that TPP Program curricula should or should not include. 138 Stat. at 671. The statute's omission of any reference to ideological preference means that purported "ideological" valence was *not* a factor Congress authorized the agency to consider. *Cf. Nebraska v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) (holding that an agency action violates the APA when the action relied on political directives not authorized by statute). Instead, Congress made a deliberate choice to pursue *evidence-based* social policy initiatives through its tiered evidence approach. Pls.' SOMF ¶ 16 (citing Tollestrup, *supra*, at 4). And Defendants' position ignores that inclusive, medically accurate content is essential to program efficacy, as HHS itself recognized in issuing the NOFO and approving Plaintiffs' programs. *See, e.g.,* Pls.' SOMF ¶ 21 (noting that the NOFO solicited applications for programs that were "culturally and linguistically appropriate, trauma-informed, and inclusive of all youth" (quoting 2023 NOFO at 11)). Nowhere does the statute authorize HHS to instead allocate or withhold funds based on its content preferences that undermine or jeopardize the program's effectiveness. In doing so, the agency exceeded the "small range of choices" Congress allowed it. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

(iii)    <u>The Policy Notice fails to consider an important aspect of the problem.</u>

The Policy Notice is also arbitrary and capricious because the agency "ignore[d]" the most "important aspect of the problem" before it: effective prevention of teen pregnancy. *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43). Effective sex education requires discussing sex, *see* Pls.' SOMF ¶¶ 40-41, which necessarily in some way, normalizes sex. Defendants argue that there is space between banning discussions of sex and normalizing sex, Defs.' Opp. at 28. But, as discussed above, this only adds to the Policy Notice's vagueness, another important aspect of the problem Defendants failed to consider. *See Timpinaro v. SEC*, 2 F.3d 453,

460 (D.C. Cir. 1993), *as amended on denial of reh'g* (Nov. 9, 1993) (remanding rule where "the SEC Order adopting the Rule manifests no concern about its possible vagueness").

Furthermore, Defendants do not address how HHS's changes to the definitions of "health equity" and "inclusivity" might further the TPP Program's evidence-based goals. *See* Policy Notice at 4-5. This argument ignores the reality that teens from diverse backgrounds still need effective education. *See also, e.g.*, Pls.' SOMF ¶ 45 ("Cultural and linguistic appropriateness is essential to ensure that programs meet the needs of youth who, in a country as large and varied as the United States, come from different settings (*e.g.*, rural, suburban and urban), cultural backgrounds, and may or may not speak English as a first language." (quoting Kantor Decl. ¶ 54)). Indisputably, teens of different backgrounds and gender identities can become pregnant; thus, excluding inclusive content does not further Congress's goal of preventing teenage pregnancy.

Finally, in issuing the Policy Notice, HHS entirely failed to account for the substantial reliance interests at stake, much less explain why its new content mandates should override them. Program participants including Plaintiffs, have operated their programs for *years* using the specific programs that HHS approved, investing staff time and financial resources into developing and implementing those curricula. *See* Pls.' SOMF ¶¶ 46-47, 50. Changing course now would upend their programs midstream, requiring Plaintiffs to invest in developing new programming and retraining their staff. On this point, HHS tries to have it both ways in its opposition. On one hand, the agency blanketly asserts that it did consider reliance interests but that those were outweighed by what it now considers the scope of the statutory requirements of the TPP Program. Defs.' Opp. at 29. On the other hand, the agency asserts it "*could*, in the context of an enforcement action, consider the reliance interests of specific grantees and adjust its enforcement approach to account for those interests." *Id.* (emphasis added). The inconsistency is clear—either the statute ties its

hands or it does not. In any event, Defendants have now produced the administrative record, which reflects no consideration of any reliance interests. "That omission alone renders [the Policy Notice] arbitrary and capricious." *DHS v. Regents of the Univ. of Cali.*, 140 S. Ct. 1891, 1913, (2020).

(iv)    <u>The Policy Notice's explanation runs counter to evidence.</u>

Courts do "not hesitate to vacate" agency action "when the agency has not responded to empirical data or to an argument inconsistent with its conclusion." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). Such is the case here. Defendants state that "the Policy Notice nowhere takes a position on the effectiveness of programs that are currently available for replication in the TPP Program." Defs.' Opp. at 30. But they decline to grapple with the inherent contradiction in requiring the replication of effective and medically accurate sex education programming—which the agency has already approved and the statute requires—while simultaneously banning the normalization of sex and requiring medically inaccurate programming. Defendants evade this issue by arguing that Plaintiffs cannot rely on "outside-the-record sources." *Id.* That is beside the point, because the administrative record does not support the Policy Notice's conclusions. By definition, the administrative record must contain all documents and materials directly or indirectly considered by the agency in reaching its decision. *See City of Duluth v. Jewell*, 968 F. Supp. 2d 281, 287 (D.D.C. 2013) ("Courts in this Circuit have interpreted the whole record to include all documents and materials that the agency directly or indirectly considered and nothing more nor less." (cleaned up)). Yet here, the record does not include *any* peer-reviewed articles, program evaluation data, or internal agency memoranda or communication explaining why previously approved curricula are suddenly deficient. *See* Certification of the Admin. Record, ECF No. 23-1. Instead, the administrative record is comprised of the Policy Notice itself, HHS's press release about the Policy Notice, the 2023 NOFO and application guidance, another Policy Notice, and Plaintiffs' applications and notices of award, unaccompanied by any evidence that could justify

26

the stark departure from prior positions. *See id.* The absence of any supporting evidence demonstrates that the agency acted not on reasoned analysis, but on its own ipse dixit.

The lack of evidentiary support for HHS's conclusions is especially stark given that the agency itself has touted its pre-Policy Notice, evidence-based curriculum review standards as "the 'gold standard' in evaluation research," and until now has never even suggested otherwise. HHS, *ASPE Research Brief: Making Sense of Replication Studies*, at 1 (May 2015), https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//55351/rb_TPP_Replication.pdf. For over a decade, HHS has approved and funded curricula under the TPP Program based on systematic reviews and rigorous evaluation akin to peer review, which often involves rigorous controlled trials. Pls' SOMF ¶¶ 12-15 (citing OASH, *Updated Findings*, at 1). Those materials consistently demonstrated that comprehensive, inclusive sex education is effective in reducing teen pregnancy and associated risk behaviors. *Id.* ¶¶ 14, 40-41, 43-44. The Policy Notice, however, now asserts that the agency "erred" in approving some of those programs. Policy Notice at 5-6. Yet the administrative record fatally omits any studies or evidence suggesting that these programs are ineffective or contrary to Congress's mandate. As the Supreme Court has explained, agencies "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). Here, the agency not only failed to analyze the evidence, it did not examine any evidence at all. The Policy Notice is also arbitrary and capricious on that ground.

(v)    <u>HHS has failed to justify its abrupt change in position.</u>

At the same time that Defendants contend the Policy Notice merely clarifies the scope of the statutory requirements governing the TPP program, they also assert entitlement to deference on the grounds that "new administrations are entitled to reevaluate and modify agency practices."

27

Defs' Opp. at 30. But that principle has limits. Under *Fox I*, an agency must do more than gesture at policy preferences: when it changes a settled interpretation, it must "display awareness that it is changing position" and provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." 556 U.S. at 515-16. The Policy Notice fails this requirement.

HHS fails to explain its reversal of statutory interpretation. For years, HHS, across various administrations, reaffirmed its approval of the curricula at issue, based on the TPP Program's longstanding evidence-based review process and established programmatic definitions. Plaintiffs and other grantees built projects predicated around these approvals, in reliance on the agency's prior view that such content was consistent with Congress's mandate. The Policy Notice, however, abruptly changes the agency's policies by introducing vague prohibitions on "ideological content" or "normalizing sexual activity"—without appropriately justifying the reversal. This is not a case of new data prompting a re-evaluation of such content: for example, the administrative record does not include studies or evidence that inclusive programming is not effective in preventing teenage pregnancy. Nor do Defendants identify any studies relied upon by HHS in support of the proposition that it was appropriate or rational to include a disclosure of "full range of health risks" of birth control in an educational (as opposed to clinical) setting. Indeed, there are no studies or evidence in the administrative record at all.[6] The APA does not permit an agency to simply change

---

[6] It is well-settled that agencies "bear the responsibility of compiling an administrative record" that must include all of the information that the agency considered "'either directly or indirectly.'" *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 151 F. Supp. 3d 1, 12 (D.D.C. 2015), *on reconsideration*, 164 F. Supp. 3d 56 (D.D.C. 2016) (quoting *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010)). While summary judgment can and should be granted for Plaintiffs on their APA claims based on the pure legal issues and scant administrative record alone, the Court can also look beyond the threadbare administrative record in assessing the arguments above. *See, e.g.*, *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156-57 (D.D.C. 2012) (noting that extra-record

its mind absent a reasoned explanation. *See State Farm*, 463 U.S. at 43 ("agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made"); *Fox I*, 556 U.S. at 515 ("An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books.").

### III.  The Policy Notice Violates the Fifth Amendment Because it is Unconstitutionally Vague.

Defendants contend that Plaintiffs' Fifth Amendment claim is barred because "'courts have resisted' applying 'due process principles to government contracts' outside 'the employment context' due to the lack of a constitutionally protected property interest in the fulfillment of such contracts." Defs.' Opp. at 32 (citation omitted). As explained in Plaintiffs' motion for summary judgment, ECF No. 22-1 at 35, that position overlooks the expectation created by the TPP regulations and the historical implementation of the TPP Program, which set an expectation that continuation funding will be available for the remainder of the ongoing grant term. *See Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("'[P]roperty' denotes a broad range of interests that are secured by 'existing rules or understandings.' A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972))).

The TPP Program application provides a two-step funding process whereby Plaintiffs' projects are first evaluated and approved for funding for a five-year period, then in the second step, the funds are drawn down as continuation funding on an annual basis. *See* Pls.' SOMF ¶¶ 17-23.

---

evidence is appropriate "when the agency failed to examine all relevant factors" and "when the agency failed to explain adequately its grounds for its decision").

Having completed the first step and received program approval for the five-year "project period" during which Defendants stated that they "intend[ed] to support the project without requiring the project to recompete for funds," 45 C.F.R. § 52.6(c); Pls.' SOMF ¶ 19, Plaintiffs reasonably expected that they would be entitled to funding at least through the five-year period. Plaintiffs "have more than an abstract need or desire for" the TPP Program to provide their *approved* program funds at least through that term; indeed, Plaintiffs "have more than a unilateral expectation of" continued funding—they have a protected property interest in the continuation funding. *Roth*, 408 U.S. at 577; *see also Goss v. Lopez*, 419 U.S. 565, 574 (1975) (finding students entitled to continuing receipt of a government-provided free "education as a property interest which is protected by the Due Process Clause and which may not be taken away . . . without adherence to the minimum procedures required by that Clause.").

For the reasons set forth in Plaintiffs' opening brief and subpart 2(c)(i), *supra*, the Policy Notice is unconstitutionally vague because it so standardless that it invites arbitrary and discriminatory enforcement in violation of Plaintiffs' due process rights.[7] *See United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (explaining that when a regulation is "so standardless that it invites arbitrary enforcement," it offends due process (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).

## IV.    The Policy Notice is *Ultra Vires*

*Ultra vires* review is available where, as here, "there is no express statutory preclusion of all judicial review," "there is no alternative procedure for review" available, and the agency action at issue deliberately exceeds delegated powers and violates a "clear and mandatory" statutory

---

[7] Defendants contend that "the Court cannot entertain [Plaintiffs' constitutional vagueness] claim absent a final agency action." Defs.' Opp. at 32 (citing 5 U.S.C. § 704; *id.* § 706(2)(b)); however, as discussed more fully in subsection II (a), *supra*, the Policy Notice is a final agency action.

provision. *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). As explained above and in Plaintiffs' opening briefing, the statute provides a "clear and specific statutory mandate involving positive statutory commands." *N.Y. v. Biden*, 636 F. Supp. 3d 1, 20 (D.D.C. 2022) (citations and quotation marks omitted), *opinion clarified*, No. 20-CV-2340 (EGS), 2023 WL 3311788 (D.D.C. Mar. 6, 2023). The Policy Notice disregards the statute's express replication, effectiveness, and "medically accurate" requirements—each of which "plainly delineate[] the outer limits of agency authority." *Id*. HHS's willful failure to meet these requirements is not a "mere legal or factual error," *Fed. Express Corp.*, 39 F.4th at 764, or a "valid[] exercise[e of] its judgment," *N.Y.*, 636 F. Supp. 3d at 26, precluding *ultra vires* review. To the contrary, the Policy Notice is an "extreme agency error . . . so clearly in defiance" of HHS's statutory authority that it "warrant[s] immediate intervention of the equity court." *Fed. Express Corp.*, 39 F.4th at 764 (cleaned up).

Moreover, Defendants' claim that alternative review is available ignores that Plaintiffs challenge the Policy Notice itself. An enforcement action—Defendants' proposed "alternate avenue . . . to pursue relief"—concerns a wholly different agency act and does nothing to remedy the injury caused by the Policy Notice or provide a meaningful opportunity to contest its validity. Defs.' Opp. at 33. The APA has been construed for decades as available even where a litigation could raise the same arguments against a final agency action as a defense in an enforcement proceeding. Because the Policy Notice itself exceeds statutory limits and directly injures Plaintiffs, judicial review of the Policy Notice is both necessary and proper.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for summary judgment

and deny Defendants' cross motion to dismiss Plaintiffs' complaint.

Dated: September 19, 2025                              Respectfully submitted,

                                          By:    */s/ Andrew T. Tutt*
                                                 Drew A. Harker (DC Bar # 412527)
                                                 Andrew T. Tutt (DC Bar # 1026916)
                                                 Bonnie E. Devany (*pro hac vice*)*
                                                 Daniel Yablon (DC Bar # 90022490)
                                                 John V. Hoover (DC Bar # 90006181)
                                                 ARNOLD & PORTER KAYE SCHOLER LLP
                                                 601 Massachusetts Avenue, NW
                                                 Washington, DC 20001
                                                 (202) 942-5000
                                                 drew.harker@arnoldporter.com
                                                 andrew.tutt@arnoldporter.com
                                                 bonnie.devany@arnoldporter.com
                                                 daniel.yablon@arnoldporter.com
                                                 jack.hoover@arnoldporter.com

                                                 Emily Nestler (DC Bar # 973886)
                                                 PLANNED PARENTHOOD FEDERATION OF
                                                 AMERICA
                                                 1100 Vermont Avenue NW
                                                 Washington, DC 20005
                                                 (202) 973-4800
                                                 emily.nestler@ppfa.org

                                                 Valentina De Fex (*pro hac vice*)
                                                 Melissa Shube (DC Bar # 241034)
                                                 PLANNED PARENTHOOD FEDERATION OF
                                                 AMERICA
                                                 123 William Street, 9th Floor
                                                 New York, NY 10038
                                                 Phone: (212) 261-4696
                                                 valentina.defex@ppfa.org
                                                 melissa.shube@ppfa.org

---

* *Admitted only in Texas; practicing in D.C. pursuant to D.C. Ct. of Appeals R. 49(c)(8), under supervision of D.C. Bar Members.*