# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PLANNED PARENTHOOD OF GREATER
NEW YORK, *et al.*,

            *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

            *Defendants*.

Case No. 1:25-cv-02453-BAH

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

I.      Plaintiffs Lack Standing To Assert Their Claims ................................................ 1

II.     Plaintiffs' Claims Are Not Ripe For Review ....................................................... 5

III.    Plaintiffs Seek To Enforce An Obligation To Pay, And Such Claims Belong In the
        Court Of Federal Claims, Not This Court ........................................................... 6

IV.     Plaintiffs Have Not Raised Appropriate APA Claims. ........................................ 7

        A.      The Policy Notice Is Not Final Agency Action. ..................................... 7

        B.      The Policy Notice Is Not Contrary To Law ......................................... 11

        C.      Plaintiffs Fail To State A Fifth Amendment Claim .............................. 13

V.      Plaintiffs' Ultra Vires Claim Should Be Dismissed .......................................... 14

CONCLUSION ....................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ............................................................................................. 7

*Ass'n of Irritated Residents v. EPA,*
  494 F.3d 1027 (D.C. Cir. 2007) ........................................................................... 9

*Bennett v. Panama Canal Co.,*
  475 F.2d 1280 (D.C. Cir. 1973) ........................................................................... 9

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................................... 10

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ......................................................................................... 2, 5

*Columbia Broadcasting Sys. v. United States,*
  316 U.S. 407 (1942) ............................................................................................. 7

*Corbett v. TSA,*
  19 F.4th 478 (D.C. Cir. 2021) ............................................................................. 3

*Ctr. For Auto Safety v. NHTSA,*
  452 F.3d 798 (D.C. Cir. 2006) ........................................................................... 10

*Griffith v. Fed. Lab. Rels. Auth.,*
  842 F.2d 487 (D.C. Cir. 1988) ........................................................................... 14

*Indep. Equip. Dealers Ass'n v. EPA,*
  372 F.3d 420 (D.C. Cir. 2004) ........................................................................... 10

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
  780 F. Supp. 3d 135 (D.D.C. 2025) ..................................................................... 9

*Matthew A. Goldstein v. U.S. Dep't of State,*
  854 F.3d 1 (D.C. Cir. 2017) ................................................................................. 7

*Nat'l Min. Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014) ........................................................................ 9, 10

*Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales,*
  468 F.3d 826 (D.C. Cir. 2006) ............................................................................. 5

*Nat'l Treas. Emps. Union v. Vought,*
  --- F. 4th ----, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ............................... 8

*NIH v. Am. Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025) ......................................................................................... 6

*New Vision Photography Program, Inc. v. Dist. of Columbia,*
    54 F. Supp. 3d 12 (D.D.C. 2014) ........................................................................ 14

*State Nat'l Bank of Big Spring v. Lew,*
    795 F.3d 48 (D.C. Cir. 2015) ............................................................................... 3

**Statutes**

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, 138 Stat. 460 (2024) ........................................................... 11

**Rules**

Federal Rule of Civil Procedure 12 .............................................................. 1, 5, 11, 14

**Regulations**

45 C.F.R. § 75.210 (2016) .................................................................................... 2

**Other Authorities**

Amy Feldman Farb & Amy L. Margolis, *Teen Pregnancy Prevention Program (2010-2015):*
*Synthesis of Findings,*
    106 Am. J. Pub. H. S9 (2016) ........................................................................ 12, 13

HHS, Grants Policy Statement 20 (Oct. 2024),
    https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024-
    archived.pdf ......................................................................................................... 4

**INTRODUCTION**

In their opening brief, Defendants—the U.S. Department of Health & Human Services, and Secretary Robert F. Kennedy ("HHS")—explained that Plaintiffs—who received Tier 1 Teen Pregnancy Prevention Program ("TPP Program") grants—have failed to demonstrate jurisdiction or a cause of action for their challenge to the "OASH Teen Pregnancy Prevention Program Policy Notice," or "Policy Notice," ECF No. 22-9, such that dismissal of this action is appropriate. Plaintiffs' responsive brief fails to address these concerns. They argue they face the prospect of imminent harm to their programs as a result of the Policy Notice such that they have Article III standing, but Plaintiffs have not even accepted the terms of their Year 3 TPP Program grants that were issued to them such that they have any legal obligations arising from those continuation grants, and there is no imminent prospect of HHS taking the steps required under its regulations to bring any enforcement action against Plaintiffs related to the Policy Notice. They argue that their case belongs in District Court, when it is not seeking mere vacatur, but relief that would require HHS to remit Plaintiffs' grant monies on terms of Plaintiffs' liking, such that it belongs in the Court of Federal Claims. And they argue that the Policy Notice is a reviewable final agency action, even though Plaintiffs have not drawn down their Year 3 TPP Program funds, HHS has not taken any steps to initiate enforcement action, and the Policy Notice does not circumscribe HHS's discretion as to whether, when, and how it chooses to pursue any enforcement actions against TPP Program grantees. The Policy Notice is also consistent with the TPP Program statute, and Plaintiffs fail to state valid challenges to the Policy Notice on a Fifth Amendment or *ultra vires* theory.

For these reasons, and the reasons set forth in HHS's opening brief, the Court should grant HHS's motion pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and dismiss this case.

## I.     Plaintiffs Lack Standing To Assert Their Claims

Defendants showed in their opening brief that Plaintiffs lack standing to press claims based on a guidance document issued in conjunction with their Notices of Award before HHS has taken any steps to apply that guidance to a specific program. Defs.' Memo. ISO MTD & Opp. To MSJ

1

("Defs. Br.") 11–13, ECF No. 24. Plaintiffs dutifully walk through the three-factor standing test in their opposition brief, arguing that "longstanding precedent allow[s] challenges to agency rules and regulations before any enforcement action is commenced." Pls.' Combined Resp.-Rep. Br. ("Pls.' Br.") 3–7, ECF No. 28. Sometimes, but not always. Pre-enforcement actions, like any other civil action, must satisfy the minimum requirements of Article III standing. That includes the requirement of a "concrete, particularized, and actual or imminent" injury in fact, one that is "certainly impending" and "not too speculative." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted). This pre-enforcement action fails to meet that standard.

In *Clapper*, the Supreme Court clarified what sorts of pre-enforcement actions may be heard in federal court. The plaintiffs in *Clapper* were "attorneys and human rights, labor, legal, and media organizations" who "believe[d] that some of the people with whom they exchange[d] foreign intelligence information" were "likely targets of surveillance" under newly enacted federal laws expanding surveillance authority. *Id.* at 404, 406. The district court and court of appeals ruled in favor of plaintiffs, concluding they had "standing due to the objectively reasonable likelihood that their communications will be intercepted at some time in the future." *Id.* at 407. The Supreme Court did not contest this finding, but nonetheless reversed the legal conclusion of the Second Circuit by holding that an "objectively reasonable likelihood" standard was "inconsistent" with the injury-in-fact requirement of Article III. *Id.* at 410. That was because plaintiffs could only "speculate and make assumptions about whether their communications with their foreign contacts will be acquired." *Id.* at 411. And plaintiffs could not bridge the gap by "asserting that they suffer present costs and burdens that are based on a fear of surveillance." *Id.* at 416.

So too here. Plaintiffs challenge a general guidance document that explains the agency's understanding and interpretation of both the TPP Program appropriation and of recent executive orders and Supreme Court decisions that have a bearing on the program, all of which have long governed Plaintiffs' grant instruments. *See* 45 C.F.R. § 75.210(b)(1)(ii) (2016); *id.* 75.300(a), (d) (2024). The Policy Notice is intended to clarify OASH policy for TPP Program grantees. Despite Plaintiffs adjusting their proposed programs in light of the March guidance, and receiving Notices

2

of Award for continuation funding of those programs through July 2026,[1] Plaintiffs assume (1) that the Policy Notice targets specific content in their programs, (3) that HHS will in fact take enforcement action to target those programs for reasons outlined in the Policy Notice; and (3) that the actions HHS proposes will impose unacceptable burdens on Plaintiffs' ability to conduct those programs consistent with the law. None of those things have happened, and Plaintiffs cannot accelerate the process by unilaterally depriving themselves of funding in lieu of any actual enforcement by HHS.

Plaintiffs' authorities underscore the disconnect between the law regarding standing for pre-enforcement actions and this case. In *Corbett v. TSA*, 19 F.4th 478 (D.C. Cir. 2021), the plaintiff was "a frequent flyer," and he challenged TSA's authority to issue a directive that all travelers on commercial aircraft wear a mask during flight. *Id.* at 483. Likewise, in *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015), the plaintiff bank was indisputably subject to regulation by the Consumer Financial Protection Board—a board that it deemed to be unconstitutional—and the D.C. Circuit found standing to bring several constitutional challenges against the Board. *Id.* at 316–18. In both cases, the injury—wearing a mask on a plane, being regulated by an unconstitutional entity—was certainly impending in a way the prospect of enforcement action here is not. By contrast, in *Big Spring*, the D.C. Circuit found no standing over the plaintiff's challenge to a provision of the Dodd-Frank Act based on a diminution in the value of their investments in certain companies due to the "possible future liquidations or reorganizations" of those companies. *Id.* at 319. That speculative type of harm arising from as-yet-untaken enforcement actions is more analogous to Plaintiffs' circumstances in this case.

The record facts only confirm the shortcomings of Plaintiffs' complaint. Plaintiffs argue that they are subjected to a Hobson's choice: accept the terms of their Notices of Award and the potential for future enforcement actions by drawing down funds, or refuse to accept the terms and

---

[1] Ex. C, Stark Decl. ¶¶ 23–25, ECF No. 22-5; Ex. D, Tosh Decl. ¶¶ 36–39, ECF No. 22-6; Ex. E, Cole Decl. ¶¶ 22–24, ECF No. 22-7.

decline federal funding.[2] Pls.' Br. 5. But neither choice gives rise to standing.

As to the first possibility, a potential enforcement action is a risk for every grantee that accepts an award from the government, and grant recipients do not have standing to challenge every term and condition of their grant simply because they might be found in breach of it and the awarding agency might take action to remedy that hypothetical breach. That sort of enforcement risk would exist for Plaintiffs if the Policy Notice had not been issued at all and HHS had chosen to proceed by case-by-case adjudication against grantees. It would also exist if the Policy Notice had been issued only as a stand-alone document instead of being copied into the text of Plaintiffs' Notice of Award. Plaintiffs received their grant awards after applying for continuation funding despite making an explicit protest in their applications regarding compliance with executive orders in the March 2025 update to the Non-Competing Continuation Award Application Guidance, and HHS has not taken enforcement action against any TPP Program grantee to date. Even if one assumes HHS is reasonably likely to act against Plaintiffs' programs in the future (the same standard the lower courts relied upon in *Clapper*), that action is not "certainly impending" and Article III standing does not exist for Plaintiffs to challenge the possibility it might occur.

The second possibility also fails to amount to an injury in fact. "Once accepted, the contents of [a notice of award] are binding," and "[t]he recipient accepts an award by drawing down funds." HHS, Grants Policy Statement 20 (Oct. 2024), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024-archived.pdf. But Plaintiffs have not drawn down money pursuant to the Year 3 Notices of Award issued to them, so the terms of those awards do not bind them, and Plaintiffs do not qualify for pre-enforcement review of rules to which they are not subject. Plaintiffs cannot make up for the lack

---

[2] Defendants' opening brief included a declaration from an HHS official asserting that two of the three Plaintiffs in this case had drawn down funds on their current TPP Program awards. In light of a review of Plaintiffs' supporting declarations attached to their response-reply brief and HHS's records, HHS determined that it did not have access to records which accurately reflected the program year from which Plaintiffs drew down these funds. Plaintiffs are correct that they have yet to draw down their Year 3 TPP Program grant funding. For a more detailed explanation, see the declaration of Eric West attached to this brief.

of an Article III injury by imposing on themselves the penalty they believe HHS will impose upon them if they accept grant funding, even if their action is "based on a nonparanoid fear" of enforcement. *Clapper*, 568 U.S. at 416; *Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.").

In sum, Article III standing for pre-enforcement review is unavailable here. Plaintiffs' purported injuries are not sufficiently imminent to give rise to Article III standing, even if one concedes their fears of injury are reasonable. Until those fears ripen into a certainly impending injury, standing does not exist, and Defendants' motion should be granted pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.      Plaintiffs' Claims Are Not Ripe For Review

Plaintiffs do not meet the requirements of constitutional ripeness for the same reason they fail to meet the "injury in fact" standard. And as discussed in Defendants' opening brief, Defs.' Br. 13–14, prudential ripeness also counsels in favor of dismissal. Plaintiffs' response brief underscores why it would be appropriate for the Court to delay review. They contend their vagueness claims "turn only on the text of the Policy Notice itself," such that "no factual development is necessary," Pls.' Br. 8, but the Policy Notice imposes no consequences on Plaintiffs in isolation. The Court's analysis of HHS's management of the TPP Program would be greatly assisted by an enforcement action that applies HHS's legal and policy concerns about the TPP Program to an actual grant program. Waiting would also allay any vagueness and notice concerns, crystalize the dispute over whether HHS is truly imposing requirements on the program that violate the statute, and allow HHS to provide more fulsome reasoning for any decisions it makes as to particular materials to supplement the more general reasoning provided in a document addressed to dozens of Tier 1 TPP Program grantees. Accordingly, the Court should dismiss this case as not ripe.

**III.      Plaintiffs Seek To Enforce An Obligation To Pay, And Such Claims Belong In the Court Of Federal Claims, Not This Court**

Plaintiffs proclaim that "cases like this one belong in federal district court under the APA." Pls.' Br. 8–9. But Plaintiffs cannot fit their case within the exception Justice Barrett identified for vacatur of "guidance" documents because (1) as explained above, the guidance at issue here does not give rise to Article III standing, and (2) as explained below, the guidance at issue here is not final agency action, an issue Justice Barrett explicitly reserved in her concurrence to *NIH v. Am. Pub. Health Ass'n* ("*APHA*"), 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring).

Plaintiffs further assert that *APHA* does not apply because HHS "has not terminated their grants," and their request to vacate the Policy Notice is separate and distinct from an attempt to seek relief to enforce an obligation to pay on a contract because it "causes Plaintiffs current harm independent of future grant terminations." Pls.' Br. 8–9. But this legal question is not determined by the fact that "HHS has not terminated [Plaintiffs'] grants." *Id.* at 9. In *APHA*, the Supreme Court held that the APA "does not provide the District Court with jurisdiction to adjudicate claims 'based on' . . . research-related grants *or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants*." *APHA*, 145 S. Ct. at 2659 (emphasis added). A proper vacatur action does not raise such concerns, as it would not inhibit the agency's freedom to operate, so long as the agency does not expressly rely upon the vacated agency action.

But Plaintiffs' suit, while styled as one for "vacatur," seeks to do more. The "current harm" that anchors Plaintiffs' theory of standing is an alleged constructive denial of their grant funding caused by the imposition of grant conditions that are, according to Plaintiffs, impossible to accept. Pls. Br. 5. As Plaintiffs have framed the case, vacating the Policy Notice will allow them to once again accept TPP Program grant money, enforcing the government's alleged obligation to fund the TPP Program as though it were frozen in amber in 2023. That is apparent from their complaint, which seeks not mere vacatur, but an injunction preventing HHS "from implementing, maintaining, or giving effect *to the new requirements in the [Policy Notice]*," not just the Policy Notice itself. Compl., Prayer for Relief at e, ECF No. 1 (emphasis added). There is no substantive

distinction between this action and one to restore a terminated grant, and the jurisdictional reach of the Tucker Act is broad enough to overcome Plaintiffs' efforts to avoid the Court of Federal Claims.

**IV.    Plaintiffs Have Not Raised Appropriate APA Claims.**[3]

**A.    The Policy Notice Is Not Final Agency Action.**

Defendants' initial memorandum explained that HHS has not applied the Policy Notice to Plaintiffs, such that HHS could be said to have reached the consummation of its deliberative process and taken actions from which legal consequences flow. Defs.' Br. 17–20. Even if the Court concludes Plaintiffs meet the minimum requirements of Article III standing and ripeness, Plaintiffs fall well short of establishing a final agency action this Court has authority to review pursuant to the APA.

The overarching theme of Plaintiffs' response, much like their response to Defendants' arguments on standing, is that Defendants are wrong to assert that "the Policy Notice is nonfinal because the agency has not yet enforced it." Pls.' Br. 10. This misstates Defendants' argument. It is certainly true that there are some agency actions that are "final" before the agency takes enforcement steps. The axiomatic example of this is a final rule promulgated after notice and comment, which was the agency action at issue in *Abbott Labs. v. Gardner*, 387 U.S. 136, 138 (1967). *See also Columbia Broadcasting Sys. v. United States*, 316 U.S. 407, 408 (1942) (challenging an order of the Federal Communications Commission that "promulgated regulations" regarding licenses for broadcasting stations); *Matthew A. Goldstein v. U.S. Dep't of State*, 854 F.3d 1, 4 (D.C. Cir. 2017) (challenging "regulations governing arms brokering").

But this case does not involve an agency action even vaguely resembling an informal rulemaking. Rather, the Policy Notice is a guidance document, "a nonbinding statement of

---

[3] HHS moved to dismiss Plaintiffs' arbitrary and capricious claims on jurisdictional grounds and on the basis that the Policy Notice is not reviewable final agency action. As such, this reply brief in support of HHS's motion to dismiss does not address Plaintiffs' response-reply brief on the merits of the arbitrary and capricious issues. Those merits issues were addressed by HHS in opposing Plaintiffs' motion for summary judgment.

something the agency intends to do in the future" that has "no immediate effect," and Plaintiffs "must await further agency actions implementing" the Policy Notice before they can challenge it, such as an enforcement action. *Nat'l Treas. Emps. Union v. Vought*, --- F. 4th ----, 2025 WL 2371608, at *8 (D.C. Cir. Aug. 15, 2025). Guidance documents are not categorically outside the definition of "final agency action," but they are only challengeable when "such items . . . impose standards that the agency treats as binding." *Id.* The Policy Notice, at most, states that grantees "may face grant suspension . . . and grant termination" and other potential corrective measures for failure to comply with the terms and conditions of their grants. Policy Notice at 5–6. But HHS did not specifically state that it would pursue enforcement actions against Plaintiffs or any other TPP Program grantee, and did not limit its enforcement discretion at all. Indeed, after reviewing their under-protest applications, which included modifications to their programs, HHS issued Notices of Award to Plaintiffs, demonstrating its continued flexibility even as it considers changes to the TPP Program. Plaintiffs make three other specific arguments regarding final agency action that play on variations on their misunderstanding of which agency actions can be challenged prior to an enforcement action and which cannot. None has merit.

First, Plaintiffs argue that they "are not required to incur liability prior to initiating suit," placing heavy reliance on *Abbott Labs*. Pls.' Br. 10–11. Plaintiffs are not being asked to do that. The Policy Noice is an interim step on the road to consummation of the agency's decision-making process. Although *Abbott Labs* creates a pathway for facial challenges to the products of notice-and-comment rulemaking, no such action is at issue here.

Second, in an attempt to skirt the problems with their theory of final agency action, Plaintiffs contend that the "Policy Notice is a legislative rule" because it "purports to create binding obligations or prohibitions." Pls.' Br. 11–12. That is wrong. To begin with, no Plaintiff has drawn down funds pursuant to its Notice of Award, and so Plaintiffs cannot maintain that any sort of legally binding relationship currently exists between themselves and HHS with regard to their Year 3 continuation funding. But even if Plaintiffs had accepted the Notices of Award by drawing down funds, the Policy Notice is not final agency action. "[W]hile legislative rules 'may be subject to

pre-enforcement review[,]' guidance may not." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 175 (D.D.C. 2025) (quoting *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (Kavanaugh, J.)). And as explained above, the Policy Notice is a guidance document, not a legislative rule, because it "provides a general statement of policy" and, at most, "allud[es]" to a final agency action that may take place in the future. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (Kavanaugh, J.). The Policy Notice states that grantees "may face grant suspension" or "grant termination," that HHS "may re-evaluate the effectiveness of programs consistent with the statutory text and this PPN," and that it "may impose additional conditions on grantees that fail to comply with any Federal statutes, regulations or terms and conditions that apply to their awards." Policy Notice 5–6. "Ordinarily 'may' is a permissive not a mandatory term." *See Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1282 (D.C. Cir. 1973). And HHS has in no way "cabin[ed] . . . its prosecutorial discretion" by issuing the Policy Notice "because it imposed no limit on its general enforcement discretion if the substantive statutory standards are violated." *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1034 (D.C. Cir. 2007) (rejecting argument that an agreement between agency and animal feeding operations was a "rule" for APA purposes). Given that Plaintiffs had their continuation grant applications awarded and no enforcement actions have been taken, there is no basis to deviate from the general rule that guidance documents are not reviewable final agency action.

Third, Plaintiffs assert that HHS somehow ignored their argument that the Policy Notice "marks the consummation of the agency's decisional process because it represents HHS's complete and final decision to fundamentally alter the TPP Program's terms, including by instituting content mandates, revising program definitions, and imposing opt-out requirements." Pls.' Br. 12. But HHS in fact responded to this argument in two ways. First, it disputed that HHS is altering the terms of the TPP Program; rather, HHS "seeks to enforce the terms and conditions of Plaintiffs' grant agreements." Defs. Br. 19. Second, it asserted that even if Plaintiffs were correct on this point, the Policy Notice is not final agency action because it "is still a guidance document that 'neither determine[s] rights or obligations nor occasion[s] legal consequences.'" *Id.* (quoting

*Ctr. For Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006). The Policy Notice clearly contemplates "further deliberative steps" that have yet to be taken. Pls.' Br. 12. Judicial review will be available at that time, but not before.

Despite its principal authorities resting on a flawed analogy of this case to informal rulemaking, Plaintiffs criticize HHS's authorities as being "distinguishable" and "off point." Not so. In the *Center for Auto Safety* case, the D.C. Circuit recognized that it "lack[ed] authority to review claims under the APA 'where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'" 452 F.3d at 808 (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.). Plaintiffs focus on the inability of the NHTSA official who prepared the guidance to issue legally binding "guidelines," but this point merely "fortified" the D.C. Circuit's primary conclusion that NHTSA "remain[ed] free to exercise discretion in assessing proposed recalls and in enforcing the Act," just as HHS remains free to exercise discretion in administering the TPP Program in light of the Policy Notice. *Id.* at 809–10. Plaintiffs also take this case's comments about "voluntary" compliance out of context. The court actually held that "the automakers' voluntary compliance with NHTSA's guidelines on regional recalls" was "not enough to establish that the guidelines have had legal consequences." *Id.* at 811. So too here, as Plaintiffs' voluntary choices to modify their programs, seek alternative funding, or suspend their programs "in order to avoid any risk of [HHS] . . . bringing an enforcement action" do not elevate the Policy Notice to the level of final agency action. *Id.* Likewise, *McCarthy* is also on point. Like the Final Guidance in that case, the Policy Notice simply explains HHS's understanding of the terms and conditions of Plaintiffs grants; in isolation, it "imposes no obligations or prohibitions on regulated entities" that do not already exist as a result of the TPP Program statute and the terms and conditions of Plaintiffs' grants. 758 F.3d at 252.

If HHS takes the enforcement actions that Plaintiffs allege it is planning to take against their programs, there will be a legal avenue through which to challenge them. But until HHS actually takes those actions, the two-part test of *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), is not satisfied. The Court should accordingly dismiss this case pursuant to Civil Rule 12(b)(6) for

10

lack of final agency action.

### B.    The Policy Notice Is Not Contrary To Law

Because this Court lacks jurisdiction over Plaintiffs' claims, and the Policy Notice is not a final agency action that can be challenged in an APA lawsuit, the Court does not need to reach the merits of Plaintiffs' contrary to law claims in order to dismiss them. Absent the sort of administrative record that would come from enforcement proceedings, it is difficult to assess Plaintiffs' assertions, which is why the APA and Article III counsel against judicial review at this time. That being said, as Defendants' opening brief explains, Plaintiffs have not shown that the Policy Notice is contrary to the governing appropriation statute at the high level of generality at which they pitch their arguments. Defs.' Br. 20–24; *see also* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 670–71 (2024) ("TPP Appropriation"). Plaintiffs raise three arguments as to why this is not the case, but none has merit.

*First*, Plaintiffs argue that the Policy Notice contravenes the "replication" requirement for Tier 1 grants because it requires changes to their programs that go beyond what is permissible for the replication to be valid. Pls.' Br. 14–15. As HHS explained, determining which changes are consistent with valid "replication" of a program, and which are not, is a context-specific exercise. Requiring adaptations or modifications to a program (even changes to so-called "core components") does not mean that implementation of the modified program no longer constitutes a valid "replication" of the program. Defs.' Br. 21–22 (discussing OASH, Off. of Population Affairs, *Core Components of Teen Pregnancy Prevention Programs* 3–4 (April 20, 2023)). Even so, if Plaintiffs contend that making changes HHS believes are required by the terms and conditions of a grant would no longer result in a "replication" of the program they are studying, HHS is not required *by statute* to allow the grantee to continue replicating the program in the way it prefers. Plaintiffs' argument appears to be based on conceptual confusion as to who the TPP Appropriation regulates. The legal burden of the TPP Appropriation to spend money on "replication" projects falls on HHS and its expenditure of appropriated funds, and HHS can still comply with the statute even if a particular grantee does not want to make requested changes to its program.

The problem with Plaintiffs' theory is underscored by the example it provides from PPGNY's declarant. Set aside, for the moment, that nothing in the Policy Notice states that TPP Program projects cannot teach "lessons that discuss methods of preventing HIV, AIDS, and other STIs, and which acknowledge high risk sexual behaviors that may result in exposure and transmission," such as "the risk of STI exposure during anal and oral sex." Stark Decl. ¶ 44, ECF No. 22-5. *If* HHS were to approach PPGNY with a proposal to remove this content from its program, and *if* PPGNY contended that doing so would so alter the program that it would no longer result in "replication," HHS would not be violating *the statute* if it directed PPGNY to choose a new program to study, or terminated the grant to instead spend the funds on a different program that complies with the statute. Such actions may have contractual consequences for HHS vis a vis the incumbent grantee, and HHS may have to provide a reasoned explanation as to why the action is appropriate. But neither hypothetical action would be contrary to the TPP Appropriation.

*Second*, Plaintiffs argue that the Policy Notice violates the "effectiveness" requirement for Tier 1 grants because it voices concerns about materials that "encourage, normalize, or promote sexual activity for minors." Pls.' Mot. 16–18. The Court should reject this tortured reading of the TPP Program Appropriation, which takes the "effectiveness" requirement out of context. Recall that Tier 1 of the TPP Program funds grant programs aimed at "replicating programs that have been *proven effective through rigorous evaluation* to reduce teenage pregnancy, behavior[] risk factors underlying teenage pregnancy, or other associated risk factors." TPP Appropriation (emphasis added). By the plain text of the statute, therefore, a program is "effective" if it is "proven" to work, regardless of the approach it takes to sex education; "effectiveness" is not a proxy for Plaintiffs' policy preferences. To take one extreme, even though the Policy Notice does not mandate abstinence-only education, the TPP Program has never excluded abstinence-only education programs from Tier 1 on the ground that they are not "effective" and instead has made such programs available for replication when they have otherwise been "proven effective through rigorous evaluation." *See* Amy Feldman Farb & Amy L. Margolis, *Teen Pregnancy Prevention Program (2010-2015): Synthesis of Findings*, 106 AM. J. PUB. H. S9, at S9 (2016) (noting Tier I

12

cohort included "abstinence education" programs). Plaintiffs voice concerns that it would not be "effective" to "instruct on pregnancy prevention, including contraceptive techniques while at the same time requiring instructors to make clear that those things are not normal in order to comply with the [Policy] Notice." Pls.' Br. 17 (quotation omitted). But as the TPP Appropriation lays out, "effectiveness" is judged at the program level to determine whether a program is eligible for replication in a Tier 1 Project. It is not a way to assess whether some hypothetical program modification is permissible.

*Third*, Plaintiffs argue that the Policy Notice is not "medically accurate" because it clarifies that information that is not "medically accurate" "may include . . . information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." Pls.' Br. 18–19. Defendants' opening brief explained that these requirements are not, on their face, medically inaccurate, and that absent an administrative record to flesh out any particular medical claims made by Plaintiffs that HHS may deems inaccurate, and HHS's basis for drawing any such conclusion, Plaintiffs have not stated a contrary to law claim. Defs.' Br. 23–24. Plaintiffs' rejoinders miss the mark. The Policy Notice does not "incorporate the language" of executive orders full-stop, as Plaintiffs contend; it only relies on two definitions from recently issued executive orders as to "gender ideology" and "discriminatory equity ideology." Policy Notice 4. Plaintiffs also fault HHS for not citing their own scientific literature on this topic. That should not come as a surprise; the Policy Notice is a general guidance document, and if and when HHS chooses to take enforcement action against a specific program for failing to provide "medically accurate" information, it will be able to provide support and context for why particular curricula elements are not "medically accurate." Even so, as Defendants' brief explained (and Plaintiffs do not respond to), not even the sources Plaintiffs cite are unanimous in disputing that (1) sex is a "biological reality" and (2) there are distinctions between "males and females" relevant to sex education. Defs.' Br. 23–24.

### C.      Plaintiffs Fail To State A Fifth Amendment Claim

Defendants' opening brief explained why Plaintiffs failed to state a claim that the Policy

Notice violates the Fifth Amendment because it is "void for vagueness," even assuming they overcome the hurdles of jurisdiction and final agency action. Defs.' Br. 31–32; *see also id.* at 25–27 (responding to vagueness concerns). Plaintiffs respond by saying Defendants have "overlook[ed] the expectation created by TPP regulations and the historical implementation of the TPP Program, which set an expectation that continuation funding will be available for the remainder of the ongoing grant term" of five years. Pls.' Br. 29. But that point could be made with equal force as to any contract or grant the government enters. Nonetheless, "courts have resisted" applying "due-process principles to government contracts" outside "the employment context" due to the lack of a constitutionally protected property interest in the fulfillment of such contracts. *New Vision Photography Program, Inc. v. Dist. of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014). Plaintiffs' theory would turn every breach of contract action against the government into a matter of constitutional import. The Court should dismiss Plaintiffs' "void for vagueness" claim.

## V.    Plaintiffs' Ultra Vires Claim Should Be Dismissed

Finally, Plaintiffs' *ultra vires* claim must be dismissed because (1) Plaintiffs have the alternative remedy of filing another civil action once the Policy Notice is enforced against them, and (2) Plaintiffs have not demonstrated the sort of statutory violation that would give rise to an *ultra vires* claim. Defs.' Br. 32–33. Plaintiffs assert that "[t]he Policy Notice disregards the statute's express replication, effectiveness, and 'medically accurate' requirements," Pls.' Br. 31, but even if the Court were to disagree with Defendants' position on the merits of these assertions, these terms hardly create the sort of "specific and unambiguous statutory directive" that could anchor an *ultra vires* claim. *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (citation omitted). Plaintiffs also assert that a future action under the APA would not be viable because Plaintiffs' injury is caused by the "Policy Notice," but there is no reason why they could not include reference to the Policy Notice in any future challenge to a final agency action.  The Court should dismiss this claim.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion and dismiss the complaint in full.

Dated: September 26, 2025             Respectfully submitted,

                                     BRETT A. SHUMATE
                                     Assistant Attorney General
                                     Civil Division

                                     MICHELLE R. BENNETT
                                     Assistant Director, Federal Programs Branch

                                     */s/ Michael J. Gerardi*
                                     MICHAEL J. GERARDI
                                     (D.C. Bar No. 1017949)
                                     Senior Trial Counsel
                                     Federal Programs Branch
                                     Civil Division, Department of Justice
                                     1100 L Street NW
                                     Washington, DC 20005
                                     Telephone: (202) 616-0680
                                     Michael.J.Gerardi@usdoj.gov

                                     *Counsel for Defendants*

15