## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLANNED PARENTHOOD OF GREATER NEW YORK *et al.*, | |
| Plaintiffs, | Civil Action No. 25-2453 |
| v. | Judge Beryl A. Howell |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, three Planned Parenthood entities that receive federal grants to conduct teenage pregnancy prevention programs around the country, seek to vacate a "Program Policy Notice" issued, in July 2025, by defendant Department of Health and Human Services ("HHS"). They argue that they cannot comply with the new requirements established in this notice and still operate effective programs under their grants as statutorily required. Having twice failed to obtain relief from these requirements in a preliminary posture, both before this Court and another judge in this district, *see* Min. Entry (July 31, 2025) (reflecting oral denial of plaintiffs' motion for a temporary restraining order); *Planned Parenthood of Greater New York v. U.S. Department of Health and Human Services*, No. 25-cv-1334 (TJK), 2025 WL 1768100 (D.D.C. June 26, 2025) (denying plaintiffs' motion for a preliminary injunction), plaintiffs have now moved for expedited summary judgment, Pls.' Mot. for Summ. J. ("Pls.' MSJ"), ECF No. 22. Defendants HHS and Secretary of HHS Robert Kennedy (collectively "defendants") have cross-moved to dismiss the case, under Federal Rules of Evidence 12(b)(1) and 12(b)(6), and opposed summary judgment. *See* Defs.' Cross-Mot. to Dismiss, ECF No. 25; Defs.' Opp'n to Pls.' MSJ ("Defs.' Opp'n"), ECF No. 24.

1

For the reasons explained below, plaintiffs have successfully demonstrated their entitlement to summary judgment on their claim in Count IV of their complaint that the policy notice is arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and defendants' arguments to dismiss that claim fail. Therefore, plaintiffs' motion is granted with respect to Count IV, and defendants' motion is denied. Plaintiffs are entitled to vacatur of the challenged policy notice.

## I.    BACKGROUND

The factual background and procedural history relevant to the pending motion are described below. The facts are undisputed, unless otherwise indicated.

### A.    Factual Background

The Teenage Pregnancy Prevention Program ("TPP") was created by Congress in 2009 as part of an appropriations act providing funds for "making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." Consolidated Appropriations Act of 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009). The funds were allocated in two parts: Tier 1 and Tier 2. Tier 1 allocations, which constitute around 75% of the funding, are for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors," while Tier 2 allocations (the remaining 25%) go to "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 671 (2024). HHS designates programs as replicable under Tier 1 after an extensive, evidence-based review process, as mandated by Congress, to ensure that those programs are "proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage

pregnancy or other associated risk factors." Off. of Population Affs. ("OASH"), Updated

Findings from the HHS Teen Pregnancy Prevention Evidence Review (TPPER), U.S. DEP'T OF

HEALTH & HUMAN SERVS., https://opa.hhs.gov/research-evaluation/teen-pregnancy-prevention-

program-evaluations/tpp-evidence-review#ftn1 (quoting 2010 Consolidated Appropriations Act);

Pls.' Statement of Material Facts ("Pls.' SMF") ¶ 12, ECF No. 22-2; Defs.' Resp. to Pls.' SMF

("Defs.' Resp.") ¶ 12, ECF No. 24-1 (not disputing the fact, only denying materiality).

### 1.    *TPP Grant Awards*

HHS grants awards through a competitive process after issuing a "notice of funding

opportunity" ("NOFO"). Pls.' SMF ¶ 17; *see also* 42 C.F.R. § 52.6(a) (describing how the

Secretary should select the best projects for grants). The awards apply to a given "project

period," during which HHS intends to keep funding the grant "without requiring the project to

recompete for funds." 42 C.F.R. § 52.6(c)(1). Generally, the project is initially funded for one

year, after which the grantee must annually submit an application for continuation of funds. *Id.*

§ 52.6(c)(2); *see also* Defs.' Statement of Undisputed Facts ("Defs.' SUF") ¶ 2, ECF No. 24-1.

This application for a "non-competing continuation" ("NCC") award generally requires a

progress report, a budget for the upcoming year, and a work plan. *See* Pls.' SMF ¶ 20; Pls.'

MSJ, Ex. B at 56, NOFO 2023: Advancing Equity in Adolescent Health through Evidence-Based

Teen Pregnancy Prevention Programs and Services ("NOFO 2023"), ECF No. 22-4. Once funds

are rewarded for the coming year, they are made available in an account from which grantees

may "draw down" funds as needed for their approved project expenses. *See* Pls.' SMF ¶ 23;

Defs.' Resp. ¶ 23 (not disputing fact, only denying materiality as outside the administrative

record); Defs.' Opp'n at 12 (referring to plaintiffs as "drawing down" funds from their accounts,

demonstrating agreement with this characterization of the process).

The TPP awards are subject to many standard requirements, including that recipients comply with "all applicable requirements of all other federal laws, executive orders, regulations, and public policies governing financial assistance awards." 2023 NOFO at 61; Defs.' SUF ¶ 4. As part of submitting an NCC application, grantees must further certify compliance with "[a]ll requirements imposed by program statutes and regulations, Executive Orders, and HHS grant regulations, as applicable." Defs.' SUF ¶ 4 (quoting Defs.' Opp'n to Pls.' Mot. for TRO, Ex. A, PPCCC Notice of Award at 6, ECF No. 14-1); Defs.' Opp'n, Decl. of Michael Gerardi, DOJ Senior Trial Counsel ("Gerardi Decl."), Ex. 1, SF-424B Form ¶ 18, ECF No. 24-3; *see also* AR (including plaintiffs' versions of these two documents).

As a general matter, if a grantee does not comply with the terms and conditions of its grant, HHS can pursue enforcement actions, such as imposing additional conditions, withholding funds, or terminating the award. 45 C.F.R. § 75.371 ("Remedies for noncompliance"); *id.* § 75.372 ("Termination"). When termination is pursued, HHS must provide a "notice of termination," *id.* § 75.373(a), and more broadly, "[u]pon taking any remedy for non-compliance, the HHS awarding agency must provide the non-Federal entity an opportunity to object and provide information and documentation challenging the suspension or termination action," *id.* § 75.374(a). A review committee then makes a final determination as to the adverse action. *See* 42 C.F.R. § 50.406.

### 2. *Plaintiffs' Awards and the 2025 NCC Application Cycle*

Plaintiffs, Planned Parenthood of Greater New York ("PPGNY"), Planned Parenthood of California Central Coast ("PPCCC"), and Planned Parenthood of the Heartland ("PPH") (collectively, "plaintiffs"), are grantees of the TPP program. *See* Defs.' SUF ¶ 12.[1]  They

---

[1]    PPH is owned by parent company Planned Parenthood North Central States ("PPNCS"). *See* Pls.' MSJ, Ex. E, Decl. of Christine Cole, Sr. Dir. of Educ. of PPCNCS ("PPH Decl.") ¶ 1, ECF No. 22-7.

received five-year grants under the 2023 NOFO to pursue Tier 1 projects and are required annually to submit NCC applications. *See* Pls.' SMF ¶¶ 21, 22; Defs.' Resp. ¶ 22 (denying materiality, as outside of the administrative record); Defs.' SUF ¶ 12; Pls.' Resp. to Defs.' SUF ("Pls.' Resp.") ¶ 12, ECF No. 29 (merely clarifying defendants' facts as stated).

In January 2025, HHS issued guidance for NCC applications in their third year of funding. *See* Defs.' Opp'n to TRO, Ex. B, Guidance for NCC Award Application January 2025 ("Jan. 2025 NCC Guidance"), ECF No. 14-2; Defs.' SUF ¶ 6. That Guidance set a NCC application submission deadline of April 15, 2025, and instructed submission of various OASH forms, a brief project narrative and work plan, and detailed budget. *See* Jan. 2025 NCC Guidance at 1, 4; Defs.' SUF ¶¶ 6, 7.

HHS issued updated "Guidance" for NCC applications in March, just a few weeks before the deadline. *See* Pls.' MSJ, Ex. F, Guidance for NCC Award Application March 2025 ("Mar. 2025 NCC Guidance"), ECF No. 22-8; *see also* Defs.' SUF ¶ 8; Pls.' Resp. ¶ 8 (contesting instructions were merely "guidance" given imposition of new requirements). The March Guidance stated, in part, that:

> Recipients are expected to review and be aware of current Presidential Executive Orders. Recipients are encouraged to revise their projects, as necessary, to demonstrate that the NCC award application is aligned with current Executive Orders. Recipients should review and be aware of all current Presidential Executive Orders; however, the following may be of most relevance to the work of the TPP program:
> - Executive Order 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government
> - Executive Order 14190: Ending Radical Indoctrination in K-12 Schooling
> - Executive Order 14187: Protecting Children from Chemical and Surgical Mutilation
> - Executive Order 14151: Ending Radical and Wasteful Government DEI Programs and Preferencing

- Executive Order 14173: Ending Illegal Discrimination and Restoring Merit-Based Opportunity.

2025 NCC Guidance at 4-5.  Recipients were also instructed to "[p]rovide information on the changes made by the recipient to align the TPP project with Presidential Executive Orders, if applicable, including the steps taken to review the project and identify the modifications proposed."  *Id.* at 5.  Examples included "selecting a different evidence-based program for implementation" and "making adaptations to existing curriculum."  *Id.*

Plaintiffs submitted their applications for NCC awards in April with what they describe as modifications made "under protest" and without "certifying compliance with the new EO 'alignment' requirement."  Pls.' MSJ, Ex. C, Decl. of Wendy Stark, CEO of PPGNY ("PPGNY Decl.") ¶ 24, ECF No. 22-5; *id.*, Ex. D, Decl. of Jenna Tosh, CEO of PPCCC ("PPCCC Decl.") ¶ 38, ECF No. 22-6; *id.*, Ex. E, Decl. of Christine Cole, Sr. Dir. Educ. of Planned Parenthood of North Central States ("PPH Decl.") ¶ 23, ECF No. 22-7; Defs.' Resp. ¶ 25 (contesting the validity of these declarations outside of the administrative record and the "legal conclusion about the requirements of [p]laintiffs' grants").  Their applications were nonetheless approved on July 2, 2025.  Pls.' SMF ¶ 26.

### 3.    *July Policy Notice*

The same day HHS approved plaintiffs' applications, HHS published a policy notice entitled "OASH Teen Pregnancy Prevention Program Policy Notice," referred to herein as the "July Policy Notice."  Pls.' MSJ, Ex. G, July Policy Notice (July 1, 2025), ECF No. 22-9.[2]  The July Policy Notice seeks to "clarify OASH policy for . . . TPP Program grant recipients, to delineate when materials are not 'medically accurate,' 'age appropriate,' do not 'reduce teen

---

[2]    Although the July Policy Notice is dated July 1, 2025, plaintiffs assert that the publication date was the day after, and defendants do not dispute that fact.  *See* Pls.' SMF ¶¶ 26-27; Defs.' Resp. ¶¶ 26-27.

pregnancy,' or are otherwise outside the scope of the TPP program." *Id.* at 1.  The Notice first repeats the instructions from the March 2025 NCC Guidance, requiring "align[ment]" with executive orders, and then explains that this Notice "further clarif[ies] these expectations for TPP Program grantees" "[i]n light of recent Presidential Executive Orders, Supreme Court decisions, current court orders, and the NCC guidance." *Id.* at 2.  That "clarif[ication]" imposes several further requirements that plaintiffs posit go beyond a general directive to "align" with executive orders and consider program revisions and instead instruct plaintiffs to make changes to their TPP curricula to comply or else risk termination of grant funding and potential claw back of funds.  *See* Pls.' Mem. at 6.

These requirements are divided into five sections, with separate headings.  First, under the heading "Statutory Language," the Notice reminds recipients that they "must comply with the requirements set out in the statutory language of the annual HHS Appropriations Act," which is then quoted.  July Policy Notice at 2.  Second, under the heading "Ending Radical Indoctrination of Youth and Protecting Rights," the Notice quotes from Executive Order 14190, *Ending Radical Indoctrination in K-12 Schooling*, which issues a broad indictment of "America's schools" for "indoctrinat[ing] their children in radical, anti-American ideologies while blocking parental oversight," and further describes concerns such as "innocent children" being "compelled to adopt identities as either victims or oppressors solely based on their skin color" and being "made to question whether they were born in the wrong body." *Id.* at 2-3.  The Notice then explains that "TPP-Program funded projects should not undermine the President's clear policy directive to protect children from harmful ideologies or the constitutional rights of parents to direct the religious upbringing of their children," citing the recent Supreme Court decision in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025).  Purportedly drawing from the holding in that opinion, the

Notice instructs that "grant recipients are expected to provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise."  July Policy Notice at 3.

Third, under the heading "Scope of the TPP Program," the July Policy Notice explains that because "[p]rograms cannot be funded under the TPP Program if they include materials or activities . . . that are inconsistent with, or beyond the scope of, the statutory requirements for TPP programs" and the statute "makes no mention of ideological content such as the content at issue in *Mahmoud*, gender ideology, or discriminatory equity ideology," the "statute does not require, support, or authorize teaching minors about such content, including the radical ideological claim that boys can identify as girls and vice versa."  *Id.* at 3-4.  "Programs must be aimed at reducing teen pregnancy, not instructing in such ideological content."  *Id.* at 4.  The July Policy Notice further cautions that "material or instruction outside the scope of the TPP program may include other content that is not related to, or counter to the aim of, reducing teen pregnancy, such as content that encourages, normalizes, or promotes sexual activity for minors, including anal and oral sex, or masturbation, including through sexually themed roleplay."  *Id.*

The fourth section, with the heading "Definitions," redefines two key terms originally described in the 2023 NOFO.  *See id.* at 4-5.  "Age appropriate" is redefined explicitly to exclude "material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content."  *Id.* at 5.  "Medically accurate" materials or instructions are redefined as "expected to include information on a full range of health risks, so that minors and their parents or guardians can make fully informed decisions."  *Id.*  This definition goes on to state: "[c]ontent that is not 'medically accurate' may include inaccurate information about methods of contraception, including associated health risks, or information that denies the biological reality of sex or

otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." *Id.* The Notice cautions that the "terms 'health equity,' 'equitable environment,' 'inclusivity,' and 'adolescent-friendly services' should not be construed to exceed the statutory scope of the TPP program, as described above, or to permit unlawful diversity, equity, or inclusion-related discrimination." *Id.*

Lastly, under the heading "Compliance," the July Policy Notice states that recipients "agree to comply with Department regulations and policies in their grant terms, and those determined noncompliant with the [Notice] may face grant suspension under 45 C.F.R. § 75.371 and grant termination under 45 C.F.R. § 75.372(a)." *Id.* "TPP Program grant recipients are expected to ensure all program materials comply with this [Notice,]" and "[m]aterials or activities outside the TPP Program's statutory scope, including those that are not 'medically accurate,' 'age appropriate,' or are unrelated to reducing teen pregnancy" are "not allowable." *Id.* The Notice acknowledged that existing programs, despite being approved, may no longer comply with these expectations: "[F]or the reasons described above, the prior administration erred in approving" materials no longer considered "medically accurate" or "age appropriate" and "that approval exceeded the agency's authority." *Id.* at 5-6. As a result, "compliance with this [Notice] may require some grantees to revise their TPP Program curricula and content." *Id.* The "need to comply with the statutory requirements of the TPP Program, Presidential Executive Orders, and the U.S. Constitution outweighs such burdens," however. *Id.* The July Policy Notice states plainly that the agency will no longer "fund materials or activities outside the TPP Programs' statutory scope" and thus may "re-evaluate the effectiveness of programs" and "impose additional conditions on grantees" as necessary. *Id.*

### B.    Procedural Background

Plaintiffs challenged changes to the TPP program in the March NCC Guidance in a separate case starting this past spring, but the instant suit concerns the legality of the July Policy Notice.

### 1.    *NCC Guidance Lawsuit*

In May 2025, the three plaintiffs in the instant lawsuit, along with two other Planned Parenthood entities, sought preliminary relief enjoining the March 2025 NCC Guidance, *see PPGNY v. HHS*, No. 25-cv-1334 (TJK), Compl., ECF No. 1, arguing that the new requirements were "impossible" for them to meet and violated their APA and constitutional rights, *see id.*, Pls.' Mem. in Supp. of Mot. for PI at 1-3, ECF No. 8-1.[3]  They anticipated that their NCC applications would be denied because they did not agree to align with all executive orders ("EOs"), as the March NCC Guidance required.  *See id.* at 16-17.  Their motion for a preliminary injunction was denied, however, based on a finding that their identified harm was too contingent and consequently, they failed to demonstrate the requisite imminent, irreparable harm.  *See id.*, 2025 WL 1768100, at *1 (D.D.C. June 26, 2025).  Despite plaintiffs' expressed belief that their applications would be denied, the court recognized that if HHS granted plaintiffs' applications, "they will not suffer irreparable harm at all," and if HHS denied them, HHS had agreed to hold their funding in obligation until August 31, so the irreparable harm would not accrue until then. *Id.* at *4.  The court subsequently, pursuant to a proposal by the parties, set an expedited briefing schedule for dispositive motions that would be ripe ten days prior to August 31.  *See id.*, Min. Order (July 8, 2025).

As already mentioned, plaintiffs' NCC applications were approved on July 2, 2025. Given this approval, plaintiffs voluntarily dismissed the litigation challenging the March NCC

---

[3]    That separate case was randomly assigned to different judge in this district.

Guidance that was focused on the NCC application process, *see id.*, Notice of Voluntary Dismissal, ECF No. 34 (filed July 11, 2025), and that case was then closed on July 14, 2025.

### 2.    *Initiation of this Lawsuit and Motion for TRO*

About three weeks after the first case was closed, on Tuesday, July 29, 2025, plaintiffs filed the instant suit, which was randomly assigned to the undersigned, challenging the July Policy Notice as generally making plaintiffs stuck between a proverbial rock and a hard place. *See* Compl., ECF No. 1.  Despite having access to grant funds after approval of their NCC applications, plaintiffs contended they could not draw down funds from their accounts without certifying compliance with the July Policy Notice but such certification could not be made without substantially changing their programs in a way they believed would contradict the statutory requirement of implementing effective programs under Tier 1; and if they nonetheless certified compliance in protest, plaintiffs could be subject to arbitrary enforcement proceedings and subject to financially ruinous claw back of funds already expended.  *See id.* ¶¶ 100-01.  The July Policy Notice could be read, for instance, to require them to conduct abstinence-only programming, which has been proven ineffective, and to eliminate important components of their curricula, such as LGBT+-inclusive content.  *See* Compl. ¶¶ 74, 83, 102.  Their Complaint seeks vacatur of the July Policy Notice, asserting claims under the Administrative Procedure Act that the July Policy Notice is contrary to the Constitution under the Due Process Clause and the First Amendment, contrary to the TPP program authorizing statutes, and arbitrary and capricious, as well as an *ultra vires* cause of action.  *Id.* ¶¶ 129-85.

Concurrently with initiating this suit, plaintiffs PPGNY and PPCCC sought a temporary restraining order ("TRO") by Thursday, July 31, 2025, the date on which their financial situation would force them either to certify compliance with HHS's allegedly unlawful requirements in

order to draw down funds from their NCC award accounts or to shut down their programs, if the July Policy Notice was not vacated. *See* Pls.' Mot. for TRO at 1-2, ECF No. 3.

This Court held an in-person hearing on July 31, 2025, and denied the requested relief in an oral ruling because plaintiffs lacked irreparable harm. *See* Min. Entry (July 31, 2025); Hr'g on Mot. for TRO Tr. ("TRO Hr'g Tr.") at 60:17-20, ECF No. 18. The Court reasoned that the possible risk of arbitrary enforcement did not constitute immediate irreparable harm, given uncertainty as to when or how the July Policy Notice would be enforced. *See* TRO Hr'g Tr. at 62:25-63:19. Further, plaintiffs' unexplained delay in seeking relief until the last minute—given that plaintiffs were aware of the July Policy Notice since July 2, even prior to dismissing their first suit pending before another Judge—weighed against granting relief. *See id.* at 65:10-19.

The next day, plaintiffs requested "clarification" of this Court's order. *See* Pls.' Emergency Motion to Clarify Order, ECF No. 17. Plaintiffs expressed their understanding that the Court "determined that there is no irreparable harm because Plaintiffs currently have the option to draw down funds unless and until the Policy Notice is enforced against them" and requested clarification that they could indeed "draw down funds without exposing themselves to risk of clawback or liability." *Id.* at 1-2. This motion was denied, given that, as defendants argued, plaintiffs were not afforded any relief requiring clarification. *See* Min. Order (Aug. 2, 2025). Nonetheless, the Court noted that defendants themselves had implied in their briefing that plaintiffs could draw down funds "under protest," but expressed no further opinion on that possibility. *See id.* The Court further explained that because the Policy Notice was not self-effectuating, any enforcement requiring plaintiffs to change their programs in a detrimental way was too speculative to satisfy the stringent imminent and irreparable harm standard at the temporary restraining order stage. *See id.*

Since the denial of the TRO, plaintiffs have been forced to make the difficult choice they had anticipated, between drawing down funds in protest, which would risk enforcement proceedings, complying with the July Policy Notice despite its seemingly problematic dictates, and refusing federal money altogether.  *See* Compl. ¶¶ 100-01.  Plaintiffs have all refrained from drawing down funds for their year three expenses.  *See* Pls.' SMF ¶ 49; Defs.' Reply in Supp. of MTD ("Defs.' Reply") at 4 & n.2, ECF No. 30 (agreeing with this fact, despite defendants' previous contestation made in error).  PPH and PPCCC have relied on reserves to keep their programming going for a short time, while PPGNY has had to halt its programming in the absence of the grant money.  *See* Pls.' SMF ¶¶ 51-53; Defs.' SUF ¶¶ 51-53 (not contesting facts but denying materiality as facts are outside the administrative record).

### 3.  *Defendants' Motion for Transfer*

Following denial of plaintiffs' TRO, defendants moved to transfer this case to the Judge who presided over the prior dismissed case, pursuant to D.D.C. Local Rule 40.5, which allows for reassignment where two cases are related.  *See* Defs.' Mot. to Transfer Case, ECF No. 19.  Plaintiffs opposed.  *See* Pls.' Opp'n to Defs.' Mot. to Transfer, ECF No. 21.  This motion to transfer was denied because, despite the similar subject matter and overlapping parties between the first case challenging the March NCC Guidance and the instant matter challenging the July Policy Notice, the two cases are not technically related under the Local Rules.  *See* Min. Order (Aug. 13, 2025).  As this Court explained, for a case to be deemed related to a *closed* matter, the case must involve the "same parties" and "same subject matter," LCvR 40.5(a)(4), which has been interpreted to mean "identical parties," not parties in interest or merely overlapping parties, *see id.* (quoting *Wilderness Soc'y v. Bernhardt*, No. 20-cv-1176 (BAH), 2021 WL 2849635, at *2 (D.D.C. June 2, 2020)).  The earlier dismissed case had two additional Planned Parenthood

entities that are not plaintiffs in this case, so the parties are not identical under Local Rule 40.5(a)(4). *See id.* The random assignment of this case has therefore remained before this Court.

### 4. *Pending Motions*

The same day as defendants filed the motion to transfer, plaintiffs moved for a scheduling order for expedited summary judgment briefing. *See* Pls.' Mot. for Scheduling Order, ECF No. 20. Feeling the financial constraints resulting from not drawing down on awarded grant funds, plaintiffs proposed a schedule to ensure the summary judgment motion would be ripe by mid-September and proposed that defendants provide the administrative record within 30 days of this Court's resolution of the summary judgment motion, assuming the motion were denied. *See id.* Defendants opposed. *See id.* ¶ 4 (indicating defendants' opposition); *see also* Defs.' Mot. to Transfer (filed on the same day as plaintiffs' motion for a briefing schedule).

Concurrently with denying defendants' transfer motion, this Court granted plaintiffs' motion for a scheduling order and imposed the requested schedule. *See* Min. Order (Aug. 13, 2025). Anticipating the difficulty of resolving a summary judgment motion regarding agency actions about a complex grant program in the absence of an administrative record or any stipulated facts and recognizing the urgent time constraints raised by plaintiffs facing financial duress, this Court invited the parties to follow the procedures in D.D.C. Local Rule 7(h)(1), which instructs the parties to provide statements of material fact and responses to the other side's statements, despite that rule not generally applying to APA actions, such as this one. *See id.*; *see also, e.g., Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer*, -- F. Supp. 3d --, 2025 WL 1795090, at *21 (D.D.C. June 30, 2025) (denying cross-motions for summary judgment in an APA case due to the deficient factual record, including the lack of an administrative record and no "statement of undisputed or disputed material facts that would have assisted in clarifying

whether either side satisfied the applicable standard for summary judgment").  If the administrative record could not be produced in time for adjudication of plaintiffs' motion, such a procedure would facilitate at least an abbreviated understanding of the basic, undisputed factual premises in this case.[4]

Plaintiffs moved for summary judgment on Counts I, III, IV, and V of their Complaint, which, respectively, allege that the July Policy Notice is constitutionally defective, contrary to statute, and arbitrary and capricious, all in violation of the APA (Counts I, III, and IV), and *ultra vires* (Count V).  *See* Pls.' MSJ.[5]  Defendants filed a cross-motion to dismiss contemporaneously with their opposition, *see* Defs.' Cross-Mot. to Dismiss; Defs.' Opp'n, resulting in an extended briefing schedule to accommodate full briefing on both motions.  *See* Min. Order (Sep. 11, 2025) (instructing defendants to file their final reply in support of their motion to dismiss by September 26, 2025).  Defendants also lodged a notice of contents of the administrative record simultaneously with their motion.  *See* Notice of Contents of Admin Record ("AR"), ECF No. 23.  Both motions are now ripe for resolution.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Motion to Dismiss

#### 1.    *Federal Rule of Civil Procedure 12(b)(1)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must demonstrate that the court has subject matter jurisdiction.  *See Arpaio v. Obama*,

---

[4]    Notably, defendants repeat a refrain expressing concerns about resolving this APA case on summary judgement without an administrative record, Defs.' Opp'n at 15-17, 21, but such concerns were ameliorated by the filing of the certified contents of the administrative record, *see* Defs.' Notice of Contents of Admin Record ("AR"), ECF No. 23, simultaneously with the filing of defendants' cross-motion to dismiss and opposition to plaintiffs' motion for summary judgment, such that both sides had ample time to incorporate the AR into their briefing, even with plaintiffs' expedited filing of their summary judgement motion.

[5]    Defendants state that "[p]laintiffs have dropped Count II of the[ir] Complaint," Defs.' Opp'n at 9, when plaintiffs merely have not moved for summary judgment on that Count.

797 F.3d 11, 19 (D.C. Cir. 2015). "Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), so they "have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto," *Johnson v. Commission on Presidential Debates*, 869 F.3d 976, 980 (D.C. Cir. 2017) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). Absent subject matter jurisdiction, the court must dismiss the case. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)).

If a jurisdictional argument "present[s] a dispute over the factual basis of the court's subject matter jurisdiction, "the court must go beyond the pleadings and resolve" any dispute necessary to resolve the motion to dismiss. *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (alteration in original) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Otherwise, the court accepts as true "material factual allegations in the complaint." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

### 2. *Federal Rule of Civil Procedure 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The plaintiff must plead facts not "'merely consistent with' a defendant's liability" but "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 557 (2007)).

16

In deciding a motion to dismiss under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true, "even if doubtful in fact," *Twombley*, 550 U.S. at 555, though the court does not "assume the truth of legal conclusions . . . or 'accept inferences that are unsupported by the facts set out in the complaint.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

### B.    Summary Judgment

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). A fact is considered "material" only "if a dispute over it might affect the outcome of a suit under governing law," and a dispute is only "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). In other words, the central question is whether "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)). The non-movant must "support an assertion that a fact is genuinely disputed with materials in the record." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 396 (D.C. Cir. 2020) (citing FED. R. CIV. P. 56(c)).

A party may move for summary judgment "at any time," FED. R. CIV. P. 56(b), "even as early as the commencement of the action," *id.* 56(c)(1), committee's note to the 2009 amendment, but "in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had," *id.* 56(b) committee's note to 2010 amendment. In such circumstances, the factual record may be underdeveloped, *see*

*id.* 56(c).  If, however, "whatever is before the district court," whether presented through stipulated facts, affidavits, or other record evidence, "demonstrates that the standard for the entry of summary judgment . . . is satisfied," the movant shall prevail.  *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1120 (D.C. Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III.    DISCUSSION

Despite defendants' efforts to manufacture sundry barriers to review of the July Policy Notice, plaintiffs have demonstrated that they are entitled to summary judgment on Count IV of their Complaint, asserting that the July Policy Notice is arbitrary and capricious.  This Court has jurisdiction to consider plaintiffs' challenges, on both constitutional and statutory grounds, to an agency guidance document that qualifies as a final agency action.  The July Policy Notice imposes binding legal obligations on plaintiffs, setting out new requirements in an incomprehensibly vague fashion, inviting arbitrary enforcement in violation of the APA.  As a result, the July Policy Notice must be vacated and its enforcement enjoined, and defendants' motion to dismiss denied.

### A.    Standing

To satisfy the "irreducible constitutional minimum of standing," a plaintiff "must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical,'"—that is "trace[able] to the challenged action of the defendant" and likely redressable "by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted).  Defendants argue that plaintiffs lack standing to assert their claims because they do not suffer an imminent injury and their injury is not fully redressable by the requested remedy of vacatur.  *See* Defs.' Opp'n at 11-15.  Defendants further argue that plaintiffs' claims lack ripeness because the

July Policy Notice is not presently fit for review, describing its scope and application as too unclear at this pre-enforcement stage. *See id.* at 13-14. To the contrary, plaintiffs are presently injured by the July Policy Notice, which injury may be relieved by the vacatur requested, and review is proper at this stage. No constitutional or prudential standing barrier prevents considerations of plaintiffs' claims, so defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

### 1.    *Injury*

Defendants first argue that because no affirmative enforcement steps against plaintiffs have yet been taken, plaintiffs have only established a "possible future injury," "as opposed to the 'certainly impending' injury necessary for standing purposes." Defs.' Opp'n at 12 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Defendants overlook, however, that even in advance of enforcement, the July Policy Notice presently injures plaintiffs by requiring them to conform to its mandates or face the threat of suspension, termination, and risk of the clawback of any funds plaintiffs may spend, which defendants do not dispute.[6] *See* Pls.' Mem.

---

[6]    Although the injury-in-fact standing inquiry may seem similar to the irreparable harm inquiry at the TRO stage, the two standards meaningfully differ such that a plaintiff may satisfy standing requirements without meeting the imminent, irreparable harm requirement to obtain a TRO. To obtain a TRO, plaintiffs must demonstrate that an alleged injury is "certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm," *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (internal quotation marks and citations omitted), which requires "proof indicating that the harm is certain to occur in the near future," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). In other words, plaintiffs must show injunctive relief is necessary and that relief must be granted *now*. That standard is a high bar, which is appropriate given the extraordinary nature of preliminary injunctive relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In the extremely expedited posture in July, plaintiffs fell short of showing that termination of their grants, or even the risk of arbitrary enforcement, was certain, imminent, and would injure plaintiffs in an irreparable way. *See* TRO Hr'g Tr. at 63:6-65:9.

By contrast, to establish standing to allow for a suit for prospective relief to proceed, plaintiffs need only show a "concrete, particularized," and "certainly impending" injury, *Clapper*, 568 U.S. at 409 (first quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) and then quoting *Lujan*, 504 U.S. at 564 n.2), elsewhere described as a "substantial probability of injury," *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (cleaned up) (quoting *Chamber of Com. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)). As a result, a risk of enforcement due to being within a regulated class of persons is generally sufficient to establish injury to challenge an agency action, even though that enforcement might not subject plaintiffs to as urgent irreparable harm. *See Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 483-84 (D.C. Cir. 2021); *see also Susan B. Anthony List v.*

at 13 (citing 45 C.F.R. §§ 75.403-05 for risk of clawback and other sanctions); TRO Hr'g Tr. at

46:12-47:3, 47:12-48:16 (raising the issue of potential clawback of funds on several occasions,

which defendants did not dispute).

As a fundamental principle, regulated entities may challenge the rules that govern them.

*See State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) ("'[T]here is

ordinarily little question' that a regulated individual or entity has standing to challenge an

allegedly illegal rule or statute under which it is regulated." (quoting *Lujan*, 504 U.S. at 561-

62)).  The July Policy Notice imposes specific requirements on plaintiffs and expressly warns of

clear consequences for noncompliance, thereby regulating plaintiffs' conduct.  Plaintiffs must

expend resources analyzing and modifying their curricula to conform to these new requirements.

The Policy Notice thus sufficiently injures plaintiffs to establish their standing.  *See Corbett v.

Transp. Sec. Admin.*, 19 F.4th 478, 484 (D.C. Cir. 2021) (explaining that because the plaintiff

was "within the regulated class of persons covered by the disputed directives, which "required[]

[him] to make significant changes" (internal quotation marks and citation omitted) and exposed

him to sanctions if he failed to observe the rules, plaintiff established constitutional standing and

his claims were ripe for review).

Defendants' contention that plaintiffs face only a premature, anticipated injury is

incorrect.  The law clearly recognizes an injury due to a credible threat of enforcement.  A

regulated entity need not violate requirements or wait for an enforcement action in order to

challenge the requirements to which the entity is already subject.  *See, e.g.*, *Corbett*, 19 F.4th at

---

*Driehaus*, 573 U.S. 149, 158-59 (2014) (holding that threatened enforcement of an unconstitutional law may satisfy the injury-in-act requirement).  Plaintiffs' ability to demonstrate an injury-in-fact here is thus a distinct question from that analyzed in the TRO proceeding.  *See Cal. Ass'n of Private Postsecondary Schls. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury.").  Notably, defendants did not even raise the issue of plaintiffs' injury-in-fact to satisfy standing at the TRO stage.  *See, generally*, Defs.' Opp'n to Pls.' Mot. for TRO.

483 ("Because [plaintiff] is the target of TSA regulations, he faces the threat of enforcement and ensuing penalties should he fail to comply," which causes plaintiff injury and thus establishes constitutional standing.); *State Nat'l Bank*, 795 F.3d at 54 ("[R]egulated parties generally need not violate a law in order to challenge the law." (citing *Abbot Lab'ys. v. Gardner*, 387 U.S. 136, 152-53 (1967))).

Defendants compare plaintiffs' situation to that of the plaintiffs in *Clapper*, 568 U.S. at 404, and in *State National Bank*, but in both of those cases, whether the challenged law would *ever* be applicable or relevant to plaintiffs was highly uncertain. *See* Defs.' Reply at 2-3. In *Clapper*, "attorneys and human rights, labor, legal, and media organizations," who sometimes conducted sensitive and privileged telephone calls with individuals abroad, challenged a provision of the Foreign Intelligence Surveillance Act ("FISA") Amendments Act authorizing the government to conduct electronic surveillance of foreign persons abroad without probable cause that the target is a foreign power or agent of a foreign power. 568 U.S. at 404-06. The Supreme Court explained that the alleged injury in fact rested on a "highly speculative fear" relying on a "chain of contingencies"—in particular, that their foreign contacts would be targeted, that the government would invoke the particular challenged provision to justify their surveillance instead of other authorities, that the FISA Court would conclude the preconditions to using that provision satisfied, and that the government would succeed in intercepting their communications. *See id.* at 410-14. The Supreme Court emphasized that plaintiffs had no basis for thinking their contacts would be targeted and their theory relied on "speculation about the decisions of independent actors," including the FISA Court. *See id.* at 411-14.

Similarly, in *State National Bank*, plaintiffs challenged the Dodd Frank Act's "orderly liquidation authority," which "g[ave] the Government broad power to liquidate failing financial

institutions that pose a significant risk to the stability of the U.S. financial system." 795 F.3d at 55-56. Plaintiffs based their standing on their investments in financial companies and the concomitant possibility they could be potential creditors if management of those companies made decisions prompting possible future liquidations or reorganizations, which by operation of this law, could injure their interests. *See id.* at 56. The D.C. Circuit there explained that the statute would only impact plaintiffs "*if* a company in which they are invested is liquidated or reorganized by the Government, and only *if* [they] are then treated differently from other similarly situated creditors." *Id.* (emphasis in original). These preconditions to the application of the statute to them rendered their injury speculative and insufficient for standing. *Id.*

By contrast to the plaintiffs in both *Clapper* and *State National Bank,* here, plaintiffs, as recipients of TPP grants, are presently subject to the requirements imposed on the funding of those grants. There is no prerequisite third-party action—by government entities, as in *Clapper*, or by investment companies, as in *State National Bank*—that needs to occur first to make the July Policy Notice applicable and relevant to plaintiffs. *Cf. Am. First Legal Found v. Greer*, No. 24-5168, slip op. at 6 (D.C. Cir. Oct. 3, 2025) (holding that plaintiff lacked standing where the injury relied on "speculation about choices by two government agencies not party to this lawsuit" because "causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts" (second passage quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024))). Unlike the plaintiffs in those cases, the July Policy Notice forces plaintiffs to take action to comply now. The only uncertainty in plaintiffs' impending injury is wholly within the single-decision-making authority of HHS as to whether, when and how HHS will enforce its own rules. That is far less than the kind of broad speculation and

hypotheticals about the series of decisions required as preconditions to the injuries contemplated in *Clapper* and *State National Bank*.

Defendants try to manufacture more uncertainty by stating that the July Policy Notice does not yet actually apply to plaintiffs because they have not drawn down funds and thus are not even subject to the July Policy Notice. *See* Defs.' Reply at 4-5. That technicality makes no difference: Plaintiffs have only refrained from drawing down funds to avoid the funds being clawed back after they have spent them should they be subject to an adverse enforcement action. This kind of uncertainty is akin to a plaintiff not violating a criminal prohibition—though he thinks it violates his constitutional rights—to avoid going to jail. The law generally does not require a plaintiff to incur penalties or directly put himself in the line of fire before bringing suit. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." (emphasis in original) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007))).

Moreover, defendants' argument that plaintiffs' purported "Hobson's choice"—either "accept the terms of their Notices of Award and the potential for future enforcement actions by drawing down funds, or refuse to accept the terms and decline federal funding"—does not give rise to standing, is undermined by recent authority. Defs.' Reply at 3-4. Courts have, in fact, recognized an imminent injury-in-fact where administrative action sets up a kind of "forced choice" between (1) "chang[ing] [plaintiffs'] programming" in a way plaintiffs believe to be unworkable, (2) "certify[ing]" compliance "without changes and risk[ing] false certification," and (3) "giv[ing] up federal funds." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 85 (D.D.C. 2025) (citing *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir.

2024)).  Plaintiffs were forced into the last option, as evinced by their choice not to draw down

funds, which has caused present injury to their programming and finances, an injury so severe, in

fact, that PPGNY has ceased providing the programming altogether, pending resolution of this

case, and the two other plaintiffs have reallocated limited internal funds in order to continue their

TPP programs for a short period of time.  Pls.' SMF ¶¶ 51-53; Defs.' SUF ¶¶ 51-53 (not

contesting facts but denying materiality as facts are outside the administrative record).  This

establishes their constitutional injury to bring suit.

>        **2.**    ***Redressability***

Defendants next argue that "[e]ven if the Court concludes there is a cognizable injury-in-

fact in this case," plaintiffs' injuries "are not redressable by the relief they seek in their motion

for summary judgment."  Defs.' Opp'n at 14.  Defendants point out that plaintiffs seek broad

relief in their complaint, including enjoining defendants from implementing, giving effect to, or

relying on the requirements in the July Policy Notice.  Defs.' Opp'n at 14.  Yet, because that

relief is akin to "enforc[ing] a contractual obligation to pay money," and federal district courts

are precluded from enforcing contractual obligations to pay money by the Tucker Act's grant of

exclusive jurisdiction to the Court of Federal Claims ("CFC"), plaintiffs in their summary

judgment briefing request only vacatur of the July Policy Notice.  *Id.* (quoting *Dep't of Educ. v.

California*, 604 U.S. 650, 651 (2025)); Pls.' Mem. at 37-38; Pls.' Proposed Order MSJ, ECF No.

22-10.  According to defendants, this slimmed-down relief request to avoid the Tucker Act's

jurisdictional barrier nonetheless fails because vacatur "alone would not accomplish anything of

substance."  Defs.' Opp'n at 14.  In defendants' words, the July Policy Notice simply "sets forth

HHS's understanding of what the terms and conditions of Plaintiffs' grants already require," so

"HHS would still be free to pursue enforcement proceedings against any grantee" even without

the July Policy Notice on the books. *Id.* Although recognizing that the recent Supreme Court emergency stay order in *NIH v. American Public Health Association*, 145 S. Ct. 2658, 2661 (2025), preserved federal district courts' jurisdiction over APA claims regarding "agency guidance," while also indicating that claims challenging individual grant terminations may need to be brought before the CFC, defendants nevertheless suggest that claims regarding "agency guidance" are not redressable and therefore not, in fact, reviewable by this Court at all. Defs.' Opp'n at 15.

Defendants, in other words, present plaintiffs with another Hobson's choice that would have the consequence of disallowing federal grant recipients from challenging agency policies under the APA altogether. In defendants' framing of the jurisdictional issue, plaintiffs can bring a suit before the CFC, but because the CFC is limited to review of contractual disputes, they could only obtain review of discrete grant terminations, not APA review of agency decision-making, *see Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (*en banc*) ("[T]he Court of Federal Claims lacks APA jurisdiction."); or, plaintiffs can bring a suit in federal district court, but because this Court cannot order the agency to pay out funds, vacating the Policy Notice gives plaintiffs no effective relief and thus this Court would lack jurisdiction. *See* Defs.' Opp'n at 14-15. Under defendants' reasoning, the July Policy Notice would be wholly immune from review.

Fortunately, the law is not so perverse in restricting any opportunity for judicial review of agency action, as defendants urge. Defendants' framing assumes that the July Policy Notice does not cause plaintiffs any present injury and is not a final agency action, so vacatur offers plaintiffs no relief whatsoever. As explained, however, *supra* Part III.A.1 (regarding injury); *see also infra* Part III.B.1 (regarding final agency action), the July Policy Notice imposes

requirements on plaintiffs, causing them a present injury through forcing their compliance.

Vacating the July Policy Notice and enjoining its enforcement alleviates that harm, even if, as

defendants argue, HHS could enforce the same requirements in its absence, based on the EOs

and terms of the grants themselves.[7] Courts have recognized that a plaintiff need not "solve all

roadblocks simultaneously." *Corbett*, 19 F.4th at 484 (quoting *Ibrahim v. Dep't of Homeland

Sec.*, 669 F.3d 983, 993 (9th Cir. 2012)).  The possibility that HHS may choose to enforce

similar requirements through different means does not render this opinion merely "advisory" and

plaintiffs' present injury not redressable.  *Id.* (explaining that "[m]erely because" plaintiff may

be subject to the same requirements through other agency rules, plaintiff is "not preclude[d]"

"from challenging" a single set of directives); *see also* Pls.' Opp'n at 9 ("[T]he possibility that

HHS could seek to terminate awards on *other* grounds makes no difference.  When an agency

action—here, the Policy Notice—causes plaintiffs harm, setting that action aside redresses it."

(emphasis in original)).[8]

---

[7]    Although defendants portray plaintiffs as eschewing any request for injunctive relief, little distinction exists
between vacating or enjoining application of the July Policy Notice, and plaintiffs request both in their Opposition.
Pls.' Opp'n at 2, 9 n.2.  Whether termed a vacatur or injunction, such relief "targets agency action distinct from
grant terminations" and does not enforce the payment of plaintiffs' grants, so is not prohibited by the Tucker Act
jurisdictional bar defendants contemplate.  *Id.*  Vacatur (or injunction) of the July Policy Notice eliminates the July
Policy Notice—in form and substance—from defendants' enforcement toolkit providing relief to plaintiffs.

[8]    Whether the terms of plaintiffs' grant awards alone would, as defendants contend, provide a basis for
termination on the same grounds as outlined in the July Policy Notice, such that vacating the Notice would not
actually reduce the risks to plaintiffs of enforcement actions or risk of termination, *see* Defs.' Opp'n at 14, is not the
legal challenge presented and thus no view on this separate legal question is offered.  To be sure, though not cited or
discussed by the parties, the D.C. Circuit has previously held that where a first regulation was developed jointly with
and imposes the same standards and same costs as a second, such that the first could not be said to cause a discrete
injury, a challenge brought only against the first was not redressable.  *See Delta Constr. Co. v. EPA*, 783 F.3d 1291,
1296 (D.C. Cir. 2015).  Plaintiffs' injury, however, is not caused by the broad principles described in the EOs, which
are directed toward agency officials and constrained by the caveat that they "shall be implemented consistent with
applicable law," *see, e.g.*, EO 14190 § 6(b), 90 Fed. Reg. 8853, but rather by the concrete dictates directly imposed
on plaintiffs in the July Policy Notice.  *See infra* Part III.B.1(b) (comparing the EOs to the July Policy Notice).
Defendants cannot defeat redressability by a mere representation that HHS will exercise the same enforcement
authority with or without the challenged July Policy Notice on the books.  A simple assertion by defendants that
"we're going to do it anyway" under some other authority—real or imagined—cannot serve as the basis to skirt
judicial review of the agency action presently challenged.

The Supreme Court's fractured decision in *NIH* supports this conclusion. Although the Court had five votes in favor of restricting review of the grant terminations at issue to the CFC, the Court also had five votes in favor of district courts exercising jurisdiction over challenges to agency policies and guidance documents when those embody final agency actions, holding that the Tucker Act did not bar such review. 145 S. Ct. at 2659. The latter five justices, including Justice Barrett as the deciding vote, clearly did not anticipate this to be an empty promise for judicial review, where plaintiffs could never achieve review of agency guidance in federal court for lack of jurisdiction due to inability to redress any injury. They contemplated that courts would be able to vacate unlawful agency policies, despite their inability to force payment of individual grants. *See id.* at 2660-62 (Barrett, J., concurring); *see also id.* at 2671 (Jackson, J., concurring in part) (summarizing the order as holding that "district courts may still exercise jurisdiction over—and vacate—grant-related policies that contravene federal law").[9]

Finally, defendants' suggestion that an opinion expressed in this case about the legality of the July Policy Notice would amount to an "advisory opinion . . . in advance of any actual enforcement decision," Defs.' Opp'n at 15, is clearly contrary to the long line of precedent allowing for pre-enforcement review of agency action. *See supra* Part III.A.1; *infra* Parts III.A.3, III.B.1. Indeed, the entire scheme of arbitrary-and-capricious review established in the APA, 5 U.S.C. § 706(2)(A) (instructing courts to "set aside agency action found to be . . . arbitrary [or] capricious"), allows for review of an agency policy on a whole, whether before or in response to enforcement, not piecemeal adjudication of specific applications of agency policy.

---

[9]        While Justice Barrett's decision does set up a complex scheme for grantees to get *complete* relief if their grants have already been terminated—indicating that they would have to pursue relief sequentially in both federal district court, with respect to the agency policy, and before the CFC, for their individual grants—plaintiffs' grants have not yet been terminated and *complete* relief is not required for redressability, so that two-track arrangement is not at issue here. *See NIH*, 145 S. Ct. at 2661-62 (Barrett, J., concurring). Again, however, that scheme presumes that some task is left for the district court—to evaluate the APA claim—reinforcing that defendants' attempt to avoid district court jurisdiction entirely is not compelling.

Vacating the July Policy Notice would meaningful redress plaintiffs' injury caused by that Notice, establishing their constitutional standing to challenge it now.

### 3. *Ripeness*

In addition to defendants' constitutional ripeness argument incorporated into their discussion of the lack of imminent injury, defendants make a prudential ripeness argument, contending that the July Policy Notice is not yet fit for judicial review and the "standard process" would be to wait until an enforcement action is brought. Defs.' Opp'n at 13-14.

Ripeness has both constitutional and prudential components. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430-32 (D.C. Cir. 1996). The constitutional ripeness inquiry is captured by the imminence feature of the injury-in-fact requirement. *See POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020) ("Constitutional ripeness 'is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is imminent or certainly impending.'" (additional internal quotation marks and citation omitted) (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012))). The prudential component considers "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *Nat'l Treasury Emps. Union*, 101 F.3d at 1431-32 (quoting *Abbott Lab'ys.*, 387 U.S. at 149). The "rationale underlying the [prudential] ripeness doctrine" is avoiding unnecessarily resolving disputes on the theory that "[i]f we do not decide it now, we may never need to." *Id.* Defendants state that "[p]laintiffs' claims meet both prongs of this test." Defs.' Opp'n at 13. Both plaintiffs and this Court would agree—although with a different outcome than what defendants mean to suggest.

As an initial matter, pre-enforcement challenges to agency policies are commonplace and frequently considered ripe for review. *See, e.g.*, *Abbott Lab'ys.*, 387 U.S. at 148 (permitting pre-

enforcement review of an FDA regulation); *Cohen v. United States*, 650 F.3d 717, 735 (D.C. Cir. 2011) (*en banc*) (explaining that "[t]his court has long understood . . . *Abbott Labs* to incorporate a presumption of reviewability" in the context of pre-enforcement action (quoting *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005)); *see also Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021) ("Bellion's challenges are fit for judicial decision because they involve final agency action and because 'judicial intervention' would not 'inappropriately interfere with further administrative action.'" (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998))).  Applying the two-factor inquiry here, *see National Treasury Employees Union*, 101 F.3d at 1431-32, this dispute is likewise ripe.

Regarding the fitness of issues for judicial decision, defendants argue that the July Policy Notice "is a document of general applicability," so review "is likely to stand on much surer footing in the context of a specific application."  Defs.' Opp'n at 13 (second passage quoting *Nat'l Treasury Emps. Union v. Vought ("NTEU")*, 149 F.4th 762, 785-86 (D.C. Cir. 2025)). Plaintiffs' claims are largely, however, purely legal questions that do not require additional factual development or specific factual application to evaluate.  *See Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003) (If "the petition for review presents a purely legal question, . . . it is presumptively reviewable." (quoting *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 739 (D.C. Cir. 1990)).  Whether the July Policy Notice is unconstitutionally vague or whether certain of its terms directly contradict the statute can be evaluated outside of the context of examples of agency application.  *See* Compl. ¶¶ 129-45, 154-85 (Counts I, III, IV, V); *see infra* Part III.B.2.  While the "exact scope" of the agency's planned enforcement certainly is "unclear," as defendants argue, that does not counsel in favor of delaying review in this case.

Defs.' Opp'n at 13 (quoting *NTEU*, 149 F.4th at 785).  Defendants cannot hide behind their own Policy Notice's vagueness to avoid judicial scrutiny.  *See infra* Part III.B.2.

Moreover, defendants do not suggest that they are releasing additional guidance soon or that plaintiffs do not have to comply with the July Policy Notice's requirements until given specific, individualized directives from the agency, such that the Policy Notice is merely a warning letter with more clarity to come.  Concerns animating the ripeness doctrine about "protect[ing] agency ability to 'deliberate and craft policy free of judicial interference,'" when agency policy has not yet crystallized are therefore not present here.  *See Nat'l Mining Ass'n*, 324 F.3d at 757-58 (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986)).  The first factor therefore indicates review is appropriate now.

Regarding the second consideration—hardship to the parties of withholding court consideration—defendants state perfunctorily that waiting until an actual enforcement action is "par for the course," even where the consequences for plaintiffs may be drastic.  Defs.' Opp'n at 13-14 (quoting *NTEU*, 149 F.4th at 786).  Since the first factor strongly favors review, the second factor here cannot be dispositive and is ultimately inconsequential.  Where "there are no significant agency or judicial interests militating in favor of delay" in the first factor, the D.C. Circuit has held that "[lack] of hardship cannot tip the balance against judicial review."  *Nat'l Mining Ass'n*, 324 F.3d at 756-57 (alteration in original) (quoting *Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990)) (explaining that "[i]f we have doubts about the fitness of the issue for judicial resolution, then we balance the institutional interests in postponing review against the hardship to the parties that will result from delay" (alteration in original)).  Nonetheless, because plaintiffs *would* face serious hardship from delay, this factor further reinforces that review should be conducted now.

Put simply, plaintiffs are presently facing hardship from the July Policy Notice, and that harm will continue to accrue until the July Policy Notice is vacated. Plaintiffs are incurring costs evaluating their programs and determining how they might possibly comply with the July Policy Notice and have had to either dip into their reserves to keep programming running or halt their programming altogether. *See supra* Part I.B.2. Plaintiffs' financial hardship due to the fear of enforcement will only exacerbate with time, even absent any actual enforcement action.

Defendants suggest that plaintiffs will have a later opportunity to bring suit because defendants "must follow its grant regulations in order to take any specific enforcement actions against particular grantees." Defs.' Opp'n at 13. Defendants' point is both irrelevant and wrong. First, whether plaintiffs might have another, later opportunity to bring suit does not matter when plaintiffs are being harmed by the July Policy Notice now and therefore seeking relief now. Second, defendants seem to envision some kind of *pre*-termination process that will essentially invite plaintiffs to bring suit at some time once enforcement is initiated but before termination occurs. Nothing in the grant regulations cited by defendants, however, requires any such formal process prior to the actual termination or suspension of plaintiffs' grants. Section 75.371 of Title 45 of the Code of Federal Regulations allows HHS to "wholly . . . suspend or terminate [a] Federal award" if HHS "determines that noncompliance cannot be remedied by imposing additional conditions," but does not require that HHS, in practice, try out imposing additional conditions before making that determination. HHS could reach that drastic conclusion of termination at the outset. Further, while defendants must *notify* recipients of termination and give an opportunity for objection, that opportunity can seemingly follow the elimination of funding. *See id.* § 75.372(b) (instructing reporting on the termination); *id.* § 75.373(a) (instructing HHS to provide a notice of termination); *id.* § 75.374(a) ("Upon taking any remedy

31

for non-compliance, the HHS awarding agency must provide the non-Federal entity an opportunity to object and provide information and documentation challenging the suspension or termination action."). As a result, plaintiffs will not necessarily have a later opportunity to challenge the new requirements in the July Policy Notice at some initial enforcement stage before suffering serious, additional harm from losing their grants altogether.

Additionally, defendants' suggestion that plaintiffs may "protect all of their rights and claims by returning to court when the controversy ripens" is ironic, Defs.' Opp'n at 13 (quoting *NTEU*, 149 F.4th at 786), considering defendants have insisted that plaintiffs cannot get relief from the terminations of their grants before this Court, *see id.* at 14, so any later suit would suffer the same redressability problem that defendants contend is present now, *id.* at 14-15. The instant suit is clearly an opportune time for plaintiffs to seek relief. Consequently, prudential ripeness considerations weigh in favor of review.[10]

*    *    *

Plaintiffs have sufficiently demonstrated this Court's jurisdiction over all of their claims and the suitability of this suit for review. Defendants' motion to dismiss based on Rule 12(b)(1) is denied.

---

[10] Notably, the primary case on which defendants rely, *National Treasury Employees Union*, arises from a very disparate factual scenario and is inapposite. There, plaintiffs had challenged a putative decision to shut down the CFPB, which decision had been "infer[red]" from "various discrete 'actions' taken by agency leadership to downsize the bureau." *NTEU*, 149 F.4th at 782. The D.C. Circuit held that no discrete shutdown decision had been made; plaintiffs were simply referring to a "constellation of then-ongoing actions," which they attempted to "dress up" "as a single decision to challenge all of them at once." *Id.* at 784. In the Circuit panel's view, the agency actions allegedly constituting the "shutdown" were ongoing, with no final decision about the CFPC's future made. *Id.* Given that there was no discrete action "fit for review," the court characterized the dispute as "unripe." *Id.* at 785-86. Here, in contrast to such a "moving target[]"or abstractness problem resulting from a constellation of related changes, *id.* at 786, HHS clearly made a decision to adopt new TPP program requirements, dictated them concretely in the July Policy Notice, and put them into effect immediately.

### B.    APA Claims

Turning to the substance, then, of the claims at issue, plaintiffs have appropriately challenged a final agency action, making review under the APA available.  Plaintiffs have also demonstrated that the July Policy Notice is arbitrary and capricious because the Policy Notice is incomprehensibly vague and lacking sufficient reasoned explanation.

At the outset, defendants take issue with the procedural posture of this case—plaintiffs' filing of a summary judgment motion before the lodging of a complete administrative record. *See supra* n.4.  Though applicable procedural rules make clear that parties may move for summary judgment "at any time" before discovery closes, FED. R. CIV. P. 56(b), defendants insist that plaintiffs should have waited since APA cases must be resolved on the record before the agency at the time the agency made its decision, not a record subsequently generated by plaintiffs.  *See* Defs.' Opp'n at 15-16.  Defendants urge that any extra-record evidence presented by plaintiffs, such as the declaration from Dr. Leslie Kantor, *see* Pls.' MSJ, Ex. A, Decl. of Dr. Leslie Kantor ("Kantor Decl."), ECF No. 22-3, should be deemed improper, especially given that plaintiffs have not even attempted to meet the high standard for supplementation of the administrative record.  *See* Defs.' Opp'n at 16-17.[11]  This point is, however, essentially moot, since defendants lodged the notice of contents of the administrative record during the briefing of these pending motions.  *See supra* n.4.  The administrative record is thus before the Court, and the parties had an opportunity to review that record and make relevant arguments.  Certainly, any records that defendants intended to use to defend against plaintiffs' arguments on summary

---

[11]    Defendants' concern about the use of extra-record materials introduced by plaintiffs is easily dispatched since those materials play no part in evaluation of plaintiffs' claims; this evaluation is based solely on materials in the administrative record, admitted facts, and the law.

judgment should be included in that record and referenced in their briefing. Consideration of plaintiffs' motion for summary judgment is therefore entirely appropriate.

In any case, as plaintiffs perhaps anticipated, the administrative record makes little difference in this case, given that the materials included are so sparse and either largely already on the docket or publicly available. Consisting of only twenty-two documents, the majority of these documents (fifteen) are HHS notices directed specifically to plaintiffs or plaintiffs' submissions directly to HHS.[12] Additionally the record includes the 2023 NOFO, the 2025 NCC Guidance from January and March 2024, a document, updated March 2025, titled "Expectations for TPP23 Tier 1 Recipients," the July Policy Notice, an "HHS Grants Policy Statement" in effect from October 2024 to April 2025, and a July 2, 2025, press release about the July Policy Notice. *See* AR; *see also* Pls.' MSJ, Ex. G, July Policy Notice; Defs.' Opp'n to Pls.' Mot. for TRO, Ex. B, Jan. 2025 NCC Guidance, ECF No. 14-2; HHS Grants Policy Statement, https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024-archived.pdf; OASH, HHS Issues Policy to Stop the Radical Indoctrination of Children and Ensure Parental Oversight for Teen Pregnancy Prevention Program Grants (July 2, 2024), https://health.gov/news/hhs-issues-policy-stop-radical-indoctrination-children-and-ensure-parental-oversight-teen. This record lacks the kinds of comments from interested parties, declarations from decisionmakers, memoranda and analysis describing decision-making considerations and alternatives, email exchanges, scientific studies, and so forth often contained in administrative records. *See, e.g.*, *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 628 F. Supp. 3d 189, 207 n.10, 213, 214 n.15 (D.D.C. 2022) ("The . . . Rule's administrative

---

[12]     These fifteen documents are: plaintiffs' 2023 Notices of Awards, plaintiffs' 2025 NCC applications, plaintiffs July 2025 NCC awards, and plaintiffs' SF-424 and SF-424B certification forms filed with their 2023 NOFO applications and 2025 NCC applications. *See* AR; *see also* Pls.' MSJ, Ex. B, NOFO 2023; *id.* Ex. F, Mar. 2025 NCC Guidance; Defs.' Opp'n to Pls.' Mot. for TRO, Ex. A, PPCC 2023 Notice of Award, ECF No. 14-1.

record totals 11,333 pages and includes regulations; environmental impact statements; reports, analyses, and technical memoranda for the rulemaking; and public comments.").  As later discussed, *see infra* Part III.B.2(b), the administrative record is most useful in showing only what reasoning is lacking.

### 1.    *Final Agency Action*

Defendants argue that the July Policy Notice is not a final agency action and therefore review is not available under the APA.  *See* Defs.' Opp'n at 17.[13]  The APA only allows for review of agency action that is considered "final."  5 U.S.C. § 704; *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014); *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (explaining that without final agency action, there is no "cause of action under the APA" (quoting *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003))).  For an agency action to be final, it must be "*both* 'the consummation of the agency's decisionmaking process' *and* a decision by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'"  *Nat'l Mining Ass'n*, 758 F.3d at 250 (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  Put another way, "[i]f an agency action announces a binding change in its enforcement policy which immediately affects the rights and obligations of regulated parties, then the action is likely final and subject to review."  *Nat'l Env't Dev. Ass'n v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014); *see also Ciba-Geigy Corp.*, 801 F.2d at 436 ("Once the agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform

---

[13]    While significant overlap is present between the prudential ripeness inquiries for justiciability described in Part III.A.3 and the APA's "final agency action" requirement, the two are not coextensive.  "Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review." *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007-08 (D.C. Cir. 2014); *cf. Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (explaining that "the requirement of finality is not jurisdictional" but without final agency action, there is no "cause of action under the APA" (second passage quoting *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003))).

to that position, the agency has voluntarily relinquished the benefit of postponed judicial review.").  The July Policy Notice is the consummation of the agency's decision regarding applicable changes to the TPP program and imposes binding obligations on plaintiffs with clear legal consequences for noncompliance.  The Policy Notice is thus a final agency action under the APA.

### a)    Consummation of Agency's Process

"The consummation prong of the finality inquiry requires [the court] to determine whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue, or is, instead, only the ruling of a subordinate official, or tentative."  *POET Biorefining*, 970 F.3d at 404 (quoting *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020)).  A final agency action is thus "circumscribed" and "discrete."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  "An agency action may" nonetheless "be final even if the agency's position is 'subject to change' in the future," as all laws are subject to change.  *Nat'l Env't Dev. Ass'n's Clean Air Project*, 752 F.3d at 1006 (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)).  The action may also be final despite taking a more informal form.  *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("[W]e [have] rejected the proposition that if an agency labels its action an 'informal' guideline it may thereby escape judicial review under the APA." (citation omitted)).  In *Ciba-Geigy Corp.*, the court held that a letter informing a regulated entity of a labeling requirement in response to an inquiry was a final agency action ripe for review.  *See* 801 F.2d at 435-38; *cf. CropLife Am. v. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003) (considering a press release articulating the agency's bar on considering third-party human studies in evaluating the safety of pesticides was a binding regulation to be reviewable because it "create[d] a 'binding norm'"

"directly aimed at and enforceable against petitioners," who "are now barred from relying on third-party human studies" (quoting *Chamber of Commerce v. U.S. Dep't of Lab.*, 174 F.3d 206, 212 (D.C. Cir. 1999)).    The crux of the inquiry is whether the action is official and presently in effect.  *See Soundboard Ass'n*, 888 F.3d at 1267 (describing the central question as "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue").

Here, the July Policy Notice was formally promulgated by HHS and does not contemplate any further deliberation or subsequent iteration.  As plaintiffs put it, the Policy Notice "represent[s] HHS's 'last word on the matter,'" Pls.' Mem. at 10 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)), and reflects a "settled agency position" on the scope of the TPP program and its requirements, *Nat'l Env't Dev. Ass'n*, 752 F.3d at 1007 (quoting *Appalachian Power Co.*, 208 F.3d at 1023).

Defendants describe the July Policy Notice as simply "another interlocutory step in the agency's decision-making process of how to reconcile the directives of recently issued Executive Orders and the Supreme Court's decision in *Mahmoud* with the TPP Program," Defs.' Opp'n at 18, but, notably, they never suggest this Notice is merely tentative or a work-in-progress. Instead, defendants re-direct the focus by pointing to the several steps that must occur as part of the enforcement process.  *See id.*  Yet, the Supreme Court has held that where formally promulgated requirements are "made effective upon publication" with "compliance . . . expected," the agency action is considered final regardless of whether any enforcement has occurred or any preliminary steps for enforcement have been initiated.  *Abbott Lab'ys.*, 387 U.S. at 150-51.  In short, contrary to defendants' suggestion, enforcement is not the only way to consummate agency decision-making.  *See Ciba-Geigy Corp.*, 801 F.2d at 437 ("Having

definitively stated its position . . ., EPA has provided its final word on the matter '[s]hort of an enforcement action.'" (quoting *Harrison v. PPG Indus., Inc.*, 446 US. 578, 586 (1980))).

On reply, defendants shift to offer a more nuanced argument—an agency action must *either* involve enforcement or "notice-and-comment rulemaking" to be final.  Defs.' Reply at 7-8.  Defendants may accurately describe the July Policy Notice as "not involv[ing] an agency action even vaguely resembling an informal rulemaking," *id.* at 7, but the fact that the underlying process may be "informal" or otherwise deficient does not make the Notice any less a final agency action.  *See Barrick Goldstrike Mines*, 215 F.3d at 48.  Defendants' own citations also defy their proposed rule that a final agency action must be either a product of notice-and-comment rulemaking or already enforced.   Defs.' Opp'n at 19 (citing *Frozen Food Express v. United States*, 351 U.S. 40 (1956)).   In *Frozen Food Express*, the Court considered an APA challenge to an agency "order" issued after a public hearing interpreting a statutory provision exempting "agricultural" commodities from regulation.  *See* 351 U.S. at 41.  The Court described the agency's classifications of what commodities are "agricultural" as "in substance . . . 'declaratory,'" alerting regulated entities of the agency's reading of the statute.  *Id.* at 44. This made the action sufficiently final to be "justiciable" even though no enforcement action had been taken.

As a subsequent opinion explaining *Frozen Foods* in the context of final agency actions put it, "[a]lthough the order 'had no authority except to give notice of how the Commission interpreted' the relevant statute, and 'would have effect only if and when a particular action was brought against a particular carrier,' [the Court] held the order was nonetheless immediately reviewable" as it shaped the standard for the trucking business and warned that violators risked criminal penalties.  *U.S. Army Corps. of Eng'rs v. Hawkes*, 578 U.S. 590, 599-600 (2016)

38

(quoting *Abbott*, 387 U.S. at 150, and citing *Frozen Foods*, 351 U.S. at 44-45).  Neither *Frozen Food* nor its subsequent interpretation in *Hawkes* discussed any formal rulemaking procedure or that its formality was essential to the analysis.  The July Policy Notice is akin to the *Frozen Foods* order: It purports to merely interpret other laws, defining acceptable and unacceptable conduct and warning of penalties.  That is enough to be the final consummation of agency process.

### b)    *Legal Consequences*

"Proceeding to the second question under *Bennett*, 'whether an agency action has direct and appreciable legal consequences,' [courts] 'pragmatic[ally]' focus on 'the concrete consequences [the] action has or does not have as a result of the specific statutes and regulations that govern it."  *POET Biorefining*, 970 F.3d at 405 (second and third alterations in original) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019)).  "For a purported guidance document, the basic question is 'whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule."  *Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) (quoting *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015)).  "Policy statements," as the D.C. Circuit has explained, "are binding on neither the public nor the agency" such that the agency "retains the discretion and the authority to change its position . . . in any specific case." *Id.* (alteration in original) (quoting *Ass'n of Flight Attendants*, 785 F.3d at 716).  To determine in which category an agency action falls—an inquiry the D.C. Circuit has described as "quite difficult and confused," *Nat'l Mining Ass'n*, 758 F.3d at 251—titles are not dispositive; rather, courts may "consider (1) 'the actual legal effect (or lack thereof) of the agency action in question on regulated entities'; (2) 'the agency's characterization of the guidance'; and (3) 'whether the

agency has applied the guidance as if it were binding on regulated parties,'" *Sierra Club*, 873 F.3d at 951 (quoting *Nat'l Mining Ass'n*, 758 F.3d at 252-53).

Though not addressed by the parties, application of this three-part analysis to the July Policy Notice shows clearly that this HHS action constitutes a binding rule, as plaintiffs posit. The first *Sierra Club* factor, which is the "most important," heavily favors plaintiffs. The July Policy Notice here clearly imposes binding legal obligations on TPP grant awardees and formal consequences for not complying. The Policy Notice "tell[s] regulated parties what they must do or may not do in order to avoid" sanctions. *Nat'l Mining Ass'n*, 758 F.3d at 252. For instance, "TPP Program grant recipients are expected to provide parents advance notice . . . and the ability to opt out of any content or activities," and "[p]rograms must be aimed at reducing teen pregnancy, not instructing in . . . ideological content." July Policy Notice at 3-4. Materials may not include "content that promotes sexual activity for minors," and content must be "medically accurate," which means "materials . . . are expected to include information on a full range of health risks." *Id.* at 5. "TPP Program Recipients" are explicitly instructed to "ensure all program materials comply with this [Notice]," revising their "TPP Program curricula and content" as necessary in order to do so. *Id.* at 5-6. The Notice also spells out the legal repercussions under the heading "Compliance": "OASH will not continue to fund materials or activities outside the TPP Program's statutory scope." *Id.* at 6. Such expenditures are "not allowable." *Id.* at 5. The July Policy Notice specifically threatens "grant suspension under 45 C.F.R. § 75.371 and grant termination under 45 C.F.R. § 75.372(a)." *Id.* at 6.

These features stand in stark contrast to the EPA guidance found to be non-binding in *National Mining Association*, where the first factor was held to weigh against finding a final agency action. The guidance at issue there instructed EPA staff to recommend limitations on

mining projects to state permitting agencies. 758 F.3d at 246. Whereas in *National Mining Association*, the state "permitting authorities" were "free to ignore" the guidance without facing any legal consequences and the guidance could "not be the basis for an enforcement action against a regulated entity," making the guidance wholly advisory in nature, the TPP recipients here are not free to ignore the July Policy Notice. *Nat'l Min. Ass'n*, 758 F.3d at 252; *see also Sierra Club*, 873 F.3d at 952 (explaining the guidance document there was not binding where it merely "invites the affected agencies to consider and apply improvements"). If recipients do not "revise their TPP Program curricula and content" to comply with the principles in the Policy Notice, "OASH will not continue to fund" their grants. July Policy Notice at 6.

To take another example cited by defendants, Defs.' Opp'n at 19, the "policy guidelines" at issue in *Center for Auto Safety v. National Highway Traffic Safety Administration* are similarly distinguishable. 452 F.3d 798, 809 (D.C. Cir. 2006). The guidelines there involved guidance on regional recalls sent by the agency to motor vehicle manufacturers. *Id.* at 800. The D.C. Circuit determined they were "nothing more than a privileged viewpoint" that did not carry the force of law. *Id.* at 808. The agency used conditional language in offering recommendations, such as "*in general*, it is not appropriate for a manufacturer" to take certain actions and "the agency *may act favorably* upon requests" of a certain kind, emphasizing that the agency's approach "remain[ed] flexible." *Id.* at 809 (emphasis in original). Here, as explained, the July Policy Notice went beyond recommending approaches or discouraging certain topics, instead spelling out "expectations" and the scope of permissible content as well as revised definitions. *See, e.g.*, July Policy Notice at 4 ("The statute does not require, support, or authorize teaching minors about . . . content [such as] the radical ideological claim that boys can identify as girls and vice versa."); *id.* at 5 ("TPP Program grant recipients are expected to ensure all program materials comply with

this PPN."); *id.* at 4-5 (altering definitions for key terms including "medical accuracy" and "age appropriate").

Defendants disingenuously try to fabricate "flexibility" in the July Policy Notice, pointing to the use of the word "may" in phrases like grantees "may face grant suspension" or "may impose additional conditions," July Policy Notice at 5-6, and noting that "HHS did not specifically state that" enforcement actions against plaintiffs or "any other TPP Program grantee" would be pursued. Defs.' Reply at 8-9. All of these permissive "may" statements, however, are framed as different alternatives that the agency might pursue as enforcement mechanisms in the final paragraph of the July Policy Notice, and the fact of enforcement is expressed in the first sentence of that paragraph in no uncertain terms. July Policy Notice at 6 ("OASH will not continue to fund materials or activities outside the TPP Program's statutory scope.").

The context of the Notice as a whole also belies any suggestion that HHS has exhibited "continued flexibility." Defs.' Reply at 8. The Notice does not contemplate any deliberation or discussion with the agency, such as in *Center for Auto Safety*, 452 F.3d at 809 (including that manufacturers must discuss all proposals with the agency to diverge from the agency's general policy), nor any exceptions or alternatives. Although defendants are correct that "HHS issued Notices of Awards to Plaintiffs," despite their "under-protest" applications, nothing in the July Policy Notice suggests those explicit exceptions will be honored going forward. Defs.' Reply at 8.

In a last gasp effort to distinguish the July Policy Notice from agency actions found to be binding in other cases, defendants point out that, unlike in those cases, the Notice does not cabin or constrain HHS's enforcement discretion, Defs.' Reply at 9, a significant feature of the Notice that, ironically, only highlights plaintiffs' concerns about arbitrary enforcement. For example, in

a case where an agency announced an action level at which merchants would be subject to enforcement proceedings under a statute, the agency clearly constrained its own enforcement discretion, establishing a bright line for permissible and impermissible behavior that the agency would rely on in enforcement proceedings, and thus the rule qualified as a binding, final agency action. *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1034 (D.C. Cir. 2007) (citing *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987)).   Defendants do not cite, however, any case establishing that a cabining of enforcement discretion is *necessary* to find that an agency action is binding on regulated parties and therefore final.   The lack of clear guardrails or clarity as to permissible and impermissible content in TPP programming under the new requirements in the July Policy Notice seems to be less an indication of HHS's intent for the Notice to be non-binding and rather reflective of its vague nature and susceptibility to arbitrary enforcement. *See infra* Part III.B.2(a).   In any case, HHS's prohibition of certain content in the July Policy Notice does bind the agency to restrict allowable use of funds in the ways described therein and only supports a finding that the Notice constitutes a final agency action.

With respect to the second factor—the agency's own characterization—the July Policy Notice here reads as a formal, binding document.   In *National Mining Association*, the court explained that when documents read "from beginning to end" "like a ukase," using terms such as "command[ing]," "requir[ing]," "order[ing]," and "dictat[ing]," they are considered binding. 758 F.3d at 252-53 (quoting *Appalachian Power Co.*, 208 F.3d at 1023).   Even where there is boilerplate language disclaiming the guidance's compulsory nature, agency guidance may still be considered binding if the whole of the document still appears to give commands. *See id.* (discussing *Appalachian Power Co.*, 208 F.3d at 1023).   Similarly, in *CropLife*, the court held the press release to be a "binding regulation" despite taking the form of a letter rather than a

formal rule in the Federal Register, because the letter used binding and unequivocal language directed at regulated entities to describe a new agency practice.  329 F.3d at 881.

Here, as explained, the text of the July Policy Notice makes the intent clear to impose obligations and bind TPP grant recipients.  Notwithstanding the title of "Policy Notice" and the described purpose as "further clarify[ing] [the] expectations for TPP Program grantees," the Notice has an entire section explicitly focused on "Compliance," referencing consequences for not meeting the requirements set out therein.  In contrast to the non-binding guidelines cited as an example by defendants, Defs.' Reply at 19, in *Center for Auto Safety*, 452 F.3d at 808-09, as well as the non-binding guidelines in *Appalachian Power Co.*, 208 F.3d at 1023, the July Policy Notice contains no boilerplate caveat feigning retreat from the text's plainly mandatory character or any advisory or conditional language.  HHS instructed immediate compliance, and plaintiffs appropriately understood HHS to be speaking in binding terms.   As the D.C. Circuit has explained, "If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, . . . ., if it leads private parties . . . to believe that it will" invalidate permits "unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.'" *Appalachian Power Co.*, 208 F.3d at 1021.

The third factor, considering how the guidance has been applied, is not instructive here. The D.C. Circuit has recognized that "whether the agency has applied the guidance as if it were binding on regulated parties" is a question to which "we will not yet know" the answer in many cases because of the recent issuance of the guidance.  *Nat'l Mining Ass'n*, 758 F.3d at 253. Indeed, the parties have not brought to the Court's attention any enforcement actions taken by HHS against TPP recipients since the issuance of the July Policy Notice, whether premised on

that Notice or otherwise. Given, however, that the first two factors strongly weigh in plaintiffs' favor and the first is most important, the lack of an enforcement application does not defeat the final nature of the agency action.

Defendants next assert that the July Policy Notice does not actually impose new, binding requirements because the agency simply "seeks to enforce the terms and conditions of Plaintiffs' grant agreements, commitments they renewed when they signed their applications for continued funding," Defs.' Opp'n at 19, presumably reasoning that the Notice does not qualify as a final agency action because no new legal consequences are imposed on TPP grant recipients. Defendants' position about the lack of new requirements is plainly wrong.[14] The July Policy Notice explicitly adopts new interpretations of the statute and what is required of plaintiffs, redefining terms and noting that HHS previously "erred in approving" certain material. July Policy Notice at 5-6. Even if those new interpretations were supposedly divined from EOs and other law to which plaintiffs had generally agreed to abide by as part of their grant agreements, the July Policy Notice sets out explicit expectations not apparent from those sources alone— which do not speak directly to and are generally unrelated to TPP grant recipients. *See, e.g.*, Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan. 29, 2025) (speaking to agencies, not grant recipients, and including the important limitation that the "order shall be implemented consistent with applicable law").

Even if the July Policy Notice "imposes new requirements," defendants discount this consideration as not relevant "[i]n assessing finality," Defs.' Opp'n at 19, relying instead on their argument that enforcement is required for the Policy Notice to be considered final, *see id.* at 19-

---

[14]    Defendants reiterate this point on reply, Defs.' Reply at 9 ("HHS is [not] altering the terms of the TPP Program; rather HHS 'seeks to enforce the terms and conditions of Plaintiffs' grant agreements.'"), but do not explain its significance to the analysis of whether the July Policy Notice qualifies as final agency action under the APA.

20.  As previously explained, however, that argument is legally flawed.  A regulated entity instructed to comply with agency rules need not wait to challenge those instructions until its grants have been terminated—at which point this Court will, according to defendants, not even have jurisdiction to address the terminations.  *See supra* Parts III.A.3, III.B.1(a).  Nor do plaintiffs need to wait until enforcement is initiated at all.  *See* Defs.' Opp'n at 18.  Plaintiffs "need not assume . . . risks while waiting for EPA to 'drop the hammer' in order to have their day in court.  *Hawkes Co.*, 578 U.S. at 600 (quoting *Sackett v. EPA*, 566 U.S. 120, 127 (2012)).  The July Policy Notice is a binding agency dictate, with immediate effect on the day-to-day function of plaintiffs' programs, and therefore a final agency action subject to immediate review.

### 2.  *Arbitrary & Capricious*

Plaintiffs, in Count IV of their Complaint, assert that the July Policy Notice is arbitrary and capricious for several reasons.  The APA requires agencies to engage in reasoned decision-making and thus instructs courts to "hold unlawful and set aside agency action . . . found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Generally, an agency's action is considered "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The requirement for a "reasoned explanation" means that when an agency is changing its policy, the agency must demonstrate recognition of that change and provide "good reasons for the new policy," and the justification must be "more detailed" when the "prior policy has engendered serious reliance interests" or the "new policy rests upon factual

46

findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.* ("*Fox I*"), 556 U.S. 502, 515-16 (2009).[15]

Here, plaintiffs argue that the July Policy Notice is "arbitrary and capricious because it: (1) is so vague that it fails to provide adequate notice and ensure nonarbitrary enforcement; (2) 'relied on factors which Congress has not intended it to consider,' (3) 'entirely failed to consider an important aspect of the problem,' (4) offered an explanation for its decision that runs counter to the evidence before the agency,'" Pls.' Mem. at 19 (quoting *Solondz v. FAA*, 141 F.4th 268, 276 (D.C. Cir. 2025), "and (5) failed to provide a sound reason for any changes in the agency's position," *id.* at 20 (citing *Fox I*, 556 U.S. 502). The July Policy Notice's vagueness renders the new requirements imposed on TPP grant recipients largely incomprehensible and unworkable, putting in place an opaque "we-know-it-when-we-see-it" standard for HHS to assess compliance with programming content restrictions that is susceptible to discriminatory application. This Notice is therefore arbitrary and capricious and, for this reason alone, warrants vacatur. The July Policy Notice also suffers from several of the other deficiencies plaintiffs identify, including that it entirely lacks reasoned explanation and justification, which independently requires the Policy Notice to be set aside.

>    *a)*    *Fatally Vague*

---

[15] Defendants suggest, in their "standard of review," a different standard for evaluation of plaintiffs' claims, citing *Bondi v. VanDerStok*, 145 S. Ct. 857, 869-70 (2024): "[I]n the context of a facial challenge[, t]o prevail, they must demonstrate that any and all potential applications of the Policy Notice to their grant programs are unlawful." Defs.' Opp'n at 11. That case considered an APA pre-enforcement "contrary to-law" claim that a gun regulation was inconsistent with a statute, so that standard is irrelevant to the arbitrary-and-capricious claim considered here. In any case, the Court in *Bondi* merely assumed, based on the parties' agreement, that plaintiffs had such a burden to demonstrate that all applications of the regulation would be unlawful, without deciding whether that was indeed the proper standard. *See id.* at 866 & n.2 ("The dissents raise a number of questions about what test courts should apply when a party contends that an agency has acted in excess of its statutory authority in a pre-enforcement challenge under the APA. . . . But the theories the dissents proceed to advance were not pressed or passed upon below, nor did the parties make them before this Court.").

An agency's requirements must be comprehensible and give entities fair notice of what is required of them—a principle so fundamental to reasoned decision-making that this standard is only rarely articulated. The D.C. Circuit has nonetheless established that fair-notice due process vagueness principles are indeed incorporated into administrative law. *See Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("[A]s long ago as 1968, we recognized this 'fair notice' requirement in the civil administrative context."). "In determining whether a party received fair notice, [courts] consider whether, 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with "ascertainable certainty," the standards with which the agency expects parties to conform.'" *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024) (quoting *Gen. Elec. Co.*, 53 F.3d at 1329). "This 'ascertainable certainty' rule prevents agencies from taking regulated parties by surprise." *Id.* Additionally, other circuit courts have held that agencies cannot set out requirements so vague as to preclude compliance. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1233, 1250-51 (9th Cir. 2001) (explaining that because, among other reasons, "whether there has been compliance with this vague directive is within the unfettered discretion of the Fish and Wildlife Service, leaving no method by which the applicant or the action agency can gauge their performance" the agency action "was arbitrary and capricious"); *Firearms Reg. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 520, 525 (8th Cir. 2024) (holding a firearms classification rule arbitrary and capricious due to lacking measurable standards, as evinced by applications "allow[ing] the ATF to arrive at whatever conclusion it wishe[d] without 'adequately explain[ing] the standard on which its decision is based" (third alteration in original)). Vague agency action that invites unreasoned, discriminatory enforcement is arbitrary and capricious. *See Ariz. Cattle Growers*, 237 F.3d at 1250-51.[16]

---

[16]    As plaintiffs explain, their vagueness argument is premised on the APA prohibition on arbitrary and

Virtually every new requirement imposed by the July Policy Notice is fatally vague. Starting with the requirement, repeated from the 2025 March NCC Guidance, that TPP recipients "should revise their projects to align with Executive Orders that are currently in force," the July Policy Notice provides no way for plaintiffs to ascertain their compliance. As plaintiffs point out, EOs are directed toward "*governmental* actors," and many, such as national security EOs or those renaming public sites, have nothing to do with the TPP program. Pls.' Mem. at 24-25 (emphasis in original); *see, e.g.*, Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025) ("Restoring Names That Honor American Greatness," such as renaming of Mount McKinley). Even the EOs explicitly listed in the July Policy Notice as relevant do not appear directly applicable to TPP programs, such as the EO titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." July Policy Notice at 1-2. HHS leaves TPP recipients with the impossible task of divining the connection HHS saw between the executive branch priority and teen pregnancy prevention.

Defendants argue that the term "align" is "hardly obscure," stating that this word is used "in the ordinary sense of the term: grantees should 'come into precise adjustment or correct relative position' with the policies set forth in executive orders." Defs.' Opp'n at 27 (quoting Merriam-Webster, *Align*; https://perma.cc/32DJ-EUDH). At the same time, defendants do not venture to suggest how Planned Parenthood entities are to "align" with an EO directed to agencies, for instance, to "combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025). Implicitly acknowledging this interpretive challenge for TPP grant recipients, defendants contend that

---

capricious decision making, not the Fifth Amendment of the Constitution, despite the overlap here with void-for-vagueness principles. *See* Pls.' Mem. at 21 n.6. As a result, no showing of a constitutionally protected property interest is required for this claim.

"vagueness concerns are also ameliorated by the design of the TPP Program itself, which contemplates review and consultation on project adaptations." Defs.' Opp'n at 27 (citing 2023 NOFO at 17, describing "federal agency substantial involvement"). Contrary to that representation, however, the July Policy Notice does not state that plaintiffs will be given warning letters before termination or that they will not have their funds terminated until after some rounds of "review and consultation." The Policy Notice mandates compliance now, without providing plaintiffs with any meaningful standard for achieving that compliance.

That the policies of the EOs are supposedly explained in the July Policy Notice itself does not save defendants. The rest of the July Policy Notice proceeds in an equally vague fashion. In the section on "Ending Radical Indoctrination of Youth and Protecting Parental Rights," the July Policy Notice instructs that "TPP Program-funded projects should not undermine the President's clear policy directive to protect children from harmful ideologies or the constitutional rights of parents to direct the religious upbringing of their children," citing to *Mahmoud*. July Policy Notice at 3. Rather than providing any clarification as to necessary steps for compliance, the Notice instead leaves wide open for interpretation precisely what constitutes "undermin[ing]" the "protect[ion of] children from harmful ideologies" or what constitutes a "harmful ideology" that should be removed from the content of teen pregnancy prevention programs. Among the five referenced EOs in the Notice, two provide definitions of terms containing the word "ideology," but none provides a definition of "harmful ideology," *see, e.g.,* Exec. Order No. 14168 §2(f), 90 Fed. Reg. 8615, 8615 (Jan. 20, 2025) (defining "Gender ideology"); Exec. Order No. 14190 §2(b), 90 Fed. Reg. 8853, 8853 (Jan. 29, 2025) (defining "Discriminatory equity ideology"), but the Notice is silent as to whether "harmful ideology" is meant to be limited to or broader than those two definitions.

Later in this same section, the July Policy Notice requires recipients "to provide parents advance notice (including relevant specifics) and the ability to opt out of any content or activities, especially those related to sexuality, that may burden their religious exercise," again relying on *Mahmoud*.  July Policy Notice at 3.  That broad statement gives no guidance as to what is considered to burden religious exercise or how the opt-out mechanism should function with respect to recipients' programs, which take place in various types of settings.  *Mahmoud* concerned constitutionally required opt-outs as part of "free public education," 145 S. Ct. at 2342, and focused on the moral vulnerability of impressionable "very young children," even explicitly acknowledging that "[e]ducational requirements . . . may be analyzed differently . . . for high school students," *id.* at 2353, but plaintiffs' programming is not limited to public schools and is exclusively targeted toward older children ("*Teenage* Pregnancy Prevention Program").  *See, e.g.*, 2023 NOFO at 9 ("We expect recipients to replicate [evidence-based programs] to scale in 3 or more settings . . . [such as] schools, clinics, community-based organizations, houses of worship, detention centers, and group and residential care programs."); PPGNY Decl. ¶ 16 (describing the program taught in schools, community-based organizations, and residential settings).  *Mahmoud* thus seems to have, at best, only limited relevance, if at all, to the necessity for parental opt-out opportunities for older adolescents, particularly outside the public school setting.  Further, the July Policy Notice does not suggest how such parental opt-outs, which could result in partial participation in programming by teenagers, might be implemented in a way that would not diminish effectiveness or diverge from the statutory "replication" requirement.

Defendants retort that *Mahmoud* itself provides "explanation of the types of 'ideological content' that the TPP Program statute does not authorize."  Defs.' Opp'n at 26.  To repeat, however, *Mahmoud* was not about teen pregnancy prevention, but rather about LGBTQ+-

inclusive storybooks in elementary school classrooms. The kind of extrapolation and mind-reading the defendants contemplate does not provide the necessary advance notice or clarity for TPP grant recipients to avoid arbitrary enforcement. Defendants further explain that the "opt outs from instruction that *Mahmoud* held to be constitutionally required in some circumstances are not unusual" and are already required under some state laws. *Id.* Yet, the July Policy Notice does not say to employ opt-outs akin to particular state laws. While defendants suggest that the vagueness is necessary to reflect "an agency's high-level policy objectives" to be "followed by potential specific future enforcement decisions," Defs.' Opp'n at 25, the July Policy Notice does not even make at the most general level any connection between the topics discussed in *Mahmoud* and teen pregnancy prevention that can then be further elaborated on a case-by-case basis, nor does the Notice provide a single illustrative example of how a parental opt-out for teenagers would be implemented and still preserve the effectiveness of a replicated program, as statutorily required.

The next section, titled "Scope of the TPP Program," provides requirements that suffer similar flaws. The July Policy Notice excludes from TPP programs "ideological content such as the content at issue in *Mahmoud*, gender ideology, or discriminatory equity ideology," again without providing definitions of any of those terms in a workable way connected to TPP programming. For example, the Notice expressly incorporates the definition of one of those terms, "discriminatory equity ideology," from EO 14190 ("Ending Radical Indoctrination in K-12 Schooling"), *see* July Policy Notice at 4, where this term is defined as an "ideology that treats individuals as members of preferred or disfavored groups, rather than as individuals, and minimizes agency, merit, and capability in favor of immoral generalizations" and gives several examples, Exec. Order No. 14190 § 2(b) . If the Notice's content prohibition were limited to

racial discrimination prohibited by federal statutes, plaintiffs could implement such a directive, but the sweep of a ban on "discriminatory equity ideology" is entirely unclear. For example, does recognition of a TPP grant beneficiaries' membership in a particular demographic or language-speaking group in order to conduct culturally sensitive pregnancy-prevention programs constitute "discriminatory equity ideology"? The July Policy Notice certainly offers no insight.

The lack of agreed-upon meaning of terms like "diversity, equity, and inclusion" ("DEI") have led other courts to deem arbitrary and capricious agency actions premised on those concepts where not adequately defined therein. *See, e.g.*, *Am. Pub. Health Ass'n v. NIH*, -- F. Supp. 3d --, 2025 WL 1822487, at *18-19 (D. Mass. July 2, 2025) (invalidating NIH grant terminations premised on implementation of DEI-related EOs); *Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149, 187 (D.N.H. 2025) (holding that plaintiffs were likely to succeed in showing that a "Dear Colleague Letter" prohibiting DEI-programs was "impermissibly vague"); *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 175-76 (D.D.C. 2025) (finding void for vagueness an EO directing government activity against law firm based on impermissible "DEI policies," and collecting cases).

The section goes on to prohibit "content that encourages, normalizes, or promotes sexual activity for minors." July Policy Notice at 4. Plaintiffs point out the intractability of this requirement given the lack of clarity as to the meaning of "normalize." Pls.' Mem. at 22-23. If the "normalize" prohibition in the Notice includes discussing sexual activity, then plaintiffs are concerned that the Notice prohibits any teen pregnancy prevention programming except abstinence-only instruction, and, since such instruction has not proven effective, the Notice would make deliver of effective sexual education impossible. *Id.* at 23. Yet, perhaps in context, "normalize" simply means touting or promoting sexual activity as preferable to alternatives like

abstinence, and such an interpretation would be far less problematic.  Defendants insist that the

July Policy Notice gave examples of the kind of content that might fall into the prohibited

category: discussion of "anal and oral sex, or masturbation, including through sexually themed

roleplay.  This also may include content on the eroticization of birth control methods, creating

more pleasurable sexual experiences, or foreplay techniques."  July Policy Notice at 4; *see* Defs.'

Opp'n at 26.  Unfortunately, those examples are not exhaustive and are not suggestive of the

outer bounds of these categories, so are insufficient to assuage plaintiffs' concerns about the

potential breadth of the Notice's prohibition.

Defendants later posit that the "Policy Notice is not a prohibition on discussing sex," and

explain that there is "space between" "'content that encourages, normalizes or promotes sexual

activity' . . . and the sort of 'medically accurate' and 'age appropriate' pregnancy prevention

education materials," Defs.' Opp'n at 28, and further offer that "the Policy Notice does not

impose an 'abstinence-only requirement,'" *id*. at 30.[17]  This guidance from defendants' briefing

is enlightening and helpful to plaintiffs, though is not at all obvious or even apparent from the

July Policy Notice.  Defendants do not point to anything in the Notice itself or in the

administrative record reflective of those clearer statements in briefing as to the scope of the

prohibitions intended in the July Policy Notice.  The "space" for permissible discussions is

exactly the kind of concept the July Policy Notice should have described and defined to give

recipients meaningful direction.  *See, e.g.*, *Firearms Regul. Accountability Coal.*, 112 F.4th at

526 (describing the APA as making it "necessary to give guidance on how the [agency] is likely

---

[17]    Defendants separately suggest that if the July Policy Notice did, in fact, restrict recipients to implementing abstinence-only programs, that would not be problematic because "[t]he TPP Program statute does not prohibit abstinence-only programs, and HHS has historically made those programs eligible for replication if they otherwise met the criteria for Tier 1 TPP Program funding," citing an academic journal article stating that Tier 1 programs include abstinence education programs.  Defs.' Opp'n at 22.  Defendants do not, however, specifically identify any of these approved, replicable programs, or anything in the AR to support this proposition.

to apply [the rule] in future instances"). Its absence makes compliance and fair enforcement impossible.

Finally, the section of the July Policy Notice clarifying "definitions" is also ambiguous. Recipients are instructed to ensure that they "include information on a full range of health risks" when providing "health-related recommendations" in order for programming to be "medically accurate." July Policy Notice at 5. That directive is up to interpretation. Is a "disclaimer-style disclosure akin to the fine print in a pharmaceutical advertisement" required? Pls.' Mem. at 23. Each of these other definitions is similarly perplexing. According to the Notice, "[t]he terms 'health equity,' 'equitable environment,' 'inclusivity,' and 'adolescent-friendly services' should not be construed to exceed the statutory scope of the TPP program, as described above, or to permit unlawful diversity, equity, or inclusion-related discrimination." July Policy Notice at 5. Again, what kind of programming this provision excludes is entirely unclear.

Defendants strain to find a safe harbor from vagueness concerns in the requirement that "HHS's procedures require it to provide appropriate written notice in conjunction with taking enforcement measures." Defs.' Opp'n at 27. The cited regulations, however, as discussed previously, *see supra* Parts I.A.1, III.A.3, do not require HHS to issue *advanced* notice. That HHS will send plaintiffs a letter notifying them of their termination—rather than just silently cutting off access to funds—does nothing to mitigate concerns about arbitrary enforcement or vagueness. The agency also has not provided any additional guidance to the plaintiffs in the *three months* since the July Policy Notice has been in effect. *See* Pls.' Opp'n at 22 (noting that no further guidance about enforcement has been provided). As this Court previously put it, the agency "provides no . . . guidance as to what . . . is considered unlawful discrimination" or otherwise prohibited activity "by the Trump administration, leaving plaintiff[s] to guess at what

is and is not permissible in the government's view, while already facing the threat of adverse actions during the guessing." *Perkins Coie*, 783 F. Supp. 3d at 177; *see also* Pls.' Opp'n at 23 ("These vague standards create uncertainty so severe that Plaintiffs must either overcomply or risk arbitrary enforcement."). That is antithetical to reasoned decision-making.

Each part of the July Policy Notice, excepting the section repeating "statutory language" verbatim and the compliance section, contains impermissibly vague language that binds plaintiffs. In other words, none of its substantive directives pass muster. The Policy Notice therefore shall be vacated in full.

> b) *Lack of Reasoned Decision-Making*

The vagueness of the new requirements imposed by the July Policy Notice renders this Notice arbitrary and capricious and justifies vacatur without considering the other APA defects raised by plaintiffs. The Notice is nevertheless also arbitrary and capricious because HHS did not provide any reasoning or evidence in support of its approach, seemingly relied on irrelevant ideological factors, and did not justify its change in position.

The July Policy Notice itself and the listed contents of the administrative record do not reveal any analysis, studies, or reports supporting HHS's determination that the July Policy Notice's requirements were logical or consistent with achieving the statutory goals for the TPP program. This program is evidence-based: Tier 1 programs implement programs proven effective in reducing teen pregnancy, and Tier 2 programs are designed to test new approaches to determine additional effective options. *See* Further Consolidated Appropriations Act of 2024, 138 Stat. at 671 (allocating funds for "medically accurate and age appropriate programs that reduce teen pregnancy" and specifically for "replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors

underlying teenage pregnancy, or other associated risk factors").  Nothing in the administrative record, however, shows consideration of the impact of the July Policy Notice's requirements on the programs' implementation or effectiveness.  *See* AR; *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 659 (D. Md. 2018) (observing that the TPP program "appropriation was not an unrestricted sum of money to use for any purpose that might fall within HHS's broad mandate, but rather directs the agency to use funds to support proven or innovative medically accurate methods of preventing teenage pregnancy.").  Nor does anything in the administrative record or Notice itself suggest that HHS evaluated how these changes would affect the statutory requirement that Tier 1 programs be "replicated," without significant changes, in order to ensure their effectiveness.  *See Planned Parenthood of N.Y.C. v. HHS*, 337 F. Supp. 3d 308, 333 (S.D.N.Y. 2018) ("'[R]eplicating' requires the prior existence of something that is to be duplicated, repeated, copied, or reproduced.").  Even more fundamentally, the July Policy Notice offers no explanation as to why the new requirements are appropriate, save for its *ipse dixit.*

The administrative record also shows no indicia of reasoned decision-making at all, consisting solely of the NOFO application, the plaintiffs' notice of awards, the NCC applications and Guidance, the plaintiffs' NCC awards, a press release summarizing the July Policy Notice, and a "HHS Grants Policy Statement" effective until April 2025.  *See* AR.  HHS therefore seemingly "ignore[d]" the most "important aspect[s] of the problem," *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43), and failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

This conclusion is reinforced by certain of the July Policy Notice's directives, such as the exclusion of teaching involving "the radical ideological claim that boys can identify as girls and vice versa" and "information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females," which appear incongruous with the reduction of teen pregnancy. July Policy Notice at 4, 5. This is because, while ambiguous, those statements appear to reject the existence of intersex and transgender individuals, which would be not only scientifically false (and thus contrary to the statutory requirement of "medically accurate" programming) but also would seem to inhibit—or at least not advance—the goal of reducing unwanted teen pregnancies.[18] Neither HHS in the Policy Notice or in the administrative record, nor defendants in their briefing, offer any evidence or reasoning to the contrary. Those directives therefore exhibit a lack of reasoned decision-making.

Plaintiffs relatedly argue that the July Policy Notice's "explanation runs counter to [the] evidence" before the agency. Pls.' Mem. at 30. This argument appears compelling, given the July Policy Notice's statements that, for instance, seem to deny the existence of intersex or transgender individuals by discounting the "claim that boys can identify as girls and vice versa," and by deeming "not 'medically accurate'…information that denies the biological reality of sex or otherwise fails to distinguish appropriately between males and females, such as for the purpose of body literacy." July Policy Notice at 4, 5. While plaintiffs argue these denials are contrary to reality and well-accepted scientific knowledge, Pls.' Mem. at 31, defendants face a much larger problem on APA review: From the administrative record, there was apparently *no* evidence before the agency to support the denials reflected in the Notice. In other words, HHS

---

[18]    Though not essential to this Court's decision, plaintiffs' declarations offer well-accepted scientific support for the fact "that some individuals identify on a spectrum of gender identity," *see, e.g.*, PPCCC Decl. ¶ 62; Kantor Decl. ¶ 58, in contrast to defendants' administrative record which reveals absolutely no analysis of medical science to support the directives contained in the July Policy Notice.

did not come to a conclusion contrary to the evidence; it just developed a policy without considering evidence at all.  *See, e.g.*, Pls.' Opp'n at 26 ("[T]he record does not include *any* peer-reviewed articles, program evaluation data, or internal agency memoranda or communication explaining why previously approved curricula are suddenly deficient." (emphasis in original)).

HHS instead seemed to make the decision based solely on ideological and political preferences contrived out of thin air with inspiration derived from the referenced EOs.  Such ideological considerations are irrelevant to the statutory program established by Congress, which targets effective, evidence-based programming.  The July Policy Notice itself acknowledges that "ideological" content is beyond the statute's scope, but then ironically injects ideological considerations into TPP programming by cutting material—that was approved as part of an evidence-backed, proven-effective program—for political, rather than scientific or effectiveness, reasons.  July Policy Notice at 3-4.  Neither the July Policy Notice nor the administrative record suggests any explanation as to why the "normaliz[ation]" of sexual activity or discussion of "boys . . . identif[ying] as girls" (nor any other content) must be removed from approved replicable, evidence-based programs in order to ensure program effectiveness, leaving the obvious conclusion that HHS's motivation was ideological.  If ideology is not contemplated as relevant under the TPP statutory provision, ideological preferences should not be part of the agency's dictates at all.

HHS also failed to justify the changes in its position in light of the substantial reliance interests.  Although more justification than usual is not "demanded by the mere fact of policy change," a "more detailed justification" is needed when "its prior policy has engendered serious reliance interests that must be taken into account."  *Fox I*, 556 U.S. at 515-16.  Specifically, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were

engendered by the prior policy." *Id.* at 516. HHS identified existing definitions of six key terms—adolescent-friendly services, age appropriateness, equitable environment, health equity, inclusivity, and medical accuracy—that "include[d] deficiencies based on the statutory language and Congressional intent of the TPP program." July Policy Notice at 4-5. The Policy Notice then sought "to clarify these definitions," noting for instance that "age appropriate programs" "do not contain material that depicts, describes, exposes or presents obscene, indecent, or sexually explicit content" and "health equity" "should not be construed to exceed the statutory scope of the TPP program . . ., or to permit unlawful diversity, equity, or inclusion-related discrimination." *Id.* at 5. Yet, HHS made no effort to explain with any precision why the existing definitions were "deficient." The same is true for several of the other requirements in the July Policy Notice: HHS never suggests why the TPP Program must now exclude content that "normalizes . . . sexual activity for minors." *Id.* at 4. The administrative record is devoid of any new evidence, studies, or factual development that would warrant a change.

Moreover, although the July Policy Notice superficially recognizes the significant reliance interests at stake for Tier 1 grant recipients with multi-year grants, HHS discounts those interests without sufficient explanation. Plaintiffs and other recipients, in receipt of multi-year grants to implement Tier 1 programs, are mid-way through these grants and have schools and community partners that rely on their programming. *See* Pls.' Mem. at 29 ("Plaintiffs are entering year three of their five-year grant cycle."). The July Policy notice states that HHS is "aware that curricula and other program materials—including content disqualified herein as not 'medically accurate' or not 'age appropriate' or unrelated to reducing teen pregnancy—were previously approved by OASH, and we have taken that into account in weighing factors relating to this policy notice." July Policy Notice at 5. The Notice goes on to say, "[h]owever, for the

reasons described above, the prior administration erred in approving such materials and that approval exceeded the agency's authority to administer the program consistent with the legislation as enacted by congress." *Id.* at 5-6.  Except for the suggestion that federal awards should generally be consistent with EOs, the July Policy Notice does not explain why aspects of the approved programs are inconsistent with the statute.  The invocation of an EO is an insufficient justification for any policy change and especially insufficient to justify an interpretation of a statute, considering that EOs do not supersede but are rather subject to statutory provisions—with every order containing the explicit caveat that it "shall be implemented consistent with applicable law and subject to the availability of appropriations," *see, e.g.*, Exec. Order No. 14190 § 6(b); *cf. State v. Su*, 121 F.4th 1, 16 (9th Cir. 2024) (explaining that "just because an agency's regulations are based on an executive order, this 'hardly seems to insulate them from judicial review under the APA' . . . [a]nd we have subjected agency actions that incorporate a presidential directive to APA review (and specifically to arbitrary-or-capricious review)" (quoting *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996))).

The Notice goes on to recognize that recipients may have to revise their curricula and content—notwithstanding the replication requirement—and that "the need to comply with statutory requirements . . ., Executive Orders, and the U.S. Constitution outweighs such burdens," July Policy Notice at 6, but that boilerplate language cannot substitute for actual analysis.  Again, the reason why the elusive "statutory requirements" outweigh the recipients' interests in applying certified Tier 1 programs, as approved in their particular grants, remains a mystery.  "In light of the serious reliance interests at stake, [HHS's] conclusory statements do

not suffice to explain its decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

Defendants make three remaining arguments in response.  First, defendants contend that they did not ignore Congress's directives about replicating effective programming or rely on impermissible factors, pointing to "an entire section of the Policy Notice . . . directed to nothing but the statutory scope of the TPP program and a consideration of what types of content is, and is not, authorized by it."  Defs.' Opp'n at 29; *see also id.* at 27.  They further emphasize that the "replicat[ion]" requirement does not forbid making *all* changes and "does not force HHS to fund a program that cannot be replicated consistent with the lawful terms and conditions of [p]laintiffs' grants."  *Id.* at 29.  The section of the July Policy Notice describing the "scope of the TPP program" indeed acknowledges that the statute requires implementation of programs that have been proven effective and are "medically accurate" but then goes on to make conclusions completely divorced from those statutory provisions.  Though stating that the conclusions are premised on the statute, the July Policy Notice misses the essential link—the explanation as to why removing content related to, for instance, "boys . . . identify[ing] as girls" and "normaliz[ing] . . . sexual activity for minors" protects and furthers the goal of implementing evidence-based effective teen pregnancy programs.  That section also does not consider—even implicitly—how the changes required in the approved curricula will be sufficiently minor to satisfy the statutory criterion of "replicat[ing]" Tier 1 programs.

Second, defendants insist that they offered sufficient explanation for their change in policy because "[a]mong the 'good' reasons for changing policies" accepted by courts "are that 'new administrations are entitled to reevaluate and modify agency practices, even longstanding ones.'"  Defs.' Opp'n at 30 (quoting *People for the Ethical Treatment of Animals v. Dep't of*

*Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019)).  That does not give the agency *carte blanche* to change its policy just because the agency feels like it.  The new administration must still provide a rationale and explain how the policy goals are consistent with the statute and supported by evidence or relevant considerations.  *See, e.g.*, *State Farm*, 463 U.S. at 43 (holding that the "agency must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made'").  No such analysis was conducted here.

Third, defendants contend that although HHS already sufficiently considered reliance interests—to which they "are not required to accede"—the agency may further "consider the reliance interests of specific grantees" in the context of a particular enforcement action.  Defs.' Opp'n at 29.  Yet, as explained, the conclusory consideration given to reliance interests in the July Policy Notice is insufficient, and defendants' argument that reliance interests may be later considered in enforcement proceedings is inconsistent with the purported rationale for all of the new requirements—that they are *mandated* by the statute.  *See* July Policy Notice at 6 ("[T]he need to comply with the statutory requirements of the TPP Program . . . outweighs such burdens" as grantees having "to revise their TPP Program curricula and content"); *id.* ("OASH will not continue to fund materials or activities outside the TPP Program's statutory scope."); *id.* at 4 ("The statute does not require, support, or authorize teaching minors about such content . . . .").  As plaintiffs put it, "[t]he inconsistency is clear—either the statute ties its hands or it does not." Pls.' Opp'n at 25-26.  The administrative record likewise contains no indication that HHS meaningfully considered reliance interests.

The July Policy Notice reflects agency decision-making motivated solely by political concerns, devoid of any considered process or analysis, and ignorant of the statutory emphasis on

evidence-based programming. Just because a pronouncement comes from the President does not make it true, even if expressed in the form of an executive order, and even then, does not supersede the law—particularly in the context of a statutory scheme for evidence-based grant funding. Yet, the Policy Notice points to little more than these orders for justification.

For this additional reason, the July Policy Notice is arbitrary and capricious and must be held unlawful and set aside. *See* 5 U.S.C. § 706(2); *see St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 357 F. Supp. 3d 30, 38 (D.D.C. 2019) ("Vacatur is the presumptive remedy for arbitrary and capricious agency action[.]"). Plaintiffs are granted summary judgment on Count IV. None of plaintiffs' other claims would entitle plaintiffs to any additional requested relief, so they are not considered here.

## IV.    CONCLUSION

Taxpayer funded programming for this country's youth to prevent teen pregnancy is statutorily required to be medically accurate, age appropriate, and effective according to rigorous, evidence-based analysis. That is what Congress required when funding Teen Pregnancy Prevention grants. In July 2025, HHS issued a Policy Notice imposing on grant recipients binding requirements to change their teen pregnancy prevention curricula, as a condition for their ongoing receipt of funds, but expressed these requirements in such vague generalities as to leave recipients like plaintiffs entirely in the dark as to how to implement or apply them in practice and in accordance with the statute. HHS has also given no indication that the new requirements in the July Policy Notice were the product of reasoned decision-making and analysis of evidence, with the sole source cited for the new requirements the general policy directions outlined in several recent EOs. The administrative record supplied by HHS reveals zero effort by the agency to conduct any evaluation of how those general directions in the EOs

may be best implemented to comply with statutory requirements for the TPP program or to accommodate the reliance interests of the multi-year grantees, like plaintiffs.

For these reasons, the challenged July Policy Notice imposes new requirements on TPP program grant recipients that are arbitrary and capricious, in violation of the APA, 5 U.S.C. § 702(2)(A). The July Policy Notice is therefore vacated, and defendants are enjoined from applying it.  Plaintiffs' motion for summary judgment is granted, and defendants' motion to dismiss denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  October 7, 2025

_____
**BERYL A. HOWELL**
United States District Judge